No. 21-6217

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

CLINTON FOLKES,

*Petitioner-Appellee*

v.

WARDEN NELSEN,

*Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA, CHARLESTON DIVISION

**JOINT APPENDIX**
**Volume 1 of 2**

JASON SCOTT LUCK
Attorney at Law
Post Office Box 47
Bennettsville, South Carolina 29512
(843) 479-6863
jason@luck.law

ALAN WILSON
Attorney General of South Carolina

DONALD J. ZELENKA
Deputy Attorney General

MELODY J. BROWN
Senior Assistant Deputy Attorney General

MICHAEL DOUGLAS ROSS
Assistant Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
(803) 734-6305

*Counsel for Petitioner-Appellee*          *Counsel for Respondent-Appellant*

# TABLE OF CONTENTS

## United States District Court Pleadings

Docket Report ................................................................................. JA1

Petition for Writ of Habeas Corpus .................................................. JA7

Return and Memorandum of Law in Support of Motion for Summary
Judgment .......................................................................................... JA38

Report and Recommendation (November 15, 2019) ........................... JA70

Order and Opinion (February 12, 2020) ............................................ JA104

Order Appointing Counsel ................................................................ JA113

Briefing Order .................................................................................. JA114

Report and Recommendation (December 8, 2020) ............................ JA117

Petitioner's Objections to Report and Recommendation .................... JA136

Order and Opinion (January 7, 2021) ............................................... JA143

Notice of Appeal .............................................................................. JA163

## State Court Record
## (Relevant Trial Proceedings)

Trial Transcript ................................................................................ JA167

Opening Statement by the State ........................................................ JA233

Opening Statement by the Defense .................................................... JA240

Testimony

    Karem Jones ................................................................................ JA247

    Tiffany Briggs ............................................................................. JA296

    James Reddick .............................................................................. JA324

    Jerome Patrick ............................................................................. JA345

    Retalia Green ............................................................................... JA397

    Tim Abney .................................................................................... JA422

Officer David Oulette.................................................................JA447

Charging Conference ...............................................................JA491

Testimony

Dr. Steven Fann....................................................................JA504

Closing Argument by the State..............................................JA546

Closing Argument by the Defense.........................................JA561

Jury Charge ............................................................................JA572

Jury Deliberations, Additional Jury Charge ..................JA587

Verdict, Polling of the Jury....................................................JA598

Sentencing.............................................................................JA612

Indictment .............................................................................JA615

Sentencing Sheet...................................................................JA617

**State Court Record**
**(Relevant Direct Appeal Proceedings)**

Final Brief of Appellant ........................................................JA618

Final Brief of Respondent ......................................................JA639

South Carolina Court of Appeals Opinion.............................JA655

Remittitur ..............................................................................JA657

**State Court Record**
**(Relevant Post-Conviction Relief Proceedings)**

Application for Post-Conviction Relief ..................................JA658

State's Return........................................................................JA664

Amended Application for Post-Conviction Relief...................JA675

Second Amended Application for Post-Conviction Relief...............JA679

PCR Hearing Transcript.........................................................JA686

Testimony

    Bob Dudek ........................................................................... JA690

    Celia Robinson .................................................................... JA721

    David Battiste ...................................................................... JA742

    Deon O'Neil ........................................................................ JA744

    Luke Shealy ........................................................................ JA763

    Clinton Folkes .................................................................... JA769

Plaintiff's Exhibit #1-Email ..................................................... JA776

Plaintiff's Exhibit #2-Letter ...................................................... JA777

Order of Dismissal ................................................................... JA778

Notice of Appeal ..................................................................... JA824

Petition for Appointment of Counsel and to Disqualify Appellate Division of
    SCCID ................................................................................ JA826

Order Appointing Counsel ....................................................... JA831

Petition for Writ of Certiorari to Supreme Court of South Carolina ............... JA832

Order Transferring Jurisdiction to the South Carolina Court of Appeals ......... JA882

Order Denying Petition for Writ of Certiorari ................................. JA887

Remittitur ............................................................................... JA888

APPEAL,CLOSED,MGB-Inmate,PRISONER

# U.S. District Court
## District of South Carolina (Charleston)
## CIVIL DOCKET FOR CASE #: 2:19-cv-00760-RMG

Folkes v. Nelson

Assigned to: Honorable Richard M Gergel

Case in other court: United States Court of Appeals for the Fourth Circ, 21-06217

Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 03/13/2019

Date Terminated: 03/22/2021

Jury Demand: Plaintiff

Nature of Suit: 530 Habeas Corpus (General)

Jurisdiction: Federal Question

**Petitioner**

**Clinton Folkes**
216506
Lee Correctional Institution
990 Wisacky Highway
Bishopville, SC 29010

represented by **Jason Scott Luck**
107 Parsonage Street
PO Box 47
Bennettsville, SC 29512
843-479-6863
Fax: 843-479-7222
Email: jason@luck.law
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**Warden Nelson**

represented by **Michael Douglas Ross**
SC Attorney General's Office
PO Box 11549
Columbia, SC 29211
803-734-6307
Email: mikeross@scag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Melody Jane Brown**
SC Attorney General's Office
PO Box 11549
Columbia, SC 29211
803-734-3970
Fax: 803-734-4035
Email: mbrown@scag.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/13/2019 | 1 | PETITION for Writ of Habeas Corpus ( Filing fee $ 5.00 Receipt number SCX300080765.), filed by Clinton Folkes. (Attachments: # 1 Exhibit 1 - Supporting |

| | | Documents, # 2 Exhibit 2 - Supporting Documents, # 3 Envelope) (egra, ) (Entered: 03/14/2019) |
|---|---|---|
| 03/13/2019 | 2 | TRUE DIVISION FOR TRIAL: Columbia. (egra, ) (Entered: 03/14/2019) |
| 03/14/2019 | 4 | **ORDER authorizing service of process. Directing petitioner to notify the clerk in writing of any change of address. Return and Memorandum due by 5/3/2019. Signed by Magistrate Judge Mary Gordon Baker on 03/14/2019. (Attachments: # 1 Petition and Supporting Documents) (hada, )** (Entered: 03/14/2019) |
| 03/14/2019 | 5 | ***DOCUMENT MAILED 4 Order 2254, placed in U.S. Mail to Clinton Folkes (hada, ) (Entered: 03/14/2019) |
| 03/15/2019 | 6 | ACKNOWLEDGMENT OF SERVICE Executed Acknowledgment filed by Nelson. (Attachments: # 1 Certificate of Service)(Brown, Melody) (Entered: 03/15/2019) |
| 03/26/2019 | 7 | NOTICE of Appearance by Michael Douglas Ross on behalf of Nelson (Attachments: # 1 Certificate of Service)(Ross, Michael) (Entered: 03/26/2019) |
| 05/03/2019 | 8 | First MOTION for Extension of Time by Nelson. Response to Motion due by 5/17/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Certificate of Service)No proposed order.Motions referred to Mary Gordon Baker.(Ross, Michael) (Entered: 05/03/2019) |
| 05/06/2019 | 9 | **TEXT ORDER granting 8 Motion for Extension of Time. Respondent must make return or otherwise plead by June 3, 2019. Entered at the direction of Magistrate Judge Mary Gordon Baker on 5/6/19.(akob, )** (Entered: 05/06/2019) |
| 05/07/2019 | 10 | ***DOCUMENT MAILED 9 Order on Motion for Extension of Time placed in U.S. Mail to Clinton Folkes (hada, ) (Entered: 05/07/2019) |
| 06/03/2019 | 11 | Second MOTION for Extension of Time by Nelson. Response to Motion due by 6/17/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Certificate of Service)No proposed order.Motions referred to Mary Gordon Baker.(Ross, Michael) (Entered: 06/03/2019) |
| 06/04/2019 | 12 | **TEXT ORDER granting 11 Motion for Extension of Time. Respondent must make return or otherwise plead by July 3, 2019. Absent extraordinary circumstances, no further extensions will be granted for this deadline. Entered at the direction of Magistrate Judge Mary Gordon Baker on 6/4/19.(akob, )** (Entered: 06/04/2019) |
| 06/05/2019 | 13 | ***DOCUMENT MAILED 12 Order on Motion for Extension of Time, placed in U.S. Mail to Clinton Folkes at 216506, Lee Correctional Institution, 990 Wisacky Highway, Bishopville, SC 29010 from Charleston Division. (hada, ) (Entered: 06/05/2019) |
| 07/03/2019 | 14 | RETURN and MEMORANDUM to Petition for Writ of Habeas Corpus 1 Petition for Writ of Habeas Corpus by Nelson. (Attachments: # 1 State Court Documents Attachment 1 - Appendix Volume 1 of 2 from CTRACK - Pages 1-500, # 2 State Court Documents Attachment 1 - Part 2 - Appendix Volume 2 of 2 from CTRACK - Page 501-861, # 3 State Court Documents Attachment 2 - Motion to Elnarge Page Limitation for Petition of Certiorari, # 4 State Court Documents Attachment 3 - Petition for Writ of Certiorari, # 5 State Court Documents Attachment 4 - Order of South Carolina Supreme Court transferring jurisdiction to South Carolina Court of Appeals, # 6 State Court Documents Attachment 5 - Order of South Carolina Court of Appeals Denying Petition for Writ of Certiorari, # 7 State Court Documents Attachment 6 - Remittitur dated November 9, 2018, # 8 Certificate of Service)(Ross, Michael) (Entered: 07/03/2019) |
| 07/03/2019 | 15 | MOTION for Summary Judgment by Nelson. Response to Motion due by 7/17/2019. Add |

**JA2**

3/23/2021                                    CM/ECF - scd

| | | |
|---|---|---|
| | | an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Certificate of Service)No proposed order.Motions referred to Mary Gordon Baker.(Ross, Michael) (Entered: 07/03/2019) |
| 07/08/2019 | 16 | **ROSEBORO ORDER directing clerk to forward summary judgment explanation to the opposing party and directing that party to respond in 31 days. Response due to 15 MOTION for Summary Judgment by 8/8/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Signed by Magistrate Judge Mary Gordon Baker on 07/08/2019. (hada, )** (Entered: 07/08/2019) |
| 07/08/2019 | 17 | ***DOCUMENT MAILED 16 Roseboro Order, placed in U.S. Mail from Charleston Clerks Office to Clinton Folkes 216506 Lee Correctional Institution 990 Wisacky Highway Bishopville, SC 29010 (hada, ) (Entered: 07/08/2019) |
| 07/29/2019 | 18 | RESPONSE in Opposition re 15 MOTION for Summary Judgment . Response filed by Clinton Folkes.Reply to Response to Motion due by 8/5/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Envelope)(hada, ) (Entered: 07/30/2019) |
| 11/15/2019 | 19 | **REPORT AND RECOMMENDATION of Magistrate Judge Mary Gordon Baker. It is recommended that 15 MOTION for Summary Judgment be granted, this case be dismissed with prejudice and decline to issue a certificate of appealability. Objections to R&R due by 12/2/2019. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Signed by Magistrate Judge Mary Gordon Baker on 11/15/2019. (hada, )** (Entered: 11/15/2019) |
| 11/15/2019 | 20 | ***DOCUMENT MAILED 19 REPORT AND RECOMMENDATION re 15 MOTION for Summary Judgment filed by Nelson placed in U.S. Mail from Charleston Clerks Office to Clinton Folkes 216506 Lee Correctional Institution 990 Wisacky Highway Bishopville, SC 29010 (hada, ) (Entered: 11/15/2019) |
| 12/09/2019 | 21 | Letter from Clinton Folkes. (Attachments: # 1 Supporting Documents, # 2 Envelope)(hada, ) (Entered: 12/09/2019) |
| 12/09/2019 | 22 | Mail Returned as Undeliverable. Addressee: Clinton Folkes. Document Returned: 19 REPORT AND RECOMMENDATION (hada, ) (Entered: 12/09/2019) |
| 12/10/2019 | 23 | **TEXT ORDER: Petitioner shall file any objections to the Report and Recommendation on or before JANUARY 3, 2020. In his letter dated December 4, 2019, Petitioner states that his legal mail is being returned to the district court. (Dkt. No. 21.) But the Report and Recommendation had been returned to the district court and marked as inmate refused, 11/22/2019. (Dkt. No. 22.) In an abundance of caution, the Court extends the objection deadline. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 12/10/2019. (ltap, )** (Entered: 12/10/2019) |
| 12/11/2019 | 24 | ***DOCUMENT MAILED 23 Order and 19 Report and Recommendation, placed in U.S. Mail from Charleston Clerks Office to Clinton Folkes 216506 Lee Correctional Institution 990 Wisacky Highway Bishopville, SC 29010 (hada, ) Modified docket text on 12/11/2019 (hada, ). (Entered: 12/11/2019) |
| 12/30/2019 | 25 | OBJECTION to 19 Report and Recommendation by Clinton Folkes. Reply to Objections due by 1/13/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Supporting Documents, # 2 Envelope)(hada, ) (Entered: 12/30/2019) |
| 01/08/2020 | 26 | MOTION for Extension of Time to File Response/Reply as to 19 REPORT AND |

**JA3**

| | | |
|---|---|---|
| | | RECOMMENDATION re 15 MOTION for Summary Judgment filed by Nelson by Clinton Folkes. Response to Motion due by 1/22/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. (Attachments: # 1 Envelope)(hada, ) (Entered: 01/08/2020) |
| 01/10/2020 | 27 | **ORDER granting 26 Motion for Extension of Time to File Response/Reply Response to Motion due by 2/3/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Signed by Honorable Richard M Gergel on 1/10/2020.(ltap, ) (Entered: 01/10/2020)** |
| 02/12/2020 | 28 | **OPINION AND ORDER The Court adopts in part and declines to adopt in part the 19 Report and Recommendation as the order of the Court. The Court grants Respondent's 15 motion for summary judgment as to Grounds 1-2 and 4-22. A Certificate of Appealability is denied as to these grounds. The Court denies without prejudice Respondent's motion for summary judgment as to Ground 3. Signed by Honorable Richard M Gergel on 02/12/2020.(hada, ) (Entered: 02/13/2020)** |
| 02/12/2020 | 29 | **ORDER The Court finds that appointment of counsel is proper under these circumstances and hereby appoints Jason Luck of the Charleston County Bar as counsel for Petitioner. Signed by Honorable Richard M Gergel on 02/12/2020. (hada, ) (Entered: 02/13/2020)** |
| 02/12/2020 | 30 | **ORDER Respondent is to file a supplemental brief in support of its motion for summary judgment and in opposition to Petitioner's habeas petition on or before March 13, 2020; Petitioner is to file a supplemental brief in support of his habeas petition and in opposition to the motion for summary judgment 30 days thereafter; and Respondent may, but is not required, to file a reply within 15 days after Petitioner's supplemental brief. The Court has set forth a series of issues and questions which should be addressed by Petitioner and Respondent in the supplemental briefs to be submitted in this matter. Details set forth in Order. Signed by Honorable Richard M Gergel on 02/12/2020. (hada, ) (Entered: 02/13/2020)** |
| 03/13/2020 | 31 | REPLY *Supplemental Brief* by Nelson to 30 Order. (Attachments: # 1 Certificate of Service)(Ross, Michael) Filing corrected for event type as per attorney filing user(sshe, ) (Entered: 03/13/2020) |
| 04/09/2020 | 32 | REPLY by Clinton Folkes to 31 Reply, 30 Order,, *(Supplemental Brief)*. (Luck, Jason) (Entered: 04/09/2020) |
| 04/24/2020 | 33 | *Reply Brief as per ECF #30* RETURN and MEMORANDUM to Petition for Writ of Habeas Corpus 1 Petition for Writ of Habeas Corpus by Nelson.(Ross, Michael) (Entered: 04/24/2020) |
| 04/24/2020 | 34 | *AMENDED* RETURN and MEMORANDUM to Petition for Writ of Habeas Corpus 1 Petition for Writ of Habeas Corpus *Reply brief in support of MSJ and to ECF #30* by Nelson.(Ross, Michael) (Entered: 04/24/2020) |
| 07/31/2020 | 35 | NOTICE of Appearance by Jason Scott Luck on behalf of Clinton Folkes (Luck, Jason) (Entered: 07/31/2020) |
| 10/07/2020 | 36 | **TEXT ORDER re 31, 32, 33, 34. Petitioner and Respondent have supplied the requested supplemental briefing regarding summary judgment on the remaining Ground 3. The Court therefore REFERS the matter back to the Magistrate Judge for a Report and Recommendation on the issue. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 10/7/20. (ltap, ) (Entered: 10/07/2020)** |
| 12/08/2020 | 38 | **REPORT AND RECOMMENDATION of Magistrate Judge Mary Gordon Baker. It** |

3/23/2021

CM/ECF - scd

| | | |
|---|---|---|
| | | is recommended that the Court grant the Warden's motion, dismiss this case with prejudice, and decline to issue a certificate of appealability. Objections to R&R due by 12/22/2020. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. Signed by Magistrate Judge Mary Gordon Baker on 12/08/2020. (hada, ) (Entered: 12/08/2020) |
| 12/13/2020 | 39 | OBJECTION to 38 Report and Recommendation by Clinton Folkes. Reply to Objections due by 12/29/2020 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Luck, Jason) (Entered: 12/13/2020) |
| 01/07/2021 | 40 | ORDER: After carefully considering the appropriate remedy under these highly unusual facts, the Court hereby GRANTS Petitioners habeas petition as to Ground 3 (Dkt. No. 1-1) and ORDERS that Petitioner be released from prison on or before May 1, 2021 unless the State of South Carolina before reinstates his right to discretionary appellate review of the September 24, 2010 decision of the South Carolina Court of Appeals denying his direct appeal. AND IT IS SO ORDERED. Signed by Honorable Richard M Gergel on 1/7/21.(ltap, ) (Entered: 01/07/2021) |
| 01/13/2021 | 41 | TEXT ORDER: The Court hereby appoints Mr. Jason Luck as counsel for Petitioner pursuant to 18 U.S.C. Section 3006A(a)(2)(B) with the nunc pro tunc date of 2/12/20. Further, the Court appoints Mr. Luck a member of the CJA panel pro hac vice for this case with the same nunc pro tunc date of 2/12/20. AND IT IS SO ORDERED. Entered at the direction of Honorable Richard M Gergel on 1/13/21. (cper, ) (Entered: 01/13/2021) |
| 02/04/2021 | 42 | NOTICE OF APPEAL as to 40 Order on Report and Recommendation,, by Nelson. - Filing fee $ 505, receipt number 0420-9630929. The Docketing Statement form, Transcript Order form and CJA 24 form may be obtained from the Fourth Circuit website at www.ca4.uscourts.gov (Ross, Michael) (Entered: 02/04/2021) |
| 02/11/2021 | 43 | Transmittal Sheet for Notice of Appeal to USCA re 42 Notice of Appeal, The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (hada, ) (Entered: 02/11/2021) |
| 02/11/2021 | 44 | ASSEMBLED INITIAL ELECTRONIC RECORD TRANSMITTED TO FOURTH CIRCUIT COURT OF APPEALS re 42 Notice of Appeal, Electronic record successfully transmitted. (hada, ) (Entered: 02/11/2021) |
| 02/12/2021 | 46 | ORDER of USCA as to 42 Notice of Appeal, filed by Nelson. (hada, ) (Entered: 02/12/2021) |
| 03/19/2021 | 47 | MOTION for Hearing *for Status Conference* by Nelson. Response to Motion due by 4/2/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Ross, Michael) (Entered: 03/19/2021) |
| 03/19/2021 | 48 | RESPONSE in Support re 47 MOTION for Hearing *for Status Conference* Response filed by Clinton Folkes. (Luck, Jason) (Entered: 03/19/2021) |
| 03/21/2021 | 49 | TEXT ORDER: The parties have jointly moved for a status conference to clarify whether the Courts Order of 1/7/21 (Dkt. No. 40) is a final order of the Court. This is to confirm that Dkt. No. 40 is a final order. AND IT IS SO ORDERED. Entered at the direction of the Honorable Richard M Gergel on 3/21/21.(ltap, ) (Entered: 03/21/2021) |
| 03/22/2021 | 50 | JUDGMENT: Petitioner be released from prison on or before May 1, 2021 unless the State of South Carolina before thenreinstates his right to discretionary appellate review of the |

**JA5**

3/23/2021                                    CM/ECF - scd

|  |  | September 24, 2010 decision of the South Carolina Court of Appeals denying his direct appeal. (hada, ) (Entered: 03/22/2021) |
|---|---|---|
| 03/22/2021 | 51 | MOTION to Stay by Nelson. Response to Motion due by 4/5/2021. Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6 or Fed. R. Crim. P. 45. No proposed order.(Ross, Michael) (Entered: 03/22/2021) |
| 03/22/2021 | 52 | RESPONSE in Opposition re 51 MOTION to Stay Response filed by Clinton Folkes.Reply to Response to Motion due by 3/29/2021 Add an additional 3 days only if served by mail or otherwise allowed under Fed. R. Civ. P. 6. (Attachments: # 1 Exhibit A - Fourth Circuit Docketing Statement)(Luck, Jason) (Entered: 03/22/2021) |

| PACER Service Center | | | | |
|---|---|---|---|---|
| **Transaction Receipt** | | | | |
| 03/23/2021 09:54:43 | | | | |
| **PACER Login:** | A_Wilson17:2630853:6130603 | **Client Code:** | | |
| **Description:** | Docket Report | **Search Criteria:** | 2:19-cv-00760-RMG | |
| **Billable Pages:** | 5 | **Cost:** | 0.50 | |

**JA6**

AO 241
(Rev. 01/15)

Page 2

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2:19-cv-760-RMG-MGB

| United States District Court | District: Of South Carolina |
|---|---|
| Name (under which you were convicted): Clinton C Folkes | Docket or Case No. GS-40 2007-GS-40-6654 |
| Place of Confinement: LEE Correctional Institution | Prisoner No.: 00216506 |
| Petitioner (include the name under which you were convicted) Clinton C Folkes | v. Respondent (authorized person having custody of petitioner) warden Nelson |
| The Attorney General of the State of: | |

**PETITION**

1. (a) Name and location of court that entered the judgment of conviction you are challenging:

   Richland County Court of Common Pleas.

   (b) Criminal docket or case number (if you know): GS-40-2007-GS-40-6654

2. (a) Date of the judgment of conviction (if you know): July 9, 2008

   (b) Date of sentencing: September 24, 2008

3. Length of sentence: life without Parole under S.C. code ANN § 17-25-45

4. In this case, were you convicted on more than one count or of more than one crime?  ☐ Yes  ☑ No

5. Identify all crimes of which you were convicted and sentenced in this case: I were Convicted AB w/k Trial was Sentenced to life without Parole under SC Code ANN § 17-25-45

6. (a) What was your plea? (Check one)

   ☑ (1) Not guilty        ☐ (3) Nolo contendere (no contest)

   ☐ (2) Guilty            ☐ (4) Insanity plea

**JA7**

AO 241
(Rev. 01/15)

Page 3

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? N/A

_____

_____

_____

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

☑ Jury    ☐ Judge only

7.  Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☑ Yes    ☐ No

8.  Did you appeal from the judgment of conviction?

☑ Yes    ☐ No

9.  If you did appeal, answer the following:

(a) Name of court: Richland County the State of South Carolina Court of Appeals

(b) Docket or case number (if you know): 2007-GS-40-6654

(c) Result: affirm and Appeals Dismissed

(d) Date of result (if you know): September 24, 2010

(e) Citation to the case (if you know): 2010-UP-420

(f) Grounds raised: On appeal, Folkes argues the Trial Court Erred in Failing to Charge the jury the absence of malice is not an element of assault and batter of a High and aggravated Nature (ABHAN) we affirm

_____

_____

_____

(g) Did you seek further review by a higher state court?    ☑ Yes    ☐ No

If yes, answer the following:

(1) Name of court: Appeal from Richland County Court of Common Pleas

(2) Docket or case number (if you know): 2016-000415

(3) Result: Appeal order of Dimissal .

_____

(4) Date of result (if you know): Order of Dismissal filed January 14, 2016

JA8

AO 241
(Rev. 01/15)

Page 4

(5) Citation to the case (if you know): 2010-CP-40-7500

(6) Grounds raised: ineffect assistance of Counsel

Judicial Error see attached (56789)

Please see attached (123)

(h) Did you file a petition for certiorari in the United States Supreme Court?    ☑ Yes    ☐ No

If yes, answer the following:

(1) Docket or case number (if you know): NO 2016-000415

(2) Result: Writ of certiorari was denied

(3) Date of result (if you know): Filed Oct. 16, 2018

(4) Citation to the case (if you know): 2010-CP-40-7500

10.    Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?    ☐ Yes    ☐ No

11.    If your answer to Question 10 was "Yes," give the following information:

(a)    (1) Name of court: RichLand County Court of Common Pleas

(2) Docket or case number (if you know): NO 2016-000415

(3) Date of filing (if you know): Oct, 26 2010    Under 28 U.S.CA §2254

(4) Nature of the proceeding: Post-Conviction Relief

(5) Grounds raised: ineffect assistance of Counsel (123)

Judicial Error see attached (56789)

please see attached (123)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☑ Yes    ☐ No

(7) Result: Post-Conviction Relief application. Dismissal

(8) Date of result (if you know): Filed on January 14, 2016

**JA9**

AO 241
(Rev. 01/15)

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: Appeal From Richland County Court Common Pleas

(2) Docket or case number (if you know): 2016-000415

(3) Date of filing (if you know): Oct, 26, 2010

(4) Nature of the proceeding: Post-Conviction Relief

(5) Grounds raised: See attachment (1 2 3)
Ineffective assistance of counsel
Judicial Error (see attachment
(5 6 7 8 9)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☑ Yes     ☐ No

(7) Result: Notice of Appeal was Dismissal

(8) Date of result (if you know): Filed on January 14, 2016

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: Richland County S.C. Court of Appeals

(2) Docket or case number (if you know): No 2016-000415

(3) Date of filing (if you know): Oct, 26, 2010

(4) Nature of the proceeding: Post-Conviction Appeal to SC Supreme Court

(5) Grounds raised: See attachment (5 6 7 8 9)
See Questions Presented at SC
Supreme Court on Post-Conviction Appeal

**JA10**

AO 241
(Rev. 01/15)

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☑ Yes    ☐ No

(7) Result:  ~~denied~~

(8) Date of result (if you know):  Oct, 16, 2018

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition:     ☑ Yes     ☐ No

(2) Second petition:    ☑ Yes     ☐ No

(3) Third petition:     ☑ Yes     ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

12.    For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

**GROUND ONE:** _____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Ineffective assistance of Counsel 123
Please see attached (123)

Judicial Error (56789)

Please see attached (56789)

(b) If you did not exhaust your state remedies on Ground One, explain why:  N/A

**JA11**

AO 241
(Rev. 01/15)

Page 7

(c)      **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☑ Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:    N/A

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:    Writ of Certiorari in P.C.R appeal

Name and location of the court where the motion or petition was filed:

Richland County Court of Common Pleas

Docket or case number (if you know):    No 2016-00415

Date of the court's decision:    On January 14, 2016

Result (attach a copy of the court's opinion or order, if available):    denying my
Post-Conviction Relief Application

(3) Did you receive a hearing on your motion or petition?    ☑ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?    ☑ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☑ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed:    Appeal From Richland
County Court of Common Pleas SC Suprme Court

Docket or case number (if you know):    2010-cp-40-7500

Date of the court's decision:    January 14, 2016

Result (attach a copy of the court's opinion or order, if available):    Post Conviction Appeal
order was Dismissal and deny

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

N/A

_____

_____

_____

**JA12**

AO 241
(Rev. 01/15)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have

used to exhaust your state remedies on Ground One:

**GROUND TWO:** ineffect assistance of Trial Counsel
Please See attachement (123) Judicial Error see (56789)

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) If you did not exhaust your state remedies on Ground Two, explain why:

(c)     **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?     ☑ Yes     ☐ No

(2) If you did **not** raise this issue in your direct appeal, explain why:     N/A

(d)     **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?
☑ Yes     ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:     Post-Conviction motion and petition

Name and location of the court where the motion or petition was filed:     Appeal From
Richland County court of Common Pleas

Docket or case number (if you know):     2010-CP-40-7500

Date of the court's decision:     Filed on Oct. 16, 2018

**JA13**

AO 241
(Rev. 01/15)

Page 9

Result (attach a copy of the court's opinion or order, if available): deny and Dismissal

(3) Did you receive a hearing on your motion or petition? ☑ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☑ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☑ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: The South Carolina Court of Appeals Richland County Court of Common Pleas

Docket or case number (if you know): 2010-CP-40-7500

Date of the court's decision: Fild on OCT, 16, 2018

Result (attach a copy of the court's opinion or order, if available): deny and Dismissal

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

ineffect assistance of trial Counsel please see attachment (123)
Judicial Error please see attachment (56789)

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two : please see attachment (56789) Judicial Error and ineffect assistance of trial Counsel please see attachment (123)

**GROUND THREE:** _____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

The Petitioner claim the Trial Counsel provided him ineffective assistance of Counsel. in Violation of his rights pursuant to the Sixth and Fourteenth amendment to the United States Constitution where Trial Counsel Failed to object to alleged Testimony from witnesses and prosecution by him not objecting to alleged Testimony, Trial Counsel Failed

**JA14**

AO 241
(Rev. 01/15)

(b) If you did not exhaust your state remedies on Ground Three, explain why: To perserve the right a ragument issued for the record in which limit petitionwer the right for any review.

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☑ Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: N/A

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Post-Coviction Relif For appeal

Name and location of the court where the motion or petition was filed:

Richland County Court of Common Pleas

Docket or case number (if you know): 2010-CP-40-7500

Date of the court's decision: Fild on Oct 16, 2018

Result (attach a copy of the court's opinion or order, if available): deny and Dismiss

(3) Did you receive a hearing on your motion or petition?    ☑ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?    ☑ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☑ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: The South Carolina Court of Appeals Richland County Court of Common Pleas

Docket or case number (if you know): 2010-CP-40-7500

Date of the court's decision: Oct 16, 2018

Result (attach a copy of the court's opinion or order, if available): deny & Dismiss

**JA15**

AO 241
(Rev. 01/15)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

_____

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Three: ineffect assistance of

Trial Counsel please see attachment (123)

Judicial Error see attachment (56789)

**GROUND FOUR:** _____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Trial Counsel Failed to object to alleged testimony
From witnesses and prosecution which trial counsel
Failed to perserve argument for the record in which
limit petitioner right for any relief.
please see attachment (123) & (56789)
which limit my right or relief

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

(c)    **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?    ☑ Yes    ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(d)    **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes    ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Post-Conviction motion of appeal

**JA16**

Page 12

AO 241
(Rev. 01/15)

Name and location of the court where the motion or petition was filed: *Appeal From*

*Richland County Court of Common Pleas*

Docket or case number (if you know): *2010-CP-40-7500*

Date of the court's decision: *Oct, 16, 2018*

Result (attach a copy of the court's opinion or order, if available): *deny and Dismiss*

_____

(3) Did you receive a hearing on your motion or petition?    ☑ Yes    ☐ No

(4) Did you appeal from the denial of your motion or petition?    ☑ Yes    ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?    ☑ Yes    ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: *the South Carolina Court*

*of appeal Richland County Court of Common Pleas*

Docket or case number (if you know): *2010-CP-40-7500*

Date of the court's decision: *Oct, 16, 2018*

Result (attach a copy of the court's opinion or order, if available): *deny & Dismiss*

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

_____

(e)    **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you

have used to exhaust your state remedies on Ground Four: *ineffect assistance*

*of trial Counsel please see attachment (123) &*

*Judicial Error please see attachment (56789)*

**JA17**

AO 241
(Rev. 01/15)

13.    Please answer these additional questions about the petition you are filing:

(a)    Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?    ☑ Yes    ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them:    N/A _____

_____

_____

_____

(b)    Is there any ground in this petition that has not been presented in some state or federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

N/A _____

_____

_____

14.    Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?    ☐ Yes    ☑ No

If "Yes," state the name and  location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy of any court opinion or order, if available.    N/A _____

_____

_____

_____

_____

_____

_____

15.    Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?    ☐ Yes    ☑ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.    N/A _____

_____

_____

_____

_____

**JA18**

AO 241
(Rev. 01/15)

16.   Give the name and address, if you know, of each attorney who represented you in the following stages of the

judgment you are challenging:

(a) At preliminary hearing:  _____

_____

(b) At arraignment and plea:  _____

(c) At trial:  *DEON O'NEIL, & Luke SHEALEY*
*Public Defender, Po Box 192 Columbia sc 29202*

(d) At sentencing:  _____

(e) On appeal:  *M-Celia Robinson, Appellate Defense,*
*P.O Box 192, Columbia sc 29211*

(f) In any post-conviction proceeding:  *Tara Dawn Shurling, PA*
*3614 Landmark Drive Suite A, Columbia sc 29204*

(g) On appeal from any ruling against you in a post-conviction proceeding:  *Tara Dawn Shurling*
*PA -3614 Landmark Drive Suite A.*
*Columbia S.C. 29204*

17.   Do you have any future sentence to serve after you complete the sentence for the judgment that you are

challenging?          ☐ Yes          ☑ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

*N/A*

_____

(b) Give the date the other sentence was imposed:  _____

(c) Give the length of the other sentence:  _____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the

future?          ☐ Yes          ☑ No

18.   TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain

why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

*N/A*

_____

_____

_____

_____

_____

**JA19**

2:19-cv-00760-RMG   Date Filed 03/13/19   Entry Number 1   Page 14 of 15
USCA4 Appeal: 21-6217   Doc: 11-1   Filed: 03/24/2021   Pg: 24 of 504

_____

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in

part that:

(1)    A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in
custody  pursuant to the judgment of a State court.  The limitation period shall run from the latest of -

   (A)    the date on which the judgment became final by the conclusion of direct review or the expiration
   of the time for seeking such review;

   (B)    the date on which the impediment to filing an application created by State action in violation of
   the Constitution or laws of the United States is removed, if the applicant was prevented from
   filing by such state action;

   (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court,
   if the right has been newly recognized by the Supreme Court and made retroactively applicable to
   cases on collateral review; or

   (D)    the date on which the factual predicate of the claim or claims presented could have been
   discovered through the exercise of due diligence.

**JA20**

AO 241
(Rev. 01/15)

(2)     The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: _____

*Vacation of his Convictions and Sentences and a New Trial*

or any other relief to which petitioner may be entitled.

_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _____ 3/8/19 _____ (month, date, year).

Executed (signed) on _____ 3/8/19 _____ (date).

*Clinton Folkes*
_____
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

_____
_____
_____
_____

**JA21**

# The South Carolina Court of Appeals

Clinton Folkes, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2016-000415

--------------------

## ORDER

--------------------

This matter is before the court on a petition for a writ of certiorari following the denial of Petitioner's application for post-conviction relief. Based on the vote of the panel, the petition for a writ of certiorari is denied.

FOR THE COURT

BY _____
CLERK

Columbia, South Carolina

cc:
Tara Dawn Shurling, Esquire
Megan Harrigan Jameson, Esquire
Clinton Folkes
The Honorable L. Casey Manning

**FILED**

Oct. 16, 2018

**JA22**

⑥

FILED

STATE OF SOUTH CAROLINA   )
                      )      IN THE COURT OF GENERAL SESSIONS
COUNTY OF RICHLAND  2008 MAY 19  AM 10: 41

BARBARA A. SCOTT
C C. C. & G.S.

The State            )   **NOTICE OF INTENTION TO SEEK A**
                    )   **SENTENCE OF LIFE WITHOUT PAROLE**
        -vs-   )
                    )   Indictment No: 2007-GS40-6654
                    )
                    )   Warrant Number: K265452
                    )
**CLINTON FOLKES,**      )
         Defendant.  )

---

TO:   CLINTON FOLKES, DEFENDANT, and Attorney for the Defendant, Deon O'Neal, Esquire.

      PLEASE TAKE NOTICE that upon conviction (trial or guilty plea) of the above-entitled action to be scheduled on a date at least ten (10) days hence, of which you will be timely notified, the State will seek a sentence of life imprisonment without the possibility of parole, pursuant to South Carolina Code of Laws, Section 17-25-45 (1995), as amended.  The State intends to rely upon the following prior convictions of the defendant to statutorily enhance his/her punishment: 2 Counts of Assault and Battery With Intent to Kill from Richland County on August 17, 1994, see attached copy of conviction.

                            W. BARNEY GIESE, SOLICITOR
                            Fifth Judicial Circuit

                            Heather S. Weiss
                            Assistant Solicitor

Columbia, South Carolina

This 19th day of May, 2008

**JA23**

**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

## THE STATE OF SOUTH CAROLINA
### In The Court of Appeals

The State,                                              Respondent,

v.

Clinton C. Folkes,                          Appellant.

RECEIVED
SEP 2 4 2010

_____

Appeal From Richland County
James R. Barber, III, Circuit Court Judge

_____

Unpublished Opinion No. 2010-UP-420
Submitted August 2, 2010 – Filed September 24, 2010

_____

**AFFIRMED**

_____

Appellate Defender M. Celia Robinson, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott,

JA24

Assistant Attorney General Julie M. Thames, and Solicitor Warren Blair Giese, all of Columbia, for Respondent.

**PER CURIAM:** Clinton C. Folkes was convicted of assault and battery with intent to kill and was sentenced to life imprisonment without the possibility of parole. On appeal, Folkes argues the trial court erred in failing to charge the jury the absence of malice is not an element of assault and battery of a high and aggravated nature (ABHAN). We affirm[1] pursuant to Rule 220(b)(1), SCACR, and the following authorities: State v. Tyler, 348 S.C. 526, 530-31, 560 S.E.2d 888, 890 (2002) ("[T]he absence of malice is not a required element of the offense of ABHAN."); State v. Curry, 370 S.C. 674, 682, 636 S.E.2d 649, 653 (Ct. App. 2006) ("A charge is sufficient if, when considered as a whole, it covers the law applicable to the case. The substance of the law is what must be charged to the jury, not any particular verbiage.") (internal quotation marks and citations omitted).

**AFFIRMED.**

**FEW, C.J., KONDUROS and LOCKEMY, JJ., concur.**

*465 S.E.2d at 111*

*- defendant is entitled to a directed ve*

---

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.

**854**

STATE OF SOUTH CAROLINA
In The Supreme Court

_____

APPEAL FROM RICHLAND COUNTY
Court of Common Pleas
L. Casey Manning, Presiding Judge

_____

2010-CP-40-7500

_____

**RECEIVED**

FEB 2 6 2016

SC SUPREME COURT

CLINTON FOLKES, #216506                                          Petitioner,

v.

THE STATE OF SOUTH CAROLINA,

                                                                Respondent.

_____

NOTICE OF APPEAL

_____

    **NOW COMES** the Petitioner in the above-captioned Post-Conviction Relief matter, acting by and through his undersigned counsel, giving notice of his appeal from the Order of Dismissal filed on January 14, 2016 denying his Post-Conviction Relief Application, which was not received for Petitioner until January 25, 2016.

Tara Dawn Shurling
Attorney and Counselor at Law
S.C. Bar No. 5099

    3614 Landmark Drive, Suite A
    Columbia, South Carolina 29204
    (803)738-8622
    (803)738-1600 FAX

    ATTORNEY FOR PETITIONER

This 24th day of February, 2016.

Other Counsel of Record:

Megan Harrigan Jameson, Assistant Attorney General
P. O. Box 11549
Columbia, SC 29211
Attorney for Respondent
(803) 734-3737

**JA26**

71.1(g), SCRCP, provides that if the applicant wishes to seek appellate review, post-conviction relief counsel must serve and file a Notice of Appeal on the Applicant's behalf. Applicant is directed to South Carolina Appellate Court Rule 243 for appropriate procedures for appeal.

**IT IS THEREFORE ORDERED:**

1.    That this application for post-conviction relief must be denied and dismissed with prejudice; and

2.    The Applicant shall remain in the custody of the State.

AND IT IS SO ORDERED this _14_ day of _Jan._, 2016

L. CASEY MANNING
Presiding Judge
Fifth Judicial Circuit

_____ South Carolina

Page 46 of 46

Amended Application for Post-Conviction Relief alleging the following additional grounds for relief:

1. Trial counsel was ineffective for failing to object to a closing argument by the State in which they told the jury that the difference between Assault and Battery with Intent to Kill and Assault and Battery of a High and Aggravated Nature was whether or not malice existed.

2. Trial Counsel was ineffective for failing to object when the prosecution erroneously advised the jury that if they found malice existed, they could not find the Applicant guilty of the lesser included offense of ABHAN.

3. Appellate Counsel was ineffective for failing to file a Petition for Rehearing in the Court of Appeals thereby depriving the Applicant of his right to seek certiorari in the Supreme Court of South Carolina.

4. Trial Counsel was ineffective for failing to advise the Applicant of his right to put up a defense regardless of whether he himself testified at his trial.

5. Trial Counsel was ineffective for failing to object to the State introducing testimony concerning other knives alleged to have been carried by the Applicant where said testimony bore no logical relevance to the Applicant's case and constituted evidence of prior bad acts. Trial Tr. p. 190, 11. 5-11.

6. Trial Counsel was ineffective for failing to challenge the position taken by the prosecutor assigned to this case, Heather Weiss, that "this is a mandatory life without parole, so I can't make an offer." Email from Weiss dated November 21, 2007.

7. Trial Counsel provided the Applicant ineffective assistance of counsel when he neglected to investigate Assistant Solicitor Weiss's claim that she could not extend any plea offers in this case due to the Applicant's exposure to a mandatory life without parole sentence.

8. Trial Counsel was ineffective for advising the jury in closing argument that the trial judge was going to instruct [the jury] that the absence of malice is not an element of assault and battery of a high and aggravated nature with determining in advance that the Court would in fact issue such an instruction.

9. Trial Counsel was ineffective for neglecting to remind the jury that, not only was there no blood visible on the shirt the State

3

**JA28**



alleged belonged to the Applicant, but the State's own witness testified that no DNA was found on the shirt when it was analyzed. Trial Tr. p. 295, 1 15-296, 1. 1 and Trial Tr. p. 404, 1.23- p. 405, 1. 7.

10. Trial Counsel failed to provide the Applicant with reasonable professional assistance of counsel when he conceded that the Applicant was not entitled to advance a claim of self-defense where under a reasonable interpretation of the facts in this case the Applicant had a colorable claim to that defense. Trial Tr. p. 330,11. 8-13.

11. Trial Counsel erred in failing to object to hearsay testimony from Investigator Robert McCracken advising that when he was dispatched to the scene he "was told someone was cut severely." Trial Tr. p. 300, 11. 7-13.

12. Trial Counsel was ineffective for neglecting to argue that State's Exhibit No. 31, a beer bottle seized at the time of the Applicant's arrest, should not be admitted into evidence where the bottle, broken after it was in the possession of law enforcement, was sealed in a bag and could not be examined by the jury, and where the Investigator who identified this exhibit prior to its admission could not positively identify what type of beer the bottle was from. Trial Tr. p. 308, 1. 17- p. 310, 1. 12.

13. Trial Counsel was ineffective for failing to object to the introduction of State's Exhibit No. 32, the tote bag seized from the Applicant at the time of his arrest, where the bag was introduced with clothing in it which was not in the bag at the time it was seized. Trial Tr. p. 323, 1. 24- p. 324, 1. 22.

14. Trial Counsel provided the Applicant ineffective assistance of counsel when he failed to introduce testimony from City of Columbia Police Department Officer Battiste to establish that the clothing packed under the sleeping bag inside of State's Exhibit 32 was in fact placed there by him after the Applicant's clothing was taken from him when he was made to strip and put on detention center uniform at the time he was booked.

15. Trial Counsel was ineffective for failing to establish for the jury that the clothing locked in the bottom of State's Exhibit No. 32 was the clothing the Applicant was wearing at the time of his arrest and had not been hidden by him under the sleeping bag found in that exhibit.

16. Trial Counsel was ineffective for failing to demonstrate that the clothing introduced inside State's Exhibit No. 28, a tote bag, was

4

③

the same clothing worn by the Applicant in a photograph of the Applicant taken by law enforcement at the scene after he was taken into custody.

17. Trial Counsel was ineffective in failing to object to the use of a knife. State's Exhibit No. 25 for ID only, in their examination of the victim where the knife was not the one used in the incident which led to the Applicant's charge and was identified by the victim as being only similar to the weapon used in this case.

18. Trial Counsel failed to provide the Applicant reasonable professional assistance of counsel when he neglected to introduce testimony, and employment records, which would have demonstrated that the Applicant was gainfully employed the week the incident involved in the Applicant's charges occurred, and that he had been at work just prior to going to Finley Park.

19. Trial Counsel erred in failing to obtain motel records which would have proven that at the time of this incident the Applicant had been living in a motel and was not homeless as the State claimed.

20. Trial Counsel was ineffective for failing to object to a portion of the State's closing argument in which the prosecution argued matters not in evidence. Trial Tr. p. 394, 11.11-19.

21. Appellate Counsel was ineffective in that she neglected to brief the error of the trial court in overruling the Applicant's objection to the jury instruction, and supplemental charge, given on ABHAN and limited her presentation on direct appeal to the failure of the trial court to issue the specific charge on ABHAN requested by Trial Counsel. Objection at Trial Tr. p. 422, 11. 17-23.

In addition to the above, based upon the evidence and testimony presented during the PCR proceedings, Applicant has argued,

22. Trial Counsel was ineffective for failing to take adequate measures to insure that Applicant understood that if he accepted a plea offer to plead guilty to ABWIK with a negotiated sentence, he would not face potential interpretation of his sentence as a mandatory life without parole sentence pursuant to §17-25-45.

5

**JA30**

## A.

QUESTIONS PRESENTED *at S.C. Supreme Court*

### I.

Did the lower court err denying Petitioner relief where the record below demonstrates that he meet his burden of proof concerning his allegation that his Sixth and Fourteenth Amendment right to effective assistance of appellate counsel was violated on direct appeal where Appellate Counsel failed to file a Petition for Rehearing in the Court of Appeals thereby depriving Petitioner of his right to seek certiorari in the Supreme Court of South Carolina?

### II.

Did the lower court err denying Petitioner relief where the record below demonstrates that he meet his burden of proof concerning his allegation that his Sixth and Fourteenth Amendment right to effective assistance of appellate counsel was violated on direct appeal where Appellate Counsel failed to brief the error of the trial court in overruling the Applicant's objections to the jury instruction, and supplemental charge, as given on ABHAN and limited her presentation on direct appeal to the failure of the trial court to issue the specific charge on ABHAN requested by Trial Counsel?

### III.

Did the lower court err in denying Petitioner relief where the record below establishes that he meet his burden of proof concerning his claim that Trial Counsel provided him ineffective assistance of counsel, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, where Trial Counsel failed to object to closing arguments by the State in which the prosecution told the jury that the difference between Assault and Battery with Intent to Kill and Assault and Battery of a High and Aggravated Nature *was whether or not malice existed?*

1

**JA31**

2:19-cv-00760-RMG    Date Filed 03/13/19    Entry Number 1-1    Page 11 of 14

## IV.

Did the lower court err in denying Petitioner relief where the record below establishes that he meet his burden of proof concerning his claim that Trial Counsel provided him ineffective assistance of counsel, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, where Trial Counsel failed to object to closing arguments by the State in which the prosecution erroneously advised the jury that if they found malice existed, they could not find the Applicant guilty of the lesser included offense of ABHAN?

## V.

Did the lower court err in denying Petitioner relief where the record below establishes that he meet his burden of proof concerning his claim that Trial Counsel provided him ineffective assistance of counsel, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, by advising the jury in his closing argument that the trial judge was going to instruct [the jury] that the absence of malice is not an element of assault and battery of a high and aggravated nature without determining in advance that the Court would in fact issue such an instruction?

## VI.

Did the lower court err in denying Petitioner relief where the record below establishes that he meet his burden of proof concerning his claim that Trial Counsel provided him ineffective assistance of counsel, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, where Trial Counsel failed to object to the State introducing testimony concerning other knives alleged to have been carried by the Applicant and said testimony bore no logical relevance to the Applicant's case and constituted evidence of prior bad acts?

JA32

*Tolkes araves at SC Supreme Court*

*①*

## X.

Did the lower court err in denying Petitioner relief where the record below establishes that he meet his burden of proof concerning his claim that Trial Counsel provided him ineffective assistance of counsel, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, by failing obtain and introduce motel records which would have proven that at the time of this incident Petitioner had been living in a motel and was not homeless as the State and its witnesses claimed?

## XI.

Did the lower court err in denying Petitioner relief where the record below establishes that he meet his burden of proof concerning his claim that Trial Counsel provided him ineffective assistance of counsel, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, by failing to object to a portion of the State's closing argument in which the prosecution argued matters not in evidence?

## XII.

Did the lower court err in denying Petitioner relief where the record below establishes that he meet his burden of proof concerning his claim that Trial Counsel provided him ineffective assistance of counsel, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, by neglecting to remind the jury that, not only was there no blood visible on the shirt the State alleged belonged to the Applicant, but the State's own witness testified that no DNA was found on the shirt when it was analyzed?

**JA33**



## VII.

Did the lower court err in denying Petitioner relief where the record below establishes that he meet his burden of proof concerning his claim that Trial Counsel provided him ineffective assistance of counsel, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, where Trial Counsel failed to object to the State's use of a knife for demonstrative purposes in their examination of the Victim where the knife was not the one used in the incident which led to the charge against Petitioner and was identified by the Victim as being only similar to the weapon used in this case?

## VIII.

Did the lower court err in denying Petitioner relief where the record below establishes that he meet his burden of proof concerning his claim that Trial Counsel provided him ineffective assistance of counsel, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, by failing to object to hearsay testimony from Investigator Robert McCracken advising that when he was dispatched to the scene he *"was told someone was cut severely"* ?

## IX.

Did the lower court err in denying Petitioner relief where the record below establishes that he meet his burden of proof concerning his claim that Trial Counsel provided him ineffective assistance of counsel, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, by failing to provide Petitioner reasonable professional assistance of counsel in that he neglected to introduce testimony, and employment records, which would have demonstrated that the Petitioner was gainfully employed the week the incident resulting in these charges occurred, and that he had been at work just prior to going to Finley Park?

JA34



## XIII.

Did the lower court err in denying Petitioner relief where the record below establishes that he meet his burden of proof concerning his claim that Trial Counsel provided him ineffective assistance of counsel, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, where Trial Counsel failed to take adequate measures to insure that Applicant understood that if he accepted a plea offer to plead guilty to ABWIK with a negotiated sentence, he would not face potential interpretation of his sentence as a mandatory life without parole sentence pursuant to §17-25-45 ?

## XIV.

Did the lower court err in denying Petitioner relief where the record below establishes that he meet his burden of proof concerning his claim that Trial Counsel provided him ineffective assistance of counsel, in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, where Trial Counsel failed to advise Applicant that he had the constitutional right under the Sixth Amendment to the United States Constitution to be fully heard in his defense?

**JA35**

Was charged with
rebutted inconsistent

~~tiffin~~

①

Gomez v Beto, 462 F.2d 596. 597 (5th Cir 1972

when a defense counsel fails to investigate
his client's only possible defense. although
requested to do so by him, and fails to
subpoena witnesses in support of the defense
and will rebut prosecution            and
witnesses and friends of victim, particularly
credible and likely would have undercut
prosecution's witnesses]. would have undermined
weak combined witnesses testimony

Failure to seek out witness and interview
in order to obtain the presence.
of the only witness that could have rebutted
the State's case at trial was ineffective
assistance where Evidence against
defendant was inconsistent, with important
fact

duty to investigate includes obligation to investigate all witnesses who may information concerning the fact of the circumstances of the case)

Counsels reliane state's investigation was ineffective assistance where Exculpatory witness Existed.

where defendant had a Substantial defense

where case came down to credibility of witness Evidence
whether such information would have produced a differenr result)

when a defendant claims his Counsel r must allege with Specificity what the investigation would have revealed and how it would altered the outcome of the trial

**JA37**

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| Clinton Folkes, #216506, | ) | C/A No. 2:19-cv-760-RMG-MGB |
| | ) | |
| Petitioner, | ) | |
| | ) | **RETURN AND MEMORANDUM OF** |
| v. | ) | **LAW IN SUPPORT OF MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| Warden Nelson, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

On March 14, 2019, the Honorable Mary Gordon Baker, United States Magistrate Judge,

issued an order directing respondent to file a return or other response to petitioner's *pro se*

Petition for Writ of Habeas Corpus filed March 13, 2019.  (ECF No. 4).  In accordance with that

order, respondent submits this Return and Memorandum of Law in Support of its Motion for

Summary Judgment, and asserts the petition should be dismissed.  As respondent will show,

petitioner's claims fail on the merits because he is not being held in custody in violation of

federal law.  Additionally, several of his claims are procedurally barred from habeas review

because he failed to present them to the state's highest court.

In making the Return and in support of its motion, respondent would show this Court the

following:

## I.  PROCEDURAL HISTORY

Petitioner is currently confined in the South Carolina Department of Corrections pursuant

to orders of commitment of the Richland County Clerk of Court.  In November 2007, a Richland

County Grand Jury indicted Petitioner for assault and battery with intent to kill (ABWIK).

(Attachment 1, 533-534).  The case proceeded to trial on July 7-9, 2008 before the Honorable

**JA38**

James Barber, III. (Attachment 1, 1). Attorneys Deon O'Neil and Luke Shealey represented Petitioner. (Attachment 1, 1). The jury found petitioner guilty as charged. (Attachment 1, 433). Based on petitioner's prior criminal history,[1] the court sentenced him to life without parole pursuant to South Carolina Code § 17-25-45, the state's two strike/three strike law. (Attachment 1, 446).

## Direct Appeal

Petitioner filed a timely appeal with the South Carolina Court of Appeals. M. Cecilia Robinson with the South Carolina Commission on Indigent Defense represented petitioner on appeal. Petitioner argued that the trial court erred in refusing his request to charge the jury that the absence of malice is not an element of assault and battery of a high and aggravated nature (ABHAN). (Attachment 1, 452). Following briefing by both parties, the South Carolina Court of Appeals affirmed petitioner's sentence in an unpublished decision dated September 24, 2010. (Attachment 1, 484-85). The court issued its Remittitur on October 18, 2010. (Attachment 1, 486). Petitioner did not petition for certiorari to the Supreme Court of South Carolina.

## Post-Conviction Relief

On October 26, 2010, petitioner filed an application for post-conviction relief (PCR) in state court alleging ineffective assistance of counsel and judicial error. (Attachment 1, 487-492). Respondent denied all allegations and requested an evidentiary hearing. (Attachment 1, 493-499). Petitioner subsequently amended his application on August 28, 2012 and March 17, 2014.

---

[1] For purposes of § 17-25-45, petitioner had two prior convictions for assault and battery with intent to kill. (Attachment 2, 440-41). Additionally, petitioner served 90 months for a federal weapons conviction. (Attachment 2, 741).

**JA39**

(Attachment 1, 501-04, 526-29).  In his second amended application, petitioner alleged twenty-one grounds in support of his claim of ineffective assistance of counsel.  (Attachment 1, 526-29).

The Honorable Casey L. Manning presided over evidentiary hearings on July 17, 2014 and September 25, 2014.  Attorney Tara Shurling represented petitioner at the hearings. Petitioner offered testimony from six witnesses, including himself, and nine exhibits.[2]  After the hearings, petitioner alleged an additional ground for relief, increasing the number of his claims to twenty-two.  (Attachment 1, 770).   In a forty-six page written order dated January 14, 2016, the PCR court found petitioner failed to establish his claim of ineffective assistance of counsel. (Attachment 1, 808-853).

### PCR Appeal

On February 24, 2016, petitioner filed a notice of appeal to the South Carolina Supreme Court.  (Attachment 1, 854).  Tara Shurling continued to represent petitioner on appeal. (Attachment 1, 861).  Petitioner sought review of the PCR court's denial of relief on fourteen grounds, which he grouped into ten arguments for appellate review. (Attachment 2).  On October 30, 2017, the South Carolina Supreme Court transferred jurisdiction of the case to the South Carolina Court of Appeals.  (Attachment 4).  The South Carolina Court of Appeals denied the petition for a writ of certiorari on October 16, 2018.  (Attachment 5).  On November 9, 2018, the South Carolina Court of Appeals issued its Remittitur.  (Attachment 6).

### ATTACHMENTS

Attached and incorporated by reference are the following documents:

---

[2] In addition to his own testimony, petitioner called Robert Dudek, Chief Appellate Defender; M. Celia Robinson, petitioner's appellate counsel; Officer David Battiste of the Columbia Police Department; and petitioner's two trial counsels.

1. Appendix from PCR Appeal;

2. Motion to Enlarge Page Limitation For Petition of Writ of Certiorari;

3. Petition for Writ of Certiorari

4. Order of South Carolina Supreme Court transferring jurisdiction to South Carolina Court of Appeals;

5. Order of South Carolina Court of Appeals denying Petition for Writ of Certiorari;

6. Remittitur dated November 9, 2018.

## II.  GROUNDS FOR RELIEF

Petitioner claims four grounds of relief in his *pro se* petition.  (ECF 1, p. 5-11).  Grounds One and Two appear nearly identical, each claiming ineffective assistance of counsel and judicial error.  (ECF 1, p. 5-8).  Ground Three also claims ineffective assistance of counsel.  (ECF 1, p. 8).  Although somewhat unclear, it appears petitioner also alleges ineffective assistance of counsel in Ground Four.  (ECF 1, p. 10).  In support of all four grounds, petitioner references attachments he has numbered one through three and five through nine.  (ECF 1, p. 5-11).  The attachments numbered one through three are Xerox copies of the twenty-two grounds of relief his PCR counsel submitted in a memorandum to the PCR court.  (ECF 1-1, p. 7-9; Attachment 2, 768-770).  Similarly, the attachments petitioner has numbered five through nine are Xerox copies of the fourteen claims of error his PCR counsel alleged in his Petition for a Writ of Certiorari to the Supreme Court of South Carolina.  (ECF 1-1, p. 10-14; Attachment 4, 1-5).  Respondent will address each allegation raised on those attachments in part IV below.

## III.  SUMMARY JUDGMENT STANDARD

"Federal Rule of Civil Procedural 56 'applies to habeas proceedings.'"  Brandt v. Gooding, 636 F.3d 124, 132 (4th Cir. 2011) (quoting Maynard v. Dixon, 943 F.2d 407, 412 (4th Cir. 1991)).  Under that rule, "[s]ummary judgment is appropriate when 'the pleadings,

**JA41**

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In this federal habeas action, the controlling facts are those facts that have been presented to and determined by state courts.  See Cullen v. Pinholster, 563 U.S. 170, 181 (2011) ("review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"); see also 28 U.S.C. § 2254(e)(2) (hearing not available unless petitioner shows a new rule of law or that the factual basis for the claim at issue was unavailable and the facts sought to be proved would "establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.").  Essentially, "[a]lthough state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so.  Pinholster, 563 U.S. at 186; see also Schriro v. Landrigan, 550 U.S. 465, 475 (2007) ("If district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts.").  Thus, the state court records control, and the records before the Court by way of this return and memorandum show that petitioner is not entitled to relief, primarily because there is no genuine issue as to any

material fact that could call into question the denial of relief in state court.  Additionally, several of petitioner's claims are barred from federal habeas review because he did not raise them on appeal to the state's highest court.

## IV.  DISCUSSION

Federal habeas relief is available to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  To be eligible for federal habeas relief, a petitioner must first exhaust his remedies available in state court. 28 U.S.C. § 2254(b)(1)(A).  The exhaustion requirement means "state prisoners must give state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).  Any issues not presented to the state's highest court are procedurally defaulted.  Id. at 848.

As such, a "federal habeas court may consider only those issues that have been fairly presented to the state's highest court."  Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997) overruled on other grounds by United States v. Barnette, 644, F.3d 192 (4th Cir. 2011).  A claim is "fairly presented" when it is "presented face-up and squarely; the federal question must be plainly defined.  Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick."  Pethtel v. Ballard, 617 F.3d 299, 306 (4th Cir 2010).  A petitioner can avoid default of claims not presented to the highest state court only by showing cause for the default and prejudice therefrom, or that a fundamental miscarriage of justice will occur if the claim is not heard, i.e., an assertion of actual innocence. See e.g. Murray v. Carrier, 477 U.S. 478, 495-96 (1986).

Furthermore, a claim that has been adjudicated on the merits in state court cannot be a basis for federal habeas corpus relief unless the state court decision was "contrary to, or involved an unreasonable application of" clearly established federal law as decided by the United States Supreme Court, or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d). This provision "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102 (2011). Therefore, a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 101 quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

Several of petitioner's claims are procedurally barred because he failed to raise them on appeal. See Boerckel, 526 U.S. at 848 (1999). All fail on the merits because fairminded jurists could disagree on the correctness of the state court's resolution of petitioner's constitutional claims. See Richter, 562 U.S at 101. Respondent will now address each allegation contained on the attachments he references for all four grounds of relief.

### ALLEGATION NO. 1 PRESENTED TO PCR COURT (ECF 1-1, p. 7)

**Trial Counsel was ineffective in failing to object to a closing argument by the State in which they told the jury that the difference between Assault and Battery with Intent to Kill and Assault and Battery of a High and Aggravated Nature was whether or not malice existed.**

The PCR court found "that the State's argument was proper based on the law of South Carolina and any objection by counsel would have been overruled." (Attachment 1, 827). The court acknowledged that there is case law stating that the absence of malice is not an affirmative element the State must prove for assault and battery of a high and aggravated nature (ABHAN).

(Attachment 1, 828). According to that precedent, "a defendant may be convicted of ABHAN regardless of whether malice is present" because the aggravating "circumstances that give rise to ABHAN may also give rise to an inference of malice." State v. Fennell, 531 S.E.2d 512, 517 (S.C. 2000).

Nevertheless, although ABHAN does not require a finding of malice, assault and battery with intent to kill (ABWIK) does. See e.g. Fennell, 531 S.E.2d at 517. Thus, the PCR court found "the only logical deduction is that the crucial difference between ABWIK and ABHAN when ABHAN is charged as a lesser included offense is whether the defendant acted with malice." (Attachment 1, 829). As such, "the State's argument was a proper application of the law and was not objectionable." (Attachment 1, 829). Therefore, petitioner failed to prove deficiency of counsel and prejudice as required by Strickland v. Washington, 466 U.S. 668 (1984)(Attachment 1, 829).

The PCR court's application of Strickland hinged on its analysis of state law: the distinction between ABWIK and ABHAN. Thus, granting relief would require a finding that the state PCR court erroneously interpreted state law. That exceeds the scope of federal habeas review. "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005); See also Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Because the PCR court's analysis of state law is binding in this case, its subsequent application of Strickland is reasonable. Accordingly, respondent requests this ground be dismissed with prejudice.

**ALLEGATION NO. 2 PRESENTED TO PCR COURT (ECF 1-1, p. 7)**

**Trial Counsel was ineffective for failing to object when the prosecution erroneously advised the jury that if they found malice existed, they could not find the Applicant guilty of the lesser included offense of ABHAN.**

As the PCR court noted, this allegation is similar to allegation one, above. (Attachment 1, 830). The PCR court denied this claim for the same reason: because the argument was proper under state law, petitioner failed to establish deficiency of trial counsel and prejudice. (Attachment 1, 830). Likewise, respondent asks this Court to dismiss the allegation for the same reason as discussed above. Granting relief would require a finding that the state PCR court erroneously interpreted state law, which exceeds the scope of federal habeas review. Richey, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); McGuire, 502 U.S. at 67-68 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

**ALLEGATION NO. 3 PRESENTED TO PCR COURT (ECF 1-1, p. 7)**

**Appellate Counsel was ineffective for failing to file a petition for Rehearing in the Court of Appeals thereby depriving the Applicant of his right to seek certiorari in the Supreme Court of South Carolina.**

As noted above, after petitioner's conviction, he pursued a direct appeal to the South Carolina Court of Appeals. (Attachment 1, 449-467). The court denied his appeal in an unpublished decision. (Attachment 1, 484-85). Petitioner's appellate counsel left the Division of Appellate Defense shortly before the court issued its opinion. At the PCR hearing, appellate counsel testified that she would have petitioned for a rehearing with the Court of Appeals had she remained at the Division of Appellate Defense. (Attachment 1, 578). That office did not seek rehearing or certiorari to the South Carolina Supreme Court. (Attachment 1, 815).

**JA46**

Even assuming (1) petitioner's appellate counsel would have sought rehearing and/or certiorari, and (2) the conviction would have been reversed, petitioner has not raised a federal constitutional claim.  As the PCR court correctly noted, there is no federal constitutional right to the effective assistance of counsel when seeking discretionary appellate review.  Wainwright v. Torna, 455 U.S. 586, 587-588 (1982).  Because petitioner had no constitutional right to discretionary appellate review, he was not deprived of effective assistance of counsel by any alleged failure to seek a rehearing or certiorari.  Id.; see also Douglas v. State, 631 S.E.2d 542, 543-44 (S.C. 2006).   As such, this claim should be dismissed with prejudice.

### ALLEGATION NO. 4 PRESENTED TO PCR COURT (ECF 1-1, p. 7)

**Trial Counsel was ineffective for failing to advise the Applicant of his right to put up a defense regardless of whether he himself testified at his trial.**

Petitioner testified at the PCR hearing that his trial attorneys failed to advise him of a potential self-defense claim.  According to petitioner, he would have taken the stand had his attorneys done so.  (Attachment 1, 732).  He also alleged in his amended PCR application that trial counsel failed to explain that even if he did not testify, he could still offer other evidence in defense.  (Attachment 1, 768, 803).  Specifically, petitioner would have offered evidence to show he was employed and living in a motel on the day of the crime.  (Attachment 1, 796).

In contrast, petitioner's lead trial counsel testified that he explained to petitioner that he needed to take the stand to present a claim of self-defense.  (Attachment 1, 661).   Trial counsel also explained to petitioner that he could offer other evidence even if he chose not to testify.

**JA47**

(Attachment 1, 612, 661-62).  Doing so, however, would forfeit petitioner's right to make the last closing argument to the jury.[3]  (Attachment 1, 661-62).

The PCR court found trial counsel more credible than petitioner.  (Attachment 1, 834).  Specifically, the court found that trial counsel fully explained petitioner's right to testify, remain silent, and put up a defense regardless of whether he took the stand.  (Attachment 1, 834).  The court also noted that petitioner failed to establish prejudice because the evidence he would have offered concerned collateral issues.  (Attachment 1, 834).

The record reveals the PCR courts findings were reasonable in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).  "Credibility determinations are factual determinations.  As such, a decision based on a credibility determination 'will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.'"  Merzbacher v. Shearing, 706 F.3d 356, 367 (4th Cir. 2013)(quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Stated differently, "'[a] federal court can disagree with a state court's credibility determination,' but disagreement alone is not enough.  The federal court must conclude not only that the state court's determination was wrong, but that it was *unreasonable* in light of the evidence presented, that is, it is not "debatable among jurists of reason."'"  Id. at 368 (emphasis in original)(internal citations omitted.).

This allegation fails because petitioner cannot establish that the PCR court's credibility determination was not only wrong, but unreasonable.  Accordingly, respondent asks that this Court dismiss the allegation with prejudice.

---

[3] Under the law of South Carolina at the time of petitioner's trial, "[w]hen a defendant in a criminal case offers no evidence, he is entitled to the final closing argument to the jury."  State v. Pinkard, 617 S.E.2d 397 (S.C. Ct. App. 2005).

USCA4 Appeal: 21-6217    Doc: 11-1    Filed: 03/24/2021    Pg: 53 of 504

**ALLEGATION NO. 5 PRESENTED TO PCR COURT (ECF 1-1, p. 7)**

**Trial Counsel was ineffective for failing to object to the State introducing testimony concerning other knives alleged to have been carried by the Applicant where said testimony bore no logical relevance to the Applicant's case and constituted evidence of prior bad acts. Trial Tr. p.190, 11. 5-11.**

At trial, a witness for the State testified that he and petitioner were issued knives at their employment with a labor company. (Attachment 1, 191). The witness also testified that he had seen petitioner with knifes outside of work. (Attachment 1, 191). During the witness's response to these questions, the trial court interrupted and asked him to speak louder. (Attachment 1, 191). Petitioner's trial counsel later testified that he did not object to this questioning because the witness did not give a clear answer. (Attachment 1, 612-13). Furthermore, trial counsel explained that the jury could not hear the response because the witness was extremely soft spoken. (Attachment 1, 614). In trial counsel's opinion, objecting to the question would unnecessarily call attention to information the jury likely did not even receive. (Attachment 1, 614).

The PCR court did not consider whether trial counsel's failure to object was deficient. (Attachment 1, 835). Instead, it dismissed the allegation because there was no reasonable chance petitioner suffered any prejudice from the testimony, citing Strickland, 466 U.S. 668, 670 (1984)("A court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed."). (Attachment 1, 835). According to the court, "[w]hether Applicant had a habit of carrying his work knives after hours is of no significance in light of the

overwhelming and uncontroverted testimony that he was indeed armed with a knife on the day in question." (Attachment 1, 835).

The PCR court's denial of this allegation was both a reasonable application of law and a reasonable determination of the facts. Simply put, petitioner failed to show how he suffered any prejudice. Therefore, this allegation should be dismissed.

## ALLEGATION NO. 6 PRESENTED TO PCR COURT (ECF 1-1, p. 7)

**Trial Counsel was ineffective for failing to challenge the position taken by the prosecutor assigned to this case, Heather Weiss, that "this is a mandatory life without parole, so I can't make an offer." Email from Weiss dated November 21, 2007.**

The PCR court dismissed this allegation with prejudice (Attachment 1, 837), and petitioner failed to appeal the ground to the Supreme Court of South Carolina. (Attachment 3, 1-5). As noted above, of the twenty-two allegations petitioner raised to the PCR court, he only appealed fourteen. (Attachment 2). Any issues not presented to the state's highest court are procedurally defaulted. Boerckel, 526 U.S. at 848. As such, this allegation is barred from federal habeas review. Id.

Furthermore, the allegation fails on the merits. In support of this allegation, petitioner offered an email from the solicitor to petitioner's first appointed attorney indicating no offer would be made. (Attachment 1, 616, 755). Petitioner's trial counsel later testified that he had ongoing plea negotiations with the solicitor, culminating in a recommendation of ten years on an ABWIK plea. (Attachment 1, 618, 650-652). According to trial counsel, petitioner rejected every offer made by the solicitor. (Attachment 1, 657). In fact, petitioner would only agree to a plea offer that included probation. (Attachment 1, 658). Trial counsel's testimony was also reflected in his case notes, which petitioner offered into evidence at the PCR hearing.

JA50

(Attachment 1, 764). Petitioner also admitted at the PCR hearing that he considered plea offers from the State. (Attachment 1, 723-26).

Based on the evidence above, the PCR court found that trial counsel performed diligently in trying to secure a favorable plea offer for his client, even after receiving the email in question from Weiss." (Attachment 1, 837). Because the court's finding is a reasonable interpretation of the facts presented, this allegation should be dismissed with prejudice.

## ALLEGATION NO. 7 PRESENTED TO PCR COURT (ECF 1-1, p. 7)

**Trial Counsel provided the Applicant ineffective assistance of counsel when he neglected to investigate Assistant Solicitor Weiss's claim that she could not extend any plea offers in this case due to the Applicant's exposure to a mandatory life without parole sentence.**

Noting its ruling with respect to allegation number 6 discussed above, the PCR court dismissed this allegation with prejudice. (Attachment 1, 837). As noted above, the evidence presented at the PCR hearing revealed petitioner received multiple plea offers after the initial email from the solicitor. (Attachment 1, 650-52, 658, 764-65). Because the court's finding is a reasonable interpretation of the facts presented, this allegation should be denied.

Furthermore, petitioner failed to appeal the denial of this ground of relief. A "federal habeas court may consider only those issues that have been fairly presented to the state's highest court." Matthews, 105 F.3d at 911. As such, the allegation is also procedurally barred from federal habeas review. Boerckel, 526 U.S. at 848.

## ALLEGATION NO. 8 PRESENTED TO PCR COURT (ECF 1-1, p. 7)

**Trial Counsel was ineffective for advising the jury in closing argument that the trial judge was going to instruct [the jury] that the absence of malice is not an element of assault and battery of a high and aggravated nature with[out] determining in advance that the Court would in fact issue such an instruction.**

**JA51**

Petitioner's trial counsel submitted a request to charge the jury that the absence of malice is not an element of assault and battery of a high and aggravated nature (ABHAN).  On the proposed jury instruction he submitted to the trial judge, trial counsel asked that the court notify him before closing argument if it planned on denying the instruction.  (Attachment 1, 756).  Trial counsel assumed the court planned on giving the instruction because the court did not inform him that the request would be denied.  (Attachment 1, 622, 625).  The State did not object to trial counsel's argument.  (Attachment 1, 404).  Petitioner alleged to the PCR court that the failure to ensure the judge would give the jury instruction constituted ineffective assistance of counsel.

The PCR court disagreed, noting that the jury instruction was "legally sound and correct."  (Attachment 1, 838).  The court found "there is no reasonable likelihood that the result of Applicant's trial would have been different absent this purported deficiency."  (Attachment 1, 838).  This finding was based on a reasonable determination of the facts presented at the PCR hearing.

Had trial counsel clarified the jury instructions prior to closing argument, the jury would have still received the same jury instructions.  However, the jury would not have heard trial counsel's legal argument that the absence of malice is not an element of ABHAN.  If anything, the alleged "deficiency" worked to petitioner's benefit because trial counsel was able to argue to the jury a more aggressive interpretation of the law.  Therefore, petitioner suffered no prejudice from trial counsel's argument.  As such, the PCR court's decision was reasonable and this allegation should be dismissed with prejudice.

### ALLEGATION NO. 9 PRESENTED TO PCR COURT (ECF 1-1, pp. 7-8)

**Trial Counsel was ineffective for neglecting to remind the jury that, not only was there no blood visible on the shirt the State alleged belonged to the Applicant, but the State's own**

witness testified that no DNA was found on the shirt when it was analyzed. Trial Tr. p.295, l 15-296, 1. 1 and Trial Tr. p.404, 1.23-p.405, l.7.

At the PCR hearing, trial counsel explained that he did in fact remind the jury that no blood was found on the shirt allegedly worn by petitioner. (Attachment 1, 626). The trial transcript also confirms that counsel made the argument to the jury. (Attachment 1, 404-405). With respect to the DNA issue, trial counsel acknowledged that he did not remind the jury that no DNA was recovered from the shirt. When asked why, he explained that "it wasn't an identity case." (Attachment 1, 629). He further elaborated that "when a jury sees you harping on an issue, they need to know what you're harping on is important. So you can quibble about time and shirts, but the question in this case [was] who started the fight and did Mr. Folkes stab the victim." (Attachment 1, 630).

The PCR court agreed, finding that "this potential argument to the jury would have had no impact" on the case because "identity was not at issue." (Attachment 1, 839). The court's finding is a reasonable determination of the evidence presented. The central issue in the case was whether petitioner intended to kill the victim. The four eyewitnesses testified that they knew petitioner prior to the attack. (Attachment 1, 90, 131-33, 159, 180, 234). Simply put, this was not a "whodunit" where DNA recovered at the scene would have mattered. The eyewitness already identified petitioner as the perpetrator. As such, this claim for relief should be dismissed with prejudice.

## ALLEGATION NO. 10 PRESENTED TO PCR COURT (ECF 1-1, p. 8)

**Trial Counsel failed to provide the Applicant with reasonable professional assistance of counsel when he conceded that the Applicant was not entitled to advance a claim of self-defense where under a reasonable interpretation of the facts in this case the Applicant had a colorable claim to the defense. Trial Tr. p.330, l1.8-13**

The PCR court dismissed this allegation with prejudice because there was no evidence in the record that would have supported a claim of self-defense. (Attachment 1, 841). Under South Carolina law, there are four elements to a claim of self-defense. State v. Goodson, 440 S.E.2d 370 (1994). If any one of the four elements are missing, then a self-defense claim fails. State v. Bixby, 698 S.E.2d 572 (S.C. 2010). As applied to this case, there was no evidence to support a finding that petitioner was not at fault in bringing on the difficulty. (Attachment 1, 841).

Petitioner's PCR counsel noted that the victim was stronger than petitioner, fitter than petitioner, and had petitioner pinned on the ground when he was stabbed. (Attachment 1, 632). Nevertheless, PCR counsel offered no evidence that petitioner was not at fault in bringing about the difficulty. Instead, the only evidence in the record was that petitioner started the fight by swinging first. (Attachment 1, 631-32). As such, he was at fault in bringing about the difficulty. As trial counsel explained, had petitioner testified contrary to this evidence, he would have argued self-defense. (Attachment 1, 633). According to the PCR court, had counsel asked the trial court for a self-defense charge, it would have been denied. (Attachment 1, 841).

Because this is a reasonable determination of the facts presented in evidence, this allegation should be dismissed with prejudice. Additionally, granting petitioner relief on this ground would require a finding that the state PCR court erroneously interpreted state law, the law of self-defense. As noted above, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Furthermore, petitioner failed to appeal the denial of this ground of relief. As noted above, a "federal habeas court may consider only those issues that have been fairly presented to the state's highest court." Matthews, 105 F.3d at 911. Accordingly, in addition to failing on the

2:19-cv-00760-RMG-MGB    Date Filed 07/03/19    Entry Number 14    Page 18 of 32

merits, this allegation is procedurally barred from federal habeas review.  <u>Boerckel</u>, 526 U.S. at

848.  As such, respondent requests this ground be dismissed with prejudice.

<u>**ALLEGATION NO. 11 PRESENTED TO PCR COURT (ECF 1-1, p. 8)**</u>

**Trial Counsel erred in failing to object to hearsay testimony from investigator Robert McCracken advising that when he was dispatched to the scene he "was told someone was cut severely." Trial Tr. P. 300, 11. 7-13.**

During petitioner's trial, an investigator testified he was dispatched to the scene because

he "was told someone was cut severely."  (Attachment 1, 300).  Petitioner alleged that his

counsel's failure to object to this alleged hearsay constituted ineffective assistance of counsel.

(Attachment 1, 527, 769).  Trial counsel explained at the PCR hearing that he did not object

because he planned on having the treating physician address the severity of the victim's injuries.

(Attachment 1, 634).  The PCR court denied the claim, finding that petitioner failed to establish

prejudice because counsel's failure to object did not affect the outcome in the case.  The court

further noted that trial counsel elicited favorable testimony during the cross examination of the

treating physician and highlighted that testimony during closing argument.  (Attachment 1, 842).

The PCR court's finding is supported by the evidence in the record.  The trial transcript

confirms that petitioner's counsel elicited favorable evidence during cross-examination of the

physician.  For example, he pointed out that the victim's trauma score was the lowest level on

the hospital's scale.  (Attachment 1, 359).  Additionally, he noted that the surgical resident

indicated in the medical records that the cuts to the victim's neck were superficial.[4]  (Attachment

1, 360-61).

---

[4] The treating physician testified that the wounds penetrated the platysma, so by definition they
would not be considered "superficial."  (Attachment 1, 350).  In layman's terms, the wounds were
very close to the jugular and anterior jugular veins.  (Attachment 1, 352).  Although the surgical

Therefore, the PCR court's finding was reasonable given the evidence presented at trial and the PCR hearing. As such, this claim should be dismissed with prejudice.

### ALLEGATION NO. 12 PRESENTED TO PCR COURT (ECF 1-1, p. 8)

**Trial Counsel was ineffective for neglecting to argue that State's Exhibit No. 31, a beer bottle seized at the time of the Applicant's arrest, should not be admitted into evidence where the bottle, broken after it was in the possession of law enforcement, was sealed in a bag and could not be examined by the jury, and where the Investigator who identified this exhibit prior to its admission could not positively identify what type of beer the bottle was from. Trial Tr. p. 308, 1. 17 - p. 310, 1.12.**

This allegation should be dismissed with prejudice because petitioner failed to raise it on appeal. As noted above, of the twenty-two allegations petitioner raised to the PCR court, he only appealed fourteen. (Attachment 2). Any issues not presented to the state's highest court are procedurally defaulted. Boerckel, 526 U.S. at 848. Thus, this allegation is barred from federal habeas review. Id.

Furthermore, the claim fails on its merits. Petitioner alleged that trial counsel should have argued that the beer bottle was inadmissible because the type of beer could not be definitively established. (Attachment 1, 635). The PCR court denied this allegation, finding that the type of beer was not relevant. (Attachment 1, 842). The PCR court further noted that trial counsel did object to the admission on the ground that the bottle had since been broken, but the trial court overruled the objection. (Attachment 1, 842).

The PCR court's findings are supported by the evidence in the record because the type of beer was irrelevant to the bottle's admissibility. Although two witnesses testified that petitioner

resident who dictated the report described the wound as "superficial," the treating physician failed to notice the error when he signed off on the report. (Attachment 1, 362). Had the treating physician seen the error, he would have corrected it. (Attachment 1, 371).

tried to hit the victim with a bottle of "King Cobra" beer, admissibility of the bottle did not hinge

on this description of the attack.  (Attachment 1, 124, 199).  Rather, another witness testified that

after the attack, petitioner fled with a book bag and "a couple of quarts of beer."  (Attachment 1,

244).  Law enforcement subsequently seized petitioner's belongings, including this beer bottle,

incident to his arrest. (Attachment 1, 308-09).  Had trial counsel pointed out that the officer

could not tell if it was a "King Cobra" beer, the bottle would have still been admitted because the

officer confirmed it was the same bottle seized incident to arrest.  (Attachment 1, 308-09).

Accordingly, this allegation should be dismissed as it is barred from habeas review and

fails on the merits.

## ALLEGATION NOS. 13, 14, & 15 PRESENTED TO PCR COURT (ECF 1-1, p. 8)

### Issue No. 13
**Trial Counsel was ineffective for failing to object to the introduction of State's Exhibit No.
32, the tote bag seized from the Applicant at the time of his arrest, where the bag was
introduced with clothing in it which was not in the bag at the time it was seized. Trial Tr. p.
323, 1. 24 - p. 324, 1. 22.**

### Issue No. 14
**Trial Counsel provided the Applicant ineffective assistance of counsel when he failed to
introduce testimony from City of Columbia Police Department Officer Battiste to establish
that the clothing packed under the sleeping bag inside of State's Exhibit 32 was in fact
placed there by him after the Applicant's clothing was taken from him when he was made
to strip and put on detention center uniform at the time he was booked.**

### Issue No. 15
**Trial Counsel was ineffective for failing to establish for the jury that the clothing locked in
the bottom of State's Exhibit No. 32 was the clothing the Applicant was wearing at the time
of his arrest and had not been hidden by him under the sleeping bag found in that exhibit.**

Petitioner's allegations 13, 14, and 15 are barred from habeas review because he failed to

raise them on appeal to the state's highest court.  As noted above, of the twenty-two allegations

of ineffective assistance of counsel raised to the PCR court, petitioner only appealed fourteen.

**JA57**

(Attachment 3).  These three allegations are among the fourteen that petitioner declined to pursue

on appeal.  Accordingly, they are barred from federal habeas review.  Boerckel, 526 U.S. at 848.

Additionally, these three claims fail on the merits.  The PCR court denied all three of

these related claims.  The court held that petitioner failed to prove that the arresting officer

erroneously placed the clothes petitioner was wearing inside the bag during the booking process.

(Attachment 1, 843-845).  The court noted that at the PCR hearing that the arresting officer,

Officer Battiste, could not recall whether there were any clothes inside the bag at the time of the

arrest, or if he put them there.  (Attachment 1, 843-845).  Furthermore, the court found that the

presence of clothes inside the bag did not affect petitioner's trial because identity was never an

issue.  (Attachment 1, 843-845).  In other words, whether petitioner changed clothes after the

attack was irrelevant because the victim and the witnesses knew petitioner before attack.

The PCR court's findings are supported by the evidence in the record.  First, it is worth

noting that it is unclear whether there were actually any clothes inside the bag as petitioner

claimed.  Prior to the bag's admission, trial counsel asked to look inside the bag to ensure

nothing was inside it.  (Attachment 1, 324).  Had there been clothes inside the bag, trial counsel

likely would have discovered them when he specifically looked inside to ensure nothing else was

there.  (Attachment 1, 324).

Second, even if there were clothes inside the bag, petitioner failed to prove how they got

there.  Although petitioner claims trial counsel should have offered Officer Battiste's testimony

to prove he was wearing the clothes later found in the bag, Officer Battiste later testified at the

PCR hearing.  Officer Battiste recalled that he arrested petitioner and collected petitioner's

clothes incident to arrest.  (Attachment 1, 597-98).  But he could not remember what petitioner

was wearing at the time of the arrest, or what type of container he put the clothes in.

**JA58**

(Attachment 1, 599).  Instead, Officer Battiste could only recall that he asked the jail personnel

to provide him something to store the clothes in.  (Attachment 1, 599).  In other words, petitioner

failed at the PCR hearing to show that Officer Battiste put the clothes petitioner was wearing

inside the bag.

Third, the presence or absence of clothes inside the bag did not affect the trial.  The

victim testified that petitioner, whom he worked with prior to the attack, was wearing a purple

shirt during the attack.  (Attachment 1, 90, 103).  Law enforcement recovered that shirt in a

trashcan, unrelated to petitioner's subsequent arrest.  (Attachment 1, 103).  The shirt was

introduced through the testimony of the victim.  (Attachment 1, 103).  Moreover, identity of the

perpetrator was never an issue.  The victim and all four eyewitnesses to the attack knew

petitioner prior to the attack.  (Attachment 1, 90, 131-33, 159, 180, 234).  Simply put, the State

did not need to use the petitioner's clothes, regardless of whether he was wearing them or

carrying them in a bag, to prove he committed the crime.  Any clothes found inside the bag were

irrelevant to the trial.

Accordingly, these allegations are not only procedurally barred, but fail on the merits.

Respondent asks that this court dismiss them with prejudice.

### ALLEGATION NO. 16 PRESENTED TO PCR COURT (ECF 1-1, p. 8-9)

**Trial Counsel was ineffective for failing to demonstrate that the clothing introduced inside State's Exhibit No. 28, a tote bag, was the same clothing worn by the Applicant in a photograph of the Applicant taken by law enforcement at the scene after he was taken into custody.**

A second bag, state's exhibit 28, was introduced into evidence through an eyewitness to

the attack.  The eyewitness, who had known petitioner for over a year, identified the exhibit as a

**JA59**

book bag petitioner was carrying.  (Attachment 1, 234, 244).  Petitioner claimed that law enforcement placed the clothes he was wearing inside the bag.

The PCR court denied this allegation, noting the inconsistency in this allegation and allegations 13-15.  (Attachment 1, 845).  As noted above, petitioner claimed in allegations 13-15 that law enforcement placed the clothes he was wearing in State's Exhibit No. 32.  The court denied this allegation for the same reasons it identified in issues 13-15.

The PCR court's finding is supported by the evidence.  As noted above, petitioner failed to establish law enforcement placed his clothes in the bag he was carrying.  More importantly, petitioner failed to establish that the presence or absence of clothes in the bag had any relevance in proving his guilt.  Furthermore, because petitioner failed to appeal this finding to the state's highest court, this allegation is also barred from federal habeas review.  Boerckel, 526 U.S. at 848.

As such, this allegation should be dismissed with prejudice.

### ALLEGATION NO. 17 PRESENTED TO PCR COURT (ECF 1-1, p. 9)

**Trial Counsel was ineffective in failing to object to the use of a knife. State's Exhibit No. 25 for ID only, in their examination of the victim where the knife was not the one used in the incident which led to the Applicant's charge and was identified by the victim as being only similar to the weapon used in this case.**

At trial, the victim testified that the knife petitioner used had a blue handle and a hook blade.  (Attachment 1, 108).  The solicitor asked the victim to identify a knife, identified as State's Exhibit No. 25.  The victim stated the knife was "very, very similar" to the one petitioner used in the attack, but he noted some small differences.  (Attachment 1, 108).  A co-worker later testified that he and petitioner used an identical type of knife at work.  (Attachment 1, 189).  The State neither attempted to introduce the knife into evidence, nor used the knife in a reenactment of the crime.  (Attachment 1, 108, 189).  The state's "demonstration" consisted of asking the victim and

**JA60**

witness to compare the exhibit with the knife they had seen petitioner carry, either at work or during the attack.

Petitioner alleged ineffective assistance of counsel in failing to object to these questions. (Attachment 1, 793). The PCR court dismissed this allegation, noting that even if trial counsel had objected to questioning, it would have been overruled because the knife used for demonstrative purposes matched the knife used in the attack. (Attachment 1, 846). As such, petitioner could not establish deficient performance or prejudice. (Attachment 1, 846).

The PCR court's finding is a reasonable given the evidence presented. As noted above, the victim testified the knife was "very, very similar" to the one petitioner used and specifically identified the differences. Petitioner failed to show that the knife the jury saw in court was any more dangerous than that used in the attack. Moreover, granting relief would require a finding that the state PCR court erroneously interpreted state rules of evidence, which exceeds the scope of federal habeas review. Richey, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); McGuire, 502 U.S. at 67-68 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Accordingly, this allegation should be dismissed with prejudice.

### ALLEGATION NO. 18 PRESENTED TO PCR COURT (ECF 1-1, p. 9)

**Trial Counsel failed to provide the Applicant reasonable professional assistance of counsel when he neglected to introduce testimony, and employment records, which would have demonstrated that the Applicant was gainfully employed the week the incident involved in the Applicant's charges occurred, and that he had been at work just prior to going to Finley Park.**

Petitioner alleged that trial counsel should have introduced records from an employer indicating he worked eight hours on the day of the incident. According to petitioner, the records

**JA61**

would have shown he was gainfully employed. (Attachment 3, 38). Trial counsel testified at the PCR hearing that he obtained the records pursuant to a subpoena, interviewed petitioner's supervisors, and considered offering records and testimony trial. However, he believed that the benefit of that evidence would be outweighed by the cost: losing the right to last closing argument.[5] (Attachment 1, 646).

The PCR court dismissed this allegation, finding that trial counsel made a well-reasoned strategic decision to not introduce the records. (Attachment 1, 647-48). The court further noted that petitioner could not establish prejudice because his employment was a collateral issue in the case. (Attachment 1, 648).

This finding is supported by evidence in the record. Establishing that petitioner worked a full day prior to attacking the victim would have been of little strategic value compared to the right to last argument. Therefore, petitioner's allegation is meritless and should be dismissed with prejudice.

### ALLEGATION NO. 19 PRESENTED TO PCR COURT (ECF 1-1, p. 9)

**Trial Counsel erred in failing to obtain motel records which would have proven that at the time of this incident the Applicant had been living in a motel and was not homeless as the State claimed.**

Petitioner alleged at the PCR hearing that trial counsel should have obtained motel records that would have established he was not homeless. Petitioner's PCR counsel informed the court that her staff attempted to obtain the motel records but could not. PCR counsel alleged that had petitioner's trial counsel attempted to obtain the records prior to trial, he would have been able to

---

[5] As noted in footnote three above, at the time of petitioner's trial, "[w]hen a defendant in a criminal case offers no evidence, he is entitled to the final closing argument to the jury." State v. Pinkard, 617 S.E.2d 397 (S.C. Ct. App. 2005).

do so. (Attachment 1, 649). Trial counsel testified that he went to the motel and spoke with the manager in order to locate a witness, but did not obtain any records of petitioner's stay. Trial counsel explained that "whether or not [petitioner] stayed in a hotel was not going to be an issue that warranted losing last closing." (Attachment 1, 647).

The PCR court dismissed this allegation, noting that trial counsel made a well-reasoned strategic decision not to introduce the records. (Attachment 1, 648). The court also noted that petitioner could not establish prejudice because his stay at a motel the night before the attack was a collateral issue. (Attachment 1, 849).

This finding is supported by evidence in the record. Similar to Allegation 18, above, establishing that petitioner spent the night prior to the attack in a motel would have been of little strategic value compared to the right to last argument. Therefore, petitioner's allegation is meritless and should be dismissed with prejudice.

### ALLEGATION NO. 20 PRESENTED TO PCR COURT (ECF 1-1, p. 9)

**Trial Counsel was ineffective for failing to object to a portion of the State's closing argument in which the prosecution argued matters not in evidence, Trial Tr. p. 394, 11. 11-19.**

Petitioner alleged that trial counsel should have objected to the following portion of the State's closing argument:

> What did he do when he left? As he's going out he tries to conceal his shirt, possible evidence. He doesn't know I guess what's on that shirt, but he knows he can be identified from it, throws it in a trashcan, takes off his shirt, changes his clothes. Clothes which are kept in that backpack are kept in that area down there that he's walking up trying to leave the park. Who knows where he got them, but he changed his clothes.

(Attachment 1, 394). According to petitioner, the solicitor argued facts not in evidence. The PCR court dismissed the allegation, noting the argument contained nothing improper and had no impact on petitioner's case. (Attachment 1, 849).

**JA63**

The PCR court's finding is reasonable because the State's argument was confined to evidence contained in the record, and reasonable inferences drawn therefrom. See e.g. State v. New, 526 S.E.2d 237, 240 (S.C. Ct. App. 1999)("If a Solicitor's closing argument remains within the record evidence and the reasonable inferences therefrom, no error occurs."). As noted above, an eyewitness testified that after the attack, petitioner fled with his backpack and sleeping bag. (Attachment 1, 244). The victim also testified that the shirt petitioner was wearing was discarded in a trashcan in the park. (Attachment 1, 103). Additional testimony revealed petitioner was homeless and often spent time hanging out in Finlay Park. (Attachment 1, p. 90, 180). Finally, the lead investigator testified that so many homeless people left their personal belongings in one secluded area of the park, that a search of all the bags was impossible. (Attachment 1, 304). Given these facts in evidence, the PCR court correctly found the State's argument was not objectionable.

Furthermore, the PCR court also correctly noted that the State's argument dealt with identity, which was not a major issue. As previously discussed, the victim and four eyewitnesses knew petitioner and identified him as the attacker. (Attachment 1, 90, 131-33, 159, 180, 234). Therefore, because the argument dealt with a collateral issue, the PCR court could reasonably find that petitioner failed to establish any prejudice. As such, this allegation should be dismissed with prejudice.

### ALLEGATION NO. 21 PRESENTED TO PCR COURT (ECF 1-1, p. 9)

**Appellate Counsel was ineffective in that she neglected to brief the error of the trial court in overruling the Applicant's objection to the jury instruction, and supplemental charge, given on ABHAN and limited her presentation on direct appeal to the failure of the trial court to issue the specific charge of ABHAN requested by Trial Counsel. Objection at Trial Tr. p. 422, 11. 17-23.**

Petitioner alleges that in addition to appealing the trial court's denial of his request to charge the jury that the absence of malice is not an element of ABHAN, appellate counsel should

**JA64**

have argued that the court's jury charge was improper. Specifically, petitioner argued that the trial court erred in charging, "Assault and battery of a high and aggravated nature includes all of the elements of assault and battery with intent to kill except express malice." (Attachment 1, 417). The trial judge later supplemented the charge, telling the jury, "Assault and battery of a high and aggravated nature includes all of the elements of assault and battery with intent to kill except malice aforethought." (Attachment 1, 430). Appellate counsel testified at the PCR hearing that she "pushed it all together in one issue" because she believed the trial court's denial of the requested charge was reversible error. (Attachment 1, 580). Appellate counsel further testified that the failure to separate the two issues had no effect on the case because she believed she briefed a winning issue. (Attachment 1, 580).

The PCR court dismissed the allegation, finding that appellate counsel's performance was not deficient because she argued a stronger issue on appeal. (Attachment 2, 852). The court noted that "appellate counsel is not required to raise every non-frivolous issue" in the record. Thrift v. State, 397 S.E.2d 523 (S.C. 1990)(citing Jones v. Barnes, 463 U.S. 745 (1983). Instead, "only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." Smith v. Robbins, 528 U.S. 259, 288 (2000)(quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1986)). Thus, because appellate counsel briefed a stronger issue, her performance was not deficient. The PCR court also found that petitioner failed to establish prejudice because there is no reasonable likelihood that he would have prevailed on appeal had the issue been raised.

The PCR court's rulings was both a reasonable application of federal law and a reasonable determination of the facts. See 28 U.S.C. § 2254(d). Furthermore, similar to allegations one, two, and eighteen above, the PCR court's application of Strickland hinged on its analysis of state law.

Granting relief would require a finding that the state PCR court erroneously interpreted state law, which exceeds the scope of federal habeas review. <u>Richey</u>, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); <u>McGuire</u>, 502 U.S. at 67-68 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Accordingly, this allegation should be dismissed with prejudice.

### <u>ALLEGATION NO. 22 PRESENTED TO PCR COURT (ECF 1-1, p. 9)</u>

**Trial Counsel was ineffective for failing to take adequate measure to insure the Applicant understood that if he accepted a plea offer to plead guilty to ABWIK with a negotiated sentence, he would not face potential interpretation of his sentence as a mandatory life without parole sentence pursuant to §17-25-45.**

Although not originally included in his PCR application, petitioner alleged the evidence presented at the hearing supported this allegation. Petitioner included it as a separate allegation in a memorandum submitted to the PCR court after the hearing. (Attachment 1, 770). The PCR court did not specifically address the issue in its Order of Dismissal, and petitioner did not file a motion to alter or amend the judgement pursuant to Rule 59(e) of the South Carolina Rules of Civil Procedure. (Attachment 1, 808-853). Under South Carolina law, petitioner would be precluded from raising the issue now. <u>See</u> <u>e.g.</u> <u>Marlar v. State</u>, 653 S.E.2d 266 (S.C. 2007)(holding that a prisoner seeking post-conviction relief must file a Rule 59(e) motion in order to preserve for appellate review any allegations not addressed in an order of dismissal); <u>see also</u> <u>Burgess v. State</u>, 738 S.E.2d 264, 265-66 (S.C. Ct. App. 2013) ("Because the State failed to file a Rule 59(e) motion asking the PCR court to make specific findings of fact and conclusions of law regarding the prejudice prong, we find the issue on appeal is not preserved for our review.").

Because petitioner failed to obtain a ruling on this issue from the PCR court, this allegation is procedurally defaulted. See Gray v. Netherland, 518 U.S. 152, 162 (1996)(holding that habeas review is procedurally defaulted if it is clear that a petitioner's claims have become procedurally barred under state law); See also Johnson v. Mississippi, 486 U.S. 578, 587 (1988) (a state procedural rule is "adequate" if it is firmly established and regularly or consistently applied by the state court); Ake v. Oklahoma, 470 U.S. 68, 75 (1985) (a state procedural rule is "independent" if it does not depend on a federal constitutional ruling).[6]   A petitioner can avoid procedural default only by showing cause for the default and prejudice therefrom, or that a fundamental miscarriage of justice will occur if the claim is not heard, i.e., an assertion of actual innocence. See e.g. Murray v. Carrier, 477 U.S. 478, 495-96 (1986).

This allegation should be dismissed because petitioner can show neither cause for the default, nor prejudice arising from it.  The "existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Coleman v. Thompson, 501 U.S. 722, 753 (1991).  Simply put, petitioner has not demonstrated any cause for his failure to properly raise the issue to the PCR court.

---

[6] In Bostick v. Stevenson, 589 F.3d 160 (4th Cir. 2009), the Fourth Circuit Court of Appeals found that South Carolina courts had not been uniformly and strictly enforcing the failure to file a motion pursuant to Rule 59(e), SCRCP, as a procedural bar, prior to the South Carolina Supreme Court's November 5, 2007 decision in Marlar.  Id. at 162–65.  Accordingly, for cases in which there was a PCR ruling prior to November 5, 2007, the failure to raise issues pursuant to Rule 59(e) is not a procedural bar.  The order in the present case was well after that date.  Therefore, the failure to file a motion pursuant to Rule 59(e), SCRCP, is an independent and adequate procedural bar to Petitioner's claim.

JA67

2:19-cv-00760-RMG-MGB    Date Filed 07/03/19    Entry Number 14    Page 31 of 32

Furthermore, petitioner cannot establish prejudice from the default because the evidence in the record reveals the allegation is meritless. At the PCR hearing, trial counsel testified that he ensured there was "no ambiguity" when he discussed the plea offers. In other words, petitioner "knew he was getting 10 or 20 years, not life without parole." (Attachment 1, 652). Although petitioner alleged otherwise at the hearing (Attachment 1, 727), the PCR court found trial counsel more credible than petitioner. (Attachment 1, 834). Therefore, even if the issue had been raised, the PCR court would have dismissed the allegation.

## QUESTIONS I – XIV PRESENTED ON APPEAL (ECF 1-1, p. 11-14)

As noted above, in addition to the above referenced twenty-two grounds of ineffective assistance of counsel, petitioner also submitted a Xerox copy of the fourteen claims of error his PCR counsel raised in his certiorari petition to the South Carolina Supreme Court. (ECF 1-1, p. 10-14; Attachment 4, 1-5). Because these fourteen claims of error are duplicative to the twenty-two allegations presented to the PCR court, respondent will not address them specifically. Instead, respondent asks that these claims be dismissed for the reasons given in responding to the twenty-two allegations of error above.

## V. CONCLUSION

Petitioner's case should be dismissed with prejudice because he is not being held in custody in violation of federal law. Furthermore, several of his claims are procedurally barred because he did not raise them to the state's highest court. Therefore, Respondent's Motion for Summary Judgment should be granted as the record conclusively shows Petitioner is not entitled to any relief.

Respectfully submitted,

ALAN WILSON
Attorney General

DONALD J. ZELENKA
Deputy Attorney General

MELODY J. BROWN
Senior Assistant Deputy Attorney General

MICHAEL D. ROSS
Assistant Attorney General
Fed. ID No. 12990

P.O. Box 11549
Columbia, South Carolina 29211
(803) 734-6305

July 3, 2019                    By: s/Michael D. Ross
Columbia, South Carolina       MICHAEL D. ROSS
                               ATTORNEYS FOR RESPONDENT

**JA69**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Clinton Folkes, # 216506, | ) | Case No. 2:19-cv-760-RMG-MGB |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Warden Nelsen, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Clinton Folkes, a *pro se* state prisoner, seeks habeas corpus under 28 U.S.C. § 2254. (Dkt. No. 1.)  The Warden seeks summary judgment.  (Dkt. No. 15.)  Under 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(c) (D.S.C.), the undersigned is authorized to review the motion and submit a recommendation to the District Judge.  For the following reasons, the undersigned recommends granting the Warden's motion and dismissing this case with prejudice.

## BACKGROUND

Folkes is serving life in prison without the possibility of parole for assault and battery with intent to kill ("ABWIK").  (Dkt. No. 14-1 at 433, 436.)  His imprisonment is the product of a July 2007 fight he started at Finlay Park in Columbia, South Carolina.  In the fight, he slashed the victim's arm and neck with a knife.  (*Id.* at 118.)

Folkes was part of a group of homeless people who spent time at the park.  (Dkt. No. 14-1 at 155–56, 238.)  Other members of that group included Karem Jones, Tiffany Briggs, James Reddick, Jerome Patrick, and Retalia Green.  (*Id.* at 83, 131, 159, 180, 233.)  They all knew Folkes; Briggs dated him until a couple of days before the fight.  (*Id.* at 89–90, 132–33, 159, 180, 234.).  All five saw the fight; one participated in it.

**JA70**

Jones was that participant. According to Jones, he was speaking with Briggs when suddenly Folkes approached them. (Dkt. No. 14-1 at 92–93.) Noticeably drunk, Folkes was hostile, demanding to know why Jones and Briggs were talking and threatening to "f--- [Jones] up." (*Id.* at 93–96.) Jones told Folkes to get away from him. (*Id.* at 95.) Folkes threw a beer bottle at Jones but missed. (*Id.* at 97.) He then punched Jones in the eye. (*Id.*) Jones responded by hitting Folkes twice. (*Id.* at 97–98.) As Folkes fell from the blows, he grabbed Jones' shirt and pulled Jones down on top of him. (*Id.* at 98.) They tussled on the ground for a moment, and then someone told Jones he was bleeding from his neck. (*Id.*) Jones got up and saw that Folkes had a knife. (*Id.* at 100, 107–08.) Folkes said, "I'm going to f---ing kill you." (*Id.* at 100.) Jones ran to a phone booth and called 911. (*Id.* at 100–01.)

The other four witnesses' accounts corroborate Jones'. Each one saw Folkes approach Jones and start the fight by throwing the first punch; Reddick and Patrick also saw Folkes throw the beer at Jones. (Dkt. No. 14-1 at 138, 139, 141, 172, 199, 210, 212, 240.) All four saw the two men struggling on the ground, followed by Folkes reaching up and cutting Jones' neck with a knife. (*Id.* at 138, 173, 200–01, 241–42.) Still watching as Jones ran to the phone booth, Reddick, Patrick, and Green heard Folkes say he should have killed Jones. (*Id.* at 169, 213, 244.)

Police arrived shortly after the incident. They quickly found Folkes nearby and arrested him. (Dkt. No. 14-1 at 285–87.) Jones was taken to an emergency room. (*Id.* at 110.)

**Trial and Direct Appeal**

The State charged Folkes with ABWIK. (Dkt. No. 14-2 at 534.) It then served Folkes with a notice that, because he had two prior ABWIK convictions, he would serve life without parole if convicted this third time. (*See* Dkt. No. 14-1 at 440–41.) Although the prosecutor initially refused to discuss a potential plea deal, she later made Folkes three offers. (Dkt. No. 14-2 at 656–57.) Folkes declined them all. (*Id.* at 658–59.)

**JA71**

The case went to trial in July 2008.  (Dkt. No. 14-1 at 1.)  Jones, Briggs, Reddick, Patrick, and Green all appeared for the State, testifying to their accounts of the altercation and identifying Folkes in court as the person who attacked Jones.  (*Id.* at 115, 146, 170, 231, 250.) The State also called several police officers involved in the case, as well as a medical expert. (*Id.* at 265–324, 338–72.)  Folkes did not present a defense case.  (*See id.* at 378.)

After closing arguments, the trial court charged the jury.  (Dkt. No. 14-1 at 406–21.) Among other things, it told the jury they had three verdict options: find Folkes guilty of ABWIK, find him guilty of the lesser-included offense of assault and battery of a high and aggravated nature (ABHAN), or find him not guilty at all.  (*Id.* at 419.)  The court also explained the elements of those two crimes and then told the jury ABHAN "includes all the elements of [ABWIK] except express malice.  In addition, the State must prove beyond a reasonable doubt an aggravating circumstance."  (*Id.* at 413–18 (quoted language at 417).)  After the charge, Folkes' lead trial counsel asked the court to instruct the jury that the absence of malice is not an element of ABHAN and thus the jury could find Folkes acted with malice and still find him guilty of ABHAN, rather than ABWIK.  (*Id.* at 422–23.)  The trial court declined.  (*Id.* at 423.)

During their deliberations, the jury asked the court "What is the difference between [ABWIK] and [ABHAN]?" (Dkt. No. 14-1 at 424.)  The court repeated its instructions on those two crimes, again concluding with the charge that ABHAN "includes all of elements of [ABWIK] except malice aforethought.  In addition, the State must prove beyond a reasonable doubt the aggravating circumstances."  (*Id.* at 425–30 (quoted language at 430).)

The jury found Folkes guilty of ABWIK.  (Dkt. No. 14-1 at 433.)  Because Folkes had two prior ABWIK convictions, the trial court sentenced him to life without parole.  (*Id.* at 468.)

Folkes appealed, arguing the trial court improperly refused to charge the jury that absence

of malice is not an element of ABHAN. (Dkt. No. 14-1 at 449–67.) The state Court of Appeals

affirmed in an unpublished decision. (*Id.* at 484–85.) Folkes did not seek further review.

### Post-Conviction Relief ("PCR") Proceedings

In October 2010, Folkes filed an application for post-conviction relief in state court,

asserting over twenty claims of ineffective assistance of trial and appellate counsel. (Dkt. No.

14-1 at 487–92; Dkt. No. 14-2 at 501–04, 526–29.)

The PCR court held a two-day hearing in July and September 2014. (Dkt. No. 14-2 at

541.) Folkes testified and called five witnesses: his appellate lawyer and her supervisor; his two

trial lawyers; and a police officer involved in his post-arrest booking at the jail. (*Id.* at 542.)

In January 2016, the PCR court issued a lengthy order denying Folkes' claims. (Dkt. No.

14-1 at 808–53.) Folkes petitioned for certiorari, challenging the PCR court's denial of fourteen

of his claims. (Dkt. No. 14-2 at 854; Dkt. No. 14-4.)[1] The state Supreme Court transferred the

case to the Court of Appeals, which summarily denied the petition in October 2018. (Dkt. No.

14-5 at 5; Dkt. No. 14-6.)

### PROCEDURAL HISTORY

Folkes filed his habeas petition on March 11, 2019. (Dkt. No. 1-3.) In the petition itself,

he summarily claims ineffective assistance of counsel and "judicial error." (Dkt. No. 1 at 5.)

---

[1]      As the rules governing § 2254 cases require, the Warden has provided the Court records from the state-court proceedings. *See* Rule 5(c)–(d), Rules Governing § 2254 Cases. However, the records for the PCR appeal are incomplete. Although the Warden submitted Folkes' original certiorari petition (*see* Dkt. No. 14-4), the South Carolina Appellate Case Management System's web site shows that later, Folkes filed an amended petition, the State filed a return, and then Folkes filed a reply. https://ctrack.sccourts.gov/public/caseView.do?csIID=61547, *last visited* Nov. 8, 2019). The Warden did not provide any of those documents. Although this Court can take judicial notice of those records, *see Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980), it was the Warden's responsibility to provide this Court all PCR appellate briefs. Rule 5(d), Rules Governing § 2254 Cases. Upon review, however, Folkes' later filings did not change the issues he raised, or the arguments he made, in his original brief. *See also* Mot. for Leave to File Am. Pet. for Writ. of Cert., *Folkes v. State*, No. 2016-000415 (S.C. Ct. App. Mar. 14, 2017). Thus, the Warden's omission does not prevent this Court from conducting meaningful habeas review.

**JA73**

However, to explain those grounds, Folkes directs the reader to several attachments, including portions of his PCR certiorari petition and portions of a brief he filed with the PCR court addressing the claims he asserted in that court. (*See id.*) Thus, it appears Folkes is raising here all twenty-two of his PCR claims. Folkes asks this Court to vacate his conviction and sentence and grant him a new trial. (*Id.* at 15.)

The Warden has moved for summary judgment. (Dkt. No. 15.) Folkes has filed a response (Dkt. No. 18), making this matter ripe for adjudication.

## LEGAL STANDARD

Habeas corpus in federal court exists to "guard against extreme malfunctions in the state criminal justice systems." *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citation and internal quotation marks omitted). Federal habeas is neither an alternative to state-court relief nor an additional chance to appeal erroneous state-court rulings. *See id.* That preference for, and deference to, state courts is borne out in the various constraints placed on federal courts. *See Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (per curiam) (stating § 2254 "imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases"); *see also Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (stating § 2254 "reflect[s] a presumption that state courts know and follow the law" (citation and internal quotation marks omitted)).

For instance, state prisoners who challenge matters "adjudicated on the merits in State court" cannot get relief in federal court unless they show that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" announced by the Supreme Court or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d). That means a state court's ruling must be "so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Federal courts must also defer to state courts' factual determinations, which are presumed correct until the prisoner rebuts that presumption with clear and convincing evidence. § 2254(e)(1).

Before state prisoners may try to clear those high hurdles, two rules steer them to first pursue all relief available in state court. *See* § 2254(b)(1). The first, known as exhaustion of remedies, requires a prisoner to present his claims to the highest state court with jurisdiction to decide them. *Stewart v. Warden of Lieber Corr. Inst.*, 701 F. Supp. 2d 785, 790 (D.S.C. 2010). A federal court cannot grant a prisoner's habeas petition until he exhausts his state-court remedies. § 2254(b)(1), (c). The second rule, called procedural default, comes into play when a prisoner failed to present a claim to the state courts at the appropriate time and has no means of doing so now. *Stewart*, 701 F. Supp. 2d at 790. Federal courts may not consider a procedurally defaulted claim unless the prisoner shows either that he has cause for defaulting and that the alleged violation of federal law prejudiced him or that not addressing the claim would be a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The ultimate issue in this case is, of course, whether Folkes should receive habeas relief under these standards. However, the Warden's summary judgment motion presents narrower questions. Summary judgment is appropriate only if the moving party shows that "there is no genuine dispute as to any material fact" and that he is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* Rule 12, Rules Governing § 2254 Cases (stating courts may apply in habeas cases any of the Federal Rules of Civil Procedure to the extent they are not inconsistent with statutes or the § 2254 rules). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse

party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Viewing the habeas rules through the lens of Rule 56, the Court has three questions to answer at this juncture:

(1)    Are there genuine issues of fact as to whether Folkes' claims are properly before the Court?
(2)    Are there genuine issues of fact as to the merits of Folkes' claims?
(3)    If the answer to either (or both) of the first two questions is "no," is the Warden entitled to judgment as a matter of law?

In answering those questions, the undersigned has carefully considered the record before the Court and has liberally construed the materials Folkes has submitted. *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## DISCUSSION

As mentioned, Folkes is asserting twenty-two claims. In each, he alleges ineffective assistance of counsel, either at trial or in the direct appeal.

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). A petitioner proves ineffective assistance by showing his attorney's performance was deficient and prejudiced him. *Id.* at 687. An attorney's performance is deficient if it was unreasonable under the circumstances of the case and under then-prevailing professional norms. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). Prejudice is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Kimmelman*, 477 U.S. at 384.

**JA76**

*Strickland* is highly deferential to counsel, and § 2254(d) is highly deferential to state courts. *Harrington*, 562 U.S. at 105. That means when a state court has adjudicated an ineffective-assistance claim on the merits, this Court's review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). In other words, the question becomes "not whether counsel's actions were reasonable," but "whether there is any reasonable argument that [Folkes'] counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.[2] Thus, although Folkes has framed his claims purely as ones of ineffective assistance, the undersigned has liberally construed them as alleging the PCR court's rulings do not withstand § 2254(d) scrutiny.

The Warden argues none of Folkes' grounds merits the granting of habeas. (Dkt. No. 14 at 1.) The Warden also asserts that eight of the grounds—Six, Seven, Twelve, Thirteen, Fourteen, Fifteen, Sixteen, and Twenty-Two—are procedurally defaulted. (*Id.* at 13, 14, 19, 20–21, 23, 29.) For the reasons below, the undersigned agrees with the Warden.

## I. Grounds One and Two

Folkes' first two grounds involve the elements of ABHAN and ABWIK, as well as the difference between those crimes. South Carolina defines ABWIK as an unlawful act of a violent nature to another person with malice aforethought, either express or implied, and intent to kill. *E.g.*, *State v. Coleman*, 536 S.E.2d 387, 389 (S.C. Ct. App. 2000) (citations omitted). ABHAN is an unlawful act of violent injury accompanied by circumstances of aggravation. *Id.* (citation omitted). "[T]he absence of malice is not a required element of the offense of ABHAN, and the

---

[2] Subsection 2254(d)'s standards are to be applied to the decision from the highest state court to decide the claim at issue on the merits. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Where, as here, the highest state court rules summarily, the federal habeas court should "look through" that unexplained decision to the last state-court decision that provides a relevant rationale, and "should then presume that the unexplained decision adopted the same reasoning." *Id.* In this case, the PCR court was the only one to issue a reasoned decision on Folkes' claims. As neither party contends the Court of Appeals denied certiorari on different reasoning than what the PCR court provided, the undersigned has used the PCR court's reasoning to analyze the merits of Folkes' claims.

fact that a defendant acts with malice does not preclude a finding of ABHAN." *State v. Tyler*, 560 S.E.2d 888, 890 (S.C. 2002).

In her closing argument, the prosecutor argued Folkes was guilty of ABWIK, not ABHAN. (Dkt. No. 14-2 at 387–89.) At one point, she told the jury, "What is in dispute today is whether there was malice aforethought, express or implied. And that's going to be the difference between" ABHAN and ABWIK. (*Id.* at 389.) She also said the jury had to find Folkes guilty of ABWIK, not ABHAN, if they determined he acted with malice. (*Id.* at 388.)

In PCR, Folkes asserted trial counsel was ineffective for not objecting to those statements. (Dkt. No. 14-2 at 526.) The PCR court disagreed. (*Id.* at 827–30.) Analyzing the law of ABWIK and ABHAN, it concluded that "the crucial difference between ABWIK and ABHAN when ABHAN is charged as a lesser[-]included offense is whether the defendant acted with malice." (*Id.* at 829.) Consequently, the court found the prosecutor stated South Carolina law accurately. (*Id.* at 829, 830.) Because an objection to the prosecutor's statements would have been overruled, lead trial counsel's decision not to object was reasonable and did not prejudice Folkes. (*Id.* at 827, 829, 830.) The court therefore denied the claim.

Folkes challenges the PCR court's rulings. To prevail, however, he would need to disprove their central premise: that the prosecutor stated the law correctly. This Court's limited scope of review prevents this Court from deciding that issue for itself; the PCR court's analysis of South Carolina law is binding on this Court. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Thomas v. Davis*, 192 F.3d 445, 449 n.1 (4th Cir. 1999). Consequently, Folkes' claims must be analyzed against the backdrop of the PCR court's unreviewable conclusion about state law. Given that, the undersigned cannot conclude the PCR court's decision was anything but reasonable. *Cf. Rice v. Pate*, No. 4:14-cv-185-TLW-TER, 2014 WL 8335449, at *9 (D.S.C. Oct. 6, 2014) (finding PCR court reasonably found counsel was not ineffective for failing to raise an

**JA78**

argument that had no merit under state law), *report and recommendation adopted*, 2015 WL 1400070 (D.S.C. Mar. 26, 2015).

## II.      Ground Three

After the state Court of Appeals affirmed on direct appeal, Folkes' appellate counsel did not file a rehearing petition.  Folkes faulted her in PCR, claiming her failure to seek rehearing prevented him from petitioning the state Supreme Court for certiorari.  (Dkt. No. 14-2 at 3.)

Appellate counsel testified at the PCR hearing.  (*See* Dkt. No. 14-2 at 576–96.)  When she represented Folkes, she practiced at the state appellate defense office, which handles criminal appeals for the indigent.  (*See id.* at 577–78.)   She resigned while Folkes' appeal was pending; the Court of Appeals issued its opinion ten days after she left.  (*Id.* at 547, 577–78.)  Appellate counsel testified that, had she stayed at appellate defense, she "certainly" would have petitioned for rehearing and certiorari.  (*Id.* at 578.)  "I thought it was a winner.  I thought it was clear error. I thought it was reversible."  (*Id.* at 578–79.)

The office's chief appellate defender testified as well.  (*See* Dkt. No. 14-2 at 546–76.)  He testified that, when Folkes' appellate counsel quit, Folkes' case became his responsibility.  (*Id.* at 554–55.)  He could not recall if, when the Court of Appeals issued its opinion, he read the opinion, reviewed Folkes' file, or assessed whether he should seek rehearing and certiorari.  (*Id.* at 555–56.)  However, he disagreed with the Court of Appeals' ruling, and he "wish[ed]" that rehearing and certiorari had been pursued.  (*Id.* at 572.)

The PCR court denied the claim.  (Dkt. No. 14-2 at 830–33.)  It based its conclusion on the state Supreme Court's ruling in *Douglas v. State* that, in criminal cases, appellate counsel has no duty to pursue rehearing or certiorari after the Court of Appeals issues an adverse decision. 631 S.E.2d 542, 543 (S.C. 2006).  (Dkt. No. 14-2 at 831, 833.)  The PCR court reasoned that

**JA79**

because the appellate lawyers had no duty to seek rehearing, their failure to do so was not deficient and did not prejudice Folkes. (*Id.* at 833.)

The appellate attorneys' testimony makes the undersigned hesitant to accept the PCR court's no-prejudice finding. Admittedly, the mere filing of petitions for rehearing and certiorari would not have guaranteed further appellate review, let alone reversal. On the other hand, two seasoned appellate attorneys testified that the Court of Appeals' opinion was wrong and that Folkes' case was a good candidate for certiorari. While their assessments of the appeal are not binding, they also are not easily dismissed.

Nevertheless, the PCR court's denial of the claim was reasonable. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011) (stating § 2254(d)(1) directs federal habeas courts to "focus[] on the result, not on the reasoning that led to the result"). The Constitution does not guarantee assistance of counsel in the pursuit of discretionary appellate review. *See Wainwright v. Torna*, 455 U.S. 586, 587–88 (1982) (per curiam) (no Sixth Amendment right to counsel in pursuing discretionary appeal); *Ross v. Moffitt*, 417 U.S. 600, 610 (1974) (no Fourteenth Amendment right to counsel when pursuing discretionary appeal). Rehearing at the state Court of Appeals is discretionary. *Williamson v. Middleton*, 681 S.E.2d 867, 869 (S.C. 2009) (per curiam). Consequently, "there is no constitutional right to counsel in seeking a rehearing" at the state Court of Appeals. *Allison v. Bodison*, No. 8:08-cv-2415-HMH, 2009 WL 2524691, at *26 (D.S.C. Aug. 14, 2009); *see also Cabbagestalk v. McFadden*, No. 5:14-cv-3771-RMG, 2015 WL 4077211, at *36 (D.S.C. July 1, 2015) (finding PCR court reasonably denied ineffective-assistance claim of failure to seek rehearing; petitioner had no right to counsel for that discretionary review). Thus, appellate counsels' failure to seek rehearing could not serve as the basis for relief, in the PCR court or here. The undersigned recommends denying this claim.

**JA80**

### III.    Ground Four

Folkes did not present a defense at trial.  (*See* Dkt. No. 14-1 at 372–73.)  In PCR, he alleged trial counsel failed to inform him that, even if he declined to testify in his own defense, he still had a right to present other evidence.  (Dkt. No. 14-2 at 526.)  At the hearing, Folkes claimed he would have testified in his own defense if trial counsel had explained the risks and benefits of testifying.  (*Id.* at 730–31.)

The PCR court did not find Folkes' allegations credible, instead believing trial counsel's PCR hearing testimony.  (Dkt. No. 14-2 at 833–34.)  Lead trial counsel testified he explained to Folkes not only his right to testify but also the potential benefits and drawbacks of Folkes taking the stand.  (*Id.* at 611–12, 660, 661–62, 833.)  Counsel told Folkes that testifying would help his case and that he would try to prevent the State from impeaching Folkes with some of his prior criminal convictions.  (*Id.* at 611.)  But according to counsel, Folkes made up his mind well before trial that he did not want to testify.  (*Id.* at 660, 833.)  In light of that, trial counsel made the tactical decision to not put up any defense witnesses; the marginal benefit Folkes might get from potential defense witnesses' testimony would come at the cost of losing the right to give the final closing argument—a right South Carolina law gave to defendants who presented no case.  (*Id.* at 612, 661–62, 833–34.)  Nevertheless, counsel did tell Folkes that he had the right to put up a defense case even if he did not personally testify.  (*Id.* at 612, 833.)  Based on all that testimony, the PCR court found trial counsel did not perform deficiently.  (*Id.* at 833–34.)

The PCR court also found Folkes failed to show any prejudice from counsel's purported failure.  (Dkt. No. 14-2 at 834.)  At the PCR hearing, Folkes testified he wanted the jury to hear evidence that he had a job and a place to live on the day of the fight.  (*Id.* at 796.)  The PCR court found those issues were "collateral . . . at best."  (*Id.* at 834.)

The undersigned sees nothing unreasonable in the PCR court's decision. Lead trial counsel's testimony directly contradicted the main premises of Folkes' claim—that is, counsel testified he did the things Folkes accused him of not doing. The PCR court's finding that counsel's testimony was credible is presumed correct. *See Merzbacher v. Shearin*, 706 F.3d 356, 367 (4th Cir. 2013). As Folkes has given this Court nothing to rebut that presumption, counsel's testimony amply supports the PCR court's ruling. The undersigned therefore recommends denying this ground.

### IV.    Ground Five

At trial, the State called Patrick, who was Folkes' friend. (Dkt. No. 14-1 at 180.) In his direct examination, he testified about roofing work he used to perform with Folkes. (*Id.* at 187–89, 190–91.) Patrick told the jury he and Folkes used special knives on the job, but Folkes sometimes carried his knife with him after work; before Folkes got that knife, he kept a straight razor with him. (*Id.* at 189–90.) Trial counsel did not object to that testimony. (*See id.*)

In PCR, Folkes argued counsel was ineffective for not objecting to testimony that "bore no logical relevance to the . . . case and constituted evidence of prior bad acts." (Dkt. No. 14-2 at 526.) Lead trial counsel testified he did not object because Patrick was so soft-spoken that the jury likely did not hear his testimony; indeed, just after Patrick made the statement, the trial court directed him to speak up. (*Id.* at 614; Dkt. No. 14-1 at 190.) Counsel thought objecting would only draw unwanted attention to testimony the jury probably did not hear. (Dkt. No. 14-2 at 614.)

The PCR court denied the claim. (Dkt. No. 14-2 at 835.) It found no reasonable possibility that the testimony had any impact on the case. (*Id.*) "Numerous witnesses testified that they saw [Folkes] with a knife at the park on the day of the incident." (*Id.*) Given the "overwhelming and uncontroverted testimony that he was indeed armed with a knife on the day

in question," the PCR court could not find Patrick's testimony prejudicial under *Strickland*.  (*Id.*)  The court declined to address whether trial counsel performed deficiently.  (*See id.* at 835–36.)

The undersigned sees no reason to disturb the PCR court's ruling.  To be sure, Patrick's testimony might have been objectionable propensity evidence.  However, the danger of propensity evidence is its power to make the jury reach the wrong conclusion about whether the defendant did the thing he is accused of doing.  *See Michelson v. United States*, 335 U.S. 469, 475–76 (1948).  Here, the testimony about Folkes' propensity to carry knives related to the issue of whether Folkes used a knife in the fight.  As the PCR court pointed out, the jury had ample independent evidence that Folkes did just that.  That independent evidence eliminated the potential for the jury to be influenced by a potentially impermissible propensity inference.  Consequently, there was no reasonable probability that Patrick's testimony prejudiced the case.  The PCR court therefore reasonably denied this claim.  The undersigned recommends this Court do so as well.

## V.  Grounds Six and Seven

In an email sent while Folkes was awaiting trial, the prosecutor told Folkes' lawyers that "this case is a mandatory LWOP, so I can't make a[ plea] offer."  (Dkt. No. 14-2 at 366.)  In PCR, Folkes asserted trial counsel was ineffective for neither challenging the prosecutor's position nor investigating whether what she wrote was true.  (Dkt. No. 14-2 at 526–27.)

At the PCR hearing, lead trial counsel testified that, despite the prosecutor's email, he nevertheless negotiated with her.  (Dkt. No. 14-2 at 618, 650–52.)  She made plea offers on three occasions: ten years, twenty years, and fifteen years.  (*Id.* at 650–52, 656–57, 764–65.)  Counsel presented all three offers to Folkes, who rejected them.  (*Id.* at 658–59.)  Counsel's case notes, which corroborated his testimony, were entered as PCR exhibits.  (*Id.* at 764–65.)

Relying on lead trial counsel's testimony and notes, the PCR court found that trial counsel were not deficient. (Dkt. No 14-2 at 836–37.) It did not address the prejudice prong of *Strickland*. (*See id.*)

### A.    Procedural Default

Folkes did not raise these grounds in his PCR appeal. Issues not presented at the appropriate time to a state's highest court are procedurally defaulted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). Thus, these grounds are defaulted.

As discussed below, several other of Folkes' grounds are procedurally defaulted for the same reason—he did not raise them in the PCR appeal. Others are defaulted because the PCR court never ruled upon them in its order, and Folkes never made a motion asking the court to address them. Folkes has not asserted that he has cause and prejudice excusing any of the defaults or that declining to address any of them would be a miscarriage of justice. The undersigned therefore recommends not addressing the merits of Ground Six, Ground Seven, or any other procedurally defaulted ground. However, in case the Court determines that any defaulted ground should be addressed, the undersigned has analyzed the merits of every defaulted claim.

### B.    Merits

The PCR court's decision was appropriate. Contrary to Folkes' assertions, trial counsel challenged the prosecution's no-offer position by obtaining several plea offers, each with far less time than life without parole. Although Folkes rejected every offer, counsel's conduct was nonetheless effective. The PCR court therefore properly denied these two claims.

### VI.    Ground Eight

Before the State presented its last witness, the trial court held a charge conference. (Dkt. No. 14-1 at 325–37.) Because malice is an element of ABWIK, the court said it would define

**JA84**

malice to the jury and explain how malice could be inferred.  (*Id.* at 326–27.)  At Folkes'
counsel's request, the court then agreed to charge ABHAN as a lesser-included offense.  (*Id.* at
335–37.)  Counsel also asked the court to instruct the jury that, under *Tyler*, absence of malice is
not an element of ABHAN.  (*Id.* at 329–33.)  After some discussion with counsel and the
prosecutor, the court said it would read *Tyler* and then make a decision.  (*Id.* at 333.)

 Also during trial, Folkes' attorneys filed a written request to charge.  (Dkt. No. 14-2 at
756–57.)  The written request included the proposed instruction that absence of malice is not one
of ABHAN's elements.  (Dkt. No. 14-1 at 422–23.)  In the request, counsel also asked the court
to tell them, before closing arguments, which of the proposed instructions it was using and which
ones it was rejecting.  (Dkt. No. 14-2 at 756–57.)  However, the court never indicated whether it
would give the absence-of-malice charge counsel requested.

 During his closing argument, Folkes' lead trial counsel told the jury the court was "going
to instruct [them] that the absence of malice is not an element of" ABHAN.  (Dkt. No. 14-1 at
404.)  The court, however, never gave such an instruction.  After closing arguments, the court
said that, during a break in the charge conference, it read *Tyler* and then decided not to give the
requested instruction.  (*Id.* at 423.)

 In PCR, Folkes asserted lead trial counsel was ineffective for telling the jury the court
would instruct them about absence of malice without first determining that the trial court would
actually give the instruction.  (Dkt. No. 14-2 at 527.)  At the hearing, PCR counsel noted his
written request for the court to tell him in advance if it was refusing to give any of his requested
instructions.  (*Id.* at 622.)  Counsel testified the combination of his request and the court's silence
led him to assume the court would tell the jury absence of malice is not an ABHAN element.
(*Id.*)

The PCR court denied the claim for lack of prejudice. (Dkt. No. 14-2 at 837–38.) It found that both trial counsel and the prosecutor told the jury "that the judge would instruct them on the correct law and that any argument from either counsel was not evidence to be considered. Additionally, the trial court instructed the jury to only apply the law as instructed during its charge." (*Id.* at 838.) Based on that, the court could not find counsel's incorrect prediction about the jury charge might have affected the case. (*Id.*) It therefore denied the claim without addressing whether counsel's prediction was deficient. (*See id.*)

The rejection of the claim was reasonable. Folkes' theory of prejudice for this claim was that counsel's mistaken prediction "exacerbated the prejudice arising from his failure to object to the state's improper closing arguments." (Dkt. No. 14-4 at 35.) In other words, Folkes premised his claim on Grounds One and Two having merit. As explained above, however, the PCR court rejected the central premise of those claims, finding the solicitor said nothing wrong. If those statements were not erroneous, there was no harm for trial counsel's mistaken prediction to exacerbate. Moreover, as the PCR court noted, the trial judge told the jury he was their "sole and only instructor of the law." (Dkt. No. 14-1 at 413.) The jury was required to "accept as correct" the court's charges and apply them to the evidence. (*Id.*) "[J]uries are presumed to follow the court's instructions." *CSX Transp. v. Hensley*, 556 U.S. 838, 841 (2009) (per curiam). As nothing in the record rebuts that presumption, the jury presumably followed the trial court's instruction to listen to only its explanation of the law. Because doing that necessarily required the jury to ignore counsel's inaccurate prediction, it is unlikely that the statement affected the case. Thus, the undersigned recommends finding the PCR court reasonably denied Ground Eight.

JA86

## VII.    Ground Nine

After the fight, eyewitnesses Green and Patrick helped police search for Folkes and the knife. (Dkt. No. 14-1 at 246–47.) In that search, Green found a shirt in a trashcan at the park. (*Id.* at 247.) The police took it as evidence and had it analyzed. The law enforcement laboratory found no DNA or blood on it. (*Id.* at 295–97.) However, Jones and the eyewitnesses to the fight testified Folkes was wearing the shirt during the fight. (*Id.* at 102–03, 247–48.) The trial court admitted the shirt into evidence. (*Id.* at 104.)

In PCR, Folkes faulted lead trial counsel for not highlighting the lack of blood or DNA in his closing argument. (Dkt. No. 14-2 at 527.) At the PCR hearing, lead trial counsel testified he *did* point out the lack of blood in his closing. (Dkt. No. 14-1 at 405; Dkt. No. 14-2 at 626.) He acknowledged, however, that he did not mention the lack of DNA evidence. (Dkt. No. 14-2 at 626.) Although he did not recall he omitted that point, he testified it was inconsequential because witnesses who knew Folkes testified they saw him attack Jones; moreover, counsel felt the issue was minor and not worth emphasizing to the jury. (*Id.* at 626, 629–30.) He also testified that, to the extent Jones' attacker's identity could have been in question, it was sufficient to point out the shirt had no blood on it. (*Id.* at 626, 629.)

Relying on that testimony, the PCR court denied the claim. (Dkt. No. 14-2 at 838–39.) Agreeing with counsel's assessment of the DNA issue, the court found that mentioning lack of DNA would not have changed the trial's outcome. (*Id.* at 839.) The court therefore denied the claim for lack of prejudice. (*Id.*)

The PCR court's decision was legally and factually appropriate. Contrary to Folkes' assertion, counsel noted the shirt's lack of blood during his closing argument. (Dkt. No. 14-1 at 404–05.) Folkes cannot fault counsel for doing the very thing Folkes wanted him to do. As to the lack of DNA, the undersigned agrees with the PCR court's no-prejudice finding. Although

the witnesses to the attack testified Jones' assailant was wearing that shirt, they also testified that they knew Folkes well and that he was Jones' assailant. The presence or absence of Folkes' DNA on the shirt was thus unlikely to make a difference to the jury. The undersigned recommends denying this ground.

## VIII.   Ground Ten

During the charge conference, trial counsel conceded Folkes could not claim self-defense because he started the fight. (Dkt. No. 14-1 at 330.) Folkes asserted in PCR that he had a colorable self-defense claim, and trial counsel was ineffective for not pursuing it. (Dkt. No. 14-2 at 527.)

The PCR court disagreed. (*Id.* at 839–41.) The court began noting that, in South Carolina, one of the elements of self-defense is that the defendant "was without fault in bringing about the difficulty." (*Id.* at 840.) The court then found the trial record contained no evidence of this element; rather, all evidence relevant to that issue showed Folkes started the fight. (*Id.* at 841.) For that reason, the PCR court found counsel did not perform deficiently by passing on self-defense. (*Id.*) It also found Folkes failed to prove prejudice because he did not submit any evidence that, if produced at trial, would have supported a self-defense jury charge. (*Id.*) Without such evidence, the trial court would have denied a request for a self-defense instruction. (*Id.*)

### A.    Procedural Default

Folkes did not appeal the PCR court's ruling. Consequently, Ground Ten is defaulted and the Court should not address it.

### B.    Merits

As with Grounds One and Two, the PCR court's resolution of this claim turned on an application of state law: whether there was any evidence at trial that satisfied South Carolina

**JA88**

law's elements of self-defense.  This Court could not grant Folkes relief on Ground Ten without first finding that state-law decision was wrong.  As that is beyond this Court's province, *see Estelle*, 502 U.S. at 67–68, the PCR court's application of South Carolina law effectively prevents this Court from disturbing the PCR court's ultimate ruling on the claim.  Thus, if the Court addresses this claim on the merits, it should deny the claim.

### IX.    Ground Eleven

Robert McCracken was one of the police officers who responded to Jones' 911 call. (Dkt. No. 14-1 at 300.)  He testified at trial that when he was dispatched to the scene, he "was told someone was cut severely."  (*Id.*)  Folkes asserted in PCR that trial counsel should have objected to McCracken's testimony because it was hearsay.  (Dkt. No. 14-2 at 527.)

The PCR court denied the claim.  (Dkt. No. 14-2 at 841–42.)  Without addressing whether counsel performed deficiently, it found the omission did not prejudice Folkes.  (*Id.* at 842.)  The court pointed out that, on cross-examination of the State's medical expert, trial counsel got the expert to concede Jones' wounds were not severe.  (*Id.*)  Further, the PCR court noted, counsel highlighted that concession to the jury during closing argument.  (*Id.*)  Because counsel elicited testimony from an important witness dispelling any notion that Jones' wounds were severe, Folkes suffered no prejudice from McCracken telling the jury what a dispatcher said to him.  (*Id.*)

The PCR court's decision was reasonable.  The State's expert testified that when emergency room patients present with wounds, the severity of their trauma is assessed and given a rating; Jones received the least serious rating on the scale.  (Dkt. No. 14-1 at 356–59.)  The expert also acknowledged that the cut on Jones' neck did not penetrate any arteries or veins, or Jones' throat.  (*Id.* at 363.)  Trial counsel's cross-examination thus demonstrated that, despite one of the cuts being to Jones' neck, the wounds were not life-threatening.  As the PCR court

**JA89**

recognized, a medical expert's explanation of how Jones' wounds were not serious almost certainly would have carried more weight with the jury than McCracken telling them what a dispatcher relayed to him in the heat of the moment. This ground should be denied.

## X.    Ground Twelve

When police arrested Folkes, they took a beer bottle and put it in their evidence room. (Dkt. No. 14-1 at 309.) Somehow, the bottle broke while in the police department's possession. (*Id.*) Nevertheless, it was admitted into evidence as purportedly the bottle Folkes threw at Jones. (*See id.* at 309–10.)

In PCR, Folkes faulted trial counsel for not objecting to the bottle's admission. (Dkt. No. 14-2 at 527.) He asserted it was improper to admit the bottle because it had been broken, preventing the jury from meaningfully examining it, and because the State could not prove what brand of beer had been in it. (*Id.*) The PCR court, however, rejected those arguments. (*Id.* at 842.) First, contrary to Folkes' assertion, trial counsel *did* object to the bottle's admission on the basis that it was broken; the trial court overruled the objection. (*Id.*) Second, although counsel did not make an argument about the inability to identify the brand of beer, the PCR court found there was "no conceivable likelihood that the type of beer had any impact on [Folkes'] case." (*Id.*) The PCR court therefore denied the claim. (*Id.*)

### A.    Procedural Default

Folkes did not appeal the PCR court's ruling on this ground. Consequently, Ground Twelve is defaulted and the Court should not address it.

### B.    Merits

The undersigned sees nothing problematic in the PCR court's ruling. As that court pointed out, trial counsel objected to the bottle being admitted, as it was no longer in the same condition as when the police seized it. (Dkt. No. 14-1 at 309–10.) The trial court overruled that

objection.  (*Id.* at 310.)  That trial counsel did what Folkes alleged they did not do undercuts that portion of Folkes' claim.  As for the brand of beer, the undersigned agrees with the PCR court: that issue was immaterial.  If the Court reaches the merits of the claim, it should deny the claim.

## XI.    Grounds Thirteen, Fourteen, and Fifteen

One of the State's trial exhibits was Folkes' backpack, which police took from him during his arrest.  (Dkt. No. 14-1 at 322–24.)  According to Folkes, when was taken to jail, officers directed him to remove the clothes he was wearing.  (Dkt. No. 14-2 at 526–27.)  At some point after that, the clothes were put in the backpack, underneath a sleeping bag.  (*Id.*)

In PCR, Folkes argued that trial counsel should have objected to the backpack being admitted with the clothes inside it, as that did not accurately illustrate the pack's contents when he had it.  (Dkt. No. 14-2 at 527.)  He also argued counsel should have called David Battiste, a police officer involved in Folkes' booking, to testify that he put the clothes in the backpack.  (*Id.*)  Finally, and similarly, Folkes argued counsel was ineffective for not establishing that the clothes in the bag were what he was wearing during the fight and that Folkes did not hide them in there under the sleeping bag.  (*Id.*)  Battiste testified at the PCR hearing, saying he only vaguely remembered Folkes' case.  (*Id.* at 596–605.)

The PCR court denied all three claims.  (Dkt. No. 14-2 at 843–85.)  Without addressing counsel's performance, the court found Folkes failed to prove prejudice on any of the claims.  (*Id.*)  In addition to discussing evidence specific to each claim, the court found all three claims failed because the question of whether Folkes changed clothes after the attack was collateral.  (*Id.*)  The clothing, the PCR court explained, was relevant to the attacker's identity; because several people who knew Folkes testified they watched him attack Jones with a knife, identity was a non-issue.  (*Id.*)  Consequently, any inference the jury might have drawn about the

**JA91**

circumstances surrounding Folkes changing his clothes was not reasonably likely to have affected the case's outcome. (*Id.*)

### A. Procedural Default

Folkes did not appeal the PCR court's rulings on any of these three claims. Consequently, they are defaulted and the Court should not address them.

### B. Merits

The record demonstrates the PCR court reasonably denied the claims. As the PCR court pointed out, whether Folkes changed clothes between the attack and his arrest was irrelevant. As previously discussed, five people who knew Folkes, including his recent ex-girlfriend, testified they saw him wound Jones. In addition, Folkes did not present any direct evidence showing the police put the clothes in the bag. Although Battiste testified at the PCR hearing that he recalled instructing Folkes to remove some clothes, he did not remember what happened to those clothes. (Dkt. No. 14-2 at 598–600.) Folkes' failure to establish the main factual premise of his claims makes the PCR court's denial of them all the more appropiate. The undersigned thus recommends denying these grounds even if the Court reaches their merits.

### XII. Ground Sixteen

The State also introduced another backpack into evidence. (Dkt. No. 14-1 at 244–45.) The State had it admitted after Green testified it was the bag Folkes had with him during the altercation. (*Id.* at 244.) Later in the trial, however, the State realized that backpack actually belonged to Jones. (*Id.* at 391.) In her closing argument, the prosecutor clarified to the jury that the backpack belonged to Jones, while the other backpack she had introduced belonged to Folkes. (*Id.*)

Despite that clarification, Folkes asserted in PCR that the clothes he was wearing when he was arrested were later placed into Jones' backpack. (Dkt. No. 14-2 at 526.) He claimed trial

**JA92**

counsel performed ineffectively by not proving that at trial.  (*Id.*)  The PCR court denied that claim.  (*Id.* at 845–46.)  After noting the claim was inconsistent with Grounds Thirteen, Fourteen, and Fifteen, the court found there was no evidence that Folkes' clothes were ever in Jones' backpack.  (*Id.*)  It then found that, as with those preceding three claims, counsel's alleged conduct could not have prejudiced Folkes; because there was overwhelming eyewitness evidence that Folkes cut Jones, what might have happened to his clothes after the fact was unlikely to impact the case.  (*Id.*)

### A.   Procedural Default

Folkes did not appeal the PCR court's ruling on this ground.  Consequently, Ground Sixteen is defaulted and the Court should not address it.

### B.   Merits

The undersigned sees no merit to this ground.  As the PCR court noted, Folkes offered no evidence that his clothes were in that backpack, and he failed to explain how having the clothes there might have affected his trial.  Even if the Court reaches the merits, the undersigned still recommends denying this ground.

## XIII.   Ground Seventeen

At trial, Jones described the knife Folkes used to slash him.  (Dkt. No. 14-1 at 107–08.)  The prosecutor then showed Jones a knife that she had marked for identification as a demonstrative exhibit and that she acknowledged was not the knife from the fight.  (*Id.* at 108.)  Jones testified the knife was "very, very similar" to the one Folkes used in the fight.  (*Id.*)  The knife was not admitted into evidence.

In PCR, Folkes alleged counsel was ineffective for not objecting to the prosecutor displaying the knife during Jones' direct examination.  (Dkt. No. 14-2 at 792–93.)  The PCR court denied the claim.  (*Id.* at 846–47.)  It reasoned that because Jones testified the knife so

**JA93**

closely resembled what Folkes used in the fight, any objection to its demonstrative use would have been overruled. (*Id.*)

The undersigned sees no basis for rejecting that ruling. In PCR, Folkes argued trial counsel should have objected to the display of the knife because it was irrelevant and calculated to inflame the jury's passions. (Dkt. No. 14-2 at 794.) Relevance and unfair prejudice are issues of South Carolina evidence law. *See* S.C. R. Evid. 401, 403. Folkes' argument, then, helps explain the PCR court's decision: by saying the objections would have been overruled, the PCR implied it found the demonstrative use of the knife permissible under state evidence law. That means this Court could not upend the PCR court's ruling without going behind that court's evidentiary determination. As discussed above, this Court may not do that. Because this Court must accept the PCR court's decision that the objections would have been futile, trial counsel's failure to object cannot be characterized as ineffective. *See Rice*, 2014 WL 8335449, at *9. The undersigned therefore recommends denying this claim.

### XIV.   Grounds Eighteen and Nineteen

In Folkes' view, the State depicted him to the jury as a homeless, unemployed drunk. (Dkt. No. 14-2 at 796.) But according to Folkes, he was employed during the week preceding the incident and had worked eight hours just before he went to the park that afternoon. (*Id.* at 528.) Folkes asserted in PCR that trial counsel should have introduced evidence of him working, as it would have rebutted the State's evidence that he showed up to the park drunk. (*Id.* at 528.) Similarly, Folkes claimed trial counsel was ineffective for not presenting evidence that he had been living in a motel before the incident. (*Id.*)

During the PCR hearing, lead trial counsel testified he investigated whether Folkes worked on the day of the fight and whether he had been living in a motel. (Dkt. No. 14-2 at 644–48, 668.) He further testified he made a tactical decision to not try to prove those facts; under a

**JA94**

state procedural rule in place at that time, he would get to go last in closing arguments if he did not present a defense case. (*Id.* at 646, 647.) Counsel felt it was better to go last at closing than to present facts that, in his view, were not important. (*Id.*)

The PCR court relied on that testimony to deny Folkes' claims. (Dkt. No. 14-2 at 847–49.) It found counsel made a "strategic and well-reasoned decision" to not pursue the issues at trial after investigating them. (*Id.* at 847–48.) Citing the proposition that counsel generally may not be found ineffective for making informed strategic decisions, the court ruled counsel performed professionally. (*Id.* at 848–49.) Additionally, it concluded Folkes' living arrangement and employment were collateral matters, and thus counsel's decision not to prove them did not prejudice him. (*Id.*)

The undersigned finds the PCR court's decisions reasonable. Before addressing any of Folkes' specific grounds, the court began its legal analysis by reciting ineffective-assistance principles. (*See* Dkt. No. 14-2 at 825–26.) In that recitation, the court noted it had to be deferential to counsel's decisions and presume counsel performed reasonably. (*Id.* at 825.) Immediately after that, it cited two state Supreme Court cases for the proposition that "when counsel articulates a valid reason for employing a certain strategy, such conduct will not be deemed ineffective assistance of counsel." (*Id.* (case citations omitted).) When the PCR court later denied Grounds Eighteen and Nineteen, it referred back to that "valid reason" language. (*Id.* at 847, 848). By doing that, the PCR court indicated it faithfully followed *Strickland* in assessing counsel's performance, determining not only that counsel made a strategic decision (that is, a decision made after an appropriate investigation) but also that counsel's choice was reasonable. *Cf. Boseman v. Bazzle*, 364 F. App'x 796, 806 (4th Cir. 2010) (holding district court erred in finding PCR court's use of the same "valid reason" proposition was an improper application of *Strickland*; PCR court's order sufficiently indicated the court followed

*Strickland*'s performance-prong standards).  Thus, the PCR court did not inappropriately apply *Strickland* in assessing trial counsel's performance.  And nothing in the record shows the PCR court's assessment of the facts relating to counsel's performance was unreasonable.  Because the record supports the PCR court's determinations that counsel performed adequately, the undersigned recommends denying these two grounds.

### XV.    Ground Twenty

In her closing argument, the prosecutor made the following statement:

> What did [Folkes] do when he left?  As he's going out he tries to conceal his shirt, possible evidence.  He doesn't know I guess what's on that shirt, but he knows he can be identified from it, throws it in a trashcan, takes off his shirt, changes his clothes.  Clothes which are kept in that backpack are kept in that area down there that he's walking up trying to leave the park.  Who knows where he got them, but he changed his clothes.

Dkt. No. 14-1 at 394.)  In PCR, Folkes asserted this statement included facts that were not in evidence, so trial counsel should have objected to it.  (Dkt. No. 14-2 at 528.)

The PCR court rejected Folkes' claim.  (Dkt. No. 14-2 at 849–50.)  Without addressing whether counsel performed deficiently, the court ruled counsel's alleged error was not prejudicial.  (*Id.*)  It again found that because Folkes' identity was not disputed, what clothes he wore during or after the attack was a collateral matter.  (*Id.*)  Moreover, the court found, the prosecutor's statements were based on trial testimony and inferences that could reasonably be drawn from it.  (*Id.* at 850.)  Thus, the PCR court concluded, counsel did not prejudice Folkes by failing to make a meritless objection.  (*Id.*)

The court's decision withstands § 2254(d).  A prosecutor may base her closing argument on "the record evidence and the reasonable inferences therefrom."  *State v. New*, 526 S.E.2d 237, 240 (S.C. Ct. App. 1999).  At trial, the State presented evidence that (1) the shirt Folkes wore during the fight was found in a trashcan (Dkt. No. 14-1 at 247); (2) Folkes had a backpack with

him during and after the fight (*Id.* at 244, 324); (3) homeless people kept their belongings in the park (*Id.* at 304); (4) Folkes had been homeless and spent time in that park (*Id.* at 131); and (5) Folkes was wearing clothes when he was arrested (*Id.* at 288, 758). That evidence supports the prosecutor's argument. Thus, as the PCR court found, counsel was not ineffective because the objection Folkes wanted would have been unfounded. *See Smith v. Padula*, 444 F. Supp. 2d 531, 539 (D.S.C. 2006) ("[T]rial counsel cannot be ineffective for failing to make a meritless[,] futile objection."). The undersigned recommends denying this ground.

## XVI.   Ground Twenty-One

In the direct appeal, appellate counsel focused on the trial court's refusal to give the ABHAN absence-of-malice charge trial counsel requested. (Dkt. No. 14-1 at 452.) She did not raise a separate claim challenging the jury charges on ABHAN that the trial court provided.   In PCR, Folkes argued appellate counsel should have done so. (Dkt. No. 14-2 at 528.) At the PCR hearing, appellate counsel admitted she did not make the charges given a separate issue; instead, she "pushed" that and the failure to give the requested instruction "all together in one issue." (Dkt. No. 14-1 at 579–80.)

The PCR court ruled Folkes did not prove either deficient performance or prejudice on this claim. (*Id.* at 850–52.) As to performance, the PCR court found appellate counsel acted appropriately by raising "three stronger, meritorious issues" for Folkes in the direct appeal. (*Id.* at 852.) As to prejudice, the court found there was no reasonable likelihood that, had appellate counsel separately challenged the ABHAN instructions in the appeal, she would have prevailed. (*Id.*) The PCR court therefore denied Folkes' claim. (*Id.*)

The PCR court conducted its analysis inside a legal framework that defers strongly to appellate counsel's issue selections. Appellate lawyers have no duty to raise every meritorious issue on appeal. *E.g.*, *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Their choice to not raise an

**JA97**

issue cannot be quickly second-guessed; rather, that choice is presumed to be effective. *See id.* at 754. In most cases, a prisoner can rebut that presumption "only when ignored issues are clearly stronger than those presented." *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

The PCR court's weighing of the potential claims' various strengths is problematic.[3] The PCR court stated appellate counsel raised three issues in the direct appeal; actually, she raised just one, and it was closely related to the issue Folkes says she should have raised. (Dkt. No. 14-1 at 452.) Although the court's error may have been typographical, rather than analytical, the undersigned is nevertheless hesitant to resolve this claim on the performance prong of *Strickland*.

The PCR court's no-prejudice finding, however, is well-supported. In their respective briefs on direct appeal, both Folkes' appellate counsel and the State's attorney debated whether the trial court's ABHAN instructions accurately stated the law even though they did not include the language trial counsel requested. (*See* Dkt. No. 14-1 at 461–66, 476–80.) Thus, although appellate counsel did not raise the instructions' correctness as an independent ground for relief, both sides put the issue of the correct elements of ABHAN before the Court of Appeals.

Importantly, the Court of Appeals addressed it as well. The court affirmed through a one-paragraph memorandum decision:

> Clinton C. Folkes was convicted of [ABWIK] and was sentenced to life imprisonment without the possibility of parole. On appeal, Folkes argues the trial court erred in failing to charge the jury the absence of malice is not an element of [ABHAN]. We affirm pursuant to Rule 220(b)(1), SCACR, and the following authorities: *State v. Tyler*, 348 S.C. 526, 530–31, 560 S.E.2d 888, 890 (2002) ("[T]he absence of malice is not a required element of the offense of ABHAN."); *State v. Curry*, 370 S.C. 674, 682, 636 S.E.2d 649, 653 (Ct. App. 2006) ("A charge is sufficient if, when considered as a whole, it covers the law applicable to a case. The substance of the law is what must be charged to a jury, not any particular verbiage.") (internal quotation marks and citations omitted).

---

[3]     The Warden agues the PCR court's assessment is a state-law ruling that this Court may not review. Although the Warden cites Supreme Court cases saying federal habeas courts cannot disturb state court's rulings on state law, he does not cite any cases saying that a post-conviction court's assessment of appellate counsel's issue selection is a question of state law.

**JA98**

(Dkt. No. 14-1 at 485.)  Especially since the parties tied their arguments about the omitted charge to the sufficiency of the trial court's ABHAN instructions, the Court of Appeals' quotation of *Curry*—particularly the first quoted sentence—shows it reviewed the instructions and found them, as a whole, appropriate.  In other words, although appellate counsel did not make the instructions' correctness a separate issue, the Court of Appeals considered that question in the course of ruling on the closely related issue she did raise.  It was thus unlikely that appellate counsel's handling of the appeal prejudiced Folkes.

The absence of prejudice defeats an ineffective-assistance claim.  *See Strickland*, 466 U.S. at 697.  Thus, although the PCR court's analysis of this claim contained an error (even if, perhaps, just a typo), its ultimate disposition of the claim was not legally or factually unreasonable.  The undersigned therefore recommends denying this ground.

### XVII.  Ground Twenty-Two

Finally, during the PCR hearing, Folkes testified he did not accept the State's plea offers because he was worried doing so would have unintended consequences.  (Dkt. No. 14-2 at 729–30.)  He was concerned that even if the trial court accepted a negotiated ABWIK plea and sentenced him to the agreed-upon number of years in prison, the state Department of Corrections would nevertheless interpret the sentence as one of life without parole.  (*Id.*)

Based on that testimony, Folkes asserted one more claim after the PCR hearing.  (Dkt. No. 14-2 at 770.)  He alleged that when lead trial counsel presented the State's plea offers to him, counsel failed to explain that pleading guilty under an agreement with a negotiated sentence would not trigger a mandatory life without parole designation.  (*Id.*)

The PCR court never addressed this claim in its order.  Folkes did not file a motion asking the court to rule on the claim.  However, he raised the issue in his PCR certiorari petition. (Dkt. No. 14-4 at 44–47.)

**JA99**

### A.    Procedural Default

The PCR court never addressed this ground.  Instead of filing a motion asking the court to rule upon it, Folkes appealed.  Folkes' failure to ask the PCR court to rule on the issue meant it was not preserved for appellate review.  *See Marlar v. State*, 653 S.E.2d 266, 266 (S.C. 2007) (per curiam).

### B.    Merits

Because no state court ever adjudicated this claim on the merits, § 2254(d)'s standard of review would not govern merits review here; rather, the Court's review would be *de novo*.  *See Cone v. Bell*, 556 U.S. 449, 472 (2009).[4]  However, even under that more generous standard, the undersigned cannot see merit in Folkes' claim.  Lead trial counsel testified that when he and Folkes discussed the plea offers, Folkes understood that the offers, if accepted, "would alleviate the life without parole."  (Dkt. No. 14-2 at 652.)  There was "no ambiguity in [Folkes'] mind," counsel said—Folks "knew" that if he accepted the State's offers, he would be "getting ten or twenty years in prison, not life without parole."  (*Id.*)

Although the PCR court made no findings on this issue,[5] it is notable that, every time the court weighed counsel's and Folkes's credibility, it believed counsel over Folkes.  Those

---

[4]    The undersigned does not mean to suggest that, if the Court reaches the merits of Ground Twenty-Two, Folkes would be free to submit any evidence on the claim he wants.  Rather, even if a claim was never adjudicated on the merits in state court, § 2254 "still restricts the discretion of federal habeas courts to consider new evidence" for that claim.  *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011).  The Court may not consider evidence outside the state-court record unless either (1) the petitioner was not at fault for that evidence's omission from the state proceedings or (2) he satisfies "stringent" criteria laid out in § 2254(e)(2).  *Holland v. Jackson*, 542 U.S. 649, 652–53 (2004) (per curiam); *Williams v. Taylor*, 529 U.S. 420, 437 (2000).  To meet those criteria, Folkes would have to show his claim relies on either "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or "a factual predicate that could not have been previously discovered through the exercise of due diligence."  § 2254(e)(2)(A).  He would also need to show that the facts underlying his claim "would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  § 2254(e)(2)(B).  Folkes has not offered any proof or argument satisfying either of § 2254(e)'s options.  Thus, if the Court were to reach the merits, it should analyze the claim using only the existing record.

[5]    In his summary judgment brief, the Warden states the PCR court found "lead trial counsel more credible than [Folkes].  (Attachment 1, 834)."  (Dkt. No. 14 at 31.)  The credibility finding the Warden cites related only to

credibility findings tend to support counsel's testimony here, as it is consistent with other things the PCR court found credible. For example, as mentioned in Ground Four, Folkes testified at the PCR hearing that trial counsel did not explain his options for testifying or presenting a defense. The PCR court discredited that testimony, instead believing lead trial counsel's testimony that he did explain those options. Similarly, as noted above, the record shows that trial counsel did several other things Folkes accused him of not doing. The undersigned is thus persuaded that, contrary to Folkes' accusation, a reasonable trier of fact could find only that trial counsel adequately informed Folkes he could avoid a no-parole sentence by accepting the State's plea offers. Consequently, if the Court were to reach the merits of this claim, the undersigned would nevertheless recommend denying it.

## XVIII. Certificate of Appealability

If the Warden's summary judgment motion is granted, the District Judge will need to decide whether to issue a certificate of appealability. *See* Rule 11(a), Rules Governing § 2254 Cases. A certificate may be issued only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a petitioner's constitutional claims have been denied on the merits, the petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell*, 537 U.S. 322, 338 (2003) (citation and quotation marks omitted). Where a petitioner's constitutional claims are dismissed on procedural grounds, the petitioner must show both (1) that jurists of reason would find it debatable whether the petition states a valid claim of denial of a constitutional right, and (2) that jurists of reason would find it debatable whether the district

---

Ground Four. (*See* Dkt. No. 14-2 at 834 (stating lead trial counsel's "testimony *regarding this allegation* should be afforded great weight" (emphasis added)). If the Warden is asserting that credibility finding was intended to apply to Ground Twenty-Two, he is mistaken.

**JA101**

court was correct in its procedural ruling. *Rose v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001). The undersigned does not see a basis for issuing a certificate in this case.

## **<u>CONCLUSION</u>**

For the above reasons, the undersigned recommends the Court grant the Warden's motion, dismiss this case with prejudice, and decline to issue a certificate of appealability.

**IT IS SO RECOMMENDED.**

November 15, 2019                              MARY GORDON BAKER
Charleston, South Carolina            UNITED STATES MAGISTRATE JUDGE

The parties' attention is directed to the **important notice** on the next page.

**JA102**

2:19-cv-00760-RMG    Date Filed 11/15/19    Entry Number 19    Page 34 of 34

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

**JA103**

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | | |
|---|---|---|
| Clinton Folkes, # 216506, | ) | Civil Action No. 2:19-0760-RMG |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| Warden Nelsen, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Before the Court is the Report and Recommendation ("R & R") of the Magistrate Judge (Dkt. No. 19) recommending that the Court grant Respondent's motion for summary judgment (Dkt. No. 15) on Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the Court adopts in part and declines to adopt in part the R & R as the order of the Court. Respondent's motion for summary judgment is granted as to Grounds 1-2 and 4-22. Respondent's motion for summary judgment is denied without prejudice as to Ground 3 to allow for appointment of counsel and further briefing on issues raised by this Ground.

## I.    Background

Petitioner Clinton Folkes proceeds *pro se* to seek a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is incarcerated on a term of life imprisonment without possibility of parole. In 2008, he was tried in the Richland County Court of General Sessions and found guilty of assault and battery with intent to kill. The conviction stemmed from a July 2007 physical fight during which Petitioner cut a man in the neck with a knife and was heard at the time, by witnesses who testified at trial, to have said, "I should have killed you[.]" (Dkt. No. 14-1 at 245, 247, 436.) The Warden has moved for summary judgment on Petitioner's § 2254 motion, to which Petitioner

**JA104**

responded in opposition. The Magistrate Judge recommends that the Warden be granted summary judgment.

**II.      Legal Standard**

**A.      Review of R & R**

The Magistrate Judge makes a recommendation to the Court that has no presumptive weight and the responsibility to make a final determination remains with the Court. *See, e.g.*, *Mathews v. Weber*, 423 U.S. 261, 270-71 (1976). The Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Where there are specific objections to the R & R, the Court "makes a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* In the absence of objections, the Court reviews the R & R to "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. Civ. P. 72 advisory committee's note; *see also Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983) ("In the absence of objection . . . we do not believe that it requires any explanation.").

**B.      Motion for Summary Judgment**

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The movant has the initial burden of demonstrating that there is no genuine

**JA105**

issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, to survive summary judgment the respondent must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

## C.    Federal Habeas Relief Pursuant to 28 U.S.C. § 2254

A state prisoner who challenges matters "adjudicated on the merits in State court" can obtain federal habeas relief only if he shows that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). When reviewing a state court's application of federal law, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). The state court's application is unreasonable if it is "objectively unreasonable, not merely wrong." *White v. Woodall*, 572 U.S. 415, 419 (2014). Meaning, the state court's ruling must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The state court's determination is presumed correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The state court's decision "must be granted a deference and latitude that are not in operation" when the case

**JA106**

is considered on direct review. *Harrington*, 562 U.S. at 101. This is because habeas corpus in federal court exists only to "guard against extreme malfunctions in the state criminal justice systems." *Id.* at 102 (citation and internal quotation marks omitted). Accordingly, pursuant to 28 U.S.C. § 2254(d), a federal habeas court must (1) determine what arguments or theories supported or could have supported the state court's decision; and then (2) ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of the United States Supreme Court. *Harrington*, 562 U.S. at 102. "If this standard is difficult to meet, that is because it was meant to be." *Id.*

Before the petitioner may pursue federal habeas relief to this standard, he must first exhaust his state court remedies. 28 U.S.C. § 2254(b)(1)(A). The petitioner "must present his claims to the state's highest court," *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997) (abrogated on other grounds by *United States v. Barnette*, 644 F.3d 192 (4th Cir. 2011)), which requires the petitioner to have "fairly present[ed] to the state court both the operative facts and the controlling legal principles associated with each claim." *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation marks omitted). A federal habeas court should not review the merits of claims that would be found to be procedurally defaulted or barred under independent and adequate state procedural rules. *Lawrence v. Banker*, 517 F.3d 700, 714 (4th Cir. 2008). Rather, for a procedurally defaulted claim to be properly considered by the federal habeas court, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## III.   Discussion

Petitioner's § 2254 petition raises four grounds for relief, each on the basis of "ineffective assistance of counsel" or "judicial error." (Dkt. No. 1.) Some of these habeas grounds then cite to

**JA107**

Petitioner's application for post-conviction relief ("PCR"). The original application for PCR similarly raised "ineffective assistance of counsel" and "judicial error" as its two grounds for relief. (Dkt. No. 14-1 at 492.) In support of these PCR grounds, Petitioner alleged that "1) counsel failed to call key witnesses for the defense; 2) that counsel failed to properly investigate a defense presented by the applicant; and that 3) counsel failed to object to the use of a knife in the courtroom (State's 25) that was not even used in the crime (pg. 108). See State v. McDonald; 4) counsel failed to object to other issues, like closing argument from solicitors, see State v. Simmons" and that "the court failed to inform him of his right to put up a defense without him having to testify, only that he could remain silent." (Dkt. No. 14-1 at 496.)   Petitioner later filed an amended application for PCR that alleged twenty-one additional grounds for relief relating to ineffective assistance of trial counsel. (*See* Dkt. No. 14-2 at 314-17.)  The PCR court conducted a two-day evidentiary hearing (Tr. at Dkt. No. 14-2 at 44-251), after which it dismissed the application for PCR in a forty-six-page written order (Dkt. No. 14-2 at 313-58).  Petitioner appealed the order of dismissal (Dkt. No. 14-2 at 359) and petitioned for a writ of certiorari (Dkt. No. 14-4), which the South Carolina Court of Appeals denied. (Dkt. No. 14-6.)

A petitioner may demonstrate ineffective assistance of counsel by showing the attorney's work was both deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  An attorney's performance is deficient if it was unreasonable under the circumstances of the case and the then-prevailing professional norms. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). Prejudice requires a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Kimmelman*, 477 U.S. at 384.  The *Strickland* test for ineffective assistance of counsel is, therefore

**JA108**

highly deferential to the attorney. The standard for § 2254 relief is itself highly deferential to the state court. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). As a result, when the state court adjudicated an ineffective assistance claim on its merits, the § 2254 district court's review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). The district court's focus is "not whether counsel's actions were reasonable," but rather "whether there is any reasonable argument that [the petitioner's] counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

The analysis is notably different, however, if the claim establishes that the defendant was denied the "actual or constructive" assistance of counsel at a critical stage of the criminal proceeding. This extends to the denial of counsel on appeal. Under such circumstances, the normal presumption of the regularity of state proceedings is cast in doubt and there is a presumption of prejudice without the necessity of showing a likelihood of success. *Smith v. Robbins*, 528 U.S. 259, 286 (2000); *Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000); *Penson v. Ohio*, 488 U.S. 75, 88 (1988); *United States v. Poindexter*, 492 F.3d 263, 268 (4th Cir. 2007). Further, there is a "constitutionally imposed duty to consult with the defendant about an appeal" if "a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal)." *Roe*, 528 U.S. at 480.

After careful review of the R & R, Petitioner's objection to it[1], and the record on summary judgment—including affording Petitioner's submissions an appropriately liberal construction for

---

[1] The extended deadline by which Petitioner was to file objections to the R & R was December 5, 2019. On December 9, 2019, the district court received a letter from Petitioner dated "12/4/2019" stating his legal mail was being returned to the court. (Dkt. No. 21.) However, the R & R was returned to the district court as "inmate refused, 11/22/19." (Dkt. No. 22.) In an abundance of caution, the Court extended the objection deadline to January 3, 2020 and re-mailed the R & R to Petitioner. (Dkt. No. 23.) Petitioner filed objections to the R & R. (Dkt. No. 25.) He then moved

**JA109**

2:19-cv-00760-RMG    Date Filed 02/12/20    Entry Number 28    Page 7 of 9

a *pro se* litigant, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) and construing the facts to the nonmovant's benefit—the Court finds that the Magistrate Judge correctly concluded that Respondent should be granted summary judgment regarding Grounds 1-2 and 4-22. The Magistrate Judge comprehensively addressed the grounds in turn, analyzing for each both the merits and risk of procedural default against the voluminous record of trial, appellate, PCR and certiorari arguments and decisions, including the trial and PCR evidentiary hearing transcripts. The Court finds no clear error on the face of the Magistrate Judge's finding that Petitioner has not satisfied the doubly deferential *Strickland* habeas standard and did not preserve certain grounds for habeas review. For these reasons, the Warden's motion for summary judgment regarding Grounds 1-2 and Grounds 4-22 is granted and Petitioner's motion for § 2254 habeas relief is denied as to those Grounds.

The record before the Court raises questions regarding Ground 3 that the Court finds have not been adequately addressed by the briefing of the Respondent and the Petitioner acting *pro se*. These include questions concerning whether Petitioner was actually or constructively denied counsel from the time of the decision of the South Carolina Court of Appeals on the direct appeal until the time expired for petitioning for rehearing—a necessary step if review was to be sought by certiorari before the South Carolina Supreme Court. Further, the record raises a question concerning whether Petitioner received proper consultation on his appeal rights from an attorney following the decision of the South Carolina Court of Appeals.

---

for an extension to again object, which the Court granted. (Dkt. No. 27.) No additional objections were filed.

**JA110**

The Court denies without prejudice Respondent's motion for summary judgment regarding Ground 3. By separate orders, the Court will appoint counsel for Petitioner and provide the parties a new briefing schedule and guidance regarding the issues that need to be addressed.

## IV.    Certificate of Appealability

The governing law provides:

> (c)(2) A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right.

> (c)(3) The certificate of appealability . . . shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253; *see also* Rule 1(b) Governing Section 2254 Cases in the United States District Courts ("The district court may apply any or all of these rules to a habeas corpus petition not covered by [28 U.S.C. § 2254]."). A petitioner may satisfy this standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683 (4th Cir. 2001). "[T]o secure a certificate of appealability on claims that the district court denied pursuant to procedural grounds, [the petitioner] must demonstrate both (1) that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Rose v. Lee*, 252 F.2d 676, 684 (4th Cir. 2001) (internal quotation marks omitted).

Here, the legal standard for the issuance of a certificate of appealability has not been met regarding Grounds 1-2 and 4-22 because a reasonable jurist would not find it debatable that Petitioner has not satisfied the deferential *Strickland* standard in the context of habeas relief, nor

**JA111**

that certain claims were not preserved for federal habeas review. Therefore, a Certificate of Appealability is denied regarding Grounds 1-2 and 4-22.

## V.    Conclusion

For the foregoing reasons, Court **ADOPTS IN PART and DECLINES TO ADOPT IN PART** the R & R (Dkt. No. 19) as the order of the Court. The Court **GRANTS** Respondent's motion for summary judgment (Dkt. No. 15) as to Grounds 1-2 and 4-22. A Certificate of Appealability is **DENIED** as to these Grounds. The Court **DENIES WITHOUT PREJUDICE** Respondent's motion for summary judgment as to Ground 3.

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Judge

February 12, 2020
Charleston, South Carolina

**JA112**

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

Clinton Folkes, # 216506,          )          Civil Action No. 2:19-0760-RMG
                                   )
                  Plaintiff,       )
                                   )
        v.                         )                    **ORDER**
                                   )
Warden Nelsen,                     )
                                   )
                  Defendant.       )
_____)

      Petitioner, an inmate, has *pro se* petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The Court granted in part and denied in part Respondent's motion for summary judgment. In reviewing the remaining claim, it is apparent to the Court that the *pro se* Plaintiff "has a colorable claim but lacks the capacity to present it." *Zuniga v. Effler*, 474 Fed. Appx. 225, 2012 WL 2354464, at *1 (4th Cir. 2012). In such circumstances, the Court has the discretion to appoint counsel for the *pro se* litigant if he is unable to afford counsel. 28 U.S.C. § 1915(e).

      The Court finds that appointment of counsel is proper under these circumstances and **HEREBY APPOINTS** Jason Luck of the Charleston County Bar as counsel for Petitioner.

      **AND IT IS SO ORDERED.**

 

_____
Richard Mark Gergel
United States District Judge

February 12, 2020
Charleston, South Carolina

**JA113**

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| Clinton Folkes, #216506 | ) | |
| | ) | |
| Petitioner, | ) | |
| vs. | ) | Civil Action No. 2:19-0760-RMG |
| | ) | |
| Warden Nelsen, | ) | |
| | ) | |
| Respondent. | ) | **ORDER** |
| | ) | |
| | ) | |

By separate Orders, this Court granted summary judgment regarding Grounds 1-2 and 4-22 of Petitioner's Petition for Habeas Corpus, denied summary judgment without prejudice on Ground 3, and appointed Petitioner counsel to address issues remaining before the Court. In denying without prejudice summary judgment regarding Ground 3, the Court noted that there were substantial issues raised by that Ground that were not adequately briefed by Respondent and Petitioner, then acting *pro se*.

The Court hereby sets the following briefing schedule regarding Ground 3:

1.   Respondent is to file a supplemental brief in support of its motion for summary judgment and in opposition to Petitioner's habeas petition on or before March 13, 2020;

2.   Petitioner is to file a supplemental brief in support of his habeas petition and in opposition to the motion for summary judgment 30 days thereafter; and

3.   Respondent may, but is not required, to file a reply within 15 days after Petitioner's supplemental brief.

**JA114**

In an effort to provide some guidance to the parties and their counsel regarding issues of concern, the Court has set forth below a series of issues and questions which should be addressed by Petitioner and Respondent in the supplemental briefs to be submitted in this matter.  The Court does not presume to limit the parties only to these issues and questions, but expects them to be addressed in the course of presenting supplemental briefs to the Court with appropriate references to the record and legal authorities:

A.    Did an attorney acting on behalf of Petitioner review the decision of the South Carolina Court of Appeals of September 24, 2010 and make a determination whether a petition for rehearing should be filed?  If the answer is in the affirmative, identify that attorney.

B.    Did an attorney acting on behalf of Petitioner consult with him regarding whether a petition for rehearing should be filed following the decision of the South Carolina Court of Appeals of September 24, 2010?  If the answer is in the affirmative, identify that attorney.

C.    Were the decisions whether to file a request for rehearing and a petition for certiorari following the decision of the South Carolina Court of Appeals of September 24, 2010 critical stages of the criminal proceedings?

D.    If no attorney acting on behalf of the Petitioner (i) reviewed the decision of the South Carolina Court of Appeals, (ii) made a decision whether a request for rehearing should be made, or (iii) consulted with Petitioner regarding his right to seek rehearing due to an attorney assignment error within the offices of his court appointed appellate counsel, would such failures, individually or collectively,

**JA115**

constitute the actual or constructive denial of appellate counsel and/or constitute

ineffective assistance of counsel?

E.   If the Court were to determine that Petitioner was actually or constructively

denied counsel at a critical stage of the criminal proceeding, would

prejudice be presumed without the necessity of Petitioner showing actual

prejudice or a likelihood of prevailing on appeal?

F.   The letter sent to Petitioner of September 28, 2010 (Dkt. No.

14-2 at 253) states that Petitioner's Writ of Certiorari had been denied,

the court had granted his attorney her petition to be relieved, and Petitioner

had exhausted his state court remedies.  Does that communication meet

professional standards of competence and reasonableness?  Was that

communication sent by an attorney acting on behalf of the Petitioner?

G.   If the Court were to determine that Petitioner was denied his right to

counsel at a critical stage of the criminal proceeding and that he had

*per se* suffered prejudice as a result, what would be the appropriate

remedy?  Would reinstating Petitioner's right to seek rehearing to

the South Carolina Court of Appeals and, if necessary, to petition

for certiorari, provide him his appropriate constitutional remedy?

**AND IT IS SO ORDERED.**

Richard Mark Gergel
United States District Judge

February 12, 2020
Charleston, South Carolina

3

**JA116**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Clinton Folkes, # 216506, | ) | Case No. 2:19-cv-760-RMG-MGB |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Warden Nelsen, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Clinton Folkes, a *pro se* state prisoner, seeks habeas corpus under 28 U.S.C. § 2254. (Dkt. No. 1.) The Warden seeks summary judgment. (Dkt. No. 15.) This Court has granted the Warden's motion for summary judgment as to Grounds One, Two, and Four through Twenty-Two. (Dkt. No. 28.) However, the parties were directed to submit supplemental briefing as to Folkes' Ground Three. (Dkt. No. 30.) The parties have submitted supplemental briefing, and the motion is ripe for review. Under 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(c) (D.S.C.), the undersigned is authorized to review the motion and submit a recommendation to the District Judge. For the following reasons, the undersigned recommends granting the Warden's motion and dismissing this case with prejudice.

## BACKGROUND

The undersigned provided a detailed summary of the facts and procedural history of this matter in the previous report and recommendation. (*See* Dkt. No. 19.) To assess the remaining ground in Folkes' habeas petition, it is sufficient to note that Folkes is serving life in prison without the possibility of parole for assault and battery with intent to kill ("ABWIK"). (Dkt. No. 14-1 at 433, 436.) His imprisonment is the product of a July 2007 fight he started at Finlay Park in Columbia, South Carolina. In the fight, he slashed the victim's arm and neck with a knife.

**JA117**

(*Id.* at 118.)  Following his conviction in a jury trial, Folkes availed himself of a direct appeal and a post-conviction relief ("PCR") action in state court, but he was unsuccessful.

## PROCEDURAL HISTORY

On March 11, 2019, Folkes filed his habeas petition, raising the same twenty-two claims he raised in his PCR action.  (Dkt. No. 1.)  The Warden moved for summary judgment, and the undersigned recommended granting the motion.  (Dkt. Nos. 15; 19.)  The District Judge adopted the report and recommendation as to Grounds One, Two, and Four through Twenty-Two but found that there were questions regarding Ground Three that were not adequately addressed in the parties' briefing.  (Dkt. Nos. 28; 30.)  Accordingly, the District Judge appointed counsel to represent Folkes and directed the parties to submit supplemental briefing as to Ground Three.  (Dkt. Nos. 29; 30.)  The parties have now filed the requested supplemental briefing, and the remaining issue—whether summary judgment should be granted as to Ground Three—is ripe for review.

## LEGAL STANDARD

Habeas corpus in federal court exists to "guard against extreme malfunctions in the state criminal justice systems."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citation and internal quotation marks omitted).  Federal habeas is neither an alternative to state-court relief nor an additional chance to appeal erroneous state-court rulings.  *See id.*  That preference for, and deference to, state courts is borne out in the various constraints placed on federal courts.  *See Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (per curiam) (stating § 2254 "imposes important limitations on the power of federal courts to overturn the judgments of state courts in criminal cases"); *see also Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (stating § 2254 "reflect[s] a presumption that state courts know and follow the law" (citation and internal quotation marks omitted)).

For instance, state prisoners who challenge matters "adjudicated on the merits in State court" cannot get relief in federal court unless they show that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" announced by the Supreme Court or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d). That means a state court's ruling must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Federal courts must also defer to state courts' factual determinations, which are presumed correct until the prisoner rebuts that presumption with clear and convincing evidence. § 2254(e)(1).

The ultimate issue in this case is, of course, whether Folkes should receive habeas relief under these standards. However, the Warden's summary judgment motion and briefing presents narrower questions. Summary judgment is appropriate only if the moving party shows that "there is no genuine dispute as to any material fact" and that he is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also* Rule 12, Rules Governing § 2254 Cases (stating courts may apply in habeas cases any of the Federal Rules of Civil Procedure to the extent they are not inconsistent with statutes or the § 2254 rules). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**JA119**

While delving into a more detailed analysis of Ground Three, the undersigned is mindful of the following questions:

(1) Are there genuine issues of fact as to whether Folkes' Ground Three is properly before the Court?

(2) Are there genuine issues of fact as to the merits of Folkes' Ground Three?

(3) If the answer to either (or both) of the first two questions is "no," is the Warden entitled to judgment as a matter of law?

In answering those questions, the undersigned has carefully considered the record before the Court.

## DISCUSSION

In Ground Three, Folkes alleges that "Appellate Counsel was ineffective for failing to file a Petition for Rehearing in the Court of Appeals thereby depriving the Applicant of his right to seek certiorari in the Supreme Court of South Carolina." (Dkt. No. 1-1 at 7.)

The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). A petitioner proves ineffective assistance by showing his attorney's performance was deficient and prejudiced him. *Id.* at 687. An attorney's performance is deficient if it was unreasonable under the circumstances of the case and under then-prevailing professional norms. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). Prejudice is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Kimmelman*, 477 U.S. at 384.

*Strickland* is highly deferential to counsel, and § 2254(d) is highly deferential to state courts. *Harrington*, 562 U.S. at 105. That means when a state court has adjudicated an ineffective-assistance claim on the merits, this Court's review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). In other words, the question becomes "not whether

counsel's actions were reasonable," but "whether there is any reasonable argument that [Folkes']

counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.[1]   The

undersigned is mindful of the doubly deferential standard in analyzing Folkes' Ground Three.

*State Court Proceedings*

M. Celia Robinson, an appellate defender with the South Carolina Commission on

Indigent Defense, Division of Appellate Defense ("Appellate Defense"), represented Folkes in

his direct appeal.  (Dkt. No. 14-1 at 452.)   Appellate counsel raised the following issue in the

direct appeal:  "Did the trial judge err reversibly in refusing to issue the requested charge on the

lesser included offense of Assault and Battery of a High and Aggravated Nature (ABHAN)

indicating that the absence of malice is not a required element for an ABHAN conviction?"

(Dkt. No. 14-1 at 455.)   The South Carolina Court of Appeals affirmed Folkes' conviction in a

per curiam opinion issued on September 24, 2010.  (Dkt. No. 14-1 at 489–90.)   The matter was

remitted to the lower court on October 18, 2010.  (Dkt. No. 14-1 at 491.)

In his PCR action, Folkes challenged appellate counsel's failure to file a petition for

rehearing following the court of appeals' affirmance of his conviction.  (Dkt. No. 14-2 at 29.)

Appellate counsel testified at the PCR hearing.  (*See id.* at 79–101.)   As noted above, when

appellate counsel represented Folkes, she practiced at Appellate Defense, which handles criminal

appeals for the indigent.  (*See id.* at 80–81.)   She resigned while Folkes' appeal was pending; the

Court of Appeals issued its opinion ten days after she left.  (*Id.* at 50, 80–81.)   Appellate counsel

---

[1] Subsection 2254(d)'s standards are to be applied to the decision from the highest state court to
decide the claim at issue on the merits.  *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).
Where, as here, the highest state court rules summarily, the federal habeas court should "look
through" that unexplained decision to the last state-court decision that provides a relevant
rationale, and "should then presume that the unexplained decision adopted the same reasoning."
*Id.*   In this case, the PCR court was the only one to issue a reasoned decision on Folkes' claim.
As neither party contends the court of appeals denied certiorari on different reasoning than what
the PCR court provided, the undersigned has used the PCR court's reasoning to analyze the

**JA121**

testified that, had she stayed at Appellate Defense, she "certainly" would have petitioned for rehearing and certiorari. (*Id.* at 81.) "I thought it was a winner. I thought it was clear error. I thought it was reversible." (*Id.* at 81–82.)

The chief appellate defender at Appellate Defense, Robert Dudek, testified as well. (*See id.* 14-2 at 49–79.) He testified that, when Folkes' appellate counsel quit, Folkes' case became his responsibility. (*Id.* at 57–58.) He could not recall if, when the Court of Appeals issued its opinion, he read the opinion, reviewed Folkes' file, or assessed whether he should seek rehearing and certiorari. (*Id.* at 58–59.) However, he disagreed with the court of appeals' ruling, and he "wish[ed]" that rehearing and certiorari had been pursued. (*Id.* at 75.)

The PCR court denied the claim.[2] (Dkt. No. 14-2 at 335–38.) The court based its conclusion on the state Supreme Court's ruling in *Douglas v. State* that, in criminal cases, appellate counsel has no duty to pursue rehearing or certiorari after the Court of Appeals issues an adverse decision. *See* 631 S.E.2d 542, 543 (S.C. 2006). (Dkt. No. 14-2 at 336, 338.) The PCR court also cited United States Supreme Court precedent that "[a]n individual has no constitutional right to the effective assistance of counsel when seeking discretionary appellate review." (Dkt. No. 14-2 at 336 (citing *Wainwright v. Torna*, 455 U.S. 586 (1982) (finding no Sixth Amendment right to counsel in pursuing discretionary appeal); *Ross v. Moffitt*, 417 U.S. 600 (1974) (finding no Fourteeth Amendment right to counsel when pursuing discretionary appeal after an appeal of right)).) The PCR court reasoned that because the appellate lawyers had no duty to seek rehearing, and because Folkes had no right to appellate review beyond "his full and complete review by the Court of Appeals," Folkes could not establish either deficiency or prejudice. (*Id.* at 338.)

---

merits of Folkes' claim.

[2] The undersigned notes that pages 24 and 25 of the PCR court's opinion are out of order in the

*Federal Habeas Corpus Proceedings*

The undersigned previously expressed hesitance in accepting the entirety of the PCR court's findings in light of the evidence presented in state court. (Dkt. No. 19 at 10–11.) But, ultimately, due to the deferential nature of habeas corpus review and the precedent that a petition for rehearing is discretionary, the undersigned recommended that summary judgment be granted as to Ground Three. (Dkt. No. 19 at 11.)

The District Judge directed the parties to submit supplemental briefing to address particular questions regarding Ground Three, including:

A.  Did an attorney acting on behalf of Petitioner review the decision of the South Carolina Court of Appeals of September 24, 2010 and make a determination whether a petition for rehearing should be filed? If the answer is in the affirmative, identify that attorney.

B.  Did an attorney acting on behalf of Petitioner consult with him regarding whether a petition for rehearing should be filed following the decision of the South Carolina Court of Appeals of September 24, 2010? If the answer is in the affirmative, identify that attorney.

C.  Were the decisions whether to file a request for rehearing and a petition for certiorari following the decision of the South Carolina Court of Appeals of September 24, 2010 critical stages of the criminal proceedings?

D.  If no attorney acting on behalf of the Petitioner (i) reviewed the decision of the South Carolina Court of Appeals, (ii) made the decision whether a request for rehearing should be made, or (iii) consulted with Petitioner regarding his right to seek rehearing due to an attorney assignment error within the offices of his court appointed appellate counsel, would such failures, individually or collectively, constitute the actual or constructive denial of appellate counsel and/or constitute ineffective assistance of counsel?

E.  If the Court were to determine that Petitioner was actually or constructively denied counsel at a critical stage of the criminal proceeding, would prejudice be presumed without the necessity of Petitioner showing actual prejudice or a likelihood of prevailing on appeal?

---

Appendix. (*See* ECF No. 14-2 at 337–38.)

F. The letter sent to Petitioner of September 28, 2010 (Dkt. No. 14-2 at 253) states that Petitioner's Writ of Certiorari had been denied, the court had granted his attorney her petition to be relieved, and Petitioner had exhausted his state court remedies. Does that communication meet professional standards of competence and reasonableness? Was that communication sent by an attorney acting on behalf of the Petitioner?

G. If the Court were to determine that Petitioner was denied his right to counsel at a critical stage of the criminal proceeding and that he had per se suffered prejudice as a result, what would be the appropriate remedy? Would reinstating Petitioner's right to seek rehearing to the South Carolina Court of Appeals and, if necessary, to petition for certiorari, provide him his appropriate constitutional remedy?

(Dkt. No. 30 at 2–3.) The undersigned outlines the parties' responses to these questions below.

*Did an attorney review the appellate court decision and decide whether to petition for rehearing?*

The parties disagree as to whether an attorney reviewed the decision of the South Carolina Court of Appeals and decided not to file a petition for rehearing. (*See* Dkt. No. 31 at 2 ("Despite conflicting evidence, it appears that Dudek made the decision not to seek certiorari in petitioner's case."); Dkt. No. 32 at 3 ("No. . . . Robinson's supervisor Robert Dudek, who was never counsel of record for Folkes, does not recall reviewing this opinion.").)

It is clear that Robinson did not review the court of appeals decision because she had already resigned when it was issued. (Dkt. No. 14-2 at 80–81.) Nor did she have any input into whether to seek rehearing and petition for certiorari following the decision. (*Id.*)

However, it is unclear from the evidence adduced at the PCR evidentiary hearing whether Dudek reviewed the decision and decided not to petition for rehearing. Dudek testified that since Robinson had resigned prior to the decision in Folkes' appeal, "it should have been run by me as far as a decision whether we would have proceeded with rehearing . . . which is the prerequisite to go certiorari to the state supreme court." (Dkt. No. 14-2 at 57–58.) But he had "no

**JA124**

independent recollection of making a decision to close this case and not go certiorari." (Dkt. No. 14-2 at 58.)

In short, it is simply unclear from the record whether an attorney acting on Folkes' behalf reviewed the decision of the state court of appeals and decided whether to petition for rehearing. Robinson did not. Dudek may have (and "should have"), but he could not recall.

*Did an attorney consult with Folkes about filing a petition for rehearing?*

The parties agree that no such consultation occurred. (Dkt. Nos. 31 at 3; 32 at 3.) Notably, Dudek's testimony indicated that the decision as to whether to continue with an appeal "rests with the attorney" and is not a decision with which counsel at Appellate Defense necessarily consult a defendant. (Dkt. No. 14-2 at 56–57, 73–75.)

*Were the decisions whether to file a petition for rehearing and/or a petition for writ of certiorari critical stages?*

"The Sixth Amendment safeguards to an accused who faces incarceration the right to counsel at all critical stages of the criminal process." *Iowa v. Tovar*, 541 U.S. 77, 80 (2004) (citing *Maine v. Moulton*, 474 U.S. 159, 170 (1985); *United States v. Wade*, 388 U.S. 218, 224 (1967)). The United States Supreme Court has "characterized a 'critical stage' as one that 'held significant consequences for the accused.'" *Woods v. Donald*, 575 U.S. 312, 315 (2015) (quoting *Bell v. Cone*, 535 U.S. 685, 696 (2002)).

In response to the District Court's question, Folkes states that both decisions are critical stages, but he fails to cite any authority specifically stating as much. (*See* Dkt. No. 32 at 4.)

The Warden, on the other hand, argues that "[w]here the United States Supreme Court has held no right to counsel exists, it follows that there can be no right to effective assistance of counsel. It also follows that the stage of the proceedings is not 'critical.'" (Dkt. No. 31 at 14.) The Warden also notes that "[t]he Supreme Court has never explicitly ruled that the right to

**JA125**

counsel exists to seek a rehearing with an intermediate appellate court" though "a reasonable argument can be made that the right to counsel extends to a petition for rehearing." (Dkt. No. 31 at 8–9.)

> *If an attorney did not review, decide, or consult, would such errors, either individually or collectively, constitute the actual or constructive denial of appellate counsel and/or constitute ineffective assistance of counsel?*

Folkes asserts that he was unrepresented from the time that Robinson left Appellate Defense, thus indicating that he believes he was denied counsel from that point forward. (Dkt. No. 32 at 4–5.) He further asserts that, to the extent he was represented by Dudek after Robinson's departure, he was constructively denied counsel because he was not informed of Robinson's resignation. (*Id.* at 5.)

While not squarely confronting this question, the Warden's submissions imply that there is not a clear answer as to whether such errors would constitute the ineffective assistance of counsel—some federal cases indicate that the right to counsel ends when the court of appeals issues its opinion. (*See* Dkt. No. 31 at 7–13.)

> *If there was an actual or constructive denial of counsel at a critical stage, would prejudice be presumed or would prejudice need to be proven?*

Folkes claims that prejudice should be presumed. (Dkt. No. 32 at 5.) However, even if a presumption of prejudice does not apply, he asserts that he can show a likelihood that he would have prevailed on appeal. (*Id.* at 5–6.)

The Warden disagrees that Folkes can demonstrate prejudice in this case. (Dkt. No. 34 at 4.) The Warden also seems to disagree that a presumption of prejudice is appropriate in this case. (*See* Dkt. No. 34 at 2 ("[I]n order to establish a constructive denial of counsel for failing to subject the case to meaningful adversarial testing, 'the attorney's failure must be complete.'")

**JA126**

(quoting *Bell v. Cone*, 535 U.S. 685, 697 (2002).)  The Warden does not believe that *Cronic*[3] is

applicable in this case.  (*Id.* at 2–4.)

> *Did the letter sent to Folkes after the denial of his direct appeal meet professional*
> *standards?  Was it sent by an attorney?*

Both parties agree the letter did not meet professional standards.  (ECF Nos. 31 at 3; 32 at

6.)

The record reflects that on September 28, 2010, Appellate Defense sent a letter to Folkes

erroneously informing him that his petition for writ of certiorari had been denied by the court of

appeals and that he had exhausted his state court remedies.  (Dkt. No. 14-2 at 253.)  The letter

purports to be signed by Robinson (or on her behalf), but she testified at the PCR evidentiary

hearing that her paralegal at Appellate Defense, Lauren Crews, had actually signed the letter.

(*Id.* at 80.)  Dudek agreed that apparently Crews had signed for Robinson.  (*Id.* at 51–54.)  He

also testified that he was "very confident" that no other attorney would have been assigned to

Folkes' case when the letter was sent.  (*Id.* at 57.)  As to his own involvement in Folkes' appeal,

Dudek testified, "I have no independent recollection of making a decision to close this case and

not go certiorari.  I, frankly, do not have any recollection of, you know, seeing this letter.  And

I'm pretty confident if I had, it would not have gone out."  (*Id.* at 58.)  Crews was not called to

testify in the PCR proceedings.  It does not appear that the letter was reviewed by an attorney

before it was sent.

> *Should habeas relief be granted, what is the appropriate remedy?*

The parties appear to disagree about what type of appellate relief is available at the state

level.  Folkes argues that "at this time the Court of Appeals only has the jurisdiction to entertain

a motion to recall remittitur."  (Dkt. No. 32 at 7.)

---

[3] *United States v. Cronic*, 466 U.S. 648 (1984).

**JA127**

However, the Warden asserts,

> The Court of Appeals likely *does not* have jurisdiction to consider any matter
> relating to this case, even a motion to recall the remittitur. *See Wise v. S.C. Dep't*
> *of Corr.*, 642 S.E.2d 551 (S.C. 2007). In *Wise*, the Supreme Court of South
> Carolina held that "[w]hen the remittitur has been properly sent, the appellate
> court no longer has jurisdiction over the matter and no motion can be heard
> thereafter. The only exception to this rule is when the remittitur is sent down by
> mistake, error or inadvertence of the Court." *Id.* (emphasis added) (internal
> citations omitted).

(Dkt. No. 34 at 6.)

*Habeas Corpus Analysis*

The undersigned now turns to whether habeas corpus relief should be granted for Ground

Three. The specific issue that the PCR court considered was whether "Appellate Counsel was

ineffective for failing to file a Petition for Rehearing in the Court of Appeals thereby depriving

the Applicant of his right to seek certiorari in the Supreme Court of South Carolina." (Dkt. No.

14-2 at 335.) After citing both state and federal case law, the PCR court denied and dismissed

Folkes' claim of ineffective assistance of appellate counsel based on the following reasoning:

> Appellate counsel had no duty to petition for rehearing or to the Supreme Court
> for discretionary review. Furthermore, Applicant had no right to appellate review
> from the Supreme Court following his full and complete review by the Court of
> Appeals. Applicant cannot establish deficiency or prejudice as to this allegation,
> which must be denied and dismissed with prejudice.

(Dkt. No. 14-2 at 338.)

Having reviewed the facts presented to the PCR court and the applicable law, the

undersigned concludes that the PCR court's denial of the claim was not unreasonable. *See Gill v.*

*Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011) (stating § 2254(d)(1) directs federal habeas

courts to "focus[] on the result, not on the reasoning that led to the result"). The Constitution

does not guarantee assistance of counsel in the pursuit of discretionary appellate review. *See*

*Wainwright v. Torna*, 455 U.S. 586, 587–88 (1982) (per curiam) (no Sixth Amendment right to

**JA128**

counsel in pursuing discretionary appeal); *Ross v. Moffitt*, 417 U.S. 600, 610 (1974) (no Fourteenth Amendment right to counsel when pursuing discretionary appeal). Consequently, Folkes was not entitled to the effective assistance of counsel in filing a petition for certiorari to the South Carolina Supreme Court.[4] Arguably, Folkes was similarly not entitled to the effective assistance of counsel in filing a petition for rehearing to the South Carolina Court of Appeals. *See Cabbagestalk v. McFadden*, No. 5:14-cv-3771-RMG-KDW, 2015 WL 4077211, at *36 (D.S.C. July 1, 2015) (finding PCR court reasonably denied ineffective-assistance claim of failure to seek rehearing; petitioner had no right to counsel for that discretionary review). *But see Nichols v. United States*, 563 F.3d 240, 252 (6th Cir. 2009) (asking, but not deciding, "Is a motion for rehearing part of the first-tier appeal (i.e., a motion within the first-tier appeal), or is it a separate review? Does a defendant have a right to the assistance of counsel on a motion for rehearing of an appellate decision?"). The PCR court noted as much and found that appellate counsels' failure to seek rehearing could not serve as the basis for relief.

Folkes has not identified, and the undersigned has not found, a United States Supreme Court case stating that a defendant is entitled to the effective assistance of counsel in filing a petition for a rehearing as part of a direct appeal of right. Federal courts are split on the issue. As the Warden noted, some believe that the right to counsel ends when the decision by the appellate court is issued. (Dkt. No. 31 at 9–13.) *See Jackson v. Johnson*, 217 F.3d 360, 363–64

---

[4] Other federal courts have questioned the logic of this tenet. *See Miller v. Keeney*, 882 F.2d 1428, 1432 (9th Cir. 1989) ("*Torna* . . . rests on a single proposition: If a state is not constitutionally required to provide a lawyer, the constitution cannot place any constraints on that lawyer's performance. Whatever the soundness of this logic, we observe that it has not commanded the Court's respect in other areas of the law. Moreover, we cannot overlook the irony inherent in the fact that while the constitution does not require a state to provide any direct appeals at all, once it has done so a number of constitutional requirements spring into place: The state must provide free transcripts to indigent appellants; cannot require indigent appellants to pay a filing fee; and must provide an attorney. Why the provision of appellate counsel beyond the first appeal as of right should be treated any differently is not self-evident." (citations

**JA129**

(5th Cir. 2000) ("[A]lthough Jackson does make a colorable argument that his opportunity to file a motion for rehearing should be considered the last step in his first appeal of right, a holding to that effect would surely create a new rule of constitutional law.").  Others, like the Sixth Circuit, have questioned that logic, *see Nichols, supra* p. 13, but have made clear that the signature by an appellate court judge is not a clear endpoint for constitutionally-required representation.  *See Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 433 (6th Cir. 2006) ("The court's ultimate decision regarding a particular legal proceeding is *part of that legal proceeding*, and appointed counsel's duties in representing a client during that legal proceeding include the duty of informing her client of the outcome of the proceeding." (emphasis in original)); *see also Gunner v. Welch*, No. 3:09 CV 3009, 2011 WL 10467929, at *8 (N.D. Ohio Mar. 29, 2011) ("[A] decision cannot be logically separated from the proceeding itself; it is the necessary end point of a single process.  The mouth and the source are different points, but manifestly a single river.  As such, if the constitution requires counsel when a defendant journeys on the river, counsel's responsibilities include, in essence, making the full trip.").

There is not clear authority that the receipt and review of the court of appeals decision constitutes a critical stage of appeal.  United States Supreme Court precedent makes clear that a defendant is entitled to counsel on their first appeal as of right.  *See Douglas v. California*, 372 U.S. 353, (1963) (finding that counsel must be appointed to indigent defendants in their first appeal as of right).  If the constitution requires counsel be offered for a first appeal of right, then it logically follows that the receipt and review of the appellate court's opinion would be part of that.  *Cf. United States v. Smith*, 411 F.2d 733, 736 (6th Cir. 1969) (finding the return of a jury verdict to be a critical stage of trial).  Nevertheless, the Supreme Court has not definitively stated that is the case.  In *Ross v. Moffitt*, the Supreme Court declined to extend the right to counsel to

omitted)).

**JA130**

discretionary appeals, emphasizing "the benefit of counsel in examining the record of [the defendant's] trial and in preparing an appellate brief on [the defendant's] behalf for the state Court of Appeals."  417 U.S. at 614.  In finding that a state was not constitutionally required to provide counsel for discretionary appeals, the Court noted that "[a]t that stage [(seeking discretionary review to the North Carolina Supreme Court)] he will have, at the very least, a transcript or other record of trial proceedings, a brief on his behalf in the Court of Appeals setting forth his claims of error, and in many cases an opinion by the Court of Appeals disposing of his case." *Id.* at 615.  The Court further explained,

> Once a defendant's claims of error are organized and presented in a lawyerlike fashion to the Court of Appeals, the justices of the Supreme Court of North Carolina who make the decision to grant or deny discretionary review should be able to ascertain whether his case satisfies the standards established by the legislature for such review.
>
> . . . .
>
> The duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process.

*Id.* at 615–16.  As far as constitutionally required representation, the reasoning in *Ross* appears to put a premium on appellate counsel participating in the identification and presentation of issues for appellate review, but it is unclear whether the Court believes that counsel need also review how the appellate court received those issues and decide if a petition for rehearing should be filed.[5]  Ultimately, neither *Ross*, nor any other Supreme Court opinion identified by the parties deems the receipt and review of an appellate court opinion and the decision as to whether to petition for rehearing as a critical stage of appeal.  The PCR court relied upon Supreme Court

---

[5] For example, in *Ross* the Court notes that "[t]he Supreme Court [of North Carolina] may deny certiorari even though it believes that the decision of the Court of Appeals was incorrect . . . since a decision which appears incorrect may nevertheless fail to satisfy any of the criteria [for

precedent in reaching its conclusion that Folkes had failed to demonstrate ineffective assistance

of appellate counsel. And the undersigned cannot find that the PCR court's decision resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court.

Furthermore, even if it was clear that Folkes was entitled to the effective assistance of

counsel in filing a petition for rehearing, he failed to show that counsel was deficient at that

stage. Based on his testimony, Dudek should have been the attorney reviewing Folkes' case and

deciding whether to petition for rehearing, but he could not recall whether he did or not. Folkes

failed to meet his burden of proof in state court that Dudek performed deficiently in receiving

and reviewing the appellate decision and deciding whether to petition for rehearing.[6]

With regard to the letter sent to Folkes following the dismissal of his direct appeal, both

parties agree the letter did not meet professional standards. (ECF Nos. 31 at 3; 32 at 6.) Folkes

asserts that he received ineffective assistance of counsel under *Strickland* as a result of the

letter.[7]    Although the letter, which contains many errors, may demonstrate deficient

---

granting certiorari]."

[6] If Folkes was able to successfully prove deficiency, he would also need to prove prejudice. Based on the undersigned's review of the direct appeal claim, it does not appear that there is a reasonable probability that, but for Dudek's errors, the result of the proceeding would have been different.

In his direct appeal, Folkes argued that the trial court should have charged the jury that the absence of malice is not an element of ABHAN. (Dkt. No. 14-1 at 460–69.) The trial court did not specifically instruct the jury as such, but the trial court did instruct that "[a]ssault and battery of a high and aggravated nature includes all of the elements of assault and battery with intent to kill except express malice." (*Id.* at 420.)

The court of appeals denied the direct appeal citing state law that the absence of malice is not a required element of the ABHAN but also that a charge is sufficient if it covers the applicable law as a whole. (Dkt. No. 14-1 at 90.) Because the wording of the jury instructions in Folkes' case did not establish the absence of malice as an element of ABHAN, the trial court did not need to correct the charge by specifically charging that the absence of malice was not an element of ABHAN. The undersigned sees no reasonable probability that the result of the proceeding would have been different had appellate counsel petitioned for rehearing.

[7] Folkes relies upon a line of cases in the Fourth Circuit, noting that "'[b]ased on Fourth Circuit

representation, the question of whether Folkes received ineffective assistance of counsel in that respect reframes the issue ruled upon by the PCR court. (*See* Dkt. No. 1-1 at 7, 10.) The undersigned is constrained by the issues that were properly raised to and ruled upon by the PCR court.

Based on the above reasoning, the undersigned recommends the Warden's motion for summary judgment as to Ground Three be granted.

## Certificate of Appealability

If the Warden's summary judgment motion is granted, the District Judge will need to decide whether to issue a certificate of appealability. *See* Rule 11(a), Rules Governing § 2254 Cases. A certificate may be issued only upon a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a petitioner's constitutional claims have been denied on the merits, the petitioner must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell*, 537 U.S. 322, 338 (2003) (citation and quotation marks omitted). The Court has previously denied a certificate of appealability as to Grounds One, Two, and Four through Twenty-Two. The undersigned does not see a basis for issuing a certificate as to remaining Ground Three.

---

precedent, the failure of an attorney to inform his client of the right to file a petition for writ of certiorari and to file a petition if requested by his client constitutes ineffective assistance of counsel under both prongs of *Strickland*.'" (ECF No. 32 at 5 (quoting *Moton v. United States*, No. 2:15cv458, 2016 WL 1732736, at *3 (E.D. Va. Apr. 28, 2016))). Upon closer inspection of the Fourth Circuit cases, it appears that the duty the court ascribes to appellate counsel stems from the Plan of the United States Court of Appeals for the Fourth Circuit in Implementation of the Criminal Justice Act of 1964, Part VI (B)(2) ("CJA Plan"). *See Proffitt v. United States*, 549 F.2d 910, 912–13 (4th Cir. 1976). But the CJA Plan is not applicable to state counsel, and Folkes has not identified any similar duty imposed by South Carolina state law. Thus, his reliance on the Fourth Circuit cases is not persuasive.

USCA4 Appeal: 21-6217   Doc: 11-1      Filed: 03/24/2021   Pg: 138 of 504

## **CONCLUSION**

For the above reasons, the undersigned recommends the Court grant the Warden's motion, dismiss this case with prejudice, and decline to issue a certificate of appealability.

**IT IS SO RECOMMENDED.**

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

December 8, 2020
Charleston, South Carolina

The parties' attention is directed to the **important notice** on the next page.

**JA134**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

**JA135**

# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

|  |  |  |
|---|---|---|
| **Clinton Folkes, #216506** | ) | Case No. 2:19-cv-0760-RMG |
|  | ) |  |
| Petitioner, | ) |  |
|  | ) | **Petitioner's Objection to Report and** |
| v. | ) | **Recommendation** |
|  | ) |  |
| **Kenneth Nelsen**, Warden of Lee | ) |  |
| Correctional Institute; | ) |  |
|  | ) |  |
| Respondent. | ) |  |

Petitioner Clinton Folkes submits the following objections (in addition to any "clear error") to the Magistrate's Report and Recommendation. (ECF Entry 38):

## Objection I: A certificate of appealability is appropriate.

The Magistrate refused to issue a certificate of appealability. (ECF Entry 38 p. 17). The final order of a habeas corpus proceeding arising out of state detention cannot be appealed unless a Circuit Judge or District Court Judge issues a certificate of appealability. *See* 28 U.S.C. § 2253. To be entitled to a certificate of appealability, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In order to make such a showing, a petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, n.4 (1983)). Determining whether a certificate of appealability should issue is a threshold inquiry, not a merits analysis, and "any doubts as to whether a COA should issue must be resolved in the applicant's favor." 39 Am. Jur. 2d *Habeas Corpus* § 113 (Aug. 2019) (citing *Thompson v. Davis*, 916 F.3d 444 (5th Cir. 2019)).

**JA136**

A central tenet of Folkes' argument is that when the United States Supreme Court held in *Douglas* a criminal defendant is entitled to effective representation for his "appeal", it meant his entire appeal, and not a fraction thereof. (Objections II, III, IV, V). The conflict noted[1] by the Magistrate between *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 433 (6th Cir. 2006) (following this interpretation) and *Jackson v. Johnson*, 217 F.3d 360, 363-64 (5th Cir. 2000) (taking the opposite position) (ECF Entry 38 pp. 13-14) is sufficient to meet the standard for the issuance of a certificate of appealability. *See Lozada v. Deeds*, 498 U.S. 430, 432 (1991).

Folkes has also advanced the argument that the conclusion of the appeal (which necessarily includes receipt and review of the opinion of the court of appeals) is a "critical stage" of the proceeding under *Cronic*. (ECF Entry 32 pp. 4-5) (Objection IV). While the Magistrate states there is "[no] clear authority that the receipt and review of the court of appeals decision constitutes a critical stage of appeal", she also postulates the existence of an interpretation of *Douglas* that supports the opposite position. (ECF Entry 38 pp. 14-15). The Magistrate even cited authority (by analogy) for the argument opposing her ultimate holding: *United States v. Smith*, 411 F.2d 733, 736 (6th Cir. 1969). (ECF Entry 38 p. 14). Accordingly, the debatable nature of the Magistrate's holding, as set forth in her holding, is sufficient to support a certificate of appealability.

**Objection II: The Magistrate does not consider *Maples v. Thomas*.**

In *Maples v. Thomas*, 565 U.S. 266 (2012), the United States Supreme Court considered a fact pattern very similar to this case. In *Maples*, the habeas petitioner's pro bono attorneys left their firm without asking to be relieved as counsel, their firm failed to monitor the case after their departure, and the firm failed to notify the petitioner of the outcome of his case. *Maples*, 565 U.S.

---

[1] The Magistrate also noted that courts question whether the right to counsel for appeal extends to discretionary petitions. (ECF Entry 38 pp. 13-14 n. 4).

at 274-277. The Supreme Court found there was "cause" to excuse the petitioner's procedural default. *Id.* at 289. Such "cause" has its roots in *Strickland*'s concern for fundamental fairness in habeas proceedings. *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (citing *Strickland v. Washington*, 466 U.S. 668, 697 (1984)). According to the *Maples* court, "cause" constitutes something greater than negligence. *Maples*, 565 U.S. at 922. The abandonment of Folkes in this action mirrors the facts of *Maples*; if such behavior would constitute "cause" to excuse a procedural default, it certainly constitutes ineffective assistance of counsel.

**Objection III: the Magistrate misapplied the clear mandate of *Douglas v. California*.**

*Douglas v. California*, 372 U.S. 353 (1963), provided criminal defendants right to counsel on their first appeal as of right. "[W]here the merits of the one and only appeal an indigent has as of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor." *Id.* at 357. Folkes' appellate counsel had abandoned him by the time the Court of Appeals issued its opinion on September 24, 2010, and when it issued its remittitur on October 18, 2010. It is a manifestly unreasonable interpretation of *Douglas* to hold its mandate was met when Folkes' appeal was, quite literally, "decided without the benefit of counsel".

Further, *Douglas* only forecloses appointed counsel for "a petition for discretionary or mandatory review beyond the stage in the appellate process at which the claims have once been presented by a lawyer and passed upon by an appellate court." *Id.* at 356. An opinion of the South Carolina Supreme Court is not truly final until the time for rehearing has expired or a petition for rehearing has been decided. *Cf.* Rule 220(a), SCRAP (published opinions may only be sent publisher after time for rehearing has expired or petition for rehearing decided); Rule 242(c), SCRAP ("A decision of the Court of Appeals is not final for the purpose of review by the Supreme Court until the petition for rehearing or reinstatement has been acted on by the Court of Appeals.").

**JA138**

Thus, a petition for rehearing before the appellate court is part of a defendant's <u>appeal</u>, as distinguished from a petition for discretionary review by another court.

Finally, terminating a defendant's right to counsel at the time an appeal's opinion is signed is also inconsistent with the policies underlying *Strickland* and *Cronic* (affording indigent criminal defendants effective representation). If a criminal defendant was no longer entitled to counsel at the moment the appellate opinion is issued, he would have no attorney to identify and address prejudicial errors in the opinion. In the event the defendant prevailed in his appeal, he would have no counsel to respond to delaying tactics by the State before the appellate court, such as a baseless motion to stay remittitur/mandate. Finally, if a defendant's right to counsel ended at the penning of his appeal's opinion, then a defendant would never be entitled to counsel to oppose a petition for rehearing advanced by the State.

The only reasonable interpretation of *Douglas* and its progeny is that an indigent defendant is entitled to representation on appeal until the appellate court relinquishes its jurisdiction. Any other interpretation injects limitations and qualifications into the clear language of the Supreme Court. Clinton Folkes was entitled to representation for his entire appeal, and he did not receive this representation.

**Objection IV: the Magistrate did not apply *Douglas* and its progeny to find the conclusion of an appeal is a "critical stage", notwithstanding the Warden's abandonment of this issue.**

As set forth in Objection III, the conclusion of an appeal is part of the appeal. Objection III (particularly its third paragraph) also sets forth how the conclusion of an appeal is a stage of the criminal process that holds "significant consequences for the accused." *See Woods v. Donald*, 575 U.S. 312, 315 (2015) (defining "critical stage" for *Cronic* analysis). Folkes argued his abandonment by appellate counsel constituted an actual or constructive denial of counsel under *Cronic*. (ECF Entry 32 pp. 4-5). The Warden did not address this argument, as noted by the

**JA139**

2:19-cv-00760-RMG   Date Filed 12/13/20   Entry Number 39   Page 5 of 7

Magistrate:

> **While not squarely confronting this question**, the Warden's submissions **imply** that there is not a clear answer as to whether such errors would constitute the ineffective assistance of counsel–some federal cases indicate that the right to counsel ends when the court of appeals issues its opinion. (*See* Dkt. No. 31 at 7-13.)

(ECF Entry 38 p. 10) (emphasis added). "The Warden also **seems** to disagree that a presumption of prejudice is appropriate in this case. (*See* Dkt. No. [33] at 2…)" (ECF Entry 38 p. 10) (emphasis added).

It is not for the Court to frame the Warden's responsive argument, particularly when the Warden is represented by counsel. *See U.S. Commodity Futures Trading Comm'n v. Calvary Currencies LLC*, 437 F. Supp. 2d 453, 465 (D. Md. 2006) (citing *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) & *Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir.1996)). If the Warden did not present this argument, it should not be considered.

**Objection V: the September 28, 2010 SCCID letter must be considered.**

The September 28, 2010 letter of SCCID, which all parties agree is deficient (and the Magistrate acknowledges was not reviewed by an attorney), is part and parcel of the ineffectiveness of appellate counsel analysis. As set forth in Objection III, *Douglas* recognizes a defendant's right to counsel for the "appeal", not "the majority of the appeal". The Magistrate erroneously excised this meritorious issue from her analysis, claiming it "refram[ed] the issue ruled upon by the PCR court." (ECF Entry 38 p. 17). However, Folkes presented this shockingly deficient and misleading letter to the PCR Court, and it was discussed at length in his PCR hearing. (ECF Entry 14-2 pp. 56, 72, 73, 75, 95, 100, 241, 253).

**JA140**

**Objection VI: The Magistrate's found, against the great weight of the evidence and the PCR Court's findings, that Robert Dudek was Folkes' attorney.**

The Magistrate found that it was "unclear" if Chief Appellate Defender Robert Dudek reviewed the opinion of the Court of Appeals, holding this supposed lack of clarity prevents Folkes from meeting his burden of proof that Dudek's representation was deficient.[2] (ECF Entry 38 pp. 8-9, 16). This finding presupposes that Dudek represented Folkes, a fact wholly unsupported by the record and the PCR Court. The PCR Court, whose findings of fact are presumed correct, found: "Dudek testified that he did not handle [Folkes'] appeal, which was assigned to Appellate Defender Celia Robinson." (ECF Entry 14-2 p. 318). *See* 28 U.S.C. § 2254(e)(1) (presumption of correctness). The record further reflects that Robert Dudek was never counsel of record for Clinton Folkes. (*e.g.* ECF Entry 14-1 pp. 452, 470-471, 488-489, 491). The evidence supports only one conclusion: Folkes was abandoned by his only appellate attorney on September 14, 2010. The Magistrate's finding that he had representation by an attorney subsequent to this date is wholly unsupported by the record.[3]

**Objection VII: There exists a reasonable probability Folkes' appeal would have been decided differently, but for counsel's errors.**

In a footnote, the Magistrate opines that Folkes would not have ultimately prevailed on his argument that the trial court incorrectly charged ABHAN. (ECF Entry 38 p. 16 n. 6). The Magistrate's analysis fails to account for the (incorrect) guidance the trial court provided to the confused jury regarding the elements of ABHAN. (ECF Entry 14-1 pp. 427-431; ECF Entry 32 pp. 5-6). Further, this analysis is unnecessary, as the abandonment of Folkes at a critical stage of

---

[2] The Magistrate also notes that Lauren Crews, the paralegal who drafted the deficient letter of September 28, 2010, did not testify at the PCR proceedings. (ECF Entry 38 p. 11).

[3] The Magistrate's implicit finding that Dudek represented Folkes demands that the record be supplemented. *See* Rules 7 & 8, Rules Governing Section 2254 Cases in the United States District Courts (supplementing the record via written submissions or an evidentiary hearing).

**JA141**

the appeal creates a presumption of prejudice under *Cronic*.

## **Conclusion**

The petition for a writ of habeas corpus should be granted.


Dated: 12/13/2020                              /s/ Jason Scott Luck
                                               Jason Scott Luck (# 9696)
                                               P.O. Box 47
                                               Bennettsville, SC 29512
                                               843.479.6863 (phone)
                                               843.479.7222 (telefax)
                                               **Attorney for Plaintiff**

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| Clinton Folkes, # 216506, | ) | Civil Action No. 2:19-0760-RMG |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| Warden Nelsen, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Before the Court is the Petitioner's petition for a writ of habeas corpus on a single remaining ground, Ground 3, challenging the effectiveness of appellate counsel following the issuance of the adverse decision of the South Carolina Court of Appeals on September 24, 2010 until the issuance of the remittitur on October 18, 2010. The Magistrate Judge issued a Report and Recommendation ("R & R") recommending that Respondent's motion for summary judgment be granted. (Dkt. No. 38.) Petitioner filed objections to the R & R and the Respondent filed no reply. (Dkt. No. 39.) For reasons set forth below, the petition is granted.

## I.    Background

Petitioner Clinton Folkes proceeded *pro se* to seek a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is incarcerated on a term of life imprisonment without possibility of parole. In 2008, he was tried in the Richland County Court of General Sessions and found guilty by a jury of assault and battery with intent to kill. The conviction stemmed from a July 2007 physical fight during which Petitioner cut a man in the neck with a knife and was heard at the time, by witnesses who testified at trial, to have said, "I should have killed you[.]" (Dkt. No. 14-1 at 245, 247, 436.)

**JA143**

The Warden moved for summary judgment on Petitioner's § 2254 motion, to which Petitioner responded in opposition. The Court granted summary judgment as to Grounds One, Two, and Four through Twenty-Two, denied summary judgment without prejudice as to Ground Three, and appointed Petitioner counsel because there were substantial issues raised by Ground Three that were not adequately briefed by Respondent or Petitioner, who was at that time proceeding *pro se*. (Dkt. No. 28.) The Court, therefore, set a supplementary briefing schedule and directed the parties to address seven specific issues. (Dkt. No. 30.) The parties have submitted this supplemental briefing, and the Magistrate Judge now recommends that the Court grant summary judgment to dismiss the remaining Ground Three. Petitioner filed an objection to this recommendation. (Dkt. No. 39.)

## II.    Legal Standard

### A.    Review of R & R

The Magistrate Judge makes a recommendation to the Court that has no presumptive weight and the responsibility to make a final determination remains with the Court. *See, e.g.*, *Mathews v. Weber*, 423 U.S. 261, 270-71 (1976). The Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Where there are specific objections to the R & R, the Court "makes a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id*. In the absence of objections, the Court reviews the R & R to "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. Civ. P. 72 advisory committee's note; *see also Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983) ("In the absence of objection . . . we do not believe that it requires any explanation.").

**JA144**

### B.    Motion for Summary Judgment

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.,* 810 F.2d 1282, 1286 (4th Cir. 1987). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The movant has the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, to survive summary judgment the respondent must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, "[c]onclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence'" in support of the non-moving party's case. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting *Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 287 (4th Cir. 1999)).

### C.    Federal Habeas Relief Pursuant to 28 U.S.C. § 2254

A state prisoner who challenges matters "adjudicated on the merits in State court" can obtain federal habeas relief only if he shows that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). When reviewing a state court's application of federal law, "a federal habeas court may not issue the writ simply because

**JA145**

that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 410 (2000).  The state court's application is unreasonable if it is "objectively unreasonable, not merely wrong." *White v. Woodall*, 572 U.S. 415, 419 (2014).  Meaning, the state court's ruling must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The state court's determination is presumed correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).  The state court's decision "must be granted a deference and latitude that are not in operation" when the case is considered on direct review. *Harrington*, 562 U.S. at 101.  This is because habeas corpus in federal court exists only to "guard against extreme malfunctions in the state criminal justice systems." *Id*. at 102 (citation and internal quotation marks omitted).  Accordingly, pursuant to 28 U.S.C. § 2254(d), a federal habeas court must (1) determine what arguments or theories supported or could have supported the state court's decision; and then (2) ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding of a prior decision of the United States Supreme Court. *Harrington*, 562 U.S. at 102. "If this standard is difficult to meet, that is because it was meant to be." *Id*.

Before the petitioner may pursue federal habeas relief to this standard, he must first exhaust his state court remedies. 28 U.S.C. § 2254(b)(1)(A).  The petitioner "must present his claims to the state's highest court," *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997) (abrogated on other grounds by *United States v. Barnette*, 644 F.3d 192 (4th Cir. 2011)), which requires the petitioner to have "fairly present[ed] to the state court both the operative facts and

**JA146**

the controlling legal principles associated with each claim." *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation marks omitted). A federal habeas court should not review the merits of claims that would be found to be procedurally defaulted or barred under independent and adequate state procedural rules. *Lawrence v. Banker*, 517 F.3d 700, 714 (4th Cir. 2008). Rather, for a procedurally defaulted claim to be properly considered by the federal habeas court, the petitioner must "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

### III. The Critical Factual Issues and the Court's Seven Questions

Ground Three of Petitioner's § 2254 petition alleges:

Appellate Counsel was ineffective for failing to file a Petition for Rehearing in the Court of Appeals thereby depriving the Applicant of his right to seek certiorari in the Supreme Court of South Carolina.

(Dkt. No. 1-1 at 7.)

A petitioner may demonstrate ineffective assistance of counsel by showing the attorney's work was both deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance is deficient if it was unreasonable under the circumstances of the case and the then-prevailing professional norms. *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). To meet the *Strickland* standard, "an attorney's performance must be objectively unreasonable." *Bostick v. Stevenson*, 589 F.3d 160, 166 (4th Cir. 2009). Prejudice requires a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Kimmelman*, 477 U.S. at 384. Where a defendant loses his appeal rights due to counsel failing to consult and inform him of his appellate

**JA147**

rights, prejudice may be shown by establishing that "but for [counsel's] failure, he would have timely appealed." *Bostick*, 589 F.3d at 168.

The *Strickland* test for ineffective assistance of counsel is highly deferential to the attorney, and the standard for § 2254 relief is itself highly deferential to the state court. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). As a result, when the state court adjudicated an ineffective assistance claim on its merits, the § 2254 district court's review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). The district court's focus is "not whether counsel's actions were reasonable," but rather "whether there is any reasonable argument that [the petitioner's] counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

On his direct appeal, Petitioner was represented by M. Celia Robinson, a member of the South Carolina Commission on Indigent Defense, Division of Appellate Defense, who raised the following issue on direct appeal: "Did the trial judge err reversibly in refusing to issue the requested charge on the lesser included offense of Assault and Battery of a High and Aggravated Nature (ABHAN) indicating that the absence of malice is not a required element for an ABHAN conviction?" (Dkt. No. 14-1 at 455.) On September 24, 2010, the South Carolina Court of Appeals affirmed Petitioner's conviction in a *per curiam* opinion. (*Id*. at 489-90.) Ms. Robinson, although still counsel of record to Petitioner, had left the Commission on Indigent Defense on September 14, 2010 and was no longer providing any legal representation to Petitioner. In clear violation of South Carolina Appellate Court Rule 264, she had not provided Petitioner notice of her withdrawal, petitioned the South Carolina Court of Appeals to withdraw, obtained an order from the Court of Appeals to withdraw, or provided notice of her withdrawal to the opposing party.

**JA148**

Following the issuance of the adverse decision by the South Carolina Court of Appeals, no attorney advised Petitioner of the decision, nor informed him of his right to seek further review via a petition for rehearing before the South Carolina Court of Appeals or a petition for certiorari before the South Carolina Supreme Court. Further, no attorney advised Petitioner that if he failed to timely seek further relief, his right to pursue a state court appeal would end.

Respondent contends that the Chief Appellate Defender, Robert Dudek, assumed responsibility for all of Ms. Robinson's pending cases upon her departure from the office. However, Mr. Dudek had no recollection of reviewing the adverse decision of the South Carolina Court of Appeals, nor of assessing whether a petition for further relief should be sought, nor is there any record evidence that he performed any legal services on Petitioner's behalf during the period from the issuance of the adverse decision on September 24, 2010 until the filing of the remittitur on October 18, 2010. (Dkt. No. 14-2 at 57-58, 71.) What is undisputed is that neither Mr. Dudek nor any other attorney moved to be substituted as Petitioner's counsel upon Ms. Robinson's departure and that no attorney advised Petitioner of the adverse decision of the Court of Appeals or of his right to seek further appellate review. Ms. Robinson testified at the state PCR hearing that had she still been representing Petitioner when the decision was entered, she would have petitioned for rehearing and certiorari. (*Id*. at 81.) Mr. Dudek testified at the same hearing that he disagreed with the South Carolina Court of Appeals decision. (*Id.* at 60-61.)

In his PCR action, Petitioner raised whether "Appellate Counsel was ineffective for failing to file a Petition for Rehearing in the Court of Appeals, thereby depriving the Applicant of his right to seek certiorari in the Supreme Court of South Carolina." (Dkt. No. 14-2 at 335.) This ground asserts a claim for ineffective assistance of appellate counsel from the time of the adverse decision of the South Carolina Court of Appeals on September 24, 2010 until the

**JA149**

issuance of the remittitur on October 18, 2010.  The PCR court denied the claim, reasoning that because criminal appellate counsel has no duty to pursue rehearing or certiorari and a petitioner has no constitutional right to effective assistance of counsel when seeking discretionary appellate review, Petitioner could not demonstrate deficiency and prejudice. (Dkt. No. 14-2 at 338.)  The PCR court did not address the issue of whether appellate counsel's performance was ineffective in the immediate post-decision period when the appeal remained before the Court of Appeals and Petitioner was given no notice of the adverse decision or of his right to seek further appellate review.

On September 28, 2010—four days after the South Carolina Court of Appeals adverse decision—Petitioner was sent a letter on the letterhead of the South Carolina Commission on Indigent Defense, purportedly signed by Ms. Robinson, stating that the South Carolina Court of Appeals had denied his petition for certiorari and granted a petition for counsel to be relieved. The letter further stated that Petitioner had now exhausted his state court remedies.  There is no dispute that Ms. Robinson's signature was a forgery and that the letter was sent by a paralegal without any supervision or knowledge of a licensed attorney. (Dkt. No. 14-2 at 80-81.)  Further, there is no dispute that this letter contained multiple false statements, including that (1) a petition for certiorari had been submitted, (2) an order had been issued denying certiorari review, (3) an order had been issued relieving Ms. Robinson as counsel, and (4) Petitioner's right to seek further state court review had been exhausted.[1]

---

[1] The September 28, 2010 letter on the letterhead of the South Carolina Commission on Indigent Defense and purportedly hand signed by Ms. Robinson, states, *inter alia*: "Enclosed is a copy of the Order of the Court of Appeal's [sic] denying our Petition for Writ of Certiorari, and granting the petition to be relieved.  This means that you have now exhausted your state court remedies." Petitioner was then advised of the one year statute of limitations regarding any petition for habeas corpus in federal court.  (Dkt. 14-2 at 253).

**JA150**

Now, to determine whether Ground Three of this § 2254 should be dismissed on summary judgment, the Court directed the parties to address seven specific questions (Dkt. No. 30), to which Respondent and Petitioner answered (Dkt. Nos. 31, 32, 34).[2]  The Court reviews the answers, and provides its own assessment of them, in turn:

A.    Did an attorney acting on behalf of Petitioner review the decision of the South Carolina Court of Appeals of September 24, 2010 and make a determination whether a petition for rehearing should be filed?  If the answer is in the affirmative, identify that attorney.

> *Petitioner:*    No.
>
> *Respondent*:    Respondent's answer is unclear, instead offering that (1) Dudek "reviewed the judicial opinions on [Robinson's] cases as they were received" and (2) "[d]espite conflicting evidence, it appears that Dudek made the decision not to seek certiorari in petitioner's case."
>
> *Analysis:*    There is no record evidence that any attorney reviewed the adverse decision of the South Carolina Court of Appeals or made any determination whether a petition for rehearing should be filed.  Respondent's claim that Mr. Dudek *may* have conducted such a review is inconsistent with his testimony that he had no recollection of conducting such a determination and regretted that no petition for rehearing had been filed. (Dkt. No. 14-2 at 58.)

B.    Did an attorney acting on behalf of Petitioner consult with him regarding whether a petition for rehearing should be filed following the decision of the South Carolina Court of Appeals on September 24, 2010?  If the answer is in the affirmative, identify that attorney.

> *Petitioner*:    No.
>
> *Respondent*:    No. ("[I]t appears no attorney personally consulted with petitioner after the Court of Appeals issued its opinion.")
>
> *Analysis*:    There is no dispute of material fact: no attorney acting on behalf of Petitioner consulted with him regarding petitioning for rehearing.

---

[2] Petitioner answered each question squarely and directly in a clear format, by listing each question and stating yes or no with supporting reasoning.  Respondent, by contrast, twice provided a block narrative answer containing argument that does not squarely answer each question asked.

**JA151**

C.    Were the decisions whether to file a request for rehearing and a petition for certiorari following the decision of the South Carolina Court of Appeals of September 24, 2010 critical stages of the criminal proceedings?

> *Petitioner:*    Yes [both decisions are critical].  A critical stage is "any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *United States v. Wade*, 388 U.S. 218 (1967).  Here, a determinative opinion was issued that could have been reheard or petitioned, which means it was a critical stage of the proceedings. But Robinson had already absented herself at that time, thereby causing prejudice.

> *Respondent*:    No.  If an individual does not have a constitutional right to counsel at a certain stage of the proceedings, then he cannot claim ineffective assistance of counsel during that stage, and therefore the stage is not critical.

> *Analysis*:    There is a dispute regarding whether the period following the adverse decision of the Court of Appeals on September 24, 2010 until the issuance of the remittitur on October 18, 2010, while Petitioner's appeal was still pending before the Court of Appeals on direct appeal, constituted a critical stage of the direct appeal proceedings.

D.    If no attorney acting on behalf of the Petitioner (i) reviewed the decision of the South Caroline Court of Appeals, (ii) made the decision whether a request for rehearing should be made, or (iii) consulted with Petitioner regarding his right to seek rehearing due to an attorney assignment error within the offices of his court appointed appellate-counsel, would such failures, individually or collectively, constitute the actual or constructive denial of appellate counsel and/or constitute ineffective assistance of counsel?

> *Petitioner:*    Yes.  Prejudice is presumed when the defendant is completely denied counsel "at a critical stage of his trial." *United States v. Cronic*, 466 U.S. 648, 659 (1984).  Petitioner had no legal representation when the opinion was issued and could have been reheard or petitioned, because Robinson had left her job and Dudek, even if he were considered Petitioner's counsel, did not inform him of Robinson's resignation or review the opinion.  "Based on Fourth Circuit precedent, the failure of an attorney to inform his client of the right to file a petition for writ of certiorari and to file a petition if requested by his client constitutes ineffective assistance of counsel under both prongs of *Strickland*." *Moton v. United States*, 2016 WL 1732736, at *3 (E.D. Va. Apr. 28, 2016) (citing *United States v. King*, 11 Fed.Appx. 219, 221 (4th Cir. 2001)).

> *Respondent:*    Respondent's answer is unclear, instead noting that "the decision to seek additional review is a matter of professional judgment" and "in deciding whether to seek further review, the attorney must assess if there is a reasonable chance of certiorari being granted."

**JA152**

*Analysis:*     The parties dispute whether these failures by counsel, individually or collectively, constitute actual or constructive denial of appellate counsel and/or constitute ineffective assistance of counsel.

E.    If the Court were to determine that Petitioner was actually or constructively denied counsel at a critical stage of the criminal proceeding, would prejudice be presumed without the necessity of Petitioner showing actual prejudice or a likelihood of prevailing on appeal?

*Petitioner*:     Yes, prejudice would be presumed under *United States v. Cronic* and related caselaw.  But Petitioner could also show actual prejudice or a likelihood of prevailing on appeal because, (1) to the extent he had any representation at the time, failure to inform him of his right to file a petition or writ of certiorari constitutes ineffective assistance under *King* and related caselaw; and (2) in light of record evidence that Robinson would have sought rehearing and a rehearing cannot otherwise be sought *pro se*.

*Respondent:*     No, prejudice would not be presumed because "appellate counsel subjected the State's case to meaningful and adversarial testing" but it was affirmed.  And, Petitioner cannot demonstrate actual prejudice or a likelihood of prevailing on appeal because "it is entirely speculative to conclude [the Court of Appeals] opinion would have been reversed" because the Court of Appeals affirmed.

*Analysis:*     There is a dispute regarding whether prejudice can be presumed if Petitioner was actually or constructively denied counsel at a critical state of the proceeding.  There is also a dispute whether Petitioner could otherwise show actual prejudice or a likelihood of prevailing on the merits.

F.    The letter sent to Petitioner of September 28, 2010 (Dkt. No. 14-2 at 253) states that Petitioner's Writ of Certiorari had been denied, the court had granted his attorney her petition to be relieved, and Petitioner had exhausted his state court remedies.  Does that communication meet professional standards of competence and reasonableness?  Was that communication sent by an attorney acting on behalf of the Petitioner?

*Petitioner*:     No, the letter does not meet professional standards of competence and reasonableness.  No, the letter was not sent by an attorney acting on behalf of Petitioner; it was prepared by a paralegal and signed in Robinson's name despite the fact that Robinson had already resigned.

*Respondent*:     No, the letter "likely does not meet professional standards."  No, it was not sent by an attorney acting on Petitioner's behalf.  Instead, it was drafted by a paralegal, using the wrong form, advising that the Court of Appeals had denied a writ of certiorari to review a denial of post-conviction relief, and signed on Robinson's behalf by the paralegal.

**JA153**

*Analysis:*   There is no dispute of material fact that the letter does not meet professional standards and was not sent by a lawyer acting on Petitioner's behalf.

G.   If the Court were to determine that Petitioner was denied his right to counsel at a critical stage of the criminal proceeding and that he has *per se* suffered prejudice as a result, what would be the appropriate remedy? Would reinstating Petitioner's right to seek rehearing to the South Carolina Court of Appeals and, if necessary, to petition for certiorari, provide him his appropriate constitutional remedy?

*Petitioner:*   "Reinstating Folkes' right to seek rehearing is an appropriate remedy. The Court of Appeals issued its remittitur in Folkes' direct appeal on October 18, 2020. (ECF Entry 14-1 p. 491). Accordingly, at this time the Court of Appeals only has the jurisdiction to entertain a motion to recall remittitur. *See Wise v. SCDOC*, 642 S.E.2d 551 (S.C. 2007). Using the relief awarded in *Bostick v. Stevenson*, 589 F.3d 160 (4th Cir. 2009) and *Galloway v. Stephenson*, 510 F. Supp. 840, 845 (M.D.N.C. 1981) as a guide, a possible order granting a writ of habeas corpus would order Folkes' judgment and conviction be vacated and he be released from custody, unless within 60 days of the District Court's order the Court of Appeals (1) recalls its remittitur in *State v. Folks*, 2008-096806, and (2) entertains Folks' petition for rehearing. This relief is also consistent with Fourth Circuit decisions finding in adequacy of appellate counsel after an opinion was issued. *See King, Moton*."

*Respondent:*   "The Court of Appeals likely does not have jurisdiction to consider any matter relating to this case, even a motion to recall the remittitur. *See Wise v. SCDC*, 642 S.E.2d 551 (S.C. 2007). . . . Because the Court of Appeals did not issue its remittitur by mistake, it could foreseeably decline to recall the remittitur based on a lack of jurisdiction. But there are other avenues of appellate relief available." (Dkt. No. 33 at 6). Respondent referenced South Carolina Appellate Court Rule 245(a) and the Fourth Circuit's decision in *Bostick v. Stevenson*, 589 F.3d 160, 168 (4th Cir. 2009) where a habeas petition was granted because defense counsel failed to consult with his client regarding his right to appeal. The South Carolina Supreme Court subsequently granted the appeal and overturned the defendant's murder conviction in *State v. Bostick*, 708 S.E .2d 774 (S.C. 2011). (*Id.* at 6-7).

*Analysis:*   The parties dispute whether the Court of Appeals would have jurisdiction, but do not dispute that an avenue of South Carolina court appellate relief is available.

**JA154**

IV.    **Discussion**

    A.    **Was appellate counsel's performance following the issuance of the decision**
        **of the South Carolina Court of Appeals on September 24, 2010 and before**
        **the Court of Appeals entered the remittitur on October 18, 2010 "objectively**
        **unreasonable?"**

       The Court must first address whether Petitioner had any functioning counsel during the period from the Court of Appeals' adverse decision issued on September 24, 2010 to the remittitur issued on October 18, 2010.    The record is clear that Ms. Robinson had left her position with the Commission on Indigent Defense on September 14, 2010 without seeking and obtaining permission to withdraw as Petitioner's counsel, as required by South Carolina Appellate Court Rule 264.    The record is also clear that no substitute counsel had appeared on Petitioner's behalf and there is no record evidence that any licensed attorney assumed the duties of substitute counsel, including the most basic duties of appellate counsel of informing the Petitioner of the adverse decision, of his right to seek further appellate review, and of the consequences of failing to do so.    Indeed, the record evidence supports finding that after Ms. Robinson left the Commission on Indigent Defense on September 14, 2010 until the remittitur was issued on October 18, 2010, that Petitioner's legal representation was left in the hands of a non-attorney staff member.

       The duty of appellate counsel to advise the client of an adverse decision and his right to seek further appellate review are mandatory under these circumstances and the failure to do so constitutes ineffective assistance of counsel. *See Bostick*, 589 F.3d at 168; *Proffitt v. United States*, 549 F. 2d 910, 912 (4th Cir. 1976); *United States v. Tajeda-Ramirez*, 380 Fed.Appx. 252, 2010 WL 2182187, at *1-2 (4th Cir. 2010); *United States v. King*, 11 Fed.Appx. 219, 2010 WL 568022, at *1 (4th Cir. 2001).    The failure of Petitioner's appellate counsel to perform these most basic duties of appellate representation strongly support a finding that Petitioner's counsel had

**JA155**

for all practical purposes abandoned him at a critical time in the appellate process before the South Carolina Court of Appeals.

An analogous factual situation arose in *Maples v. Thomas*, 565 U.S. 266 (2012), where two post-conviction counsel for a death row inmate left their law firm without informing their client or the court of their departure. An adverse state court order was subsequently issued and the time for appeal expired without any filing of a notice of appeal. The issue before the U.S. Supreme Court in *Maples* was whether, under these circumstances, the defendant could show cause for procedural default. Justice Ginsburg, writing for the Court's majority, described the post-conviction attorneys' actions as "abandonment," leaving the defendant "unrepresented at a critical time for his state postconviction petition."[3] *Id*. at 271. The Court concluded that "no just system would lay the default at Maples' death-cell door." *Id*.

Moreover, even if this Court were to assume that Petitioner had not been abandoned by counsel, the performance (or lack thereof) of appellate counsel following the issuance of the adverse Court of Appeals decision on September 24, 2010 and before the issuance of the remittitur on October 18, 2010 was objectively unreasonable. The failure to advise Defendant of the adverse decision and of his right to seek further review under these circumstances falls far short of competent representation.

Additionally, the Court can not let pass without further comment regarding the gravity of the extraordinarily unprofessional and illegal conduct associated with the letter to Petitioner of

---

[3] The Court emphasized, "Maples maintains that there is [cause to excuse the default], for the lawyers he believed to be vigilantly representing him had abandoned the case without leave of court, without informing Maples they could no longer represent him, and without securing any recorded substitution of counsel. We agree. Abandoned by counsel, Maples was left unrepresented at a critical time for his state postconviction petition, and he lacked a clue of any need to protect himself *pro se*. In these circumstances, no just system would lay the default at Maples's death-cell door."

**JA156**

September 28, 2010 on the letterhead of the Commission on Indigent Defense. The letter contained a forged signature of counsel, was prepared and delivered by a non-attorney staff member of the Commission engaged in the unauthorized practice of law, and inaccurately informed Petitioner that his still active state court appellate rights had expired. The letter also falsely represented that the Court of Appeals had issued an order denying a petition of certiorari and an order relieving counsel of further representation. The September 28, 2010 letter provides an additional and independent basis for a finding that Petitioner was denied effective assistance of counsel.[4]

B.  **Did Petitioner suffer prejudice as a result of the ineffective assistance of assistance of counsel following the adverse decision of the South Carolina Court of Appeals on September 24, 2010 and the issuance of the remittitur on October 18, 2010?**

Where a defendant was denied effective assistance of counsel by being informed of neither an adverse appellate court decision nor his right to seek further appellate review, he may demonstrate prejudice by showing that "but for [counsel's] failure, he would have timely appealed." *Bostick*, 589 F.3d at 168. All the record evidence supports the conclusion that had Petitioner received timely notice of the adverse decision of the Court of Appeals and of his right to seek further appellate review, he would have pursed an appeal. First, Ms. Robinson testified that had she still been Petitioner's counsel she would have filed a petition for rehearing and for certiorari, and Mr. Dudek testified he wished a rehearing and certiorari had been pursued.

---

[4]  Respondent dismisses the September 28, 2010 letter as simply an oversight by a paralegal who used the wrong form letter. (Dkt. No. 31 at 3.) The Court finds this a far too benign interpretation of a seriously unprofessional act of professional conduct undertaken under the letterhead of the Commission on Indigent Defense. Ms. Robinson testified at the PCR hearing that the letter was prepared and signed by a paralegal without her knowledge or consent. (Dkt. No. 14-2 at 81.) Nonetheless, Ms. Robinson's forged signature was placed on correspondence to Petitioner. Mr. Dudek acknowledged that no attorney had assumed responsibility for Petitioner's case at the time the letter was sent and he had no recollection of seeing the letter. (*Id.* at 58.)

**JA157**

Second, Petitioner has diligently pursued his habeas petition, initially *pro se*, attempting to raise, among other things, a number of issues he had raised unsuccessfully in his direct appeal. Third, having been sentenced to life without a possibility of parole, it seems implausible that Petitioner would have not wished to pursue every appellate avenue. Petitioner has clearly established prejudice under these facts.

### C. Was Petitioner denied counsel at the stage of his appellate proceedings in which he had a constitutional right to counsel?

The PCR court and Respondent have attempted to posit this case as only raising the question of whether Petitioner had a constitutional right to have his counsel file a petition for rehearing to the South Carolina Court of Appeals and for certiorari to the South Carolina Supreme Court. If this were the sole issue before the Court, the PCR court and Respondent would be correct. *See Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982) (no right to counsel for discretionary appellate review). What the PCR court did not address, and Respondent seeks to avoid, are the duties of appellate counsel during the period post an adverse decision while the appeal is still pending on direct appeal before the appellate court. During this critical period in state court appellate practice—in this case from the issuance of the adverse decision on September 24, 2010 until the filing of the remittitur on October 18, 2010—appellate counsel had the duty to advise the client of the adverse decision and of his right to seek further appellate review. If appointed counsel was unable or unwilling to pursue further appellate review on Petitioner's behalf, Petitioner retained the right to pursue his appeal *pro se*, just as he initially did in the filing of his habeas petition.

The Court recognizes that there has been considerable debate among federal courts regarding what actions of appellate counsel fall within the proceedings of direct state court review, where the defendant enjoys the right to competent appointed counsel. These cases often

**JA158**

turn on the specific facts of each case. The Court finds persuasive the Sixth Circuit's well-reasoned decision in *Smith v. State of Ohio Department of Rehabilitation and Corrections*, holding that appellate counsel's failure to inform the defendant of the adverse decision on his direct appeal was an integral part of counsel's representation at the direct appeal stage. 463 F.3d 426, 432-33 (6th Cir. 2006) ("The court's ultimate decision regarding a particular legal proceeding is *part of that legal proceeding*, and appointed counsel's duties in representing a client during that legal proceeding include the duty of informing her client of the outcome of the proceeding.") (emphasis in original).[5] *See also Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000) (noting that Constitution requires "that counsel make objectively reasonable choices" and must do so not only during the legal proceeding for which counsel represents the client, but also after the judicial proceeding has concluded in determining whether an appeal should be filed); *Strickland*, 466 U.S. at 688 ("From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution."); *Jones v. Barnes*, 463 U.S. 745, 751 (1983) (because defendant's decision regarding whether to "take an appeal" is a "fundamental decision" that "the accused has the ultimate authority to make," it follows that counsel has duty to timely inform accused of proceeding's resolution); *Paris v. Turner*, 187 F.3d 637 (Table), 1999 WL 357815, at *2-3 (6th Cir. 1999), *cert. denied*, 529 U.S. 1104 (2000) (where counsel delays informing defendant of decision on first appeal of right and "fails to communicate to his client

---

[5] The facts of *Smith* bear important resemblance to those here. As that court emphasized: "The only way that Smith could have learned of the unpublished decision of the Ohio Court of Appeals affirming his conviction was if his counsel notified him. When she failed to do so, Smith was without any means of notice of the decision and thus did not and could not know that the forty-five day deadline for filing a notice of appeal to the Ohio Supreme Court had started to run." *Id*. at 434.

**JA159**

2:19-cv-00760-RMG    Date Filed 01/07/21    Entry Number 40    Page 18 of 20

how to proceed with further appeals," it cannot "fairly be said that [defendant] truly had his first appeal of right").

The Court finds that the failure of appellate counsel to timely advise Petitioner of the adverse decision of the Court of Appeals on his direct appeal and of his right to seek further appellate review was integral to their duties in representing Petitioner at the direct appeal stage. Consequently, the failure of appellate counsel to perform in an objectively reasonable way at the state court direct appeal stage entitles Petitioner to habeas relief.  Moreover, the delivery of the September 28, 2010 letter to Petitioner on the letterhead of the Commission on Indigent Defense with the forged signature of departed counsel, Ms. Robinson, inaccurately informing Petitioner that his state court appellate rights had been exhausted, was also integral to appellate counsel's representation at the direct appeal stage and provides an additional and independent basis for habeas relief.

**V.    Remedy**

Having found that Petitioner was denied effective assistance of counsel at a critical time in his direct state court appeal proceedings and suffered prejudice as a result, the Court must now fashion an appropriate remedy.  It is worthwhile to note that Petitioner's requested remedy is rather modest:  the reinstatement of his right to seek discretionary state court appellate review of the adverse decision of the Court of Appeals in his direct appeal.

Respondent suggests as a model for a remedy the Fourth Circuit's decision in *Bostick v. Stevenson*, which involved defense counsel's failure to consult with his client regarding his right to pursue a direct appeal. (Dkt. No. 33 at 6-7.)  In *Bostick*, the Fourth Circuit instructed the district court on remand to "issue a writ of habeas corpus and that it order Bostick released from prison unless the state grants him a direct appeal within a reasonable time." 589 F.3d at 168.  The

**JA160**

district court thereafter issued an order on January 25, 2010 granting the petition for habeas corpus and directed that "the State of South Carolina shall grant Mr. Bostick direct appeal no later than May 1, 2010 or he shall be released from prison pursuant to the Fourth Circuit mandate." *Bostic v. Warden of Broad River Correctional Institute*, C.A. No. 8:07-727, 2010 WL 360514 (D.S.C. 2010). The South Carolina Supreme Court subsequently allowed Bostick to file a belated appeal and reversed his murder conviction. *State v. Bostick*, 708 S.E. 2d 774 (S.C. 2011).

Petitioner urges the Court to grant a slightly different remedy, by directing the South Carolina Court of Appeals to recall its remittitur and to entertain a petition for rehearing. (Dkt. No. 32 at 7-8.) Respondent argues that this proposed remedy would be technically defective because the South Carolina Court of Appeals has no authority under these facts to recall its remittitur. Respondent suggests that the better course is for this Court to follow the *Bostick* model, ordering the State of South Carolina to reinstate Petitioner's appeal rights or release him from prison. (Dkt. No. 33 at 6.)

After carefully considering the appropriate remedy under these highly unusual facts, the Court hereby **GRANTS** Petitioner's habeas petition as to Ground 3 (Dkt. No. 1-1) and **ORDERS** that Petitioner be released from prison on or before May 1, 2021 unless the State of South Carolina before then reinstates his right to discretionary appellate review of the September 24, 2010 decision of the South Carolina Court of Appeals denying his direct appeal.[6]

---

[6] The Court's remedy is fashioned to restore Petitioner's right to seek discretionary review of the South Carolina Court of Appeals adverse decision of September 24, 2010. The Court will leave to the South Carolina Supreme Court whether it will simply allow Petitioner to petition for certiorari review before it or remand the matter to the South Carolina Court of Appeals with instructions that the remittitur be recalled and discretionary review of a petition for rehearing be granted. Should the Court of Appeals recall its remittitur and then deny a petition for rehearing,

**JA161**

USCA4 Appeal: 21-6217    Doc: 11-1    Filed: 03/24/2021    Pg: 166 of 504

**AND IT IS SO ORDERED.**

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

January 7, 2021
Charleston, South Carolina

---

Petitioner shall be entitled to seek certiorari review, before the South Carolina Supreme Court, of the adverse decision of the Court of Appeals on his direct appeal.

**JA162**

# UNITED STATES DISTRICT COURT
# DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Clinton Folkes, #216506, | ) | C/A No. 2:19-0760-RMG |
| | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | **NOTICE OF APPEAL** |
| Warden Nelsen, | ) | |
| Respondent. | ) | |
| | ) | |

Notice is hereby given that the above-named Respondent Warden Nelsen of the Lee Correctional Institution, South Carolina Department of Corrections, hereby appeals, pursuant to Rule 4, Fed.R.App. P., to the United States Court of Appeals for the Fourth Circuit from the Order and Opinion by the District Court of South Carolina filed on January 7, 2021 [Docket Entry #40].[1]

Respectfully submitted,

ALAN WILSON
Attorney General

DONALD ZELENKA
Deputy Attorney General

MELODY J. BROWN
Senior Assistant Deputy Attorney General

MICHAEL D. ROSS
Assistant Attorney General
Fed. ID No. 12990

Post Office Box 11549
Columbia, SC 29211
(803) 734-6305

*s/Michael D. Ross*

By:_____

February 4, 2021                ATTORNEYS FOR RESPONDENT

---

[1]    As of this filing, the judgment has not been formally entered.

**JA163**

**VOLUME I OF II**

### STATE OF SOUTH CAROLINA
### In The Supreme Court

---

### APPEAL FROM RICHLAND COUNTY
### Court of Common Pleas

Casey L. Manning, Circuit Court Judge

**RECEIVED**

**SEP 20 2016**

S.C. SUPREME COURT

---

Appellate Case No. 2016-000415

---

CLINTON FOLKES, 216506,

PETITIONER,

v.

STATE OF SOUTH CAROLINA,

RESPONDENT.

---

### APPENDIX
### TO
### PETITION FOR WRIT OF CERTIORARI

---

**ALAN WILSON**
Attorney General

**JOHN W. MCINTOSH**
Deputy Attorney General

**J. BENJAMIN APLIN**
Interim Senior Assistant Deputy Attorney General

**MEGAN HARRIGAN JAMESON**
Assistant Attorney General
Post Office Box 11549
Columbia, S. C. 29211
(803) 734-3737

**ATTORNEYS FOR RESPONDENT.**

**TARA DAWN SHURLING**
Attorney and Counselor at Law

3614 Landmark Drive, Suite A
Columbia, S. C. 29204
(803)738-8622 Phone
(803)738-1600 Fax
Email: tdslaw@shurlinglaw.com

**ATTORNEY FOR PETITIONER.**

# INDEX

## VOUME I of II

Index ............................................................................................................................. i

Trial Transcript dated July 7 – 9, 2008 ................................................................... 1-448

Final Brief of Appellant dated October 12, 2009 ........................................................ 449

Final Brief of Respondent dated September 1, 2009 ................................................... 470

Court of Appeals Unpublished Opinion 2010-UP-420 filed September 24, 2010 ................. 484

Remittitur from the Court of Appeals dated October 18, 2010 ................................................ 486

Application for Post-Conviction Relief filed October 26, 2010 ................................................. 487

State's Return filed February 28, 2011 (incorrectly clocked as 2010) ...................................... 493

## VOUME II of II

*Pro se* Amendment and Supplement to Application for Post-Conviction Relief
     filed August 28, 2012 ........................................................................................... 501

Applicant's Motion and Memorandum in Support of Motion for Leave to Serve
     Discovery Requests filed July 8, 2013 ................................................................. 505

Supplement to Motion for Discovery filed July 19, 2013 ......................................................... 523

Consent Order for Substitution of Counsel, Court Appointed Zoe Sanders, Esquire,
     is Relieved as Counsel and Tara Dawn Shurling, Esquire,
     is substituted as Counsel, filed August 1, 2013 ................................................................. 525

Second Amended Application for Post-Conviction Relief filed March 17, 2014 ..................... 526

Clerk of Court Records ................................................................................................................. 533

SCDC Records ............................................................................................................................. 538

**JA165**

PCR Hearing Transcript, hearings held July 17, 2014 and September 25, 2014 ...................... 541

  PCR Exhibits:

  Applicant's # 1 Email from July 15, 2015 from Lisa Campbell at HR
    for SCCID to Bob Dudek .............................................................................. 747
            Per Court Reporter's Receipt for Exhibits marked Missing
            Per PCR Transcript it was introduced into evidence pg. 7
            Duplicate copy included herein

  Applicant's #2 Letter from Ms. Robinson September 28, 2010 ......................................... 748

  Applicant's #3 Letter dated 3/17/14 with attachments ...................................................... 749

  Applicant's # 4 Email forwarded from Heather Weiss 11/21/07 ..................................... 755
            Per PCR Transcript Exhibit #4 is blank, however Court Reporter's
            Receipt for Exhibits says # 4 is the above listed email and it is included
            in this Appendix, introduced at pg. 76 -77.  Apparently, 1st Exhibit
            introduced at 2nd day of hearing September 25, 2014

  Applicant's #5 Defendant's Motion .................................................................................. 756

  Applicant's #6 Photo ....................................................................................................... 758

  Applicant's #7 Employee Wage History .......................................................................... 760

  Applicant's #8 Pay Subs .................................................................................................. 762

  Applicant's s #9 Case Notes ............................................................................................. 764

Memorandum in Support of PCR Application in the Form of a Proposed Order
  Filed January 14, 2016 ................................................................................................... 766

Order of Dismissal filed January 14, 2016 ................................................................................ 808

Notice of Appeal filed February 26, 2016 ................................................................................. 854

Petition for Appointment of Counsel and to Disqualify Appellate Division of SCCID
filed February 26, 2016 .......................................................................................................... 856

Order dated March 14, 2016 Appointing Tara Dawn Shurling as Counsel for Petitioner ........ 861

```
STATE OF SOUTH CAROLINA          )   COURT OF GENERAL SESSIONS
COUNTY OF RICHLAND               )
                                       GS-40-2007-GS-40-6654


State of South Carolina          )
                                 )
           vs.                   )     TRANSCRIPT OF RECORD
                                 )          (Trial)
                                 )
Clinton Folkes,                  )
                                 )
             Defendant.          )
```

July 7, 8, 9, 2008
Columbia, South Carolina

*BEFORE*:

   THE HONORABLE JAMES BARBER, III, JUDGE

*APPEARANCES*:

   HEATHER WEISS, ASSISTANT SOLICITOR
   ANDREW ROGERS, ASSISTANT SOLICITOR
   Attorneys for the State


   DEON O'NEIL, DEPUTY PUBLIC DEFENDER
   LUKE SHEALEY, DEPUTY PUBLIC DEFENDER
   Attorneys for the Defendant


JENNY H. WILLIAMS
Official Circuit Court Reporter
(803) 576-1743

2

1                    INDEX OF WITNESSES

2   *TIFFANY T. BRIGGS*

3        Direct By Ms. Weiss . . . . . . . . . .    37

4        Cross By Mr. Shealey  . . . . . . . . .    41

5        Redirect By Ms. Weiss . . . . . . . . .    44

6   *KAREM E. JONES, JR.*

7        Direct By Ms. Weiss . . . . . . . . . .    45

8        Cross By Mr. Shealey  . . . . . . . . .    50

9   *ROBERT MCCRACKEN*

10       Direct By Ms. Weiss . . . . . . . . . .    54

11       Cross By Mr. Shealey  . . . . . . . . .    57

12  *KAREM E. JONES, SR.*

13       Direct By Ms. Weiss . . . . . . . . . .    81

14       Cross By Mr. O'Neil . . . . . . . . . .   119

15  *TIFFANY T. BRIGGS*

16       Direct By Ms. Weiss . . . . . . . . . .   130

17       Cross By Mr. O'Neil . . . . . . . . . .   148

18  *JAMES REDDICK*

19       Direct By Ms. Weiss . . . . . . . . . .   158

20       Cross By Mr. O'Neil . . . . . . . . . .   171

21       Redirect By Ms. Weiss . . . . . . . . .   176

22       Recross By Mr. O'Neil . . . . . . . . .   177

23  *JEROME PATRICK*

24       Direct By Mr. Rogers  . . . . . . . . .   179

25       Cross By Mr. O'Neil . . . . . . . . . .   218

3

1        Redirect By Mr. Rogers  . . . . . . . .  230

2   *RETALIA GREEN*

3        Direct By Mr. Rogers  . . . . . . . . .  232

4        Cross By Mr. O'Neil . . . . . . . . . .  250

5   *TIM ABNEY*

6        Direct By Ms. Weiss . . . . . . . . . .  257

7        Cross By Mr. O'Neil . . . . . . . . . .  263

8   *ANTONIO SESSIONS*

9        Direct By Mr. Rogers  . . . . . . . . .  265

10       Cross By Mr. Shealey  . . . . . . . . .  275

11  *DAVID OULETTE*

12       Direct By Mr. Rogers  . . . . . . . . .  281

13       Cross By Mr. Shealey  . . . . . . . . .  289

14       Redirect By Mr. Rogers  . . . . . . . .  293

15  *KERMIT SCOTT*

16       Direct By Ms. Weiss . . . . . . . . . .  294

17       Cross By Mr. Shealey  . . . . . . . . .  296

18  *ROBERT MCCRACKEN*

19       Direct By Ms. Weiss . . . . . . . . . .  298

20       Cross By Mr. Shealey  . . . . . . . . .  315

21       Redirect By Ms. Weiss . . . . . . . . .  323

22  *DR. STEPHEN A. FANN*

23       Direct By Ms. Weiss . . . . . . . . . .  338

24       Cross By Mr. O'Neil . . . . . . . . . .  352

25       Redirect By Ms. Weiss . . . . . . . . .  367

4

|  | STATE'S EXHIBITS | | |
|---|---|---|---|
| NO. | DESCRIPTION | ID | EV |
| 1 | Photo Line-up | 32 | 55 |
| 2 | Photo Line-up Affidavit | 32 | 55 |
| 3 | Photograph | 32 | 101 |
| 4 | Photograph | 32 | 136 |
| 5 | Photograph | 32 | |
| 7 | Photograph | 33 | |
| 8 | Photograph | 33 | 136 |
| 9 | Photograph | 33 | |
| 10 | Photograph | 33 | 88 |
| 11 | Photograph | 33 | 88 |
| 12 | Photograph | 33 | 116 |
| 13 | Photograph | 33 | 117 |
| 14 | Photograph | 33 | 117 |
| 15 | Photograph | 33 | 117 |
| 16 | Photograph | 33 | 117 |
| 17 | Photograph | 33 | 117 |
| 18 | Photograph | 33 | 117 |
| 19 | Photograph | 33 | |
| 20 | Photograph | 34 | 237 |
| 21 | Photograph | 34 | 217 |
| 22 | Photograph | 34 | |
| 23 | Photograph | 34 | 103 |
| 24 | Shirt | 103 | 106 |

JA170

5

| | | | | |
|---|---|---|---|---|
| 1 | 25 | Knife | 106 | |
| 2 | 26 | Statement | 112 | |
| 3 | 27 | Statement | 147 | |
| 4 | 28 | Bag | 244 | 245 |
| 5 | 29 | Map | 267 | 284 |
| 6 | 30 | 911 Tape | 280 | 281 |
| 7 | 31 | Beer Bottle | 309 | 310 |
| 8 | 32 | Backpack | 323 | 324 |
| 9 | 33 | Styrofoam Head | 344 | 371 |

10                    **DEFENDANT'S EXHIBITS**

| | NO. | DESCRIPTION | ID | EV |
|---|---|---|---|---|
| 11 | | | | |
| 12 | 1 | Knife | 148 | |

13                     **COURT'S EXHIBITS**

| | NO. | DESCRIPTION | ID | EV |
|---|---|---|---|---|
| 14 | | | | |
| 15 | 1 | Requested Charge | 424 | |
| 16 | 2 | Note from Jury | 431 | |

17

18

19

20

21

22

23

24

25

6

<u>Monday, July 7, 2008</u>

1

2  *THE COURT:* Do we have any pre-trial?

3  *MR. O'NEIL:* Just a couple of Neil v. Biggers.

4  *THE COURT:* Pardon me?

5  *MR. O'NEIL:* Just a couple of Neil v. Biggers

6  hearings, Your Honor.

7  *THE COURT:* You've got a Neil v. Biggers?

8  *MR. O'NEIL:* Two Neil v. Biggers, Your Honor.

9  I'm sorry.

10  *THE COURT:* All right.

11  *MR. O'NEIL:* May I approach Your Honor?

12  *THE COURT:* Yes, sir.

13  (Document handed to the Court)

14  *THE COURT:* What is the charge?

15  *MS. WEISS:* Your Honor, this is assault and

16  battery with intent to kill.

17  *THE COURT:* I don't have a sheet in front of me.

18  *MS. WEISS:* You do not?

19  *THE COURT:* Is it five and five?

20  *MR. O'NEIL:* Five and five, Your Honor.

21  14-7-1110.

22  *THE COURT:* All right.  We ready to go?

23  *MR. SHEALEY:* Yes, sir, Your Honor.  I'll be

24  handling the motions for the defense.

25  *THE COURT:* All right.

**JA172**

7

1         *MR. O'NEIL:*  Your Honor, do you want to do

2     motions first or pick a jury first?

3         *THE COURT:*  I don't care.  What do you all want

4     to do?  Pick the jury and then send them to lunch and

5     do the motions?

6         *MR. O'NEIL:*  Yes, Your Honor.

7         *MS. WEISS:*  Yes, Your Honor.

8         *THE COURT:*  All right.  We can do that.  I'm

9     ready.

10        *THE BAILIFF:*  The jury is all present, Your

11    Honor.

12        *THE COURT:*  All right.  Good morning, ladies and

13    gentlemen.  My name is Jim Barber and I'm a circuit

14    judge here in Richland County.  And we are about to

15    select a jury in a case entitled The State of South

16    Carolina vs. Clinton Folkes, F-O-L-K-E-S.  Mr. Folkes

17    has been charged in a bill of indictment with the

18    offense of assault and battery with intent to kill.

19        Now, before we select the jury, ladies and

20    gentlemen, I want to ask you certain questions and I

21    want to introduce you to some individuals who may be

22    involved in this trial.  I also want to tell you a

23    couple of things about our criminal justice system

24    that I want you to keep in mind throughout the course

25    of this trial.

**JA173**

8

1           First, ladies and gentlemen, in every instance a

2      defendant who comes into this courtroom comes in with

3      a presumption of innocence.  He is prepared innocent,

4      and that presumption only changes if the jury after

5      hearing the evidence determines that in fact a

6      defendant is in fact guilty.

7           The second basic principle of our criminal

8      justice system is that the burden of proving this

9      defendant guilty falls upon the State of South

10     Carolina.  The State is obligated to prove the

11     defendant guilty and prove him guilty beyond a

12     reasonable doubt.  The defendant has no burden

13     whatsoever in this case.  It all falls upon the State

14     of South Carolina.

15          Now, before we begin, ladies and gentlemen, I'd

16     like to introduce you to the defendant, Mr. Clifton

17     (sic) Folkes.  Mr. Folkes, if you would please stand

18     and face the jury.  This is Mr. Folkes, ladies and

19     gentlemen.  And I would inquire at this time, is

20     there any member of this jury panel or any member of

21     the jury panel's immediate family who is related by

22     blood or connected by marriage or either now or in

23     the past has had a close personal relationship with

24     Mr. Folkes or either now or in the past has had an

25     employment or a business relationship with Mr.

9

1    Folkes?  If so, please stand.

2         MR. O'NEIL:  Your Honor, his first name is

3    Clinton Folkes.

4         THE COURT:  It's Clinton?

5         MR. O'NEIL:  Yes, sir.

6         THE COURT:  Oh.  Excuse me.  I'm sorry.

7    Mr. Clinton Folkes.  Thank you, sir.  You may be

8    seated.

9         Ladies and gentlemen, in most instances when

10   cases come into the court the parties are represented

11   by attorneys, and that is in fact the situation here

12   today.  The State of South Carolina is represented by

13   the Solicitor's Office or the Fifth Judicial Circuit.

14   The attorneys, the assistant solicitors who will be

15   handling this case for the Solicitor's Office are

16   Ms. Heather Weiss.  And this is Mrs. Weiss right here

17   and Mr. Andrew Rogers.  Mr. Rogers is standing as

18   well.

19        And I would inquire at this time, ladies and

20   gentlemen, is there any member of this jury panel or

21   any member of the jury panel's immediate family who

22   is related by blood or connected by marriage or

23   either now or in the past has had a close personal

24   relationship with either of these individuals or

25   either now or in the past has had an employment or a

JA175

10

1    business relationship with either of these

2    individuals or with the Solicitor's Office of the

3    Fifth Judicial Circuit?  If so, please stand.  All

4    right.  Thank you all.

5         Ladies and gentlemen, representing Mr. Folkes

6    are Mr. Deon O'Neil and Mr. Luke Shealey.  Mr. O'Neil

7    is the one on my right, your left; and Mr. Shealy is

8    on the other side.  And I would inquire -- they are

9    both members of the South Carolina Bar.  They're

10   employed by the Richland County Public Defender's

11   Office.

12        And I would inquire at this time, is there any

13   member of this jury panel or any member of this jury

14   panel's immediate family who is related by blood or

15   connected by marriage or either now or in the past

16   has had a close personal relationship with either of

17   these gentleman or either now or in the past has had

18   an employment or a business relationship with these

19   young men or with the Public Defender's Office or

20   either now or in the past has been represented by

21   these two individuals?  If so, please stand.  Yes,

22   sir, Mr. Goins.  Robert Goins, who do you know?

23        *Yes:*  Thank you, Your Honor.  Juror number

24   83.  I went to law school with Mr. O'Neill.  We're

25   not really close personal friends, but we are

11

1    acquaintances.

2        **THE COURT:**  The fact that you went to law school

3    with Mr. O'Neil, would that prevent you from

4    listening to the evidence in this case and based upon

5    such evidence rendering a fair and impartial verdict?

6        *Yes:*  No, Your Honor.

7        **THE COURT:**  All right.  Thank you, sir.  Ladies

8    and Gentlemen, I'd now like to read to you the names

9    of some potential witnesses who may testify in this

10   trial.  And if any of them are here, I will ask them

11   to stand and to face the jury so that the jury can

12   see who you are.

13       Karem Jones, Tiffany Briggs, Tim Abney, Jerome

14   Patrick, Retalia Green.  I hope I am pronouncing

15   these right.  Nathaniel Spann.  Dr. Stephen Fann,

16   F-A-N-N with Palmetto Richland Memorial.

17   Investigator R. C. McCracken of the Columbia Police

18   Department.  Sergeant D. Shuler of the Columbia

19   Police Department.  Investigator Montgomery with the

20   Columbia Police Department.

21       Lieutenant Evans with the Columbia Police

22   Department.  Officer Sessions with the Columbia

23   Police Department.  Officer Oulette, O-U-L-E-T-T-E,

24   with the Columbia Police Department.  Officer

25   Battiste with the Columbia Police Department.

**JA177**

12

1       Officer Dingle with the Columbia Police Department.

2       Officer Huntley with the Columbia Police Department.

3       CSI Ross.  I've never seen that before.  With the

4       Lexington County Sheriff's Department.

5          Mr. Steven Grigsby who is an EMT, emergency

6       medical technician.  Mr. Michael Smith who is an EMT.

7       Ms. Kim Gathers with 911.  Ms. Jennifer Blair with

8       911.  Mr. Mike King with 911.  CSI Currie.

9       Mr. Kermit Scott.  Mr. James Reddick.

10         Ladies and gentlemen, I would inquire at this

11      time, is there any member of this jury panel or any

12      member of the jury panel's immediate family who is

13      related by blood or connected by marriage or either

14      now or in the past has had a close personal

15      relationship with any of the potential witnesses

16      whose names I just read to you or either now or in

17      the past has had an employment or a business

18      relationship with any of those individuals or with

19      respect to a physician, been a patient of that

20      physician?  If so, please stand.  Yes, sir.  Your

21      name?

22      *Yes:*  I'm juror number 55, Steve Wilson.

23      Officer Battiste has worked for me at my school just

24      after hours.

25      *THE COURT:*  All right.  You know Officer

13

1    Battiste because he's done some work at a school
2    where you're employed as well.  Is that correct?
3         *Yes:*  That's right.
4         *THE COURT:*  And your name is Mr. Lewis?
5         *Yes:*  Wilson.
6         *THE COURT:*  Oh, Wilson.  All right, Mr. Wilson.
7    The fact that Officer Battiste has been employed at
8    the same school that you are employed, would that
9    prevent you from listening to the evidence in this
10   case and based upon such evidence rendering a fair
11   and impartial verdict?
12        *Yes:*  No, sir.
13        *THE COURT:*  All right.  Thank you, sir.  Ladies
14   and gentlemen of the jury, is there any member of
15   this jury panel who has formed or expressed an
16   opinion as to the guilt or the innocence of the
17   defendant?  If so, please stand.
18        Is there any member of this jury panel who is
19   conscious of any interest or any bias or any
20   prejudice for or against the defendant, Mr. Folkes?
21   If so, please stand.
22        Can each member of this jury panel give the
23   State and the defendant, Mr. Folkes, a fair and
24   impartial trial?  If you believe you cannot, please
25   stand.

**JA179**

14

```
 1              Is there any further inquiry from the State?

 2         MS. WEISS:  Nothing from the State, Your Honor.

 3         THE COURT:  Anything from the defendant?

 4         MR. O'NEIL:  No, Your Honor.

 5         THE COURT:  Madam Clerk.

 6         MR. O'NEIL:  May we approach?

 7         THE COURT:  Yes.

 8         (Whereupon, a bench conference is had)

 9         THE COURT:  All right.  All right, Madam Clerk.

10         THE CLERK:  Ladies and gentlemen of the jury

11    panel, as I call your name, please come down and

12    bring all your belongings with you.  Stand here in

13    front of this microphone and give your name and your

14    occupation.  Vickie Thigpen.

15         (White female)

16         Yes:  Hello.  I'm Vickie Thigpen.  I'm

17    employed as a federal government employee with the

18    Department of Agriculture.

19         THE CLERK:  What says the State?

20         MS. WEISS:  Please present Ms. Thigpen.

21         THE CLERK:  What says the defense?

22         MR. O'NEIL:  Please excuse the juror.

23         THE CLERK:  Please have a seat in the back.

24    Alan Knight.

25         (White male)
```

**JA180**

15

```
 1          Yes:  Yes.  My name is Alan Knight.  I'm a
 2     music instructor at Carolina Music Academy at
 3     Columbia College.  Is there anything else?
 4          THE CLERK:  What says the State?
 5          MS. WEISS:  Please present Mr. Knight.
 6          THE CLERK:  What says the defense?
 7          MR. O'NEIL:  Please seat Mr. Knight.
 8          THE CLERK:  Have a seat in the jury box, please,
 9     sir.  Isaac Lee.
10          (Black male)
11          Yes:  Isaac Lee.  I'm employed at Owens
12     Field.
13          THE CLERK:  What says the State?
14          MS. WEISS:  Please excuse Mr. Lee.
15          THE CLERK:  Have a seat in the back of the room,
16     please.  Joella Ryan-Cook.
17          (White female)
18          Yes:  I'm Joella Ryan-Cook.  I work for
19     the Columbia Museum of Art as deputy director.
20          THE CLERK:  What says the State?
21          MS. WEISS:  Please present Ms. Ryan-Cook.
22          THE CLERK:  What says the defense?
23          MR. O'NEIL:  Please seat Ms. Ryan-Cook.
24          THE CLERK:  Have a seat in the jury box.
25     Margaret McElveen.
```

16

```
 1          (White female)
 2          Yes:  I'm Margaret McElveen.  I'm a
 3     teacher in Richland School District one.
 4          THE CLERK:  What says the State?
 5          MS. WEISS:  Please present Ms. McElveen.
 6          THE CLERK:  What says the defense?
 7          MR. O'NEIL:  Please seat Ms. McElveen.
 8          THE CLERK:  Have a seat in the jury box, please.
 9     Edward Wilson.
10          (Black male)
11          Yes:  Edward Wilson.  I work for
12     orthodontic specialists.
13          THE CLERK:  What says the State?
14          MS. WEISS:  Please present Mr. Wilson.
15          THE CLERK:  What says the defense?
16          MR. O'NEIL:  Please seat Mr. Wilson.
17          THE CLERK:  Have a seat in the jury box.
18     Cherilyn Taylor.
19          (Black female)
20          Yes:  I'm Cherilyn Taylor.  I'm a
21     psychologist at South Carolina State University.
22          THE CLERK:  What says the State?
23          MS. WEISS:  Please excuse Ms. Taylor.
24          THE CLERK:  Have a seat in the back of the room,
25     please.  Caroline Meyer.
```

**JA182**

17

1          *JUROR:*  Hi.  I'm Caroline Meyer.  I'm a graphic

2      designer for the University of South Carolina.

3          *THE CLERK:*  What says the State?

4          *MS. WEISS:*  Please present Ms. Meyer.

5          *THE CLERK:*  What says the defense?

6          *MR. O'NEIL:*  Please seat Ms. Meyer.

7          *THE CLERK:*  Have a seat in the jury box.  Marvin

8      Foster.

9          (Black male)

10         *JUROR:*  Marvin Foster, elementary school

11     principal.

12         *THE CLERK:*  What says the State?

13         *MS. WEISS:*  Please present Mr. Foster.

14         *THE CLERK:*  What says the defense?

15         *MR. O'NEIL:*  Please seat Mr. Foster.

16         *THE CLERK:*  Have a seat in the jury box, please.

17     Carrie Glenn.

18         (Black female)

19         *Yes:*  I am Carrie Glenn.  I work with

20     Carolina Block Division Center as a receptionist.

21         *THE CLERK:*  What says the State?

22         *MS. WEISS:*  Please present Ms. Glenn.

23         *THE CLERK:*  What says the defense?

24         *MR. O'NEIL:*  Please seat Ms. Glenn.

25         *THE CLERK:*  Have a seat in the jury box, please.

18

1    Sandra Roseborough.

2         (Black female)

3         *Yes:*  Hi.  I'm Sandra Roseborough and I

4    work for the South Carolina military, at the present

5    at McEntire Joint National Army Guard Base.

6         *THE CLERK:*  What says the State?

7         *MS. WEISS:*  Please present Ms. Roseborough.

8         *THE CLERK:*  What says the defense?

9         *MR. O'NEIL:*  Please seat Ms. Roseborough.

10        *THE CLERK:*  Have a seat in the jury box, please.

11   Jennifer Drumwright.

12        (Black female)

13        *Yes:*  Hi.  I'm Jennifer Drumwright and I'm

14   a clerk at SCANA Corporation.

15        *THE CLERK:*  What says the State?

16        *MS. WEISS:*  Please present Ms. Drumwright.

17        *THE CLERK:*  What says the defense?

18        *MR. O'NEIL:*  Please seat Ms. Drumwright.

19        *THE CLERK:*  Have a seat in the jury box, please.

20   John Hutto.

21        (White male)

22        *Yes:*  My name is John Hutto and I manage

23   public relations for the Department of Mental Health,

24   Bull Street.

25        *THE CLERK:*  What says the State?

19

1          MS. WEISS:  Please present Mr. Hutto.

2          THE CLERK:  What says the defense?

3          MR. O'NEIL:  Please seat Mr. Hutto.

4          THE CLERK:  Have a seat in the jury box.

5     Michael O'Shaughnessey.

6          (White male)

7          Yes:  I'm Michael O'Shaughnessey.  I'm a

8     sales manager for Vulcan Materials Company.

9          THE CLERK:  What says the State?

10         MS. WEISS:  Please present Mr. O'Shaughnessey.

11         THE CLERK:  What says the defense?

12         MR. O'NEIL:  Please seat this juror.

13         THE CLERK:  Have a seat in the jury box.  Daniel

14    Wiedemann.

15         (White male)

16         Yes:  My name is Dan Wiedemann.  I work

17    for AT&T as an I.T. analyst.

18         THE CLERK:  What says the State?

19         MS. WEISS:  Please present Mr. Wiedemann.

20         THE CLERK:  What says the defense?

21         MR. O'NEIL:  Please seat Mr. Wiedemann.

22         THE CLERK:  Have a seat in the jury box.

23         THE COURT:  All right.  What do you think?  We

24    need one?

25         MR. O'NEIL:  That's fine, Your Honor.

20

1          MS. WEISS:  Yes, Your Honor.

2          THE COURT:  All right.  Each one of you get one

3     strike.

4          THE CLERK:  Kathy Lindsey.

5          (Black female)

6          Yes:  I'm Kathy Lindsey, a fifth grade

7     math teacher with Richland School District two.

8          THE CLERK:  What says the State?

9          MS. WEISS:  Please present Ms. Lindsay.

10          THE CLERK:  What says the defense?

11          MR. O'NEIL:  Please seat Ms. Lindsey.

12          THE CLERK:  Have a seat in the jury box.

13          THE COURT:  All right.  Anything from the State

14     with respect to the composition of the jury?

15          MS. WEISS:  Nothing, Your Honor.

16          THE COURT:  Anything from the defendant?

17          MR. O'NEIL:  No, Your Honor.

18          THE COURT:  Okay.  Ladies and gentlemen of the

19     jury panel that did not get selected, I thank all of

20     you very much for making yourself available.  I'm

21     going to ask you to return back downstairs to the

22     jury assembly room.  You will get further

23     instructions down there.  You all have a nice

24     afternoon.  Thank you for coming up.

25          All right, ladies and gentlemen of the jury of

**JA186**

21

1    the jury panel.  Let's go ahead and swear the jury if

2    we could.

3        *THE CLERK:*  Ladies and gentlemen, would you

4    please stand and raise your right hand.

5        (Whereupon, the jury is sworn)

6        *THE CLERK:*  Thank you.

7        *THE COURT:*  Ladies and gentlemen, we're going to

8    break for lunch in just a few minutes because I need

9    to take up some pre-trial matters with the attorneys

10   before we actually begin the trial.  So I'm going to

11   ask that you all be back here at 2:15 when we do

12   that.  That will give us time to do our pretrials and

13   then let everybody have lunch.

14       A couple of things I want to tell you though

15   before we break.  First of all, ladies and gentlemen,

16   this case is very, very important to both the State

17   and the defendant.  So we want to do everything we

18   can to ensure that both sides get a fair and

19   impartial trial.  One of the ways that I'm going to

20   ask that you help in that regard is that you not

21   discuss this case with each other or with anyone else

22   at any time until you have been given instructions

23   that you can begin your deliberations.

24       And that means that at any time you are back in

25   the jury room, please don't discuss the case with

**JA187**

22

1      each other.  When you go to lunch in just a little
2      bit, I know you have limited knowledge of this case,
3      please don't discuss the case with anybody that you
4      come in contact with.  I anticipate this trial will
5      last several days.  So you'll be going home this
6      evening and you may come in contact with people,
7      including family or friends.  Don't discuss the case
8      with anybody.
9          And the reason I ask you to do that, ladies and
10     gentlemen, is because I don't want you to begin to
11     formulate any sort of opinion about this case until
12     you have had an opportunity to hear from both sides.
13         If you start talking about the case in the midst
14     of the State's case, you may begin to form some
15     opinion about the case.  And the defendant hasn't
16     been given an opportunity to put forth any evidence
17     the defense wishes to offer.  If you go home and talk
18     to your spouse or your child or somebody about the
19     case, they may offer some opinion about the case that
20     may have some influence on you.
21         And they're certainly not here to listen not
22     evidence, to see any exhibits that have been
23     introduced, to weigh the credibility of the witnesses
24     who have testified.  So that's not fair to either the
25     State or the defendant.

**JA188**

23

1      I promise you when you begin your deliberations

2    you can talk about the case as long as you wish.

3    When the case is over you can talk to anybody that

4    you want to talk to about the case.  But until then,

5    please do not discuss case with anybody.

6         As I've told you, Mr. Clinton Folkes who is the

7    defendant has been charged with the offense of

8    assault and battery with intent to kill.  The bill of

9    indictment states that Mr. Folkes did in Richland

10   County on or about July 22, 2007 with malice

11   aforethought commit an assault and battery upon one

12   Karem Jones with the intent to kill the said victim.

13        Now, ladies and gentlemen, the indictment is a

14   notice document.  It is this document right here.

15   And it is prepared for the purpose of putting the

16   defendant on notice of the particular charge.  It is

17   nothing more.  It's not evidence.  It's not to be

18   considered by you for any purpose other than it is

19   giving the defendant notice of this particular

20   charge.

21        To this charge the defendant has pled not guilty

22   which now means that the burden falls upon the State

23   to prove this defendant guilty and to prove him

24   guilty beyond a reasonable doubt of this particular

25   charge.

JA189

24

1          As I told you earlier, Mr. Folkes comes into

2     this courtroom presumed to be innocent and this

3     presumption of innocence will only change if you

4     after hearing all of the evidence determine that you

5     believe that he is in fact guilty.

6          As I told you, the burden falls upon the State.

7     The defendant has no burden whatsoever.   The

8     defendant doesn't have to offer any evidence.   If the

9     defendant believes the State has failed to meet its

10    burden, the defendant hey not offer any evidence.   If

11    the defendant does wish to offer evidence, I assume

12    it would be of a similar type evidence that the State

13    will offer.

14         Most of the evidence, ladies and gentlemen, will

15    come into this case by way of testimony from

16    witnesses.   Those witnesses will get into this

17    witness box where the deputy is seated and will tell

18    you what information that witness knows from having

19    seen something, heard something, smelled something,

20    felt something, tasted something.   That witness has

21    learned something from one of his or her senses and

22    they will pass that factual information on to you.

23         Now, there may be witnesses who are considered

24    expert which are a little different than a factual

25    witness in that an expert has specialized knowledge

25

1  or training in some particular field by virtue of his

2  or her education and that witness is an expert in

3  that field and can offer opinions in and his or her

4  areas of expertise.  Fact witnesses generally just

5  tell you what factual information they have.

6       Other types of evidence that might be introduced

7  may be photographs or documents, things of that

8  nature.  That is actually introduced.  It becomes an

9  exhibit in the trial and that evidence will go you

10  with you to the jury room for your review during the

11  course of your deliberations.

12       The testimony, ladies and gentlemen, will go

13  with you in your memory.  So it is absolutely

14  essential that you pay close attention to what is

15  being said in this trial.  If you can't hear

16  something or you don't understand something either by

17  a witness or the lawyer or the judge or anyone,

18  please indicate in some manner.  Raise your hand or

19  let me know that you can't hear, don't understand

20  what's being said, and we will correct that problem.

21       A third type of evidence that might be

22  introduced is what we call a stipulation.  And that's

23  where the parties stipulate or agree as to some fact

24  or some matter.  If there is a stipulation the

25  lawyers will tell me and I will pass that on to you,

26

 1        and you are to accept that fact or matter as though

 2        it has been proven here in the courtroom.

 3             Now, ladies and gentlemen, these lawyers in this

 4        case are very important to the trial because they

 5        really are the ones that conduct the trial.  They

 6        call witnesses.  They question witnesses.  They're an

 7        integral part of this process.  Listen carefully to

 8        what they say.  But understand this, that what the

 9        lawyers say in the course of this trial is not

10        evidence.  They are advocates for their respective

11        client.  Pay close attention to them, but understand

12        what they tell you is not evidence in this trial.

13             Now, the way a trial takes place, ladies and

14        gentlemen, is the first thing that happens when we

15        come back from lunch is these lawyers are going to

16        given an opportunity to get up and make an opening

17        statement.  The solicitor will go first because the

18        State has the burden of proof, and because of that,

19        they get to go first throughout the trial.

20             The opening statement is a chance for the

21        lawyers to introduce themselves or their co-counsel

22        so you know who they are.  They also have an

23        opportunity to talk to you a little bit about what

24        they think will come out during the course of this

25        trial.  It's a chance for them to educate you or

27

1     inform you a little bit so you have some
2     understanding of this matter as it unfolds in the
3     course of the trial.
4          After the State makes its opening statement the
5     defendant is given the same opportunity.  When both
6     sides have completed their opening statement, then
7     the State will go forward with the presentation of
8     its evidence.  I've told you what types of evidence
9     will be called or introduced.
10         When the state has finished the defendant is
11    given an opportunity to offer his evidence.  If the
12    defendant offers evidence; again, it would be of a
13    similar nature I would believe to the State's
14    evidence.  And that is, most of it would be testimony
15    from witnesses.
16         When both sides have completed the presentation
17    of their evidence, then the lawyers are given another
18    opportunity to speak with you.  This is called a
19    closing argument.  And the closing argument is a
20    little different from the opening statement in that
21    the closing argument is a time for these lawyers to
22    review what came out during the course of the trial
23    to point out to you what they believe is essential
24    things that you need to consider and discuss in your
25    deliberations.  It is their chance to attempt to

JA193

28

```
 1        convince you or persuade you as to why you should

 2        ultimately return a verdict for their respective

 3        client.

 4             When both sides have completed their argument,

 5        then, ladies and gentlemen, I will charge you or

 6        instruct you as to the law.  You will then retire to

 7        the jury room, determine the facts, apply the law and

 8        render your verdict.

 9             Now, ladies and gentlemen, you are probably the

10        most important aspect of this trial because you are

11        the fact finders in this case.  You will listen to

12        this evidence and you will determine what you believe

13        to be the facts in the case.  No one else will

14        participate in that process.  After you determine the

15        facts, then you'll apply the law that I gave you

16        during the charge portion of the trial and then

17        render your verdict.

18             My responsibility is a little bit different.  In

19        addition to my responsibility to charge you or

20        instruct you as to the law, I'm also sort of a

21        referee in this matter.  In most structured events we

22        have rules, and we have rules of evidence in South

23        Carolina in a trial.  We have rules of procedure.

24        And it's my responsibility to see that this trial is

25        conducted according to those rules.
```

29

1    I've already told you these lawyers have an

2    integral participation in this trial because they

3    represent their respective clients and they're here

4    to advocate positions for their respective clients.

5    As I said, this case I think will take several

6    days. Whether it will get into a third day or not I

7    don't know. But we'll see. We have good lawyers and

8    they'll proceed in the case as quickly as they can

9    without jeopardizing any of what they believe they

10    need to do for their respective client.

11    As I told you, I need to take up some matters

12    with these lawyers now while you're gone. I know it

13    may seam like a long lunch, but that's going to give

14    us an opportunity to do what we need to do. Rather

15    than keep the whole jury panel around while we dealt

16    with the facts, the legal matters this morning, we

17    decided we'd select the jury, we could send the other

18    panel members to any other courtrooms if they need to

19    select juries in those courtrooms.

20    So again, do not discuss this case while you're

21    gone. Be back here at 2:15. The folks that you're

22    going to have the most dealings with, ladies and

23    gentlemen, are the bailiffs. And these are the

24    gentleman who are seated in the back. Mr. Dye is in

25    the back, Mr. Hollis is right here, and Mr. Whittle

30

1    is behind you.

2        And these are experienced bailiffs.  They will

3    show you how to get from the courtroom to the jury

4    room, how to get from the jury room to leave the

5    courthouse and get back in the morning.  They'll sort

6    of take role when you come back from lunch and when

7    you come back in the morning.  They are here to help

8    you.  Any questions come up, you feel free to ask

9    them.  They'll bring any problems to my attention or

10   to the clerk's attention.

11       This is a court of record which I'm sure they

12   talked to you about in jury qualification.  Our court

13   reporter is Ms. Jenny Williams who is the young lady

14   seated here.  You won't know that she's here but

15   she'll take down every word that's being said in this

16   process.

17       The young lady to my left is Katherine Harrison

18   who is my law clerk and she helps me in a number of

19   ways.  We'll all work to do what we can to see that

20   this trial goes as quickly and as smoothly as it can.

21       Mr. Whittle, if you would take the jury and take

22   them to the jury room, then let them go to lunch, I

23   would appreciate it.  You all have a nice lunch,

24   ladies and gentlemen.  Please don't discuss the case

25   while you're gone.  And we'll see you back here at

31

1     2:15.

2          (Jury out at 12:30 p.m.)

3          THE COURT:  All right.  You all ready?

4          MS. WEISS:  Your Honor, our victim has some

5     personal issues this morning.  He is on his way but

6     he is not in the courtroom at this time.  He is the

7     primary witness for the Neil v. Biggers.  So we would

8     ask if it's possible just to break now, come back

9     early.

10         THE COURT:  How long is all this going to take?

11         MS. WEISS:  I think 15 minutes.

12         THE COURT:  All right.  Well, why don't we break

13    for lunch and come back here at -- let's see -- 1:30.

14    What time do you think we need to be back, Mr.

15    O'Neil?

16         MR. O'NEIL:  Your Honor, we may need 25 minutes.

17         THE COURT:  I was going to give you at least a

18    half hour.

19         MR. O'NEILL:  We're requesting two Neil v.

20    Biggers.

21         MS. WEISS:  Quarter of two.

22         THE COURT:  Can we do it in a half hour?  I

23    mean, I don't want to --

24         MR. SHEALEY:  I think it can be done in half an

25    hour.  But there are two of them, so we'll have to go

**JA197**

32

1    through separate inquiries.

2        **THE COURT:** Let's see.  Why don't we come back

3    about 20 'til 2.  That will give us an hour and ten

4    minutes and that will give us 40 minutes to do what

5    we need to do in that period of time.  Okay?

6        **MS. WEISS:** Thank you, Your Honor.

7        **MR. O'NEIL:** Thank you, Your Honor.

8        **THE COURT:** All right.  You all have a nice

9    lunch and we'll see you then.

10       (Whereupon, a lunch break is taken)

11       (WHEREUPON, State's Exhibit No. 1 is marked for

12   identification.)

13       (WHEREUPON, State's Exhibit No. 2 is marked for

14   identification.)

15       (WHEREUPON, State's Exhibit No. 3 is marked for

16   identification.)

17       (WHEREUPON, State's Exhibit No. 4 is marked for

18   identification.)

19       (WHEREUPON, State's Exhibit No. 5 is marked for

20   identification.)

21       (WHEREUPON, State's Exhibit No. 6 is marked for

22   identification.)

23       (WHEREUPON, State's Exhibit No. 7 is marked for

24   identification.)

25

33

1        (WHEREUPON, State's Exhibit No. 8 is marked for
2    identification.)
3        (WHEREUPON, State's Exhibit No. 9 is marked for
4    identification.)
5        (WHEREUPON, State's Exhibit No. 10 is marked for
6    identification.)
7        (WHEREUPON, State's Exhibit No. 11 is marked for
8    identification.)
9        (WHEREUPON, State's Exhibit No. 12 is marked for
10   identification.)
11       (WHEREUPON, State's Exhibit No. 13 is marked for
12   identification.)
13       (WHEREUPON, State's Exhibit No. 14 is marked for
14   identification.)
15       (WHEREUPON, State's Exhibit No. 15 is marked for
16   identification.)
17       (WHEREUPON, State's Exhibit No. 16 is marked for
18   identification.)
19       (WHEREUPON, State's Exhibit No. 17 is marked for
20   identification.)
21       (WHEREUPON, State's Exhibit No. 18 is marked for
22   identification.)
23       (WHEREUPON, State's Exhibit No. 19 is marked for
24   identification.)
25

34

```
 1          (WHEREUPON, State's Exhibit No. 20 is marked for

 2     identification.)

 3          (WHEREUPON, State's Exhibit No. 21 is marked for

 4     identification.)

 5          (WHEREUPON, State's Exhibit No. 22 is marked for

 6     identification.)

 7          (WHEREUPON, State's Exhibit No. 23 is marked for

 8     identification.)

 9          THE COURT:  Ms. Weiss, do you know what time

10     we're supposed to start?

11          MS. WEISS:  Sir?

12          THE COURT:  Do you know what time we're supposed

13     to start?

14          MS. WEISS:  Yes, Your Honor.  We're having

15     trouble getting our witnesses down here.

16          THE COURT:  I don't care.

17          MS. WEISS:  I apologize, Your Honor.

18          THE COURT:  Apparently you're having trouble

19     getting the lawyers down here.

20          MS. WEISS:  Yes, Your Honor.

21          THE COURT:  Is Mr. Rogers coming?

22          MR. SHEALEY:  No, sir.  Yes, sir.  I'm sorry,

23     Judge.

24          THE COURT:  He doesn't come on time either.

25          MR. SHEALEY:  No, sir.  Yes, sir.
```

**JA200**

35

1      **THE COURT:**  Where is the defendant?

2      **DEPUTY:**  He's in route.  That's all I've been

3      told.

4      **THE COURT:**  Is that route from the detention

5      center?

6      **DEPUTY:**  No.  He's downstairs.  He's being

7      shackled.

8      **THE COURT:**  Do you all know what time he's

9      supposed to be here?

10     **DEPUTY:**  I don't have anything to do with that.

11     That's the other deputy.

12     **THE COURT:**  Well, ...

13     (Pause)

14     **THE COURT:**  All right.  We've got a Neil v.

15     Biggers hearing.  Let's go ahead and proceed.  Who is

16     it that made the identifications?

17     **MR. SHEALEY:**  Your Honor, we do have a problem

18     with the out-of-court identifications as to the

19     victim, Mr. Karem Jones, identifying Mr. Folkes in a

20     photo line-up.  We also have a problem with the

21     suggestiveness of the show-up I.D. of another

22     witness, Ms. Tiffany Briggs.  As to both of those

23     we'd like to hold separate inquires.  And I believe

24     the suggestiveness of each violates Mr. Folkes'

25     Fourteenth Amendment rights to due process.

36

1              **THE COURT:**  We haven't heard it yet.

2              **MR. SHEALEY:**  Yes, Your Honor.

3              **MS. WEISS:**  Your Honor, this is the problem we

4       had.  I don't know where the witnesses -- who is

5       bringing them down.  They'll be down in a moment.

6              But in response to that, the first Neil v.

7       Biggers they're asking for, the State would argue

8       Neil v. Biggers should not apply because the show-up

9       I.D. was done by his former girlfriend and she had a

10      history with him.  She had known him for

11      approximately two years, dated him off and on for

12      several months.  The prior knowledge of the defendant

13      means that Neil v. Biggers does not apply.  And I

14      would --

15             **THE COURT:**  The show-up line-up was done by

16      somebody's prior girlfriend.

17             **MS. WEISS:**  Yes, sir.

18             **THE COURT:**  What does that mean?  Girlfriend got

19      pictures of --

20             **MS. WEISS:**  No, Your Honor.  This was a show-up.

21      The date of the incident Mr. Folkes attacked the

22      victim in the park, then left the park and walked a

23      couple of blocks away.  His former girlfriend was in

24      the park at the time.  The former girlfriend was in

25      the park at the time.  She then went with the officer

37

1    to where the defendant was and said, "That's him.

2    He's changed shirts, he's changed pants, but that's

3    him.  I know him.  I dated him."

4        MR. SHEALEY:  Your Honor, as to the nature and

5    the length of the relationship, I think that's a fact

6    that would need to be established.  I've never heard

7    any mention of a two-year relationship.  In her

8    statement she says a month or so.  I don't really

9    know what their past relationship is.  I just think

10   that given the suggestive nature of her being brought

11   to the scene where he is arrested a ways away --

12       THE COURT:  All right.  Well, let's call whoever

13   you want to call.  I mean, I hope you're not putting

14   us through an exercise just to go through an

15   exercise.

16       MR. SHEALEY:  No, sir.

17       THE COURT:  Call these people Ms. Weiss, please.

18       MS. WEISS:  Thank you, Your Honor.  The State

19   calls Tiffany Briggs.

20       TIFFANY T. BRIGGS, after being duly sworn,

21   testifies as follows:

22       THE CLERK:  State your name, please.

23       WITNESS:  My name is Tiffany Tranice Briggs.

24                 DIRECT EXAMINATION

25   BY MS. WEISS

Tiffany T. Briggs - Direct by Ms. Weiss (In Camera)

38

1   Q   Ms. Briggs, good afternoon.  Back in July, on

2       July 22nd, 2007, do you have a specific memory of

3       this date?

4   A   Yes, because it was my birthday.

5   Q   Okay.  And where were you living at that time?

6   A   Actually the day the incident happened I was living

7       at Riverside Estate which is an apartment complex.  I

8       had just moved out the homeless situation I think two

9       or three days before that.

10  Q   And just two or three days prior to that you were

11      living in the homeless situation?

12  A   Yes, ma'am.

13  Q   And did you spend a lot of time at Finlay Park?

14  A   Yes, ma'am.

15  Q   Did you have the opportunity to know Clinton Folkes?

16  A   Yes, ma'am.  He was my boyfriend for about three

17      months.

18  Q   Okay.  And prior to actually being your boyfriend,

19      did you have the opportunity to know him?

20  A   Yes, I did.  We were in a homeless situation I would

21      say before that.  Exactly I would say I came into it

22      December of two-thousand and, yeah, 2007.  2006,

23      2007.  Maybe a little bit before two years now we've

24      been knowing him.  But a good bit, about eight, seven

25      months before that.

**JA204**

Tiffany T. Briggs - Direct by Ms. Weiss (In Camera)

39

1    Q    Okay.  So you had known him for about seven, eight
2         months prior to that?
3    A    Yes.
4    Q    Did you spend a lot of time with Mr. Folkes?
5    A    While we were in the relationship, yes.  And in the
6         homeless situation, yes.
7    Q    Okay.  And do you see him probably every day?
8    A    I wouldn't say every day.  But generally, in the
9         homeless situation, I seen him at least about every
10        day.  He didn't stay at the shelter we were staying
11        in.  But, yeah; other than that, every day.
12   Q    And did you have an opportunity to get to know him,
13        his facial features, his mannerisms, his walk, his
14        voice?
15   A    Yes, ma'am.
16   Q    Okay.  And on July 22nd, 2007, did you have the
17        opportunity to see him that day?
18   A    Yes, ma'am.
19   Q    And when did you first see him that day?
20   A    I actually first seen him in the park because I had
21        got there around about, I will say 6:30, 7:00, around
22        about that time.
23   Q    And was it still light at that time?
24   A    Yes, ma'am.
25   Q    And is there any question in your mind that he's the

Tiffany T. Briggs - Direct by Ms. Weiss (In Camera)

40

1      person you saw?

2  A  Yes, ma'am.  I mean, there is no question in my mind

3      that he was not the person.

4  Q  And after he left the park, did you have the

5      opportunity to see him again?

6  A  Yes, I did.  When the officer actually took me to

7      identify him on, I think it was Calhoun and -- okay.

8      Yes.  I got to see him when the officer brought us

9      around to see him.

10  Q  Did you say it was a few blocks away from the park?

11  A  Yes, ma'am.

12  Q  And did you have the opportunity to see him?

13  A  Yes, ma'am, I did.

14  Q  And is it the same person that you saw there that you

15      had seen in the park?

16  A  Yes, ma'am.

17  Q  Was there any difference?

18  A  Yes.  He had switched clothes actually.

19  Q  And do you see that person in court today?

20  A  Yes, I do.

21  Q  And where is he?

22  A  Standing right there.  Sitting right there.

23      MS. WEISS:  Okay.  Please let the record reflect

24      that she has picked out the defendant, Mr. Clinton

25      Folkes.

Tiffany T. Briggs - Direct by Ms. Weiss (In Camera)

41

1          *THE COURT:*  Is that the man sitting between the

2      two lawyers?

3          *WITNESS:*  Yes, sir.

4          *THE COURT:*  At the defense table.  Okay.  The

5      record reflects it.

6    Q   Thank you.  No further -- or one more question.  When

7      the officer drove you over to where he was, did he

8      tell you that that was the person from the park?

9    A   No, he didn't.  I -- I actually stayed after the

10     incident happened.  And the defense left, Clinton

11     Folkes left.  I actually stayed to talk to the

12     officers.  And all he wanted me to do is come around

13     and identify him.  And that's what I did.

14   Q   And are you the one that gave the officers his name?

15   A   Yes, ma'am.

16   Q   And the description of what he was wearing?

17   A   Yes, ma'am.

18   Q   Okay.  Thank you.  No further questions, Your Honor.

19         *THE COURT:*  All right.  Mr. Shealey.

20         *MR. SHEALEY:*  Thank you.  May it please the

21     Court.

                          CROSS EXAMINATION

23   *BY MR. SHEALEY*

24   Q   So, Ms. Briggs, you say that Mr. Folkes was your

25     boyfriend for three months?

Tiffany T. Briggs - Cross by Mr. Shealey (In Camera)

42

```
 1   A   Yes, sir.

 2   Q   You knew him from your homeless situation?

 3   A   Yes.

 4   Q   Does that mean you saw him every once in a while

 5       because he was homeless?

 6   A   Yes.  He was in a homeless situation.  As of

 7       December 14th I went into the homeless shelter on

 8       Bull and Taylor.  Most of our Sundays we spent in the

 9       park because we get to eat at Turnipseed or Cafe

10       Ministries.  So, yes, I have seen Clinton Folkes from

11       that time on.  And I --

12   Q   So he would frequent some of the same areas that you

13       would frequent?

14   A   Yes, sir.

15   Q   Now, do you recall making a statement to the police?

16   A   Yes, I do.

17   Q   And you did some writing in that statement?

18   A   Yes, sir.  Yes, I did.

19   Q   Do you recall telling the police that you had been

20       dating him for a month?

21   A   Might be so.  Yeah.  We had broke up three times

22       within -- me and Clinton had an affection to where

23       our relationship he worked at Action Labor.  We had

24       an okay relationship where we'd break up and then get

25       back together and then break up.  And this happened
```

**JA208**

Tiffany T. Briggs - Cross by Mr. Shealey (In Camera)

43

1    three times within that time period.

2    Q    So you would agree that a month is different from

3         three months, right?

4    A    The whole relationship I based on three months.  But,

5         yes.  I would say, yes, it is a bigger difference.

6    Q    Now, the police, they brought you to where Mr. Folkes

7         was arrested, right?

8    A    Mm-hmm (affirmative).

9    Q    And they asked you to look at him, correct?

10   A    Mm-hmm (affirmative).

11   Q    He was in handcuffs at that time, wasn't he?

12   A    Actually, Clinton Folkes, yes, he was in handcuffs.

13   Q    He was sitting in the car, wasn't he?

14   A    No, he wasn't.  He was standing up.  I was sitting in

15        the car.

16   Q    You were sitting in the police car?

17   A    Yes, I was.  He was just standing at -- and actually

18        he was not in handcuffs.  Another officer was

19        standing there about to put Clayton in handcuffs.  I

20        was in the police car.

21   Q    Okay.  Was he surrounded by several officers?

22   A    No, he wasn't.  By the time me and the second officer

23        had got there or me and the officer I was with, I

24        would say it was about three officers the whole time

25        when I was there.

Tiffany T. Briggs - Cross by Mr. Shealey (In Camera)

44

```
1   Q   So whether he was in handcuffs or about to be put in
2       handcuffs, you knew that he was about to be arrested,
3       right?
4   A   Yes.
5   Q   These were City of Columbia Police Department
6       officers?
7   A   Yes.
8   Q   And at that time you said he was wearing something
9       different from what you saw him in?
10  A   Yes.
11  Q   Beg the Court's indulgence.  Nothing further, Judge.
12          THE COURT:  All right.  Anything further?
13      Anything further?
14          MS. WEISS:  Just briefly.
15                  REDIRECT EXAMINATION
16  BY MS. WEISS
17  Q   The same statement that the defense was talking
18      about, I believe you said that you had known Clinton
19      Folkes for eight months?
20  A   Yeah.
21  Q   Okay.  Thank you.
22          THE COURT:  All right.  Thank you, ma'am.  You
23      may step down.  All right.  Who is the next one?
24          MR. SHEALEY:  Your Honor, we have a separate
25      motion as to Mr. Karem Jones.
```

Tiffany T. Briggs - Redirect by Ms. Weiss (In Camera)

45

1          **THE COURT:**  All right.

2          **MR. SHEALEY:**  He is the victim in this case.

3          **MS. WEISS:**  Thank you, Your Honor.  May it

4     please the Court.  The State calls Karem Jones.

5          KAREM E. JONES, JR., after being duly sworn,

6     testifies as follows:

7          **THE CLERK:**  Thank you.  Have a seat in the

8     witness stand.  Give the court reporter your name.

9     State your name, please.

10         **WITNESS:**  Karem Emanuel Jones, Sr.

11                    DIRECT EXAMINATION

12    **BY MS. WEISS**

13    **Q**    Good afternoon, Karem.  Karem, did you have the

14         opportunity to be in the park on July 22nd of 2007?

15    **A**    Yes, ma'am.

16    **Q**    And did you receive any injuries while you were in

17         the park that day?

18    **A**    Yes, ma'am.  I received a laceration to my neck and

19         my arm.

20    **Q**    Okay.  And about how long -- what time of day did

21         that injury occur?

22    **A**    For the exact time, I couldn't give.  I know the sun

23         was still out and bright.  So it was probably about

24         6, 6:30.

25    **Q**    And did you have the opportunity to see who cut you?

**JA211**

Karem E. Jones, Sr. - Direct by Ms. Weiss (In Camera)

46

1   A   Yes, ma'am, I did.

2   Q   About how long did you have from the time the person

3       first approached you until they left to view that

4       person?

5   A   From the beginning to the end, I'd say about 30

6       minutes.

7   Q   Thirty minutes?

8   A   It was a while.  The person was -- he was there the

9       whole time.  He was the same person that attempted to

10      kill me.  I mean, I'll never forget his face.  I'll

11      never forget anything about him.

12  Q   And you said the sun was out?

13  A   The sun was out nice and bright because we were all

14      sitting under the tree to try to stay out of the

15      sunlight.

16  Q   And there was no trouble to view him?

17  A   No, ma'am.

18  Q   Did he come at you face only?

19  A   Yes, ma'am, he did.  He actually stood there for a

20      minute or two.

21  Q   And after he left, did you have to be transported to

22      the hospital?

23  A   Yes, ma'am, I did.

24  Q   And did you have the opportunity to talk to

25      Investigator McCracken while you were in the

Karem E. Jones, Sr. - Direct by Ms. Weiss (In Camera)

47

```
 1        hospital?
 2   A    The next day, I believe so.  I think I'm pretty sure
 3        it was the next day.
 4   Q    And do you remember meeting or talking to
 5        Investigator McCracken?
 6   A    Yes, ma'am, I do.
 7   Q    And were you under any heavy narcotics?  Is there
 8        anything that would have altered your memory or your
 9        ability to think at that point?
10   A    No, ma'am.  Like I said, it was the next day.  It was
11        the next morning.  I had already started eating and
12        pretty much getting back to myself.
13   Q    Okay.  Do you recall Investigator McCracken coming
14        into your hospital room?
15   A    Yes, ma'am, I do.
16   Q    What did he do when he came in?
17   A    He asked me how -- first he asked me how I was doing
18        and then he asked me if I could identify the person
19        that did this to me.  I told him yeah.
20   Q    Was there any question in your mind at that point --
21   A    No, ma'am.
22   Q    -- that you could identify him?
23   A    No, ma'am.  None at all.
24   Q    And did he show you anything?
25   A    Yes, ma'am.  He showed me a picture with six people
```

Karem E. Jones, Sr. - Direct by Ms. Weiss (In Camera)

48

```
 1        on it.
 2   Q    Okay.  And did he tell you anything about these
 3        pictures?
 4   A    No, ma'am, he did not.
 5   Q    Okay.  Did he point out any specific person out of
 6        these six pictures?
 7   A    No, ma'am, he did not.
 8   Q    I'm going to show you what's been marked as State's
 9        Exhibit No. 1 for identification.  Do you recognize
10        this?
11   A    Yes, ma'am, I do.
12   Q    What is it?
13   A    It's a line-up of people.
14   Q    And is this the same line-up you looked at that day?
15   A    Yes, ma'am; the exact same.
16   Q    Okay.  And are there any markings on it?
17   A    Yes, ma'am.  My initials and a circle.
18   Q    And is that in your handwriting?
19   A    Yes, ma'am, it is.
20   Q    Okay.  That's the person that you picked out?
21   A    Yes, ma'am.  That's him.
22   Q    Was there any question in your mind that that's the
23        person?
24   A    Yes, ma'am.
25   Q    I'm going to show you what's been marked as State's
```

Karem E. Jones, Sr. - Direct by Ms. Weiss (In Camera)

49

1     Exhibit No. 2.  Do you recognize that?

2  **A**  I do.

3  **Q**  Is that your signature on it?

4  **A**  Yes, ma'am, it is.

5  **Q**  Is that your address?  Or was that your address at

6     the time?

7  **A**  Yes, ma'am.

8  **Q**  Okay.  And that says on this date Investigator

9     McCracken showed you six pictures and you picked out

10    picture 55484.  And that would be the same picture

11    that's on here?

12  **A**  Yes, ma'am.

13  **Q**  And that was done on July 23rd, 2007, the day after

14    this incident?

15  **A**  Yes, ma'am.

16  **Q**  And can you pick out this person?  Is he in the

17    courtroom at this time?

18  **A**  Yes, ma'am.  He's sitting right there, right

19    inbetween those two gentlemen.

20       **MS. WEISS:**  Your Honor, may the record --

21       **THE COURT:**  The record reflects he's identified

22    the defendant.

23  **Q**  Okay.  And Investigator McCracken didn't give you any

24    indication whether the person would be on this sheet

25    or who the person was on this sheet?

Karem E. Jones, Sr. - Direct by Ms. Weiss (In Camera)

50

1    A    No, ma'am.

2    Q    Okay.  Thank you.  No further questions for this

3         witness, Your Honor.

4              *THE COURT:*  Mr. Shealey.

5              *MR. SHEALEY:*  Thank you, Your Honor.

6                         CROSS EXAMINATION

7    *BY MR. SHEALEY*

8    Q    Good afternoon.  Mr. Jones.  Obviously the solicitor

9         just walked you through some of the events of that

10        day.  But do you remember calling 911 from a pay

11        phone?  Right?

12   A    Yes, sir.

13   Q    Okay.  You'll agree that when you called 911 you

14        didn't name Clinton Folkes as the person who attacked

15        you, right?

16   A    I'm not sure if I did or didn't.

17   Q    Would it be fair to say that you said a black male

18        wearing a multicolored striped shirt attacked you?

19   A    No.  Because I do recall I think they did ask me his

20        name and I said Clinton Folkes.  As a matter of fact,

21        is it possible for us to hear the tapes?  Because I'm

22        pretty sure I did hear his name.

23   Q    We may or may not go back to that.  Let's stick to

24        just these basic questions.  Okay?

25   A    Okay.

**JA216**

Karem E. Jones, Jr. - Cross by Mr. Shealey (In Camera)

51

1   Q   I was asking if you recall naming him or not.  And I

2       was saying that you do not name him.  And I'll ask

3       you if you agree with --

4   A   That, I guess so.  I guess I can.

5   Q   Isn't it true that you only had known him for a week

6       as someone who goes to that park, right?

7   A   Known him as talked to him, probably so.  But I've

8       seen him every day.  We worked at the same labor

9       company, Action Labor.  He was there every day like I

10      was there every day.

11  Q   Do you recall giving a statement to Investigator

12      McCracken in the hospital you just talked about?

13  A   Yes.

14  Q   Have you gone over that statement recently with

15      anybody?

16  A   Have I gone over that with anybody?

17  Q   Have you looked at it recently?

18  A   Have I looked at it?

19  Q   You haven't read it at all recently?

20  A   I'm not sure.  I'm not sure.

21  Q   Do you remember in that statement saying you'd known

22      Mr. Folkes for about a week?

23  A   Yeah.

24  Q   Okay.

25  A   I mean, I talked to him about a week.  Yes, sir.

**JA217**

Karem E. Jones, Jr. - Cross by Mr. Shealey (In Camera)

52

1  Q  Now, I'm not trying to embarrass you.  But you've

2     been arrested before, right?

3  A  Yes, sir, I have.

4  Q  So you're aware that when they take you down to jail

5     they don't let you wear the clothes that you're

6     wearing right now or anything off the street, right?

7  A  Right.

8  Q  And they he have a special little blue uniform they

9     put you in sometimes?

10  A  Right.

11        MS. WEISS:  Objection, Your Honor.  I don't see

12     the relevance to this identification.

13        MR. SHEALEY:  Your Honor, I believe it goes to

14     this particular photo line-up.  I think we're about

15     to get to the fact that Mr. Folkes is wearing one of

16     those blue jail uniforms.  And my questioning is

17     regarding whether Mr. Jones is familiar with what

18     those uniforms look like.  I think it goes exactly to

19     this.

20        THE COURT:  You can ask him a question.  Let's

21     see what the photograph --

22        MS. WEISS:  It looks like a t-shirt to me.

23        (Document handed to the Court)

24  Q  Now, the line-up that Ms. Weiss was just showing you,

25     was that the exact line-up that you were shown in

**JA218**

Karem E. Jones, Jr. - Cross by Mr. Shealey (In Camera)

53

1           your hospital room?

2    A      Yes, it is.

3    Q      Were you a shown a color line-up, or were you a shown

4           a black and white line-up?

5    A      I was shown a black and white, that same piece of

6           paper.

7    Q      Now, you were homeless at the time, correct?

8    A      Yes, sir.

9    Q      Have you frequently associated with some of the

10          people down at the park?

11   A      Somewhat.  Because like I say, I pretty much stayed

12          to myself.  I only talked with and hung out with

13          certain people.

14   Q      Well, you hung out with Ms. Briggs, right?

15   A      Ms. Who?

16   Q      Ms. Briggs?

17   A      Yeah.  I associated with her every now and then.  We

18          never really kind of hung out.

19   Q      People generally met on Sundays, right?

20   A      Yes.  Some people would go to church.  Some people

21          would go over places.

22   Q      You all had been doing some drinking that day,

23          correct?

24   A      We all or me?  Me, yes, I was drinking.

25   Q      You'd been using marijuana as well, right?

**JA219**

Karem E. Jones, Jr. - Cross by Mr. Shealey (In Camera)

54

1   **A**     Yes, sir, I had.

2   **Q**     Beg the Court's indulgence. Nothing further for this

3           witness, Your Honor.

4                   **THE COURT:** Anything further?

5                   **MS. WEISS:** Not from this witness, Your Honor.

6                   **THE COURT:** Thank you, sir. You may step down.

7           Anything further?

8                   **MS. WEISS:** The State calls Investigator

9           McCracken.

10                  ROBERT MCCRACKEN, after being duly sworn,

11      testifies as follows:

12                  **THE CLERK:** Thank you. Have a seat in the

13          witness stand and give the court reporter your name.

14                  **WITNESS:** Robert McCracken.

15                          DIRECT EXAMINATION

16  **BY MS. WEISS**

17  **Q**     Investigator McCracken, are you the lead investigator

18          on State vs. Clinton Folkes?

19  **A**     Yes, ma'am.

20  **Q**     And did you have the opportunity on July 23rd, 2007

21          to talk to the victim, Mr. Karem Jones?

22  **A**     Yes, ma'am.

23  **Q**     Where was that conversation?

24  **A**     It was at the hospital in his hospital room.

25  **Q**     I'm going to show you what's been marked as State's

**JA220**

Robert McCracken - Direct by Ms. Weiss (In Camera)

55

1    Exhibits 1 and 2 for identification.  Do you

2    recognize these?

3  A   Yes, ma'am.

4  Q   And what are they?

5  A   A photo line-up and a photo line-up form that was

6    used to identify which photograph, as well as him

7    circling the photographs.

8  Q   And are these the photos and the form that you used

9    in this case?

10       MS. WEISS:  Your Honor, I would ask that these

11    forms be admitted for the purposes of this hearing.

12       THE COURT:  All right.  Any objection?

13       MR. SHEALEY:  No objection, Your Honor.

14       THE COURT:  All right.  So admitted.

15       (WHEREUPON, State's Exhibit No. 1 is admitted

16    into evidence.)

17       (WHEREUPON, State's Exhibit No. 2 is admitted

18    into evidence.)

19  Q   Thank you, Your Honor.  Investigator McCracken, when

20    you went into Mr. Jones' hospital room, what did you

21    say to him?  Do you have something that you typically

22    say when you first talk to a victim?

23  A   I initially got a statement from him and/or a verbal

24    statement as to what happened.  I asked him if he

25    could identify the person, how he knew the person,

Robert McCracken - Direct by Ms. Weiss (In Camera)

56

1    and at that point I would show them the photo
2    line-up.
3  Q  And did he indicate at the time he could identify the
4    perpetrator?
5  A  Yes, ma'am.  He had no doubt that he could identify
6    the person.
7  Q  He was very certain of that fact?
8  A  Yes, ma'am.
9  Q  Okay.  And did you then hand him this piece of paper?
10 A  Normally what I do with photographic line-up's is I
11    turn them face down and I ask the person to turn it
12    over, that way I'm not touching the photo or holding
13    the photo any particular way, and ask them if they
14    recognize any person in those photographs.
15 Q  And is that what you did with Mr. Jones?
16 A  Yes, ma'am.
17 Q  Okay.  And how long did it take him before he
18    identified a photo?
19 A  He looked at the photographs, but it was almost
20    immediately.  He pointed to him.
21 Q  Okay.  And did he have any hesitation?
22 A  No, ma'am.
23 Q  Is this his handwriting on this form?
24 A  Yes, ma'am.  I had him initial it.
25 Q  So did he also circle it?

Robert McCracken - Direct by Ms. Weiss (In Camera)

57

1   **A**   Yes, ma'am.

2   **Q**   And did he seem to be under the influence of anything

3        at the time you were talking to him?

4   **A**   No, ma'am.

5   **Q**   And State's Exhibit 2 is your form.  Did you fill

6        that out, or did Mr. Jones fill that out?

7   **A**   I filled out my name, the date, the time, the charge

8        down at the bottom, the address.  He filled out the

9        picture number 6 and he wrote down 6 and he filled

10       out the number.

11  **Q**   Okay.  And this is his signature?

12  **A**   Yes, ma'am.

13  **Q**   And is that --

14  **A**   That's my signature.

15  **Q**   That's your signature?  And you're a notary?

16  **A**   Yes, ma'am.

17  **Q**   So you notarized this.  Did he ever have any

18       hesitation in picking this out?

19  **A**   No, ma'am.

20       **MS. WEISS:**  No further questions at this time.

21       **THE COURT:**  Anything, Mr. Shealey?

22       **MR. SHEALEY:**  Yes, Your Honor.  Briefly.

23                    CROSS EXAMINATION

24  **BY MR. SHEALEY**

25  **Q**   Good afternoon, Investigator.

Robert McCracken - Cross by Mr. Shealey (In Camera)

58

1   A   Yes, sir.

2   Q   So it's your testimony that this is essentially a

3       photo line-up that we're talking about, right?

4   A   The one that's in evidence is the photo line-up.

5       But, yes, sir.

6   Q   Is this the exact one, or was a color photo line-up

7       generated?

8   A   No, sir.  That's the exact line-up.

9   Q   Do you generally use just a black and white line-up,

10      or do you ever do a color line-up?

11  A   I've done both.  It depends on how the backgrounds

12      are and the color comes out.  We want to make them

13      all similar.

14  Q   Now, that photo line-up was generated through the

15      jail's website I assume, correct?

16  A   Yes, sir.

17  Q   And these are past pictures of arrests, right?

18  A   Does he --

19  Q   These are pictures generated through people being

20      arrested?

21  A   Yes, sir.

22  Q   And their photos are taken, right?

23  A   Yes, sir.

24  Q   Okay.  Now, that picture that is particularly used in

25      that was from the arrest of that day, right?

**JA224**

Robert McCracken - Cross by Mr. Shealey (In Camera)

59

1  A   I believe so.  I'd have to go back to check that, but
2      I can do it by the date on the photograph.
3  Q   Because he wasn't arrested in jail uniform, right?
4  A   No, sir.
5  Q   He was arrested wearing street clothes, correct?
6  A   Yes, sir.
7  Q   Okay.  Now, did you not go and visit -- you didn't
8      visit Mr. Jones the date of the incident, right?
9  A   No, sir.  He was in surgery that morning.  Or that
10     afternoon he was in emergency surgery and I could not
11     visit him at that time.
12 Q   You're not a doctor.  You're not sure as to what type
13     of treatment he was given.  But did you try to visit
14     him that day?
15 A   No, sir.  Sergeant Shuler advised me that he was in
16     emergency surgery.  At that point I did not figure I
17     could visit him that evening.
18 Q   Okay.
19 A   Due to those circumstances.
20 Q   Beg the Court's indulgence.  Nothing further for this
21     witness, Judge.
22         THE COURT:  All right.
23         MS. WEISS:  Nothing further for this witness,
24     Your Honor.
25         THE COURT:  All right.  You got anything you

JA225

60

1    want to say, Mr. Shealey?

2         MR. SHEALEY:  Yes, sir.  Your Honor, as to Ms.

3    Briggs, I will withdrew my motion as to her.  I

4    apologize for that.  Simply based on discovery it was

5    really hard to tell what type of relationship they

6    had, if any; but I don't think it's appropriate for

7    her.

8         As to Mr. Jones, I would think that his I.D. is

9    unduly suggestive.  Also Neil v. Biggers and its

10   progeny, we've got a two-prong test; first, whether

11   it's unduly suggestive; and then if it is suggestive,

12   then you've got other factors to consider.  Maybe

13   it's reliable anyway.  I would argue that it's

14   suggestive based on the fact that Mr. Jones and

15   Investigator McCracken both agree that is this a jail

16   uniform jumpsuit that he's wearing.  It's not

17   anything that would not stick out.  And none of the

18   other people in the line-up are wearing their jail

19   uniforms.  They're all photographed in their plain

20   street clothes.

21        The fact that Mr. Jones admitted to being

22   arrested before, admits knowing what the Alvin S.

23   Glenn jumpsuit looks like I think makes it

24   particularly able for that to stick out in his mind

25   in a line-up, that this is something different from

61

1    normal street clothes and that's something that the

2    rest of people in the line-up did not have.  They

3    were not in jail jumpsuits.  Only Mr. Folkes was.  So

4    I would argue that it is unduly suggestive to pick

5    someone out of a line-up wearing a jail jumpsuit.

6        If you agree with that, then I think, you know,

7    there are other factors we need to see.  Well, it's

8    so reliable that this mistaken identification might

9    not be made.  As you know, some of these factors to

10   look at are the opportunity of the witness to view

11   the crime at the time.

12       **THE COURT:**  I'm familiar with those.

13       **MR. SHEALEY:**  Yes, sir.  They would argue that I

14   think Mr. Jones testified that in his statement he

15   agreed that he said he'd only known him for a week.

16   There is some discrepancy.  But my argument is that

17   on the 911 to dispatch, he didn't say Clinton Folkes,

18   you know, cut me or hurt me.  He said a black male

19   and he gave a description.  He didn't know him well

20   enough to say his name at the time.

21       And he also admitted in terms of his perception

22   his opportunity to view this defendant that he was

23   drinking, he had been using marijuana.  I think that

24   skews his perception to as he might not be able to

25   accurately know his attacker that evening.

62

1         And I think it was a relatively short
2    altercation.  I think just given all these factors,
3    the totality of the circumstances, I think it is
4    unduly suggestive and that even looking at the
5    totality, I don't think it should be allowed in
6    because it would prejudice my client and violate his
7    Fourteenth Amendment due process rights.
8         **THE COURT:**  Anything you want to say, Ms. Weiss?
9         **MS. WEISS:**  Your Honor, I did not think -- I
10   mean, I don't even know that that is a jail jumpsuit.
11   I mean, it's a dark shirt.  I think it's a black and
12   white picture.  It goes along with everybody else
13   wearing different outfits.  I think the defense is
14   assuming that it is.
15        **THE COURT:**  I saw it.
16        **MS. WEISS:**  You saw it.  I'm not even sure that
17   it is a jail jumpsuit.  And even if it is, I don't
18   know how anybody could notice what it was in that
19   short a period of time.  The Investigator said he
20   looked at it, looked at the pictures and went, that's
21   him.  He was certain about it.  He has time to look
22   at it.  I don't think it is unduly suggestive.  I
23   mean, I think it's reliable information.
24        I don't even think the factors would even have
25   to be looked at.  I don't think it is unduly

63

1    suggestive and I think it's a reliable I.D.  He was

2    certain at the time.  Certainly the moment

3    Investigator McCracken came in the room, he could

4    pick it out.  And this just happens to be somebody

5    who knew him for a week and then actually saw him

6    commit the crime.

7         Obviously most of the crimes that we deal with

8    in these courts, somebody only sees them when they're

9    being attacked.  This person just happened to know

10   him for a week prior from this time and knew what he

11   looked like.  So when he came to take him, he just

12   knew him that much better, as you'll hear when this

13   crime began as he was getting in his face.  So I

14   think this is a very reliable identification and

15   should be admitted.

16        *THE COURT:*  All right.  I'm going to deny it.

17   The witness says he'd actually known him for six

18   months, having worked with him, didn't know him as an

19   acquaintance but knew who he was, knew his face and

20   had worked with him for six months, then says for a

21   period of time prior to the incident he knew him and

22   associated with him to some degree for a period of a

23   week prior to the incident.  So I'm not even sure

24   that it's a situation where a Neil v. Biggers is

25   necessary.  He's got knowledge of who this person is.

**JA229**

64

1    I can look at the picture.  I wouldn't have any

2    idea that that was a jail suit.  It looks like a dark

3    t-shirt to me.  It's black and white.  I don't see

4    anything in there that suggests that that's

5    suggestive in any way.  And clearly if the fellow

6    knew who he was and had contact with him for six

7    months, a week, whatever, he knew him, and he can

8    testify that that's the person who did what he did.

9         Now, you may have some areas that you can attack

10   his testimony because of things that you point out.

11   He didn't identify him with his name and all of that.

12   But I think it's certainly appropriate and I'm going

13   to allow it in.

14        **MS. WEISS:**  Thank you, Your Honor.

15        **THE COURT:**  All right.  Are we ready to go?

16        **MR. O'NEIL:**  Just a couple more housekeeping.  I

17   I'd just like to renew my Rule 5, specifically as it

18   relates to any additional statements by the victim in

19   this case, Karem Jones.  I think by me looking

20   through the discovery, it was noted by the hospital

21   staff that an individual from the police department

22   came to speak with Mr. Jones on the night of the

23   incident, July 22nd, 2007.  I don't have a statement

24   from Mr. Jones on that day.  But out of an abundance

25   of caution, I would renew my Rule 5 to see.

65

1      **THE COURT:**  Have you all given them everything?

2      **MS. WEISS:**  We've given them everything, Your

3   Honor.

4      **THE COURT:**  All right.

5      **MR. O'NEIL:**  Thank you, Your Honor.  I would ask

6   the Court to sequester our lay witnesses with the

7   exclusion of the victim, Mr. Jones, to prevent the

8   witnesses from altering their testimony in light of

9   what they heard through other witnesses's testimony,

10  Your Honor, specifically because I think at least

11  three of the witnesses in this case, Your Honor, did

12  not give a prior statement.

13     **THE COURT:**  What you all say about it?  Do you

14  have any objection to sequestering?

15     **MS. WEISS:**  Except for the victim and the

16  investigating officer.

17     **THE COURT:**  They're entitled.

18     **MS. WEISS:**  That's fine.

19     **THE COURT:**  We'll do that.  The victim and the

20  investigator can stay.  All witnesses will be

21  sequestered.

22     **MR. O'NEIL:**  Your Honor, we would ask at some

23  time to settle the records of all lay witnesses

24  involved in the case, Your Honor.

25     **THE COURT:**  Have you all already done that?

**JA231**

66

1          MS. WEISS:  Let's see.

2          (Pause)

3          THE COURT:  All right, sir.  Are we ready to go

4     yet?

5          MR. O'NEIL:  Yes, Your Honor.

6          THE COURT:  You got the record resolved?

7          MR. O'NEIL:  I think we do.  Yes, Your Honor, we

8     do.

9          THE COURT:  All right.  Let's bring us in some

10    witnesses, I mean jurors.

11         THE BAILIFF:  Be glad to, Your Honor.

12         (Jury in at 2:25 p.m.)

13         THE BAILIFF:  The jury is all present, Your

14    Honor.

15         THE COURT:  All right.  Thank you.  Ladies and

16    gentlemen, I apologize for keeping you all waiting

17    but our pre-trial matters took a little bit longer

18    than we anticipated.  But we are now at the point of

19    beginning our trial.  As I told you, the lawyers have

20    an opportunity to talk to you.  So, Ms. Weiss, I'll

21    call on you and ask if you are prepared to go

22    forward.  Oh, Mr. Rogers, if you would, please.

23         MR. ROGERS:  The State is ready, Your Honor.

24    May it please the Court?

25         THE COURT:  Yes, sir.

**JA232**

1          **MR. ROGERS:** Your Honor, counsel, on July 22nd,

2      2007 here in Richland County mere blocks from this

3      very courthouse, that man, Clinton Folkes, did it,

4      cut the victim, Mr. Karem Jones, sitting right there

5      at the corner on his neck causing serious injuries to

6      his neck and to his forearm.

7          Now, as a result of these actions the State of

8      South Carolina has charged the defendant with assault

9      and battery with intent to kill.  In order to prove

10     that today the State is going to call various

11     witnesses, and those witnesses will come before you

12     in front of this witness stand right here and testify

13     as to the fact that they remember and the evidence

14     that they remember seeing.

15         What you will hear today is on the afternoon of

16     July 22nd, 2007, here in Richland County, the

17     defendant ate dinner with two witnesses, Ms. Retalia

18     Jones -- or excuse me -- with Ms. Retalia Green and

19     Mr. Jerome Patrick, that after eating dinner at the

20     Salvation Army they walked a few blocks down to

21     Finlay Park which is just down the street.

22         Upon arriving in the park they met a number of

23     people who were gathered in an open field down by the

24     stadium, if you're familiar with the area.  It was a

25     sunny day in July, so everybody was congregated in

68

1    the shade underneath some trees.  At that time the

2    defendant started to interact with some of the people

3    down there and the various witnesses were talking to

4    each other.

5        You'll hear that Mr. James Reddick, first found,

6    came in contact with the defendant, that at that time

7    the defendant picked a fight with him, and that after

8    the defendant pulled a blade out of his pocket,

9    Mr. Reddick backed away understanding that he didn't

10   want a piece of this fight, that this was going to be

11   dangerous and he didn't want a part of that.

12       You will hear that moments later the defendant

13   picked a fight with Mr. Jones.  We have multiple

14   witnesses to this effect.  And you will hear that the

15   defendant first took a swing -- had a verbal argument

16   with the victim.  That verbal argument turned

17   physical when the defendant took a swing at Mr.

18   Jones.  Mr. Jones defended himself, took two quick

19   punches to the defendant and knocked him on the

20   ground.

21       Mr. Jones didn't want to fight this afternoon or

22   that day.  He didn't want any trouble.  He was just

23   trying to enjoy a day in the park.  But as he was

24   trying to keep the defendant down to avoid further

25   confrontation, you will hear that the defendant

69

1    reached in his pocket, pulled out a blade and cut Mr.

2    Jones across the neck and across his forearms, that

3    this was not a mere flesh wound that somebody might

4    get shaving in the morning.  This was a serious

5    injury dangerously close to a major artery.

6         At that time Mr. Jones noticed that he was cut,

7    ran away and called 911, used a pay phone a short

8    distance from there.  You will hear from Ms. Tiffany

9    Briggs who is the ex girlfriend of the defendant.

10   She was in the park and witnessed all this.  And you

11   will hear from her that after she saw the defendant

12   cut Mr. Jones that he then hit her in the back and

13   taunted the victim as she ran away.

14        You will hear that after the incident a couple

15   of people called 911.  The defendant lingered around

16   the area for a couple of moments and then left the

17   park going in a northeast direction.  If you're

18   familiar with the park, it's towards the stairs,

19   towards the northeast.  He went back in that

20   direction.

21        At the time of the incident he was wearing a

22   striped shirt and dark pants.  Now, you will hear

23   from a couple of witnesses here that it's not

24   uncommon for people hanging out in the park to have

25   bags, and in those bags they have changes of clothes.

70

1    You will hear that when the witness or when the

2    defendant caused the injuries, he was wearing a

3    striped shirt.  He was then located a short distance

4    later wearing a different shirt.  Listen to see how

5    that change of clothing occurred.

6         After 911 was called, officers responded to the

7    scene.  You will hear from officers today that say

8    they investigated the incident.  They came to the

9    scene, secured the scene.  They spoke with some

10   witnesses, spoke to specifically Mr. Patrick, Ms.

11   Green, Ms. Briggs, and three other key people who

12   watched the incident occur.

13        They then did a search of the area for the

14   defendant.  Now, at the time, this is immediately

15   after the incident occurred, at the time the suspect

16   description was pretty -- wasn't extraordinarily

17   specific.  Listen for the initial description.  The

18   initial description was black male, striped shirt,

19   dark pants.

20        Based on that initial description one of the

21   officers that you will hear from, Officer Oulette,

22   stopped the defendant and another gentleman as they

23   exited the park at the northeast corner, as they

24   exited the park towards the street, that these two

25   individuals roughly matched the description.

**JA236**

71

1          At that time there wasn't a specific name of the

2     suspect.  So he stopped them, took identification

3     from them to verify who they were.  They didn't

4     specifically match the initial description, so he let

5     them go but took their name.  Moments later, after

6     the officers were able to finish talking to the

7     witnesses, calm them down a little bit and get a more

8     thorough description, one of the witnesses gave a

9     name of the defendant, Clinton Folkes.

10          As soon as that name came on the radio Officer

11     Oulette realized that's the guy I just pulled.  I

12     just saw him.  He immediately turned his police car

13     around and went to go look for the defendant and

14     stopped him a few blocks away.  At that time the

15     defendant was placed into custody.  This was the end

16     of Officer Oulette's shift, so he handed the

17     defendant off to another officer.

18          You will hear that the witnesses at the scene

19     who witnessed the incident occur, they knew the

20     defendant.  This wasn't some random person that they

21     had never seen before.  They were able to identify

22     the defendant.  That there was an identification that

23     occurred moments after the incident.  And you will

24     also hear about the investigation that occurred.

25          Now, as I stated earlier, the defendant is

72

1    charged were assault and battery with intent to kill.

2    At the conclusion of this trial the judge is going to

3    instruct you specifically related to the law.  And

4    these are going to be much more in depth

5    instructions.  If anything I say contradicts what the

6    judge says, please listen to the judge.

7        But for our purposes right now so that you can

8    understand the key points to listen for throughout

9    the trial, assault and battery with intent to kill is

10   a bit misleading.  The law of South Carolina does not

11   require that the State prove that the defendant

12   actually intended to kill the victim.  On the other

13   hand, the State does have to prove that the defendant

14   unlawfully committed an act of violent injury on the

15   person of another and that he did this with either

16   implied or expressed malice.

17        Notice that this does not state that the State

18   has to prove that the defendant intended to kill the

19   victim.  We only have to prove that the defendant

20   intended to inflict violent injury.  When we talk

21   about malice, there are two types of malice.  Malice

22   is a legal definition, a legal word.  And one of

23   definitions that's used is that malice is the

24   wrongful intent to injure another and indicates a

25   wicked heart.  There are two types of malice.  There

73

1    is implied and there is expressed malice.

2         Expressed malice is a deliberate intent to

3    unlawfully like take the life of another,

4    deliberately, expressed.  Implied malice on the other

5    hand are when circumstances demonstrate a wanton or

6    reckless disregard for human life or when a

7    reasonable person would have known that there was a

8    strong likelihood that death would result from his

9    actions.  Okay?

10        You will hear some conversations throughout this

11   trial about reasonable doubt.  What is reasonable

12   doubt?  And like I said, the judge will instruct us

13   specifically at the end of the trial.  One of the

14   definitions of reasonable doubt that is from the

15   Supreme Court that I'd like for you to keep in mind,

16   is that reasonable doubt is that which leaves you

17   firmly convinced of the defendant's guilt.

18        There are few things in this world that we know

19   with absolute certainty.  And in criminal court, in

20   criminal law, we only have to prove things beyond a

21   reasonable doubt.  The law says that if after hearing

22   all of the evidence after careful consideration of

23   the facts in this case you are firmly convinced that

24   the defendant did commit these crimes, you must find

25   him guilty.  Now, let me say that again.  If you are

**JA239**

74

1    firmly convinced that the defendant committed these

2    acts, you must find him guilty.

3        Now, if on the other hand after your

4    deliberations you find that there is a real

5    possibility, a real possibility that the defendant

6    did not commit these acts, you must find him not

7    guilty.  At the conclusion of this trial, after

8    listening to the witness statements, after seeing the

9    evidence that's introduced, we will address you once

10   again.  And I am confident that after carefully

11   listening to the evidence, after careful deliberation

12   of the facts in this case you will have no choice but

13   to return a verdict of guilty.  Thank you.

14       **THE COURT:**  All right, Mr. Shealey.

15       **MR. SHEALEY:**  Thank you, Your Honor.  May it

16   please the Court.  I'd like to tell you about the

17   world of homeless people.  These are the people that

18   we ignore as they sit on park benches, the people

19   that are panhandling while we're out shopping.  Now,

20   in order for you to fully understand this world and

21   to understand this case, we're going to have to get

22   into what this means, to be homeless.

23       Now, Mr. Rogers, the State's government lawyer,

24   has come up here and he's tried to paint you a

25   picture of my client, Mr. Folkes, as a monster, Mr.

75

1    Jones, an angel just out getting a bite to eat when

2    he gets attacked.  But I think after you hear the

3    evidence you'll realize that this is not a black and

4    white situation.  This is a gray area.  There's no

5    angels; there's no monsters here.  This is not an

6    innocent victim.  And you're going to hear about

7    that.

8         Now, the State is going to ask that you believe

9    the stories they're selling to you today.  And

10   they're selling this story to you through the

11   government lawyer mainly by testimony that comes from

12   this stand.  And it's going to be testimony mostly

13   from other homeless people that they claim were there

14   that night.

15        Now, they are going to ask that you decide that

16   their version, their tale they're trying to sell is

17   credible and that Mr. Folkes is bad and not credible.

18   And I think after you hear this evidence, after you

19   hear the testimony that comes from this stand, you'll

20   realize that this is not the gospel truth as they

21   would have you believe it and that you must take

22   everything with a grain of salt, a substantial grain

23   of salt, a lump of salt in this case, ladies and

24   gentlemen.

25        I want to turn your attention to July 22nd of

2:19-cv-00760-RMG-MGB    Date Filed 07/03/19    Entry Number 14-1    Page 79 of 505

76

```
 1        last year, Sunday in Finlay Park.  Finlay Park is
 2        right across there.  Some of you all are probably
 3        familiar with that.  Now, this is a place where
 4        homeless people often congregate.  It's very
 5        attractive to the people who don't have homes.  It
 6        has public restrooms, showers.  It has a place to be
 7        when it's warm when you don't have anywhere else to
 8        do.  It's also right across from the Oliver Gospel
 9        Mission near the Salvation Army.  You get a hot, free
10        meal.
11            Now, on the night of July 22nd of last year,
12        2007, a large congregation of homeless people were
13        congregating.  They're all there when Mr. Jones gets
14        in an altercation with another person.  It's a quick
15        altercation.  He realizes he's injured after this
16        fight and he walks to a pay phone that's in the park
17        a ways away.  And the evidence is going to show that
18        he calls 911.
19            The evidence is going to also show that he says
20        an unknown black male is the person he got in a fight
21        with.  And the best description he can give is that
22        he's wearing a multicolored shirt and blue jeans.  He
23        doesn't say, "Clinton Folkes just cut me."
24            So sometime later and several blocks away
25        Clinton Folkes is detained and arrested.  He's
```

77

1    wearing a white shirt and green genes, not matching

2    the description initially given by the police, given

3    by the so-called victim.  And he's charged with

4    assault and battery with intent to kill.  They're

5    saying he's intending and he intended to murder Mr.

6    Jones that night.

7         Now, Mr. Rogers here is telling you his version

8    of the law.  He is not the judge of the law.  The

9    judge is the judge of the law.  You all are the

10   judges of the facts.  I want to talk to you about

11   your role as jurors.

12        You decide what's credible coming from that

13   witness stand.  You decide what fact is true, what

14   fact is not true and who can you believe.  You're

15   going to hear from these witnesses, and when you hear

16   from them I ask that you please do your duty and

17   question.  Credibility is always an issue when you're

18   on this witness stand.  You need to think to

19   yourself, anybody that I'm hearing from up here, do

20   they have a reason, a motive to lie, to not tell the

21   truth?  Do they have something to again from selling

22   their story to you today?  I want you all to think

23   good and hard about that.

24        Now, they're saying that Mr. Folkes intended to

25   murder Mr. Jones that night, but the evidence you're

78

1    going to hear is that Mr. Jones calls 911 after this
2    alleged vicious injury to his neck.  He's alert.
3    He's responsive.  He then walks from the telephone
4    there to wait at the stage, if you all are familiar
5    with the park, which is another ways away, does not
6    lose consciousness.  We never hear that in the
7    medical records that he ever lost consciousness from
8    this vicious injury that they say had intent to kill.
9    You'll never hear any of that.
10       You will hear that his bleeding was under
11   control before EMS even got there, this vicious
12   injury.  You will hear that the doctors, the experts
13   on what or how severe or not sever an injury is, they
14   will classify his injury as simply superficial.  And
15   at the end of the day the only treatment it required
16   was a few stitches and some topical antibiotics.  But
17   they're going to tell you or sell you a story today
18   that he had the intent to murder somebody that day.
19       Let's talk about what's missing from this case.
20   You're not going to find any weapon in evidence.  No
21   weapon was found.  These are just stories,
22   allegations from people.  You're not going to find
23   any DNA linking my client to this crime.  What you
24   have are stories based on the testimony of homeless
25   people with questionable credibility.

**JA244**

2:19-cv-00760-RMG-MGB    Date Filed 07/03/19    Entry Number 14-1    Page 82 of 505

79

1          Now I want to tell you about what your job is.
2     And the judge is going to instruct you as well.  The
3     State's job is to try to convince all 12 of you all
4     together of their story.  They have to do all the
5     work here.  They have to convince all 12 of you
6     beyond a reasonable doubt of their story for you to
7     find guilt.
8          What does reasonable doubt mean?  Reasonable
9     doubt means that after listening to all the testimony
10    from this stand, taking all that evidence into
11    consideration that all 12 of you would have to be
12    firmly convinced of what they're trying to sell you
13    without hesitation.  So that means if one of you
14    hesitates, has a reasonable hesitation about their
15    version of events, Mr. Folkes remains an innocent
16    man.
17         He's an innocent man sitting there right here
18    today because that is the way our wonderful judicial
19    system allows us to be.  The Supreme Court says he's
20    clothed in a robe of righteousness.  And that's just
21    fancy language meaning he doesn't have to come here
22    and prove himself innocent.  He doesn't have to prove
23    himself not guilty.  The burden is on the State
24    through its government lawyers to sell their story to
25    you so that all of you would believe it beyond a

80

1       reasonable doubt.

2               We have the best judicial system in the world.

3       It's envied by all other nations.  It didn't come

4       easy to get here.  It took sweat and blood and tears

5       over many, many years.  And it's been here to protect

6       you.  And I ask that today you protect it.  Hold them

7       to their burden.  Do your duty as jurors.  Listen to

8       what comes from this stand.  I feel that once you do

9       that you can only find a verdict of not guilty on

10      assault and battery with intent to kill.

11              *THE COURT:*  All right.  Thank you, Mr. Shealey.

12      Madam Solicitor, are you ready to call your first

13      witness?

14              *MS. WEISS:*  Your Honor, may we approach?

15              (Whereupon, a bench conference is had)

16              *THE COURT:*  Mr. Rogers, who your first witness?

17              *MR. ROGERS:*  Your Honor, the first witness will

18      be Mr. Karem Jones.

19              *THE COURT:*  Let's bring him up here and swear

20      him, please.

21              KAREM E. JONES, SR., after being duly sworn,

22      testifies as follows:

23              *THE CLERK:*  Thank you very much.  Have A seat in

24      the witness stand and give the court reporter your

25      name.

**JA246**

Karem E. Jones, Sr. - Direct by Ms. Weiss

81

1                    DIRECT EXAMINATION

2    BY MS. WEISS

3    Q    Good afternoon.

4    A    Good afternoon.

5    Q    Mr. Jones, will you please introduce yourself to the

6         jury?

7    A    Hello.  My name is Karem Emanuel Jones, Sr.  How are

8         you all doing?

9    Q    Karem, where are you from originally?

10   A    Originally I'm from Los Angeles, California.

11   Q    And what brought you to Columbia, South Carolina?

12   A    My father was in the military.  We were moving around

13        a lot.  And before him and my mom separated, this was

14        the last stop, sort of the last place we went to.

15   Q    Did you run into some hard times about a year ago?

16   A    Yes, I did.  Me and a friend of mine had separated

17        which left me pretty much homeless.  I didn't have a

18        place to stay any more.

19   Q    Prior to that did you have a place that you lived?

20   A    Well, mainly it was just with my sister, not really a

21        really stable, stable place, not like my home rather.

22   Q    Did you live with your friend prior to your splitting

23        up?

24   A    Yes, ma'am.  Sort of back and forth, just couldn't

25        seem to get everything right.

JA247

Karem E. Jones, Sr. - Direct by Ms. Weiss

82

```
 1   Q   And when you say, can you explain to the jury what
 2       you mean by get everything right?
 3   A   Well, we just couldn't seem to -- you know, I've
 4       always felt like if you're in a relationship with
 5       someone, you should be able to get together and
 6       progress.  It should only get better.  It shouldn't
 7       stay the same nor get worse.  Inbetween her things
 8       never changed.  It just stayed the same.  It's like
 9       the more we talked about it, it just didn't go
10       anywhere.  It was just pretty much a waste of time.
11   Q   Things different now?
12   A   Yes.  They're a lot different now.
13   Q   How are things different now?
14   A   Well, for one, I'm actually getting ready to get
15       custody of my son.  I just met my fiancee who I am
16       getting ready to marry in about another year.  And
17       I'm working two jobs now, pretty much going in the
18       right direction.  Everything is -- everything is the
19       way it should be.
20   Q   And do you have a place that you live now?
21   A   Yes, ma'am.
22   Q   A permanent residence, your home?
23   A   Yes, ma'am.  My name is actually on the lease.
24   Q   All right.  About how long were you without a
25       residence, without a home?
```

**JA248**

Karem E. Jones, Sr. - Direct by Ms. Weiss

83

1   A   I would say about four months total.  About three to
2       four months total.
3   Q   During that time were you living completely just out
4       in the park or just around Columbia?
5   A   Well, just pretty much around Columbia.  I was
6       staying with friends here, staying in abandoned
7       apartments there and just -- excuse me -- and just
8       pretty much just trying to keep a roof over my head
9       somehow.
10  Q   Now, back on July 22nd, 2007, would you say that's
11      about the time things hit rock bottom?
12  A   Yes, ma'am.
13  Q   And what was going on that week in your life?
14  A   Well, that week I had just -- I had just -- I didn't
15      know which way to turn.  And so I met a friend.  I
16      had -- well, I had known them from a temporary
17      service that we worked at, you know, and his brother
18      was a pastor.  So I had actually went to church with
19      him that Sunday morning and rededicated my life to
20      God that day.  So, you know, that was -- I had just
21      kind of just needed some help, was just trying to
22      figure out which way to go.
23  Q   The people that you knew, your friend from the
24      temporary service, the people at the park, would you
25      say that those were your acquaintances, your friends,

JA249

Karem E. Jones, Sr. - Direct by Ms. Weiss

84

1    your associates at the time?

2  A   Yes.  Yes.  Those two were definitely.  If I had a

3    problem or something or needed something, I could

4    always go to them.  One of them always had like

5    cigarettes or an extra blanket or something like

6    that.

7  Q   And did you spend some nights actually outside in the

8    City of Columbia?

9  A   Yes, ma'am, I did.

10  Q   The night before this were you actually outside?

11  A   Yes, ma'am, I was.

12  Q   Where did you spend the night?

13  A   In a parking garage.

14  Q   When you got up that morning, where did you go?

15  A   I went to the park.  That's where a friend of mine

16    told me about church.  And he said his brother was a

17    pastor and he was going.  And I had decided that, you

18    know, that would be the best thing to do, is to try

19    to get back in church to get myself together.

20  Q   And what was your friend's name?

21  A   Jerome.

22  Q   Okay.  And did you go with Jerome to church?

23  A   Yes, ma'am, I did.

24  Q   And about how long did you stay at the church?

25  A   We stayed there until about -- he picked us up at

**JA250**

Karem E. Jones, Sr. - Direct by Ms. Weiss

85

1     like 9:30 that morning.

2   Q   Who picked you up?

3   A   Yeah.  His brother, the pastor.  He comes to all the

4       places where all the homeless people are and sees if

5       they want to go to church.  So he had came to an

6       apartment, a boarding home.  Jerome said that's where

7       we need to meet him at.  So he picked us at about

8       9:30 that morning.  We left about maybe 2:30; 2:30,

9       3, something like that.

10  Q   Okay.  And is there any alcohol at the church?

11  A   Oh, no, ma'am.  No, ma'am.

12  Q   And so you just prayed and hung out with people at

13      the church?

14  A   Yes, ma'am.

15  Q   Did you eat there?

16  A   Yes, ma'am, I did.

17  Q   And at 2:30 where did you return to?

18  A   We returned to the park.  Yes, ma'am.  He dropped us

19      back off in the park.

20  Q   And your hesitation, is that just because it was a

21      year ago?

22  A   Yes, ma'am.  I'm just trying to make sure I was just

23      correct.

24  Q   So you return to the park.  What did you do next?

25  A   Well, me, I talked to them for a few minutes and then

Karem E. Jones, Sr. - Direct by Ms. Weiss

86

1     I stepped off.  I walked to a place where I kind of
2     hid a beer at from the previous night before because
3     you can't buy beer on Sundays.  Well, back then you
4     couldn't.
5         But I had previously walked to a place where I
6     had left a beer from the night before.  I went and
7     got it and ran into another friend of mine.  We
8     talked.  And, you know, after that, after I finished
9     the beer, I came back to the park.  I actually laid
10    down for a little bit until it was time to go to the
11    Salvation Army.
12  Q  So you drank the beer.  And that was just one beer?
13  A  Yes, ma'am.  A high gravity, a 24-ounce.
14  Q  I'm sorry.  How much?
15  A  A high gravity, a 24-ounce.
16  Q  Okay.  And at that point did you smoke any marijuana,
17    do any drugs?
18  A  Yes, ma'am, I did.  I smoked a half a blunt with a
19    friend of mine.
20  Q  Okay.  Did you use any other drugs?
21  A  No, ma'am.  That was it.
22  Q  Okay.  You say you smoked half a blunt.  Were there a
23    couple of people you were sharing it with?
24  A  Yes.  It was in a circle.  There was about three of
25    us.

JA252

Karem E. Jones, Sr. - Direct by Ms. Weiss

87

1    Q    And then what did you do next?

2    A    I went back to the park.  I laid out my little

3         blanket and just laid under the tree and laid down.

4    Q    Did you -- were you talking to anybody or hanging out

5         or just getting some peace and quiet?

6    A    I think I might have spoke to a few people and just

7         laid down from there.

8    Q    Okay.  And where did you go next?

9    A    Well, after that, there was an altercation between me

10        and "New York", as they call him.

11   Q    You said you went to the Salvation Army?

12   A    Oh, yeah.  Yeah.  That was like at like 2:30 or 3.

13        Yeah.  Because we did go.  We went and ate at the

14        Salvation Army.  That was -- I think, if I remember,

15        they served from like 5 to 6 or something like that.

16   Q    Okay.

17   A    I haven't been down there in a while.  So...

18   Q    And then you came back to the park?

19   A    Yes, ma'am.

20   Q    And that's when you laid down your blanket?

21   A    Yes, ma'am.

22   Q    Okay.  Let me show you what has been marked as

23        State's Exhibits 10 and 11 for identification.  Do

24        you recognize these pictures?

25   A    Yes, I do.

Karem E. Jones, Sr. - Direct by Ms. Weiss

88

1    Q    And can you identify them for me?

2    A    Yeah.  This is the bottom of Finlay Park or Sidney

3         Park, whichever one it's called.  That's the tree

4         that I had my stuff laying out under.

5    Q    And there is some stuff in that picture.  Is that

6         similar to the same place yours would have been?

7    A    Yes, ma'am.  I believe that is my stuff.

8    Q    If these were taken more recently, it probably

9         wouldn't be.

10   A    Well, it looks so much -- it looks just like my

11        stuff.  I had a bag and the same colored blanket.

12        Somebody might have got my stuff.

13            MS. WEISS:  The State moves State's 10 and 11

14        into evidence.

15            MR. O'NEIL:  No objection.

16            THE COURT:  So admitted, without objection.

17            (WHEREUPON, State's Exhibit No. 10 is admitted

18        into evidence.)

19            (WHEREUPON, State's Exhibit No. 11 is admitted

20        into evidence.)

21   Q    Karem, I'm going to ask you just to show -- I

22        couldn't show these to the jury a minute ago.  If you

23        can, show on this picture where it was that you were

24        laying down?

25   A    I'd say about right up in this area here under the

**JA254**

Karem E. Jones, Sr. - Direct by Ms. Weiss

89

```
 1        tree, more or less.  Well, I know I was under the big
 2        tree.  So I was probably over in this area right
 3        here.
 4   Q    Somewhere around here?
 5   A    Yes, ma'am.
 6   Q    Okay.  And just to get a little different view you
 7        can see, is that the same tree?
 8   A    Yes, ma'am.
 9   Q    So you'd be right about where?  Let me get you
10        oriented.
11   A    About over here.  I would be over this way.
12   Q    That way?
13   A    Yes, ma'am.
14   Q    But you were underneath the tree?
15   A    Yes, ma'am.  It was -- everybody was pretty much
16        under the tree.  It was hot that day.
17   Q    Okay.  And you were laying on your blanket and you
18        had spoken to a couple of people?
19   A    Yes, ma'am.
20   Q    Did you have any personal relationships with anybody
21        that hung out in the park?
22   A    No, ma'am.  Not any personal relationships.  Just
23        with people I just associated with.
24   Q    Okay.  And did you know Clinton Folkes prior to
25        July 22nd of 2007?
```

**JA255**

Karem E. Jones, Sr. - Direct by Ms. Weiss

90

1  A    As of like know him know him, no.  I had worked with
2       him through Action Labor.  It was a temporary
3       service.  That's where everybody that was pretty much
4       homeless worked at.  So I had seen him there a couple
5       of times.  And then prior, about a week, you know, we
6       had worked on a job together.  So, you know, we just
7       started just talking.  You know, I'd see him and
8       speak; he'd see me and speak and, you know, pretty
9       much go on his way.
10 Q    Did you call him by name, or did you just kind of
11      know him by face?
12 A    I called him by his nickname which was "New York".  I
13      used to call him "New York".
14 Q    So the name Clinton Folkes didn't necessarily mean
15      anything to you?
16 A    No.  Well, like I say, I had heard them call his
17      name.  Say, like at Action Labor, they'll call your
18      names on tickets.  And, you know, it would be like
19      Karem Jones or something like that.  But, no, not
20      really.
21 Q    You knew him as "New York"?
22 A    Yes, ma'am.
23 Q    Prior to this day when you were laying on your
24      blanket hanging out under the tree, did you have any
25      problems with Clinton Folkes?

**JA256**

Karem E. Jones, Sr. - Direct by Ms. Weiss

91

 1   A   No, ma'am.  I didn't -- no.

 2   Q   Had you ever gotten into an argument with him?

 3   A   No.  Never.

 4   Q   Had you ever gotten into a fight with him?

 5   A   No, ma'am.

 6   Q   And prior to the actual moment that this happened,

 7       did you actually have a problem with Clinton Folkes?

 8   A   No, ma'am.

 9   Q   So you all had no reason to be arguing or fighting or

10       anything?

11   A   I had -- like I say, I've made mistakes myself.  I

12       didn't -- I mean, I just tried to -- I tried to

13       associate with people with the same goals as me which

14       was trying to get out of the situation.  I really,

15       you know, didn't too much associate with a lot of

16       people, just people, you know.

17   Q   And you were laying on your blanket.  Were you drunk

18       at this time?

19   A   No, ma'am.  I did have a little buzz but I wasn't

20       drunk.

21   Q   Would you say you were high at this time?

22   A   So-so.  It wasn't really -- it wasn't really a good

23       one.

24   Q   Would you say that the alcohol or the drugs would

25       have skewed your ability to know what was going on?

Karem E. Jones, Sr. - Direct by Ms. Weiss

1    **A**    No, ma'am.  Not at all.

2    **Q**    And you remember this day clearly?

3    **A**    Yes, ma'am.

4    **Q**    When you were laying on your blanket, go ahead and

5          tell the jury.  What happened next?

6    **A**    Well, I was laying on my blanket and I just happened

7          to notice, you know, Clinton was talking loud,

8          flashing money, you know, just being an overall

9          nuisance.  And so a friend of his came up to me, and

10         she was like, "Hey."

11             **MR. O'NEIL:**  Objection, Your Honor.  Hearsay.

12             **THE COURT:**  Well, I don't know what he's going

13         to say.

14             **MS. WEISS:**  Your Honor, this doesn't go to the

15         truth of the matter asserted.

16             **THE COURT:**  Pardon me?

17             **MS. WEISS:**  This doesn't go to the truth of the

18         matter asserted.

19             **THE COURT:**  All right.  Well, let's see what --

20   **A**    She said, "Hey.  How you doing?"  You know, we

21         started talking.  And that's when I noticed Clinton.

22         You know, he was running his mouth.  And, you know,

23         he was talking and he started getting closer to me.

24         And I told him, "Hey, you know, back up."

25   **Q**    Wait a minute now.  I'm going to slow you down for

Karem E. Jones, Sr. - Direct by Ms. Weiss

93

1    just a minute.  She started getting closer to you or

2    he did?

3  A  No.  He did.  She was already standing by me talking

4    to me.  She was --

5  Q  She was standing next to you just talking?

6  A  Yes, ma'am.

7  Q  Were you touching each other?

8  A  No, ma'am.

9  Q  Okay.  Was this somebody that you had a romantic

10    relationship with?

11  A  No, ma'am.  She was just an associate, you know, just

12    somebody you talk to.

13  Q  And you said that Clinton was being just a regular

14    nuisance.  Could you tell if he was intoxicated?

15  A  Yes, ma'am.  He was intoxicated.

16  Q  And what led you to believe that?

17  A  Well, after he was standing so close to me, you

18    could -- I mean, you could see it, you know.  He was

19    just -- I mean, he was out of his normal character as

20    I have always seen him, you know.  He was always a

21    work type person.  You know, he was just slurring his

22    speech, talking to everybody.  He had -- I could

23    definitely tell he had something to drink.

24  Q  Okay.  And he was beyond just his normal way of

25    acting or beyond one drink?

Karem E. Jones, Sr. - Direct by Ms. Weiss

94

1    **A**   Yes, ma'am.

2    **Q**   Okay.  And what did he do next?

3    **A**   Well, we exchanged a couple of words, you know, and I

4        kept telling him to --

5    **Q**   Now, before you exchanged words, what did he do

6        first?

7    **A**   He walked up and stood there and stood right by me

8        while me and another person was talking.

9    **Q**   Okay.

10        **MS. WEISS:**  Your Honor, I'm going to ask that

11    the witness be allowed to step down for just a

12    minute.

13        **THE COURT:**  All right.

14    **Q**   And if I am you, show me where he was standing next

15        to you?

16    **A**   About -- about right there.  And another person was

17        standing directly right here.

18    **Q**   Okay.  And did he just -- you be him.  If I am you,

19        where is he standing?

20    **A**   Well, if you're me, he was standing on the side of me

21        right here.

22    **Q**   Okay.

23    **A**   And I kept telling him because --

24    **Q**   Can you hear?  I'm sorry.  Can you hear?

25    **A**   He was talking trash.  And I kept telling him --

Karem E. Jones, Sr. ~ Direct by Ms. Weiss

95

1  Q  What was he saying?

2  A  Just what the F is going on?  What are you doing with

3     her, and all this and that.  I'm like, you know, what

4     are you talking about?

5  Q  And what did he do next?

6  A  He started getting closer.  And that's when I told

7     him again, "Hey, back up.  You're getting too close

8     to me."

9  Q  How close did he get to you before anything got

10    physical, if I am you?

11 A  Probably about this close.

12 Q  So he kept approaching you?

13 A  Yes, ma'am.  I stayed in the same spot the entire

14    time.  I did not move.

15 Q  Okay.  You can sit back down.  Thank you.  And you

16    said that he was kind of talking trash?

17 A  Yes, ma'am.

18 Q  Did his trash escalate from, "What are you doing

19    there with her?"

20 A  Yes, ma'am.  He punched me in my -- he punched me in

21    my eye.

22 Q  Okay.  But verbally, did he escalate what he was

23    saying to you before he touched you?

24 A  I mean, he was just saying the same thing.  I'll F

25    you up and such-and-such, such-and-such.

Karem E. Jones, Sr. - Direct by Ms. Weiss

96

1    Q    Okay.  And I know you probably are trying to edit

2         what you're saying for the jury.  But it's important

3         for them to hear what exactly he was saying.  So if

4         you can just say one of lines exactly what he was

5         saying?

6    A    "I'll fuck you up."

7    Q    Okay.  And what did you think he meant by that?

8    A    Meaning he was going to --

9              MR. O'NEIL:  Objection, Your Honor.

10             MS. WEISS:  It's opinion as to what he thought,

11        what he took it to mean.

12             THE COURT:  Well, he can testify how he took it.

13             MS. WEISS:  Right.  That was the --

14             THE COURT:  What he thought he meant, he can

15        testify what he believed his meaning of the statement

16        was, not what the other party's belief was.

17             MS. WEISS:  Yes, Your Honor.

18   Q    What did you think that statement meant?

19   A    I thought it meant he was going to try to hurt me,

20        try to fuck me up.  I'm just going on what he said.

21   Q    And, in fact, how much time elapsed between his

22        saying that statement and when he touched you?

23   A    I'd say about another five to six seconds because --

24   Q    And what did he do first?

25   A    Well, he kept talking.  And like I told him, you

Karem E. Jones, Sr. - Direct by Ms. Weiss

97

```
 1        know, he just kept coming towards me.  And I do
 2        recall him pulling a bottle out.  He threw it at me.
 3        But it didn't -- like I said, it didn't hit me.
 4   Q    So he threw a bottle.  Did you see what kind of
 5        bottle it was?
 6   A    Yeah.  A king Cobra bottle.  Full.
 7   Q    A full King Cobra bottle?
 8   A    Yes, ma'am.
 9   Q    And he threw it at you but it didn't you?
10   A    Yes, ma'am.
11   Q    Okay.  And what did he do next?
12   A    He was --
13   Q    Did you react at that point?
14   A    No, ma'am.  I just -- like because Tiffany was still
15        standing there.  And I'm like, you know, you going to
16        say something or something?  She was pretty much
17        ignoring him.  And that's when he took a step closer,
18        and then that's when he punched me in my eye.
19   Q    Okay.  And what happened next?
20   A    I defended myself.  I hit him back.
21   Q    And what happened when you hit him?
22   A    Well, when I hit him, he staggered.
23   Q    Now, before you start, did you have any weapons on
24        you at all?
25   A    No, ma'am.
```

Karem E. Jones, Sr. - Direct by Ms. Weiss

98

1   Q   Did you have any weapons in your hands?

2   A   No, ma'am.

3   Q   Okay.  He hit you in the eye, and then what did you

4       do?

5   A   I hit him back.

6   Q   How did you hit him?

7   A   Hit him a two-piece.

8   Q   And what does that mean?

9   A   That's when you hit somebody twice.

10  Q   Two hands?

11  A   Yeah.  Right and left.

12  Q   Okay.  And what happened next?

13  A   Well, he started falling back and he grabbed ahold of

14      my shirt.  And in turn, I started falling with him.

15      And as we were tussling on the ground, he is like,

16      uh-uh, and he hit me in my neck twice.  And I didn't

17      think anything of it, you know, because I'm still

18      trying to -- I'm still wrassling with him trying to,

19      you know, trying to get him to calm down.  Like I

20      say, I had no intention of hurting this man.  I'd

21      just rededicated my life to Christ.  I was trying to

22      straighten up, you know.  And that's when somebody

23      was like, "Hey, you're bleeding."

24  Q   All right.  I'm going to ask you to step down one

25      more time.  If that's okay, Your Honor?

JA264

Karem E. Jones, Sr. - Direct by Ms. Weiss

99

1        **THE COURT:**  Yes, ma'am.

2    Q    Just to show just one more time.  If you're him and

3        I'm you, can you show me when you said he just

4        punched twice how he punched you?

5    A    Well, he punched -- I punched him twice.  He punched

6        me once.

7    Q    Right.

8    A    But he would hit me with his left hand because he hit

9        me in this eye.

10    Q    And then when you were on the ground, he pulled you

11        to the ground?

12    A    When I hit him, he staggered back.  But in turn, he

13        grabbed me and I started falling toward him.

14    Q    And then he hit you?

15    A    And then we was like half way on the ground wrassling

16        and he -- so he hit me --

17    Q    Here.  Show me how he hit you on me.

18    A    Like he -- like trying to -- like I thought he was

19        just missing his punches when he was like hitting me

20        up in here.

21    Q    Okay.  And I'm going to ask you to turn to the jury.

22        Is this where he hit you?

23    A    Yes, ma'am.

24    Q    I'm just trying to turn sideways so they can see

25        that.  And do you have any other scars?

Karem E. Jones, Sr. - Direct by Ms. Weiss

100

1   A   This one right here on my arm.

2   Q   That scar right there.  And do you have any others on

3       your face?

4   A   I have one under here.

5   Q   Right there?

6   A   Yes, ma'am.

7   Q   Okay.  Go ahead.  You can have a seat.  And you were

8       in the throes of him pulling on you and pulling you

9       toward the ground.  You were trying to subdue him?

10  A   Yes, ma'am.

11  Q   And then did somebody yell out?

12  A   Yes.  Somebody said, "You're bleeding."  And I just

13      noticed the blood on my arm, you know.  And I was

14      still wrassling him.  And they were like, "No, no.

15      You're bleeding from the neck."  So I immediately

16      jumped up and I checked my neck.  And I'm like, oh,

17      crap, I'm bleeding.  So I'm like in just like sort of

18      shock.  And he jumps up off the ground, just like,

19      I'm going to f'g kill you, and starts running towards

20      me.  So I ran to the phone booth.

21  Q   Wait a second.  This is important.  What was that

22      line?  What did he say?

23  A   He said, "I'm going to fucking kill you."

24  Q   And he started running towards you?

25  A   Yes, ma'am.  And I turned around and ran to the phone

**JA266**

Karem E. Jones, Sr. - Direct by Ms. Weiss

101

1      booth.

2   Q  Okay.  And I show you what's been marked as State's

3      Exhibit 3 for identification.  Do you recognize this?

4   A  Yes, ma'am.

5   Q  And what is it?

6   A  It's a pay phone.

7   Q  Is that the phone booth?

8   A  I'm not -- I thought the pay phone was this way.

9   Q  This is looking back into the park?

10  A  Okay.  Yeah.  Then that's it.

11  Q  Okay.  And that's the same pay phone you ran to.

12     These are the trees?

13  A  Yes, ma'am.

14        MS. WEISS:  Okay.  Your Honor, we'd like to

15     enter State's Exhibit 3 into evidence.

16        MR. O'NEIL:  No objection.

17        THE COURT:  So admitted.

18        (WHEREUPON, State's Exhibit No. 3 is admitted

19     into evidence.)

20  Q  Showing the jury, the altercation took place out here

21     in the middle of the field?

22  A  Yes, ma'am.

23  Q  And then once you started bleeding, you came to the

24     pay phone?

25  A  Excuse me.  Yes, ma'am.  I had stood up and I was

Karem E. Jones, Sr. - Direct by Ms. Weiss

102

1      like still checking my neck.  And he jumped up and

2      said, "I'll fucking kill you", and he started running

3      toward me.  So I was more concerned then about my

4      neck.  So I ran and called the police.

5    Q   What did you think was going to happen with your neck

6      bleeding?

7    A   Well, for a minute there I thought I was dying.

8    Q   Okay.  And you ran to the phone and called 911?

9    A   Yes, ma'am.

10   Q   What did Clinton Folkes do next?

11   A   Well, after I pretty much outran him to the phone

12      booth, I mean, he turned around and started walking

13      off.

14   Q   Do you remember what he was wearing that day?

15   A   He had on a blue striped shirt.  And I'm not sure

16      about the pants.  But like I say, I remember the

17      shirt he had on.

18   Q   I show you what's been marked as State's Exhibit 23.

19      Do you recognize this?

20   A   Yes, ma'am.

21   Q   What is it?

22   A   It's a shirt with a stripe.  Well, it's a purple

23      striped shirt it looks like.

24   Q   Does that shirt look familiar?

25   A   Yes, ma'am.

Karem E. Jones, Sr. - Direct by Ms. Weiss

103

1    Q    What is it familiar from?

2    A    Familiar?  That's the shirt he had on.

3    Q    Okay.

4         MS. WEISS:  Your Honor, at this time I'd like to

5    enter State's Exhibit 23 into evidence.

6         MR. O'NEIL:  No objection, Your Honor.

7         THE COURT:  So admitted.

8         (WHEREUPON, State's Exhibit No. 23 is admitted

9    into evidence.)

10        (WHEREUPON, State's Exhibit No. 24 is marked for

11   identification.)

12   Q    And where is that shirt located?

13   A    I'm lot sure.  Somewhere in the park.

14   Q    A trashcan?

15   A    Oh, yes, ma'am.

16   Q    Okay.  A trashcan in the park.  I show you what's

17   been marked as State's Exhibit 24.  Do you recognize

18   this?

19   A    Yes, ma'am.

20   Q    What is it?

21   A    It's the shirt.  It's the same shirt he had on.

22   Q    Okay.

23        MS. WEISS:  Your Honor, at this time I'd like to

24   enter State's Exhibit 24 into evidence.

25        MR. O'NEIL:  I would object at this point until

Karem E. Jones, Sr. - Direct by Ms. Weiss

104

1    the proper chain foundation is laid.

2         THE COURT:  Say that again?

3         MR. O'NEIL:  I said I would object at this point

4    until the proper chain foundation is laid.

5         THE COURT:  What chain?

6         MR. O'NEIL:  The chain of evidence, Your Honor,

7    as it relates to the shirt.

8         THE COURT:  All right.  Ladies and gentlemen,

9    let me let you step back to the jury room.  Please

10   don't discuss the case while you're there.

11        (Jury out at 3:20 p.m.)

12        THE COURT:  Tell me what you mean by the chain.

13        MR. O'NEIL:  Chain of custody, Your Honor.

14        THE COURT:  Why do we need that?

15        MR. O'NEIL:  They need to show this is the

16   particular shirt that was found in the trashcan on

17   that particular day, Your Honor.  There's been no

18   testimony that --

19        THE COURT:  He's identifying this is the shirt.

20        MR. O'NEIL:  Yes, Your Honor.

21        THE COURT:  This is not like drugs.  The drugs

22   are not identifiable in and of themselves and they're

23   fungible; something might happen to them.  This is

24   the shirt that he's identifying is the shirt he saw

25   that day.

**JA270**

105

1    *MR. O'NEIL:*  Yes, Your Honor.

2    *THE COURT:*  I don't know what chain you're

3    talking about.

4    *MR. O'NEIL:*  My only concern is that there's

5    going to be testimony that there were clothes all

6    over this particular park.  I just want to ensure

7    that this is the same shirt that was found in the

8    trashcan.

9    *THE COURT:*  Well, he's identified it.  He's

10   testifying that that's the shirt.

11   *MR. O'NEIL:*  Yes, sir.  That's the shirt that he

12   saw the defendant wearing, Your Honor.  I'm not sure

13   that that's the shirt that was found, the same shirt

14   that came out of the trashcan, Your Honor.

15   *THE COURT:*  Well, didn't he just testify that

16   was the shirt that was recovered?

17   *MS. WEISS:*  I mean, he said that that was the

18   same shirt, that's the shirt in the trashcan that he

19   saw him wearing and that's the same shirt he saw him

20   wearing.

21   *THE COURT:*  You know, I think he can testify to

22   that.  If you've got some question as to whether

23   that's the shirt, you can certainly cross examine

24   him.  I don't know what chain -- you mean that this

25   officer found it and passed it to this officer and

106

1    passed it to that officer?

2         MR. O'NEIL: Yes, sir.

3         THE COURT: Well, I don't think you need to do

4    that on a case such as this where it's an

5    identifiable piece of property.

6         MR. O'NEIL: Yes, Your Honor.

7         THE COURT: All right. We're going to take a

8    little bit of a break since we've got the jury out.

9    We'll take about ten, fifteen minutes or so. You can

10   step down. Don't discuss your testimony while we're

11   down. All right?

12        WITNESS: Yes, sir.

13        THE COURT: Go ahead and give the jury something

14   to drink.

15        (Whereupon, a break is taken)

16        (WHEREUPON, State's Exhibit No. 24 is admitted

17   into evidence.)

18        (WHEREUPON, State's Exhibit No. 25 is marked for

19   identification.)

20        THE COURT: All right. Mr. Hollis, let's bring

21   the jury in.

22        THE BAILIFF: Be glad to, Your Honor.

23        THE COURT: Where is our witness?

24        MS. WEISS: Right here, Your Honor.

25        THE COURT: Come back up here.

**JA272**

Karem E. Jones, Sr. - Direct by Ms. Weiss

107

1        (Jury in at 3:38 p.m.)

2        **THE BAILIFF:** The jury is all present, Your

3    Honor.

4        **THE COURT:** All right. Thank you, Mr. Hollis.

5    All right, Ms. Weiss.

6        **MS. WEISS:** Thank you, Your Honor.

7  Q    All right. Go back to the shirt. This was the same

8    shirt that you saw him wearing that day?

9  A    Yes, ma'am.

10 Q    Now, when he pulled you down to the ground by your

11   shirt, he was pulling you down, you were kind of over

12   him, could you see anything in his hand?

13 A    I seen a blue -- like a blue handle. And it was just

14   like -- I thought it was like a club or something.

15   But it was just -- I seen like a blue -- like a blue

16   handle, like a blue bulb or something.

17 Q    Okay.

18 A    And that was pretty much what I seen until we like --

19   until he got up afterwards. I didn't really -- I

20   seen what was in his hand but I didn't know what it

21   was until after he had stood up.

22 Q    Okay. You say you saw a bulb sticking out of one

23   side. Did you see anything coming out of the other

24   side?

25 A    At the time when we were on the ground, no.

**JA273**

Karem E. Jones, Sr. - Direct by Ms. Weiss

108

1  Q   And after he stood up, what did you see?

2  A   I seen that he had a knife.  It was blue.  It had a

3      blue handle and it had a hook blade on the end of it.

4  Q   Okay.  I show you what's been marked as State's

5      Exhibit 25 for demonstrative purposes.  Do you

6      recognize this?

7  A   Yes, ma'am.

8  Q   Is that the same type of blade that you were just

9      describing?

10 A   Yes, ma'am.  That's very, very similar to it.  Except

11     the point, this part here wasn't there, and it had a

12     blue handle and it was bigger on the end down here.

13 Q   Okay.

14 A   And it had lines, like grip lines through it.

15 Q   Okay.  Now, you went to the phone and you called 911?

16 A   Yes, ma'am.

17 Q   Do you recall what type of description, if any, you

18     gave on that phone call?

19 A   I remember vaguely.  I couldn't tell you the exact

20     description.

21 Q   But you remember calling 911?

22 A   Yes, ma'am.

23 Q   And where did you go after you made that phone call?

24 A   They put me in an ambulance and took me to Palmetto

25     Richland Hospital.

Karem E. Jones, Sr. - Direct by Ms. Weiss

109

1    Q    While you were making that phone call, was anybody

2         else helping you?

3    A    I remember a guy, a little short white guy with long

4         hair.  And I think Jerome or somebody gave me some

5         ice to put on my neck.  And that's like all I pretty

6         much remember of that.

7    Q    So you had some ice.  Somebody gave you some ice?

8    A    Yes, ma'am.  Ice and a brown towel to hold onto it

9         because it was bleeding so much.

10   Q    And you were able to hold that onto your -- hold all

11        that onto your neck?

12   A    Yes, ma'am.

13   Q    And where did you wait?

14   A    In that area I believe.  I think I walked over to the

15        stage or whatever.

16   Q    Okay.

17   A    But I know I was still -- I was in the area by the

18        phone booth.  That's where they told me they were

19        coming.  Because I know the dispatcher kept asking me

20        what side, and I didn't know the numbers to the

21        block, 700 block or something like that they were

22        saying.  But I couldn't -- I just told them I was on

23        the side where the stage was, the side where the

24        stage was.

25   Q    And were you still bleeding pretty heavily?

Karem E. Jones, Sr. - Direct by Ms. Weiss

110

```
 1    A    Oh, yes, ma'am.

 2    Q    You said you went to Richland Memorial Hospital?

 3    A    Yes, ma'am.

 4    Q    What happened once you got to Richland Memorial?

 5    A    Well, when they took me in there for emergency

 6         surgery, they wouldn't let me see a mirror because I

 7         kept asking for one.  They was just trying to get me

 8         to lay down.  And they started -- they started

 9         talking amongst each other.  And I asked the doctor,

10         I was like, "Well, how bad is it?  Can I see a

11         mirror?"  He was like, "No.  Just" --

12              MR. O'NEIL:  Objection, Your Honor.

13              THE COURT:  Sustained.

14    Q    Okay.  So what did they do?  You went to the

15         hospital.  And then what happened to you next?

16    A    Like I said, they took me back for surgery.

17    Q    And how long did you end up staying in the hospital?

18    A    Until about 6:00 the next day.  That's when I was

19         discharged.

20    Q    The next afternoon?

21    A    Yes, ma'am.

22    Q    Okay.  And do you recall what, if anything, what

23         treatment you received?

24    A    Well, I know I had stitches.

25    Q    Okay.  The next day while you were in the hospital,
```

Karem E. Jones, Sr. - Direct by Ms. Weiss

111

1    did you have the opportunity to talk to an

2    investigator?

3    A    Yes, ma'am.

4    Q    Did any other investigators come up there?

5    A    No, ma'am.

6    Q    Okay.  Do you remember who came up there the next

7    day?

8    A    Yes, ma'am.

9    Q    Who was that?

10   A    Mr. McCracken.

11   Q    When he came to your room, what did he do first?

12   A    The first thing he asked me was how was I doing.  And

13       I'm like, "Okay."  Then he asked me about to pick up

14       a line-up.  And --

15   Q    Let's do it a little bit slowly.  Were you under any

16       heavy narcotics at this point?

17   A    No, ma'am.  I had already started -- they had already

18       started bringing me food and started taking the IV's

19       and stuff out of my arm.

20   Q    And were you pretty coherent?  Did you know what was

21       going on?

22   A    Yes, ma'am.

23   Q    Okay.  So do you remember Investigator McCracken

24       asking you what happened?

25   A    Yes, ma'am.  Somewhat.  I think so.  I'm not sure

**JA277**

Karem E. Jones, Sr. - Direct by Ms. Weiss

112

1        because this was so long ago.  I do remember -- the

2        main thing I do remember is the line-up.  And I think

3        I did -- I think I signed a statement, too.

4  Q  Okay.

5          (WHEREUPON, State's Exhibit No. 26 is marked for

6        identification.)

7  Q  I'm going to show you what's been marked as State's

8        Exhibit No. 26 for identification.  Do you recognize

9        this?

10  A  Yes, ma'am, I do.

11  Q  And who handwriting is that in?

12  A  That is in Mr. McCracken's handwriting.

13  Q  Okay.  And whose signature is that on the bottom?

14  A  That's my signature.

15  Q  And do you recall signing this --

16  A  Yes, ma'am.

17  Q  -- at the hospital?

18  A  Yes, ma'am.

19  Q  So you talked to Investigator McCracken.  And you

20        said you remember something about a line-up.  Did he

21        ask you about who had cut you?

22  A  No, ma'am.  He didn't ask me about it.  He just asked

23        me could I identify the person that had done this.

24  Q  And what did you say?

25  A  Yes, ma'am.

Karem E. Jones, Sr. - Direct by Ms. Weiss

113

1    Q   Were you certain of that?

2    A   Yes, ma'am.

3    Q   And did you feel that you had had enough time to view

4       the person that had cut you?

5    A   You don't forget a person's face that does something

6       like that.  You just -- you -- I could never -- I

7       can't forget his face now.

8    Q   Okay.  Let me show you State's Exhibit 1 for

9       identification.  Do you recognize this?

10   A   Yes.

11   Q   Okay.  Can you describe, tell me what this is?

12   A   That's the line-up.  That's the exact same line-up

13      from the hospital.

14        MS. WEISS:  Your Honor, at this time I'd like to

15      enter State's Exhibit 1 into evidence.

16        MR. O'NEIL:  Your Honor, subject to our previous

17      objection.

18        THE COURT:  You all step up here a minute.

19        (Whereupon, a bench conference is had)

20   Q   So you said this is the actual one that you looked

21      at?

22   A   Yes, ma'am.

23   Q   Okay.  And did you make any markings on this piece of

24      paper?

25   A   Yes, ma'am.  I put my signature under there, I mean

Karem E. Jones, Sr. - Direct by Ms. Weiss

114

1          my initials under it.

2      Q   And is that in your handwriting?

3      A   Yes, ma'am.  It is my handwriting.

4      Q   And there is a circle.  Did you make that circle?

5      A   Yes, ma'am.

6      Q   About how long do you recall looking at this piece of

7          paper before you were able to pick him out?

8      A   Two, three seconds.

9      Q   And do you recognize what's been marked as State's

10         Exhibit 2?

11     A   Yes, ma'am.

12     Q   And did you fill this out with Investigator

13         McCracken?

14     A   Yes, ma'am.

15     Q   And it says that you identified photo 55484?

16     A   Yes, ma'am.

17     Q   Right there.  Is that your handwriting?

18     A   Yes, ma'am.

19     Q   Okay.  And does that correspond to the same number as

20         the picture on this paper?

21     A   Yes, ma'am.

22     Q   And that's your signature?

23     A   Yes, ma'am.

24     Q   And how certain --

25     A   It looks like a doctor's handwriting.

Karem E. Jones, Sr. - Direct by Ms. Weiss

115

1   **Q**   And how certain were you that that's the person that

2        cut you?

3   **A**   Without a shadow of a doubt.  There is no doubt.

4        500,000 percent.  I mean, how can you -- I could

5        never forget his face.

6   **Q**   Do you see the person in the courtroom today that cut

7        you in Finlay Park on July 22nd, 2007?

8   **A**   Yes, ma'am, I do.

9   **Q**   And can you please point him out and describe him?

10  **A**   This gentleman right here, ma'am, the one with the

11       red colored shirt.  It looks like his eye is swollen,

12       and the jacket in the middle of these two gentlemen.

13       But not to be confused with the gentleman that's

14       sitting behind him.

15       *THE COURT:*  All right.  He has identified the

16       defendant.

17       *MS. WEISS:*  Thank you, Your Honor.

18  **Q**   Is there any question in your mind that he is the

19       person that did it?

20  **A**   No, ma'am.

21  **Q**   After you got out of the hospital -- beg the Court's

22       indulgence one second.  After you got out of the

23       hospital, did you have the opportunity to go to

24       police headquarters?

25  **A**   Yes, ma'am.

**JA281**

Karem E. Jones, Sr. - Direct by Ms. Weiss

116

1    **Q**  And what happened when you went to headquarters?

2    **A**  I had got out of surgery.  I had to get into the

3        victim's program.

4    **Q**  I'm not talking about that as much.  Did they take

5        pictures when you were there?

6    **A**  Yes, ma'am.

7    **Q**  I'm going to ask you to look at State's Exhibits 14,

8        13, 18, 17, 15, 16 and 12.  Do you recognize these

9        pictures?

10   **A**  Yes, ma'am.

11   **Q**  And just look through them real quick.

12   **A**  Yes, ma'am.

13   **Q**  Do those pictures accurately depict what you looked

14       like when you went to the police headquarters shortly

15       after your surgery?

16   **A**  Yes, ma'am.  Everything even down to the shirt I had

17       on, South Pole.

18       **MS. WEISS:**  Your Honor, at this time the State

19      would like to enter the aforementioned exhibits into

20      evidence.

21       **MR. O'NEIL:**  No objection, Your Honor.

22       **THE COURT:**  So admitted.

23       (WHEREUPON, State's Exhibit No. 12 is admitted

24      into evidence.)

25

Karem E. Jones, Sr. - Direct by Ms. Weiss

117

1          (WHEREUPON, State's Exhibit No. 13 is admitted

2       into evidence.)

3          (WHEREUPON, State's Exhibit No. 14 is admitted

4       into evidence.)

5          (WHEREUPON, State's Exhibit No. 15 is admitted

6       into evidence.)

7          (WHEREUPON, State's Exhibit No. 16 is admitted

8       into evidence.)

9          (WHEREUPON, State's Exhibit No. 17 is admitted

10      into evidence.)

11         (WHEREUPON, State's Exhibit No. 18 is admitted

12      into evidence.)

13         *MS. WEISS:*  Your Honor, if the witness may step

14      down just a minute?

15         *THE COURT:*  He may.

16   Q   Okay.  If you can just show the jury the injuries on

17      these pictures, what these are depicting?

18   A   This is my neck right here.

19   Q   Okay.  Show them where the scar is on here, on the

20      picture?

21   A   Oh.  Right here.  This is the same scar.  This is one

22      under here, right here.

23         *THE COURT:*  All right.  I need you to --

24   Q   Speak up a little bit louder.

25         *THE COURT:*  -- speak up a little bit, Mr. Jones,

Karem E. Jones, Sr. - Direct by Ms. Weiss

118

1         because the court reporter has to get what you're

2         saying.

3    **A**   Yes, sir.  I was describing the one right here

4         directly under my neck.

5    **Q**   And that is a close-up view of which scar?

6    **A**   Of this one right here on my neck here.

7    **Q**   This is --

8             **THE COURT:**  Why don't you all swap.

9             **MS. WEISS:**  Okay.

10   **Q**   That's the same one on your neck?

11   **A**   Yes, ma'am.

12   **Q**   And that's just got a measuring tool up next to it?

13   **A**   Yes, ma'am.

14   **Q**   The same one?

15   **A**   Yes, ma'am.  I was still swollen up real, real bad.

16   **Q**   And what is that scar?

17   **A**   That's the one to my arm right here.

18   **Q**   Okay.

19   **A**   That's the same one.

20   **Q**   And finally?

21   **A**   It looks like the same one.

22   **Q**   Okay.  Thank you.  You can step back up to the stand.

23        Beg the Court's indulgence just one minute.  Karem,

24        on July 22nd, 2007, when you were in Finlay Park and

25        you were on the ground and you realized you had

**JA284**

Karem E. Jones, Sr. - Direct by Ms. Weiss

119

1       started bleeding, what did you think was happening?

2   A   Well, I figured -- because at the -- before I knew I

3       was bleeding at the neck, I figured I had just got

4       scratched or something during the tussle, you know,

5       maybe from dragging my arm on the ground or

6       something.

7   Q   So you just thought it was your arm bleeding?

8   A   Yes, ma'am.

9   Q   What did you think when you found out your neck was

10      bleeding?

11  A   I'm dying.

12  Q   Thank you.  No further questions at this time, Your

13      Honor.

14          THE COURT:  All right.  Mr. O'Neil.

15          MR. O'NEIL:  Thank you, Your Honor.

16                  CROSS EXAMINATION

17  BY MR. O'NEIL

18  Q   Mr. Jones, you're from California?

19  A   Yes, sir.

20  Q   And what high school did you go to there in

21      California?

22  A   I didn't attend high school in California.

23  Q   Where did you attend high school?

24  A   I didn't attend -- where I attended high school was

25      A. C. Flora.

Karem E. Jones, Sr. - Cross by Mr. O'Neil

120

1   Q   You play any sports at A. C. Flora?

2   A   Football.

3   Q   You consider yourself a pretty athletic guy?

4   A   Well, back in the day, yeah.

5   Q   Yeah.  And back in July of last year, you would have

6       been what?  About 31 years old?

7   A   Yes, sir.

8   Q   And do you know Mr. Folkes was about 44 years old?

9   A   I guess.  I didn't know his age.

10   Q   You knew he was older than you?

11   A   Yes, sir.

12   Q   And how tall are you?

13   A   I think about maybe five-nine, almost six.

14   Q   You're taller than Mr. Folkes?

15   A   Yes, sir.

16   Q   How much did you weigh?

17   A   Now?

18   Q   Back then.

19   A   Back then, probably like 150, 160.

20   Q   You would agree that you were a little bit heavier

21       than Mr. Folkes?

22   A   I guess.

23   Q   And so you were younger, taller and heavier than Mr.

24       Folkes back then?

25   A   Yes.

Karem E. Jones, Sr. - Cross by Mr. O'Neil

121

1   **Q**   And you say he was drunk?

2   **A**   Yes, sir.

3   **Q**   Slurred speech I think was the words you used?

4   **A**   Yes, sir.

5   **Q**   And you were not drunk?

6   **A**   No, sir.

7   **Q**   You just had one beer?

8   **A**   I had one beer and a half a blunt.

9   **Q**   And you say Clinton swung at you and hit you in your

10      eye?

11  **A**   Yes, sir.

12  **Q**   And after that you all started fighting?

13  **A**   Yes, sir.

14  **Q**   But you didn't have a bruise on your eye, did you?

15  **A**   Yeah.  My eye was swollen.

16  **Q**   Your eye was swollen?

17  **A**   Yes.

18  **Q**   I'm going to show you what's been marked State's

19      Exhibit No. 12.  Permission to approach, Your Honor?

20          *THE COURT:*  Sure.

21  **A**   Okay.  What am I pointing out?

22  **Q**   And your eye wasn't swollen in this picture, was it?

23  **A**   I think the swelling had went down some.

24  **Q**   But it wasn't swollen in this picture?

25  **A**   So-so.

**JA287**

Karem E. Jones, Sr. - Cross by Mr. O'Neil

122

1    Q    And you said, I think your words were, you used a

2         two-piece on Mr. Folkes.  Is that correct?

3    A    Yes, sir.

4    Q    You hit him twice?

5    A    Yes, sir.

6    Q    And he started falling?

7    A    Yes, sir.

8    Q    And you kind of fell on top of him?

9    A    Yes, sir.  He grabbed, kind of threw my balance off.

10        I started falling with him.

11   Q    Okay.  But you never saw him use a knife to your

12        neck.  Is that correct?

13   A    No, sir.

14   Q    You never saw him cut you?

15   A    No.

16   Q    In fact, you didn't even know you were cut until Ms.

17        Briggs told you?

18   A    Yes.  She told me I was cut.  I knew I was cut on the

19        arm.  I didn't know I was cut on the neck.

20   Q    Didn't have no idea you were cut on the neck?

21   A    No, sir.

22   Q    And I think today you said after you got up Mr.

23        Folkes said something about I'm going to f'g kill

24        you?

25   A    Yes, sir.

Karem E. Jones, Sr. - Cross by Mr. O'Neil

123

1    Q    Okay.  No doubt that's what he said to you?

2    A    No doubt.

3    Q    And you talked to law enforcement a day after this

4         event, right?

5    A    Yes, sir.

6    Q    Investigator McCracken sitting right there?

7    A    Yes, sir.

8    Q    And you gave him a statement?

9    A    Yes, sir.

10   Q    And you wanted to be thorough in that statement you

11        gave him?

12   A    Yes, sir.

13   Q    You wanted to be honest?

14   A    Yes, sir.  Of course.

15   Q    You definitely wanted to be truthful?

16   A    Yes, sir.

17   Q    You wanted the person that attacked you to be caught?

18   A    Yes, sir.

19   Q    And you wanted to include in that statement all the

20        important information so he could have been caught?

21   A    Yes, sir.

22   Q    Now, I'm going to show you a statement from that day.

23        Permission to approach, Your Honor?

24             *THE COURT:*  Yes, sir.

25   Q    Show me in that statement where you said Clinton

**JA289**

Karem E. Jones, Sr. - Cross by Mr. O'Neil

124

1   Folkes said I'm going to f'g kill you?

2 A  It's not on this statement.

3 Q  It's not in your statement?

4 A  It's not on -- it's not on this statement.

5 Q  Okay.  Now, you say you saw a blue hook blade?

6 A  Yes, sir.

7 Q  A hook blade with a blue handle?

8 A  Yes, sir.

9 Q  And you also saw a red knife on the ground?

10 A  Yes, sir.

11 Q  This was when you all were tussling on the ground?

12 A  Yes, sir.

13 Q  Okay.  Now, you also said Clinton had a King Cobra in

14   his hand?

15 A  A King Cobra, a beer.  A beer, yeah.  Not in his hand

16   at that time.  That was like in the beginning after

17   he threw it at me and missed.

18 Q  Now, this fight occurred where the bench at, where

19   the statute of Mr. Finlay is, correct?

20 A  Yes, sir.

21 Q  Near that area?

22 A  Yeah.  In that area.

23 Q  Now, after the fight happened you got up and ran and

24   called 911?

25 A  Yes, sir.

**JA290**

Karem E. Jones, Sr. - Cross by Mr. O'Neil

125

1    Q    Now, Clinton ran the other direction?

2    A    After he seen he couldn't catch me, he ran the other

3         direction.

4    Q    But he ran the other direction?

5    A    After he seen he couldn't catch me, because he ran

6         towards me first.  That's when I ran to the phone.

7         That's how I can describe the knife he had in his

8         hand.

9    Q    Now, did you mention anywhere in your statement that

10        he ran towards you?

11   A    In this statement here?

12   Q    Yeah, that statement.  That statement that you gave a

13        day after the event when you were questioned by the

14        cops?

15   A    No.  It's not mentioned in here.

16   Q    So you ran towards the pay phone?

17   A    Yes.

18   Q    Now, the pay phone is probably about, you would

19        agree, about 75 yards from the bench?

20   A    From the bench?  I would guess so.  But the fight

21        didn't take place at the bench.  It took place under

22        the tree which is closer than the bench.

23   Q    So you agree that the pay phone is probably about

24        50 yards away from the tree?

25   A    Well, give or take.

Karem E. Jones, Sr. - Cross by Mr. O'Neil

126

1   Q   And you called 911, right?

2   A   Yes, sir.

3   Q   And you talked to 911 for a few minutes?

4   A   Yes, sir.

5   Q   And you never mentioned to 911 the name of the person

6       you were in the fight with?

7   A   I may or I may have not.  I can't recall.

8   Q   But you do agree that you had heard Clinton's name

9       before?

10  A   Yeah.

11  Q   You met him at the job, as a matter of fact?

12  A   Yeah.

13  Q   And you told them that there had been a fight at the

14      park when you talked to 911?

15  A   Yes, sir.

16  Q   And you told them two people had been involved?

17  A   Yes, sir.

18  Q   And you said one dude with a knife was trying to walk

19      out the park?

20  A   No.  I'm not sure.  I don't think I said that.

21      Because the phone conversation I recall, they asked

22      me, "Were you a victim?"  And I was like, "Yes,

23      ma'am."  And they started asking me questions about

24      me.  No questions were asked about the assailant

25      until toward the end of the conversation.

Karem E. Jones, Sr. - Cross by Mr. O'Neil

127

1   Q   But I guess my question is solely, do you remember

2       telling them that the dude with the knife walked out

3       the park?

4   A   I don't remember.

5   Q   Okay.  But after you got off the phone with 911, you

6       moved off to the stage.  That's where you were

7       waiting for an EMT to come?

8   A   Yes, sir.

9   Q   As a matter of fact, I think Mr. Abney was there, the

10      kind of heavyset black guy?

11   A   Honestly, I can't recall him.

12   Q   But somebody helped you get the bleeding under

13      control?

14   A   Yeah.  The little short white guy with long hair.

15   Q   He helped you?

16   A   He helped me.

17   Q   Okay.  And you had the bleeding under control before

18      EMS arrived?

19   A   Well, with the ice and the water, it wasn't under

20      control, but it wasn't bleeding as bad it was.

21   Q   And you never passed out during this whole time?

22   A   No, sir.

23   Q   And you didn't have any cuts on your hands or

24      anything?

25   A   On my arm.

JA293

Karem E. Jones, Sr. - Cross by Mr. O'Neil

128

1    Q    Yeah.  But not on your hands?

2    A    No, sir.

3    Q    And you had been drinking that night you said?

4    A    Yes, sir.

5    Q    Had you been using cocaine that night?

6    A    No, sir.

7    Q    But you had been using marijuana?

8    A    Yes, sir.

9    Q    In fact, I think you had been using marijuana about

10        45 minutes before getting to the hospital?

11   A    Well, maybe.  I don't think it was that close

12        together though.

13   Q    Did you share that marijuana with Ms. Green and Mr.

14        Patrick?

15   A    No.

16   Q    But Ms. Retalia Green and Mr. Patrick, those are your

17        friends?

18   A    Well, associates.

19   Q    Did Mr. Patrick's brother help you get your apartment

20        that you're in right now?

21   A    Mr. Patrick's brother?

22   Q    Yeah.  Did he help you get that apartment?

23   A    No.

24   Q    You said EMS took you to the hospital that night?

25   A    Yes, sir.

Karem E. Jones, Sr. - Cross by Mr. O'Neil

129

1    Q    And the doctors, they treated your injuries?

2    A    Yes, sir.

3    Q    They stitched you up?

4    A    Yes, sir.

5    Q    Gave you a little ointment?

6    A    Yeah.  The next day.

7    Q    Yeah.  They referred you to the Lexington/Richland

8         Drug and Alcohol Counseling Center, didn't they?

9    A    I think so.  I'm not sure.

10   Q    And you said this was the shirt that Mr. Folkes had

11        on that night?  This is the shirt?

12   A    Yep.  Blue collar.  That's it.

13   Q    The shirt he had on while you all were tussling on

14        the ground?

15   A    Yeah.

16   Q    You say he cut you and you were bleeding?

17   A    Yes, sir.

18   Q    But you would admit that there's no blood at all on

19        this shirt?

20   A    It doesn't look like it to me.

21        MR. O'NEIL:  Beg the Court's indulgence, Your

22   Honor.  No further questions, Your Honor.

23        THE COURT:  All right.  Madam Solicitor,

24   anything further?

25        MS. WEISS:  Nothing, Your Honor.

**JA295**

Karem E. Jones, Sr. - Cross by Mr. O'Neil

130

1    **THE COURT:** All right. Thank you, sir. You may

2 step down.

3    **MS. WEISS:** The State calls Tiffany Briggs.

4    TIFFANY T. BRIGGS, after being duly sworn,

5 testifies as follows:

6    **THE CLERK:** Thank you. Have a seat in the

7  witness stand and give the court reporter your name.

8        DIRECT EXAMINATION

9 *BY MS. WEISS*

10 **Q** Good afternoon, Ms. Briggs. How are you?

11 **A** I'm fine.

12 **Q** Tiffany, where are you from originally?

13 **A** Columbia, South Carolina.

14 **Q** And did you grow up here for most of your life?

15 **A** Yes, ma'am.

16 **Q** Did you go to school here?

17 **A** Yes, ma'am.

18 **Q** Where did you graduate from high school?

19 **A** Actually I dropped out of Brooklyn Cayce. And when I

20  came back to Columbia in 2005, actually 2006, I went

21  to Midlands Tech to do my undergrad.

22 **Q** And what brought you back to Columbia?

23 **A** Katrina.

24 **Q** Where are you currently living now?

25 **A** I'm actually staying on Rosewood in a rental room.

Tiffany T. Briggs - Direct by Ms. Weiss

131

1    Q    And who do you stay with?

2    A    I have a boyfriend.  So me and my boyfriend stay

3         together.

4    Q    And it's just the two of you?

5    A    Yes, ma'am.

6    Q    Things are going pretty well now?

7    A    Yes, ma'am.

8    Q    Okay.  Back July 22nd of 2007, do you remember that

9         day for any particular reason?

10   A    Yes, ma'am.  Because it's my birthday.

11   Q    And on that day where were you living?

12   A    Actually I was staying in Riverside Estates.  I had

13        just left the homeless situation I'd say three days

14        before that.

15   Q    You said three days before that you were living in

16        what you call the homeless situation?

17   A    Yes, ma'am.

18   Q    How long had you been living in the homeless

19        situation?

20   A    Since December the 14th of 2006.

21   Q    And during that time did you have the opportunity to

22        get to know Clinton Folkes?

23   A    Yes, ma'am.

24   Q    And back in June, sometime in June of 2007, did you

25        end up picking up a fraudulent check charge while you

Tiffany T. Briggs - Direct by Ms. Weiss

132

```
1        were living out there?
2   A    Actually I picked up the fraud case right after
3        Katrina when me and my daughter were staying at 1719
4        Winyah.  So I got brought up for the charges in 2007.
5        Yes, ma'am.
6   Q    Okay.  So right about right during all this?
7   A    Yes, ma'am.
8   Q    Okay.  So you said you did get to know Clinton
9        Folkes.  So did you know him from the time you moved
10       into the park, into the homeless situation?
11  A    I would say within a couple of months, yeah, of
12       December, January, February, around about that time,
13       yes.  That's when I come to know a lot of people that
14       I know that are in the witness stand with me or in
15       the court testifying.
16  Q    And did you at some point get to know Clinton Folkes
17       a little bit better?
18  A    Yes, ma'am.  We started to become boyfriend and
19       girlfriend.  I can't really tell you exactly what day
20       because we had went together.  We broke up like three
21       times and went back together.  So we had did that
22       three times.
23  Q    And would you say that Mr. Folkes is kind of a
24       jealous type?
25            MR. O'NEIL:  Objection, Your Honor.
```

Tiffany T. Briggs - Direct by Ms. Weiss

133

1      **THE COURT:**  What's the point of that?

2   A   Yes.  I would say that myself.

3      **THE COURT:**  Whoa, ma'am.

4      **MS. WEISS:**  Hold on.  Sorry, Your Honor.

5      **THE COURT:**  Is the objection on relevancy?

6      **MR. O'NEIL:**  Yes, Your Honor.

7      **MS. WEISS:**  Your Honor, I think this will tie it

8   directly into the altercation that we're here about.

9      **THE COURT:**  All right.  Overruled.

10  Q   So you would say yes, that he is?

11  A   Yes, ma'am.

12  Q   On July 22nd of 2007, were you and Mr. Folkes

13      together or were you separated?

14  A   We were separated at the time.

15  Q   How long had you been separated?

16  A   Like I say, about three days, three or four days.

17  Q   So this was a fresh breakup again?

18  A   Yes.  Actually that was our last breakup.

19  Q   Okay.  But it had just happened a couple of days

20      earlier.  And you actually went to live with some

21      friends?

22  A   Yes, ma'am.

23  Q   You knew Mr. Folkes fairly well.  You had plenty of

24      opportunities to know who he was, what he looked

25      like, where he hung out?

Tiffany T. Briggs - Direct by Ms. Weiss

134

1   A   Yes, ma'am.  I even got to know a lot of the

2       people -- well, not a lot -- a couple of people in

3       South Carolina that he knew besides the homeless

4       situation.

5   Q   And on July 22nd, 2007, what did you do that day?  It

6       was your birthday.  Tell the jury what you did?

7   A   Actually on July 21st we went -- me and my roommate,

8       we went to Sumter and we stayed at her mom's house

9       that night with her daughter, with her foster little

10      girl that was staying there.  We went to church

11      actually together.  Then she works at Friedman's

12      which is in Sandhill, and she got off work I'd say

13      about 6, between 6, 6:30, 7.

14  Q   That night?

15  A   Yes, ma'am.  It was a Sunday.  So I think Friedman's

16      is open from 1 to 6.

17  Q   What did you do when she got off work?

18  A   As we were coming back around, because I live in

19      Riverside Estates, so that's Cayce way, I told her to

20      drop me off by the park because I wanted to see a

21      couple of people in the homeless situation that were

22      friends of mine.

23  Q   So you said you were probably through around about

24      6:30 or so?

25  A   Yeah.  I'd say right between there.

**JA300**

Tiffany T. Briggs - Direct by Ms. Weiss

135

1    Q    Who did you see when you first came into the park?

2    A    I came from the top of the hill.  I actually seen the

3         witness.  Well, I wouldn't even say it, the defendant

4         and the rest of everybody that's here with me who is

5         actually telling their side of the story, too.  They

6         were all sitting in the park having a conversation.

7         And Mr. Green, too.

8    Q    Had you been drinking that day?

9    A    No.

10   Q    Had you been using any drugs?

11   A    Not that day.

12   Q    Okay.  So were you under the influence of anything

13        when you came to the park that day?

14   A    No, ma'am.

15   Q    I'm going to show you what's been marked as State's

16        Exhibits 10 and 11.  Do you recognize these pictures?

17   A    Yes, ma'am.

18   Q    And if you can show the jury; when you say you came

19        from the top of the park, show them what you meant by

20        the top of the park?

21   A    When I say top of the park, there is also an entry

22        over here which comes by the Veterans.  It's all the

23        way at the top.  It comes by the V.A. service

24        building I think it is, and I know it's a fed

25        building.  So I was coming from that way.

Tiffany T. Briggs - Direct by Ms. Weiss

136

1   **Q**   Okay.  All right.  I'm going to show you State's

2       Exhibits 4 and 8.  Do you recognize these pictures?

3   **A**   Yes, ma'am.

4   **Q**   And is that where you're talking about?

5   **A**   Yes, ma'am.  This is the direction I came from.

6          **MS. WEISS:**  Okay.  Your Honor, at this time I'd

7       like to enter State's Exhibits 4 and 8 in evidence.

8          **MR. O'NEIL:**  No objection, Your Honor.

9          **THE COURT:**  So admitted.

10       (WHEREUPON, State's Exhibit No. 4 is admitted

11      into evidence.)

12       (WHEREUPON, State's Exhibit No. 8 is admitted

13      into evidence.)

14  **Q**   Showing the jury, so you came down from these steps

15       down into the park?

16  **A**   Yes, ma'am.

17  **Q**   There.  And that would be the same as coming from

18       this way --

19  **A**   Yes, ma'am.

20  **Q**   -- down into the park?  And back to State's

21       Exhibits -- well, State's Exhibit 11.  Is that where

22       you were headed?

23  **A**   Yes, ma'am.

24  **Q**   To that general area there?

25  **A**   Actually, yeah, right here somewhere.

Tiffany T. Briggs - Direct by Ms. Weiss

137

1  **Q**  And is that where everybody was seated and sitting

2      around talking that you knew?

3  **A**  Yes, ma'am.  A lot of them, a lot of us laid on

4      blankets because I also had one at one point, too,

5      that we laid on blankets under the tree either to

6      stay out the sun or to not have the sun and have the

7      little breeze that was out there.

8  **Q**  And did you know Karem Jones when you came into the

9      park that day?

10 **A**  I did not honestly know his name, but I did know him

11     as an associate of part of the homeless situation.

12 **Q**  And had you known him to be down there for a very log

13     period of time?

14 **A**  No.  Because he had lost a baby I think a couple of

15     weeks before.  He lost one of his children before he

16     came into the homeless situation.

17 **Q**  So he had just been in there a couple of weeks?

18 **A**  Yes, ma'am.

19 **Q**  Okay.  So you -- did you have any sort of

20     relationship with him?

21 **A**  No.  Other than talking about his kid that passed,

22     no.  Because him and the baby's mama at the time were

23     talking and were getting along.

24 **Q**  Okay.  So there was no relationship between the two

25     of you?

Tiffany T. Briggs - Direct by Ms. Weiss

138

1   A   No.

2   Q   You just knew who he was?

3   A   Yes, ma'am.

4   Q   Okay.  So when you came into the park, who did you

5       talk to first?

6   A   I actually talked to Clayton before I talked to Karem

7       because they were starting out arguing.

8   Q   Okay.  So when you say Clayton, who are you talking

9       about?

10  A   I mean Clinton Folkes which we called "New York".

11  Q   And did you call him Clayton sometimes?

12  A   I called him Clayton or "New York".  I have never

13      called him Clinton Folkes.

14  Q   And you talked to him.  What was his demeanor when

15      you came in contact with him first in the park?

16  A   He was intoxicated, I wouldn't say drunk.  He was

17      drinking.  And he was in a bad mood that day, a

18      little bit worse than I've seen him on a normal day.

19  Q   Okay.  And did you all have much of a conversation?

20  A   No, not really.  It was more of a demeanor of me

21      between Karem Abdoob (phonetic) and him.  It was more

22      between them of Clayton and him fussing and him

23      accusing Karem Dubarts (phonetic) that I was going --

24      or that we were going to date or that we had dated or

25      something like that that day.

Tiffany T. Briggs - Direct by Ms. Weiss

139

1    Q    So would you say, who was starting things when you
2         were standing down there?
3    A    When I stood there for a while, I sat there and I
4         watched Clayton.  Actually I watched it for a minute
5         before I even got into it.  I watched Karem and
6         Abdoob sit there.  And they were arguing.  It was
7         just -- it was like it was going from one person --
8         first it was going from one person to another.  And I
9         sat there and watched it I'd say no more than five or
10        six minutes before I stepped in.
11   Q    And what did you see happen next?
12   A    I seen -- through the whole thing, I seen -- I saw
13        Clayton jump up and say something, him and Karem go
14        at it.  I remember Clayton punching at Karem and then
15        Karem turning around and getting up and punching
16        Clayton.  And then it went from them two punching
17        each other, Karem running to Clayton, coming in and
18        just taking the knife and cutting his neck.
19   Q    So did you see a knife?
20   A    Actually I didn't see a knife.  I seen a box cutter
21        which I would call a copy cutter also.
22   Q    Where did you see that?
23   A    Actually it was on Clayton at the time.
24   Q    And you've known Clayton for a while.  Have you ever
25        seen him to have a knife?

Tiffany T. Briggs - Direct by Ms. Weiss

140

1   A   Yes.

2       MR. O'NEIL:  Objection, Your Honor.

3       THE COURT:  Overruled.

4   Q   Have you known him to have a knife?

5   A   Yes.  Because we went together, he also -- I had one

6       that he had gave me.  And I've known him to carry

7       them because he at least carries three.  It's not

8       really safe for a female to be out in case something

9       happens.

10  Q   And you said you saw a box cutter.  Was that in his

11      hand or on the ground or on him or --

12  A   It was on his -- I know him to have that one.  This

13      one was on him like it always is.

14  Q   Okay.  And did you see him punching at Mr. Jones, at

15      Karem?

16  A   Yes.  I did at first.

17  Q   You saw him punch him first.  Did you see him getting

18      into his face or starting --

19  A   Yeah.  They were arguing.  I mean, they were at it

20      arguing.  Then --

21  Q   Who started that fight or that argument?

22  A   I would say Clayton because Clayton had -- even

23      standing from it, Clayton was the only one talking

24      and Clayton was the one that was very upset and very

25      mad.  And just everybody -- it was more of a guy

Tiffany T. Briggs - Direct by Ms. Weiss

141

1   thing.  When you see guys go at it and they -- well,

2   guys to go at it and have verbal things as if they

3   were going to fight.  I thought it was going to be an

4   argument and then it got louder between them.

5   Q   And at some point did you see Karem bleeding?

6   A   Yes, I did.

7   Q   When was that?

8   A   After Karem actually -- Clayton swung at Karem and

9       Karem went running, I seen Clayton chase him.  And

10      then I seen Karem -- I heard them say, "Karem is

11      bleeding from his neck."  I just knew he pulled out

12      the knife.  I did not see him actually -- I didn't --

13      it happened so quick when I seen it, it was just, he

14      was holding the side of his neck and there was blood.

15  Q   And you say you saw Clayton chasing him?

16  A   Yes, I did.

17  Q   And was he saying anything?  Did you hear him saying

18      anything?

19  A   They were arguing that day.  There was a lot of words

20      and a lot said in that conversation.  So, yes, I did

21      hear them but I don't remember the exact words.

22  Q   Do you recall any exact words when he was chasing

23      Karem after Karem was bleeding?

24  A   He didn't actually chase Karem after Karem was

25      bleeding.  He actually cut Karem.  Karem realized

Tiffany T. Briggs - Direct by Ms. Weiss

142

1  that he was bleeding.  Karem went towards getting ice

2  and stuff.  And that's when Clayton came behind me

3  and struck me in the back.  And then I seen him

4  exiting the park the same way I came in.

5  Q And did you actually see the cut on Karem?

6  A All I seen was Karem's hand had blood on it.  No, I

7  never got to see the cut, even from the ambulance.  I

8  just seen the blood coming from his neck.

9  Q And was there a lot of blood?

10  A Yeah.

11  Q And what were you thinking when you saw the blood?

12  A I don't even remember what I was saying.  I was like

13  I just -- I just -- I couldn't believe he cut him.

14  And they were calling -- and there were so many

15  people grabbing phones.  There was another set of --

16  there was a family of Caucasians sitting over there

17  with their kids.  They had a little boy and a little

18  girl and they got up and they left.  And I just seen

19  everything just moving.  I really didn't hear

20  anything.  I just seen more than I could hear.

21  Q And did you stay in the park after Clayton left?

22  A Yes, I did.

23  Q And did you have the opportunity to talk to law

24  enforcement?

25  A The officer is not here today, the man I talked to.

Tiffany T. Briggs - Direct by Ms. Weiss

143

1    But me and the officer had a brief disagreement or a

2    brief --

3  Q    Discussion?

4  A    Yeah.  Attitude with each other I would say.

5  Q    And what did you talk to the officer about?

6  A    The officer, the ambulance had came and picked up

7    Karem.  And when the ambulance came and picked him

8    up, the officer was like, "Okay, Ms. Briggs."  He was

9    like, "So who is the guy?"  He was like, "Who was the

10    guy that just went in the ambulance which just got

11    stabbed?"  I was like, "I don't know."  He said, "But

12    I thought you said you knew the guy that just" -- he

13    said, "I thought you said one of the guys was your

14    boyfriend."  I was like, "The guy that just went in

15    the ambulance", which started us to arguing, "I don't

16    know his name."  The one that stabbed was the name

17    that I gave him when I said Clayton.

18  Q    What name did you give him?

19  A    Clayton Folkes.

20  Q    Folkes?

21  A    (Nods head affirmatively)

22  Q    And were you able to give them a description of what

23    Clayton was wearing?

24  A    Yes, ma'am.

25  Q    And do you remember what that description was?

Tiffany T. Briggs - Direct by Ms. Weiss

144

1   A   Clayton was wearing a purple/green striped I would

2       say collared shirt which is pullover.  And that's

3       what he had on when he left the park, and a pair of

4       blue jeans.

5   Q   I show you what's been entered as State's Exhibit 24.

6       Do you recognize this shirt?

7   A   Yes, ma'am.

8   Q   Why do you recognize this shirt?

9   A   Because that's the shirt Clayton had on the day that

10      he stabbed Karem.  That's the shirt he had when he

11      stabbed him.

12  Q   And do you recognize this as a shirt that Clinton

13      owns, owned?

14  A   Yes, ma'am.

15  Q   Do you recognize State's Exhibit 23?

16  A   Yes, ma'am.

17  Q   And what is that?

18  A   It is actually where we sit.  The bench is -- well,

19      actually where you sit, where I came into the park,

20      there is a metal thing where we have swings where you

21      can sit and rock back and forth.  It's a trashcan

22      right there.

23  Q   And what do you see in that trashcan?

24  A   Clayton's shirt.

25  Q   Did you give the officers information on which

Tiffany T. Briggs - Direct by Ms. Weiss

145

1    direction Clinton went to leave the park?

2  A   Yes, ma'am.

3  Q   And which direction was that?

4  A   I told them that he went towards the park when he

5    went towards the Strom Thurmond building because

6    that's actually what I call it over there.  I told

7    them he went out towards the park.

8  Q   And did you have the opportunity to leave the park

9    with an officer?

10  A   Yes, ma'am.

11  Q   And what was that purpose?

12  A   To actually go identify Clayton.

13  Q   Okay.

14  A   The gentleman that you have on your side, he actually

15    put me in one of the police's cars and he actually

16    took me up and he told me to sit.  I actually got to

17    sit in the front seat.  And he told me to tell him

18    was that Clayton.  That's all he asked me.  He was

19    like, "Was that the person who stabbed the guy in the

20    park?"  And I told him yes.  And we waited there

21    until another officer got there because that's when

22    it became three.

23  Q   So was there any doubt in your mind that that was the

24    same person?

25  A   It was the same person.  But like I told the officer,

Tiffany T. Briggs - Direct by Ms. Weiss

146

1      he changed clothes.  He changed clothes.  But it was

2      the same person that did it, because he had on the

3      same book sack.

4  Q  He had the same book sack but different clothes?

5  A  Yes, ma'am.

6  Q  And did you know him to carry clothes with him?

7  A  Yes, ma'am.  Because they have lockers at Action

8      Labor in which we keep our clothes.  And in a

9      homeless situation you carry your clothes in a bag.

10     You leave it in the storage room that's now on

11     Elmwood or you leave them at your job.  So I carried

12     my clothes in my bag, too.

13  Q  Would he have had an opportunity to change clothes?

14        MR. O'NEIL:  Objection, Your Honor.  It calls

15     for speculation.

16        THE COURT:  Sustained.  I don't know that she

17     can testify --

18        MS. WEISS:  Withdrawn.  That's fine.

19  Q  And do you see Clinton Folkes, the person that you

20     saw stab Mr. Jones, in the courtroom today?

21  A  Yes.  I see him right there.

22  Q  And can you identify what he's wearing?

23  A  He actually has on a I would say orange button-up

24     shirt and a -- what do we call it?  Blazer, a blue --

25     I would say a dark blue blazer.

Tiffany T. Briggs - Direct by Ms. Weiss

147

1      **THE COURT**:  All right.  She's identified the

2      defendant.

3          **MS. WEISS**:  Beg the Court's indulgence one

4      minute.

5          (WHEREUPON, State's Exhibit No. 27 is marked for

6      identification.)

7   Q   I'm going to show you what's been marked as State's

8      Exhibit 27 for identification.  Do you recognize

9      this?

10  A   Yes, ma'am.

11  Q   And whose handwriting is that?

12  A   My handwriting.

13  Q   Okay.  And what is it?

14  A   Actually it was the day of my birthday.  And the

15     officers needed me to stay also and write the report.

16     So that's what I did.

17  Q   And you wrote this statement?

18  A   Yes, ma'am.

19  Q   And whose handwriting is this?

20  A   The actual officer's.

21  Q   Okay.  Did he ask you questions?

22  A   Yes, ma'am.

23  Q   Did you have the opportunity to read over these

24     questions and answers?

25  A   Yes, ma'am.

Tiffany T. Briggs - Direct by Ms. Weiss

148

1   Q   And whose signature is that on the bottom?

2   A   Mine.  He gave me time to write my report.  Then he

3       came back in and read mine.  Then he went over the

4       questions because I was kind of nervous that day.

5       And then he asked questions from there.

6   Q   Okay.

7           MS. WEISS:  Thank you.  No further questions at

8       this time, Your Honor.

9           THE COURT:  All right.

10                      CROSS EXAMINATION

11  BY MR. O'NEIL

12          (WHEREUPON, Defendant's Exhibit No. 1 is marked

13      for identification.)

14  Q   So, Ms. Briggs, you say you were not drinking that

15      night?

16  A   Yes.

17  Q   And were you on any type of mental health medication

18      that night?

19  A   No.  At that time I think it's been about -- before

20      actually they took me off of it, I stopped taking it

21      after Lexington, about January of 2007.  I stopped

22      taking it myself.

23  Q   So you stopped taking your mental health medication?

24  A   Yes.

25  Q   And you say you were not under any influence of any

Tiffany T. Briggs - Cross by Mr. O'Neil

149

1     drugs this particular night?

2   A  No, not that night.  And I am not a known drinker.

3   Q  And you claim you and Mr. Folkes used to date?

4   A  Yes.

5   Q  But you were talking to Mr. Jones that night?

6   A  Actually I was talking, well, Mr. Folkes.  That day I

7     started talking to Mr. Folkes before I started

8     talking to Mr. Jones.

9   Q  Were you standing right beside Mr. Jones when the

10    fight occurred?

11  A  Actually, no.  I was standing in the middle of both

12    of them.

13  Q  But how close were you to the fight, I guess is what

14    I'm asking you?

15  A  I wasn't close enough to get hit.  As a matter of

16    fact, I wasn't -- it would be like from the gentleman

17    in the white coat to about -- too close, too close.

18    I would say between you all, I was standing right

19    there in the middle, a little bit, where the white

20    cups are.  We were standing, if this is Clayton and

21    this is Mr. Jones, I would be standing right there in

22    the middle where the white cups are.

23  Q  So about 45 feet away is about right?

24  A  Yeah.  I would say right there in the middle, good

25    enough for them to hear me but not too close to

**JA315**

Tiffany T. Briggs - Cross by Mr. O'Neil

150

1    either one of them.

2  Q   And you say you saw a gray box cutter?

3  A   Yeah.

4  Q   Sort of like -- I'm showing you Defense Exhibit No. 1

5      for identification.  Sort of like this, a box cutter?

6  A   Yes, sir.

7  Q   And it was gray?

8  A   Yes, it was.  It was I would say gray.  Yes, it was.

9  Q   I'm going to show you what's been marked as State's

10     Exhibit I think 25 for I.D. purposes.  It wasn't

11     anything like this, was it?

12 A   No.

13 Q   It wasn't this?

14 A   Hmm-mm (Negative)

15 Q   You're absolutely sure?

16 A   He might have had one but everybody else said it.

17     But what I seen him have that day and what I seen him

18     actually cut the guy with was totally different than

19     what everybody else seen.

20 Q   So you were about four or five feet away?

21 A   Yes, I was.

22 Q   So you absolutely didn't see this?

23 A   I'm positive.

24 Q   I think you said you saw Clinton punch at Mr. Jones?

25 A   No.  Clinton punched him because he was sitting down

**JA316**

Tiffany T. Briggs - Cross by Mr. O'Neil

151

1    when Clinton punched him.  I was always -- there

2    is -- right there where they were sitting and the

3    trees are in the middle, if you go all the way to the

4    edge, there is a walkway.  There is a bench sitting

5    there and there is a tree standing there.  I stood

6    there and watched it.

7  Q  So you said the fight started when Mr. Jones was

8    sitting down?

9  A  Yeah.  This was going on -- actually there was two

10    other people there.  There was three other people.

11    The guy I've seen in the homeless situation since

12    I've been back to the park, but I've never seen the

13    woman and her daughter again after that.  They were

14    standing there and I looked at them.  And they were

15    standing back behind me.  Actually they weren't

16    standing.  They were sitting in the chair behind

17    where I was standing.

18  Q  Okay.  And how many times did you see Mr. Jones

19    strike Mr. Folkes?

20  A  I actually seen them hit about -- he just -- when

21    guys go to punch, they go to punch.  And that's

22    just -- I just seen him going to swing at him.  Once

23    Clayton had took the first punch at Mr. Jones, then I

24    seen -- I seen Mr. Jones get up and I just seen him

25    just start.  And they wasn't good enough because Mr.

Tiffany T. Briggs - Cross by Mr. O'Neil

152

1    Jones is taller than Clayton.  So when he went to

2    swing, Clayton fell back to the ground.  And when

3    Clayton fell back to the ground, this one, like a box

4    player, just went running around like a boxing

5    player.  So I've seen a lot of fights.  So when I

6    seen it, you've got to understand, it was more like

7    that in this fight.  When I say being a fight, it's

8    more like that.

9  Q  Who did you see running around?

10 A  I actually seen, when Clayton took the first hit and

11   then Mr. Jones came back and Mr. Jones swung, Mr.

12   Jones got up to where he could fend and realized that

13   Clayton was going for the pocket, and he just went

14   running right before he got stabbed.

15 Q  You didn't see Mr. Jones hit Mr. Folkes at all?

16 A  Yes, I did.  After -- actually Clayton hit Mr. Jones

17   first.  Then Mr. Jones actually went at him like a

18   boxing player and then Mr. Jones actually got a good

19   couple of licks because Clayton fell back.  And then

20   he actually jumped up.  I mean, he actually went

21   running towards the flag post where the American flag

22   and other flags are.

23 Q  Did you see Mr. Jones on top of Mr. Folkes?

24 A  Once he hit the ground, I wouldn't say I seen him on

25   top of him.  Once he hit the ground, Mr. Jones did  .

**JA318**

Tiffany T. Briggs - Cross by Mr. O'Neil

153

1    back up, and that's when he went -- Clayton got up

2    because Clayton stumbled and fell and he got up and

3    he went towards Mr. Jones again.  And Mr. Jones went

4    running because Clayton couldn't get up too fast.

5  Q  Because Clayton was drunk that day?

6  A  Yes, he was.  I think everybody was drunk.

7  Q  Everybody was drunk?

8  A  Well, I wouldn't say everybody.  I would say -- well,

9    yeah.  I would say the ones that were sitting there,

10   even Mr. Jones, I wouldn't know if they were

11   drinking.  I had just got in there first of all.

12   Secondly, I'm not a known drinker from any of the

13   homeless situations.  They don't know that I drink

14   now.  And they don't even have a history of me

15   drinking.  So for them, they were drinking, but I

16   ain't a part of that situation.

17 Q  And it's fair to say that Mr. Jones was getting the

18   best of Mr. Folkes?

19 A  No.  I would say it was best that when the first lick

20   was threw Clayton got the first lick in.  Then Mr.

21   Jones actually defended himself, like any man would.

22   And then Clayton fell.  And then Mr. Clayton Folkes,

23   like a wimp, went at him and stabbed him.

24 Q  But you didn't actually see Mr. Folkes stab Mr.

25   Jones, did you?

JA319

Tiffany T. Briggs - Cross by Mr. O'Neil

154

1   A    I seen him when -- Clayton was the only one by Mr.

2        Jones when Mr. Jones was bleeding.  There was nobody

3        else.  There was not even me by him.

4   Q    I understand that.  But my question is simply, you

5        actually didn't see Mr. Folkes stab Mr. Jones, did

6        you?

7   A    Actually, I seen him just swing.  All I did was see

8        him swing at him.  And the next thing I know this one

9        started saying he got blood.  That's what I seen.

10  Q    And you saw Mr. Jones run towards the pay phone?

11  A    Yes.

12  Q    You saw Mr. Folkes run the other way towards --

13  A    No.  Then when -- actually he went running towards

14       the pay phone and he was actually grabbing like this,

15       I didn't know Clayton came behind me because I was

16       still standing in the spot of them supposedly be

17       trying to calm down and act like decent human beings

18       because there were kids around.  He came behind and

19       punched me in the back.

20  Q    And then what's when he ran?

21  A    That's when he went up.  Because I was even going

22       towards hitting, too.

23  Q    So after you say he struck you, that's when he ran

24       towards --

25  A    Yeah.  That's when he ran up.

Tiffany T. Briggs - Cross by Mr. O'Neil

155

1    Q    And where did you go after the fight?

2    A    Actually I went with the police.

3    Q    And you went with Investigator McCracken?

4    A    That day, yes.  I went with Investigator McCracken

5         and the other gentleman that was sitting in the

6         chair.  Yeah.  I went with Investigator McCracken to

7         the City of Columbia, to their office.

8    Q    He took you down to headquarters to get a written

9         statement?

10   A    Yes.  I went from going from -- there were so many

11        police that day.  I went from in the car to going to

12        identify Clayton to going back to the top of the park

13        for them finding the t-shirt actually there.  Because

14        all I said is, "Yes, that's Clinton Folkes."  But his

15        clothes had done changed.  They went back towards the

16        park because they said everything must be left there.

17        I waited through the whole process.

18   Q    And I think you said some other people are with you

19        here today?

20   A    Yes.

21   Q    Who are those people?

22   A    Actually a part of the homeless situation, too.  When

23        you're in a homeless --

24             MS. WEISS:  Objection, Your Honor.  I mean, I'm

25        not sure about the way he's phrasing that people are

**JA321**

Tiffany T. Briggs - Cross by Mr. O'Neil

156

1    with her here today.

2         MR. O'NEIL:  Your Honor, that's what her

3    testimony was on direct.

4         THE COURT:  Well, she obviously felt like she

5    could answer it.  I'm going to overrule the

6    objection.

7  A   Well, I would say with me because we were there the

8    day of the incident and we were part of the homeless

9    situation.  And we associate.  They don't come to

10   where I live now on Rosewood.  They don't assist me,

11   meaning I've never met them other than the homeless

12   situation ever in my life before.

13 Q   And who were those people that's with you today?

14 A   Actually they were people from the homeless

15   situation.  Jada, another guy, was just there.  He's

16   not even a part of the homeless situation.  The other

17   two were normally frequently of the park, stayed at

18   Oliver Gospel Mission.  Jada has never stayed at Bull

19   and Taylor shelter with me.  So they were a part of

20   the homeless situation, meaning if you eat at -- what

21   would I call it -- Turnipseed or Cafe Ministries,

22   when I say a part of it, that's where I met you

23   between the homeless situation.  There's are places

24   where you can go eat free on Sundays in the park.

25   Salvation Army is another one.  Also the Salvation

**JA322**

Tiffany T. Briggs - Cross by Mr. O'Neil

157

1  Army there turns to churches that feed to the
2  homeless, that actually feed the homeless more.
3  There is actually a church on Gervais that feeds.
4  There is actually a couple of them downtown that
5  feeds.  So these are tons of places they feed in
6  homeless situations.
7  Q  Now, you were a little bit upset with Clinton that
8     day, were you not?
9  A  No, I wasn't.
10 Q  But you say you all had just broken up though?
11 A  Yeah.  About three days earlier.  But not upset.  I
12    broke up.  I went to go stay with my friends.  I was
13    supposed to be going back to school at the time but I
14    did not get there.
15       MR. O'NEIL:  Beg the Court's indulgence, Your
16    Honor.
17       (Pause)
18       MR. O'NEIL:  No further questions, Your Honor.
19       THE COURT:  All right.  Anything further?
20       MS. WEISS:  Nothing further from the State, Your
21    Honor.
22       THE COURT:  Thank you.  You may step down.
23       MS. WEISS:  Your Honor, may this witness be
24    excused?
25       THE COURT:  Any objection?

Tiffany T. Briggs - Cross by Mr. O'Neil

158

1          **MR. O'NEIL:**  No objection.

2          **THE COURT:**  Yes, ma'am.  You're free to leave.

3          **MS. WEISS:**  The State calls James Reddick.

4          **MR. O'NEIL:**  Your Honor, may we approach?

5          **THE COURT:**  You may.

6          (Whereupon, a bench conference is had)

7          JAMES REDDICK, after being duly sworn, testifies

8    as follows:

9          **THE CLERK:**  Thank you.  Have a seat in the

10        witness stand.

11                    DIRECT EXAMINATION

12   **BY MS. WEISS**

13   **Q**    Good afternoon, Mr. Reddick.  How are you?

14   **A**    Fine.

15   **Q**    Mr. Reddick, introduce yourself to the jury.  Tell

16        them where you live, where you're from?

17   **A**    My name is James Reddick.  I'm originally from

18        Philadelphia.  I reside here in Columbia, and I work

19        at the Dorn V.A. Medical Hospital.

20   **Q**    You work at the Dorn V.A. Medical Hospital?

21   **A**    Yes.

22   **Q**    And who do you live with?

23   **A**    My fiancee.  Dorothy Osborne.

24   **Q**    Back on July the 22nd of 2007, who were you living

25        with at that time?

**JA324**

James Reddick - Direct by Ms. Weiss

159

1    A    Nobody.  I was staying in a motel.

2    Q    Okay.  And did you spend some time at the park at

3         that time?

4    A    Yes, ma'am.

5    Q    Do you still like to spend some time at the park?

6    A    Yes, ma'am.

7    Q    And are you friends with the people that hang out

8         down there?

9    A    Yes, ma'am.

10   Q    Back in July, on July 22nd of '07, were you steadily

11        employed?

12   A    Yes.

13   Q    Who were you working with?

14   A    I was working for Campbell Roofing through Action

15        Labor.

16   Q    Okay.  And did you ever -- did you have the

17        opportunity to know Clinton Folkes?

18   A    Yes, ma'am.

19   Q    And how did you get to know him?

20   A    He was working for Campbell Roofing through Action

21        Labor.

22   Q    Okay.  Now, just to cover this, just to get it out of

23        the way, you actually have a history with law

24        enforcement, with getting in trouble with the law?

25   A    Yeah.

James Reddick - Direct by Ms. Weiss

160

1   Q   Is that right?

2   A   Used to.

3   Q   Used to.  Back in 1993 you had an attempted armed

4       robbery conviction.  And back in '95 you had a

5       burglary third, a burglary second convictions?

6   A   Correct.

7   Q   And let's see.  In 2000 a breach of trust?

8   A   Yes, ma'am.

9   Q   And 2003 breach of trust?

10  A   No, ma'am.

11  Q   No?

12  A   Just one breach of trust.

13  Q   Just one breach of trust?  Okay.  But you have a

14      history of that.  But that's all.  You don't have

15      anything since 2003?

16  A   No, ma'am.

17  Q   Okay.  And has your life changed since 2003?

18  A   Yes, ma'am.

19  Q   And tell the jury about that.

20  A   I used to be out of control, drugs and just running

21      wild.  I have settled down and trying to do the right

22      thing now.

23  Q   So you're now working for the V.A.  At the time you

24      were working for Campbell Roofing.  Is there a type

25      of knife that you used on a regular basis with

James Reddick - Direct by Ms. Weiss

161

1      Campbell Roofing?

2  A   There is two types.

3  Q   Okay.  Tell the jury a little bit -- I know you've

4      educated us a little bit on the two different types

5      of roofs and the two different types --

6  A   I worked on a hot tar roof.  I was actually the

7      kettle man and I ran the kettle.  So I did a lot of

8      cutting the paper that goes on the roof.  If anybody

9      knows anything about hot tar, you put tar into the

10     paper --

11 Q   Make sure you speak up a little bit slower so

12     Ms. Williams can actually hear you.

13 A   Oh.  And you put paper, tar, paper, tar.  So it was

14     my job to cut strips of paper.  So I always had a

15     utility knife that was closed and I could hook it up

16     to my belt.  That's what I carried seven days a week.

17 Q   And what's the other type of roof?

18 A   There is a metal roof that you put metal over the top

19     of wood.  And you use a hawk blade, a blade with a

20     hook in it.  And it has a fixed handle.  The ones

21     that we had had fixed handles.

22 Q   I show you what's been marked as State's Exhibit 25.

23     Do you recognize this?

24 A   Yeah.  That's a roofing hawk blade.

25 Q   It's a roofing hawk blade.  And this would be used

James Reddick - Direct by Ms. Weiss

162

```
 1        for which type of roof?
 2   A    Metal.
 3   Q    Metal roof.  But you worked on the hot tar roof?
 4   A    Yes, ma'am.
 5   Q    Did Mr. Clinton Folkes also work for Campbell
 6        Roofing?
 7   A    Yes, ma'am.
 8   Q    Which type of roof did he work on?
 9   A    Hot tar.  He started on hot tar.  He tried to
10        transfer to the metal roof.  Well, he worked on the
11        metal roof for a couple of days while we were rained
12        out.  They can do metal roofs in the rain but we
13        couldn't do hot tar in the rain.
14   Q    Would you have to have this type of knife to work on
15        a metal roof?
16   A    Yes, ma'am.
17   Q    Did you ever see Clinton Folkes with this type of
18        knife?
19   A    Yes, ma'am.
20   Q    Did you have any problems with Clinton Folkes?
21   A    Not that day.
22   Q    Did you ever have any arguments or any beef with him,
23        any reason that you all had problems?
24   A    No, ma'am.
25   Q    Okay.  Would you consider him one of your friends,
```

**JA328**

James Reddick - Direct by Ms. Weiss

163

1       just as anybody else in the park would have been your

2       friend that day, prior to that day?

3   A   Yes, ma'am.

4   Q   Now, did something happen on July 22nd that changed

5       that relationship?

6   A   Yes, ma'am.

7   Q   Okay.  Tell us a little bit about that day.  That was

8       a Sunday.  What were you doing in the park?

9   A   I had just came home from -- well, I just came back

10      to the park from church and then steady be going back

11      to my room.  I decided to hang in the park with some

12      of the other guys that, you know, I associated with

13      and just chill out, you know.  And --

14  Q   Had you been drinking that day?

15  A   I don't drink, period.  I haven't had a drink since I

16      was 15 and I'm 53 now.  So alcohol wasn't a factor

17      for me.

18  Q   Had you been using any drugs that day?

19  A   No kind of drugs.

20  Q   And did you have the opportunity to see Clinton

21      Folkes?

22  A   Yes, ma'am.

23  Q   When did you first see him?

24  A   I was sitting in the park.  I just got some ice cream

25      from the ice cream man.  I was sitting there eating

James Reddick - Direct by Ms. Weiss

164

| | | |
|---|---|---|
| 1 | | ice cream.  And he walked up and said -- |
| 2 | Q | What was his demeanor when he walked up? |
| 3 | A | He was intoxicated. |
| 4 | Q | And was he loud or quiet? |
| 5 | A | He was loud. |
| 6 | Q | Okay.  And what was he saying to you? |
| 7 | A | Everything about the child of God.  You know, he was |
| 8 | | calling me all kind of names, this and that.  And |
| 9 | | like I said, I'm from Philadelphia.  So he said |
| 10 | | everybody from Philly is this, P's.  And so I said, |
| 11 | | you see a P, come get some. |
| 12 | Q | So he came up to you out of nowhere? |
| 13 | A | Yeah.  Yeah.  We were sitting there.  I had a New |
| 14 | | York hat on.  And I think it offended him because he |
| 15 | | is from New York.  I'm from Philadelphia.  He asked |
| 16 | | me why would I have on a New York hat.  I told him |
| 17 | | plain and simple, it matched my outfit. |
| 18 | Q | So when he came up to you, how close did he get to |
| 19 | | you? |
| 20 | A | As close as this mike is. |
| 21 | Q | As close as that mike is?  And what was he saying |
| 22 | | when he was in your face? |
| 23 | A | That I was a P and a B and he was going to do this |
| 24 | | and he was going to do that.  And I just -- |
| 25 | Q | Now, did you have any weapons on you? |

**JA330**

James Reddick - Direct by Ms. Weiss

165

1   A   No, ma'am.

2   Q   And did you think he was about to do anything?

3   A   Not right then.  Because I had sat down.  I just got

4       -- I didn't even want to hear it no more.  I sat down

5       and he was just kept going.  And he called me a few

6       more names.  And I got frustrated and I stood up and

7       said, "Well, come get some."  He reached in his back

8       pocket and pulled --

9           MR. O'NEIL:  Objection, Your Honor.  There's

10      been no temporal connection.

11          THE COURT:  Pardon me.

12          MR. O'NEIL:  There's been no temporal

13      connection, Your Honor.

14          THE COURT:  What kind of connection?

15          MR. O'NEIL:  Time connection.  I apologize.

16          THE COURT:  I don't know what you mean any time

17      connection.  I'm going to overrule your objection.

18  A   And he reached in his pocket and I seen him pull the

19      handle of that hawk blade out.  So I threw my hands

20      up in the air and said, "Okay.  You know, you got it.

21      I'm going to let it go."  I backed off.

22  Q   And what did you see him do next?

23  A   Rakeem (phonetic) was laying on the blanket beside

24      the chair I was sitting in.  Him and Clayton started

25      arguing, or Clayton started arguing with him.

James Reddick - Direct by Ms. Weiss

166

| | | |
|---|---|---|
| 1 | Q | What was he saying?  What did he start saying to -- |
| 2 | A | The same thing.  He was calling him B's and P's and |
| 3 | | this and that.  He was laying on the ground.  So I |
| 4 | | think he felt that, you know, he was overpowered |
| 5 | | because Clinton was standing over the top of him.  So |
| 6 | | he stood up. |
| 7 | Q | Okay.  Do you think -- is there any reason that he |
| 8 | | would have seen the knife? |
| 9 | A | No.  He had it in his back pocket. |
| 10 | Q | Okay.  So there is no reason that the victim would |
| 11 | | have seen the knife? |
| 12 | A | No, ma'am. |
| 13 | Q | Okay.  So keep going.  I'm sorry.  So he went over to |
| 14 | | him, and what did he say? |
| 15 | A | And they just started arguing.  And Hakim (phonetic) |
| 16 | | told him just to back up and get out of his space. |
| 17 | | You know, "Back up a little bit, you're too close." |
| 18 | Q | How close did you see he him get to Karem? |
| 19 | A | About from here to here. |
| 20 | Q | Okay. |
| 21 | A | So Akeem (phonetic) told him to back up.  You know, |
| 22 | | "You're getting a little bit too close.  You're |
| 23 | | getting in my space.  I don't want no trouble.  We're |
| 24 | | just chillin', you know, having a good time."  And |
| 25 | | they kept exchanging words.  And Clinton had a beer |

**JA332**

James Reddick - Direct by Ms. Weiss

167

1    in his hand at the time.  And he tried to hit Akeem
2    with the beer.
3  Q  Okay.
4  A  And he missed.
5  Q  Beg the Court's indulgence just one minute.  All
6    right.  Did you see what type of beer it was?
7  A  No, not really.
8  Q  Okay.  But you saw it was a beer bottle?
9  A  It was beer in a brown bag.  He had it in a bag.  And
10    the bag I think was wet, and that's how it slipped
11    out of his hand.
12  Q  And where did it go?
13  A  On the ground.
14  Q  Okay.  And then what happened next?
15  A  After he dropped the beer, he swung.  He hit Akeem in
16    the eye.
17  Q  Okay.
18  A  And Akeem hit him twice and knocked him down.
19  Q  So that was all pretty quick?
20  A  Yeah.
21  Q  So he tries to hit him with the beer bottle, throws
22    that, punches him in the eye, and then Karem hits him
23    pretty quick?
24  A  Twice.
25  Q  Twice.  And he goes down.  Did you see what happened

James Reddick - Direct by Ms. Weiss

168

1       next?

2   A   Yeah.  Keem (phonetic) just stood over the top of him

3       and he seen him reaching in his back pocket.  So

4       Akeem tried to grab his right hand.  But when he

5       pulled the hawk blade out of his pocket, he missed

6       his hand, and that's when he got hit across his

7       throat.  And then he grabbed it.  He was already cut

8       across his throat and he grabbed his hand.  He put it

9       in the other hand and hit him across his arm I think

10      three or four times.  And Akeem just ran off and

11      grabbed it.  He was holding his neck.

12  Q   Did you see the knife in his hand?

13  A   Yeah.  I seen him when he cut him.

14  Q   Did you see how he was holding the knife?

15  A   Yeah.

16  Q   Can you show the jury how he was holding the knife?

17  A   Like this.  And he reached up and pulled it down

18      across his throat, across the side of his neck.

19  Q   Did it appear to you that he was aiming for anything

20      in particular?

21          MR. O'NEIL:  Objection, Your Honor.

22          MS. WEISS:  It's his opinion.

23          THE COURT:  Well, he can tell what he observed.

24      He's not going to opine whether he was aiming or

25      something.  Sustained.

James Reddick - Direct by Ms. Weiss

169

1       **MS. WEISS:** Thank you, Your Honor.

2  Q    So he was holding the knife in his hand.  He reached

3       up and cut Karem across the throat?

4  A    Yes, ma'am.

5  Q    Did you see Karem bleeding?

6  A    Yes.

7  Q    Did you actually see the mark on his neck?

8  A    I seen an open hole in his neck.

9  Q    And what did you see happen next?  Or what did you

10      hear?  Did you hear anything?

11 A    Akeem ran over.  He got on the phone.  And there was

12      a guy out there throwing a football with his little

13      boy.  And he called the police.  A couple of other

14      people called the police.  We walked over to Akeem.

15      And that's when I seen his neck was lanced open.  And

16      we tried to cover it up until the ambulance got

17      there.  And they took him to the hospital.  Clinton

18      walked back over.  He said, "It ain't over.  I should

19      have killed you."  And then he punched Tiffany in the

20      back and ran out through the top of the park.

21 Q    Okay.  Now, did you know Clinton by name?

22 A    Yeah.

23 Q    And about how long had you known him?

24 A    I started working for Campbell January the 2nd.  I

25      think he started in March.  And he ended up in

**JA335**

James Reddick - Direct by Ms. Weiss

170

1     April -- I mean, July when the incident started

2     happening.

3  Q  Okay.  And is there any question in your mind who the

4     person was that cut Karem Jones that day?

5  A  No.  I went to work with Clinton every day.

6  Q  And do you see that person in the courtroom today?

7  A  Yes, ma'am.  Sitting right there.

8  Q  Can you describe him for the court reporter?

9  A  He's sitting inbetween the two gentlemen with the

10     pink shirt, I guess it's a pink shirt, and suit

11     jacket on.

12        *THE COURT:*  All right.  He's identified the

13     defendant.

14        *MS. WEISS:*  Thank you, Your Honor.

15  Q  You said that Karem was intoxicated?

16  A  No.  Karem wasn't.

17  Q  I mean not Karem.  I'm sorry.  That Clinton was

18     intoxicated?

19  A  Yeah.

20  Q  And how would you describe his demeanor throughout

21     this whole thing?

22  A  I mean, he was -- he was loud.  He was prancing

23     around like he can beat the world.  And he was

24     looking for trouble and he got it.

25  Q  And what did you think was going to happen when he

**JA336**

James Reddick – Direct by Ms. Weiss

171

1          reached in his pocket for the knife?

2               MR. O'NEIL:  Objection, Your Honor.  Relevance.

3               THE COURT:  Pardon me?

4               MR. O'NEIL:  Relevance to what this witness

5          thought was going to happen.

6               THE COURT:  Well, I'm going to let him testify

7          about what it appeared to him.  Overruled.

8               MS. WEISS:  Thank you, Your Honor.

9     Q    What did it appear to you was going to happen when he

10         reached in his pocket and grabbed that knife?

11    A    At me?

12    Q    Yes.

13    A    I thought he was going to cut me.

14    Q    Okay.  And what about with Karem Jones?

15    A    Well, he did cut him.

16    Q    And was there a lot of blood?

17    A    Yeah.  There was pretty much.

18    Q    Thank you.  Beg the Court's indulgence.  No further

19         questions, Your Honor.

20              THE COURT:  All right.

21              MR. O'NEIL:  Thank you, Your Honor.

22                    CROSS EXAMINATION

23    BY MR. O'NEIL

24    Q    Mr. Reddick?

25    A    Yes, sir.

James Reddick - Cross by Mr. O'Neil

172

| | | |
|---|---|---|
| 1 | Q | You said Mr. Folkes and Mr. Jones were arguing? |
| 2 | A | Yeah. |
| 3 | Q | And you were arguing with Mr. Folkes as well? |
| 4 | A | Well, he was arguing with me. |
| 5 | Q | How close were to you Mr. Folkes and Mr. Jones? |
| 6 | A | As close as me and you are right now. |
| 7 | Q | And you said Mr. Folkes swung and hit Mr. Jones once? |
| 8 | A | After he tried to hit him with the beer bottle, the |
| 9 | | beer bottle slipped out his hand.  Then he punched |
| 10 | | him in the eye.  And Akeem hit him two times and |
| 11 | | knocked him down. |
| 12 | Q | So Mr. Jones hit Mr. Folkes twice? |
| 13 | A | Twice. |
| 14 | Q | And Mr. Folkes fell down? |
| 15 | A | Right. |
| 16 | Q | And then did you see Mr. Jones get on top of Mr. |
| 17 | | Folkes? |
| 18 | A | He just stood there. |
| 19 | Q | Stood over him like this? |
| 20 | A | Yeah.  And then he reached in -- Clinton reached in |
| 21 | | his pocket.  And when he pulled it out, Mr. Jones |
| 22 | | tried to grab his arm to keep him from coming up with |
| 23 | | it because he was bent over him.  When he bent over |
| 24 | | Clinton to grab the knife, Clinton hit him across his |
| 25 | | neck. |

JA338

James Reddick - Cross by Mr. O'Neil

173

1    Q    So you're saying Mr. Jones bent over Mr. Folkes?

2    A    After he pulled the razor out of his pocket.

3    Q    He grabbed his arm?

4    A    He tried to be grab it and missed.

5    Q    And that's when Mr. --

6    A    And that's when Mr. Folkes cut him across the arm, I

7         mean his neck.

8    Q    So Mr. Jones would have seen the knife at that point?

9    A    No.  I don't think he seen it.

10   Q    But you saw it?

11   A    I knew he had it.

12   Q    But you saw it though?  Did you see it?

13   A    Did I see it?

14   Q    Yeah.

15   A    Yeah, I seen it.

16   Q    And you were standing about this far away?

17   A    Yes.

18   Q    Okay.  So if you saw it, Mr. Jones would have saw it?

19   A    He should have saw it.

20   Q    Where were you when the police arrived?

21   A    Sitting in the park.

22   Q    Did the police talk to you that day?

23   A    No, they didn't.

24   Q    And you say you heard Mr. Folkes come back up to

25        where you all were standing?

JA339

James Reddick - Cross by Mr. O'Neil

174

1   A   No.  He never came back up to where we were standing.

2       We were all -- well, he never -- see, Mr. Jones ran

3       away from us because we was bleeding.  Clinton was

4       still standing there.

5   Q   Okay.

6   A   That's when he hit Tiffany and hollered at him, told

7       him he should have killed him, it ain't over with.

8       And he punched Tiffany in the middle of her back and

9       then he took off running.

10  Q   Did you ever tell the police that?

11  A   They never asked me.

12  Q   Did you ever tell them?

13  A   No, I didn't.

14  Q   Did you ever give them a statement?

15  A   No, sir.  They made us leave.  They made everybody

16      leave from around the area.  They said it was a crime

17      scene so they made everybody leave.

18  Q   Did you tell them you had just witnessed a crime?

19  A   They have never said anything to me.

20  Q   I'm asking what you told him.  Did you tell them you

21      had just witnessed a crime?

22  A   No, sir, I did not.

23  Q   You never gave any statement about what you said

24      happened?

25  A   No, sir.

**JA340**

James Reddick - Cross by Mr. O'Neil

175

1   Q   And you say you had an attempted armed robbery in
2       '93?
3   A   I don't remember when it was.  She's got the paper.
4       It's been a while ago.
5   Q   And you have a burglary second degree.  And you have
6       a breach of trust?
7   A   Correct.
8   Q   Now, you say you carry a knife with you?
9   A   I used to when I was working roofing.  I don't carry
10      a knife any more.  I don't carry any weapons.
11  Q   But you were carrying a knife back then?
12  A   I was doing roofing.
13  Q   So you were carrying a knife?
14  A   No.  I was carrying a box cutter.
15  Q   A box cutter?
16  A   Yeah.
17  Q   Now, you say you worked with Action Labor?
18  A   Yes, sir.
19  Q   And you were doing roofing jobs for Action Labor?
20  A   Campbell Roofing.
21  Q   Campbell Roofing?
22  A   Mm-hmm (affirmative).
23  Q   And you said you were working on a hot tar roof?
24  A   Tar roof.
25  Q   And Mr. Folkes was working on a hot tar roof?

JA341

James Reddick - Cross by Mr. O'Neil

176

```
 1    A    Yes, sir.
 2    Q    And you said you don't use these type of knives on a
 3         hot tar roof?
 4    A    No, sir.
 5    Q    Does Action Labor supply those tools when you're
 6         working at these job sites?
 7    A    No, sir.  Not a razor they don't.
 8    Q    Does the job sites supply tools for you?
 9    A    No.
10    Q    So the job site don't give you those tools?
11    A    Not on hot tar.
12    Q    Okay.  Beg the Court's indulgence, Your Honor.
13         Nothing further, Your Honor.
14              THE COURT:  Anything further?
15              MS. WEISS:  Very briefly, Your Honor.
16                   REDIRECT EXAMINATION
17    BY MS. WEISS
18    Q    You say that you worked on hot tar and Clinton worked
19         on hot tar.  But you also said that Clinton worked on
20         the metal roofs?
21    A    Yeah.  When we had rain days, he would go over on the
22         metal roof.
23    Q    So he had to have one of these to go do that?
24    A    They issued those on the metal roof, and you're
25         supposed to turn them in when you leave, when you get
```

**JA342**

James Reddick - Redirect by Ms. Weiss

177

 1      off from work.  You're supposed to turn them in.

 2   Q   So he had one of these in his hands when he was

 3      working on metal roofs?

 4   A   Yes, ma'am.

 5   Q   And on this Sunday afternoon, July 22nd, 2007, were

 6      you carrying your box cutter?

 7   A   No, I was not.

 8   Q   So were you armed at all?

 9   A   No, ma'am.

10   Q   But was Clinton Folkes armed?

11   A   Yes, ma'am.

12   Q   Is this the knife, a similar knife to this that he

13      had in his hand?

14   A   Similar to that; yes, ma'am.

15   Q   Is there any question in your mind?

16   A   No, ma'am.

17   Q   Thank you.

18          THE COURT:  Anything further?

19          MR. O'NEIL:  Briefly, Your Honor.

20                RECROSS EXAMINATION

21   BY MR. O'NEIL

22   Q   What color was the knife you saw Mr. Folkes had?

23   A   It was a brown handle just like that and steel.

24   Q   It was a brown handle?

25   A   Like that right there, just like that.

James Reddick - Recross by Mr. O'Neil

178

1    Q    Just like this?

2    A    Just like that.

3    Q    Brown handle?

4    A    Just like that.

5    Q    No question about it?

6    A    No question about it.

7    Q    And you said when you get these knives at the job

8         site you have to turn these back in?

9    A    On the metal roof.

10   Q    On the metal roof you have to turn these back in?

11   A    You're supposed to turn them in.

12   Q    They have a supervisor to make sure you turn these

13        back in?

14   A    I don't work on the metal roof.

15   Q    So you don't know whether they have a supervisor or

16        not?

17   A    I know they have a supervisor, but I don't know how

18        close they scrutinize their equipment.

19   Q    But you're supposed to turn these back in?

20   A    Supposed to; yes, sir.

21   Q    No further questions.

22        **THE COURT:**  All right.  Thank you, sir.  You may

23        step down.

24        **MS. WEISS:**  Your Honor, may this witness be

25        excused?

**JA344**

James Reddick - Recross by Mr. O'Neil

179

1           **THE COURT:**  He may.

2           **MR. O'NEIL:**  No objection, Your Honor.

3           **THE COURT:**  You're free to leave.

4           **MR. ROGERS:**  Your Honor, the State calls Jerome

5       Patrick.

6           JEROME PATRICK, after being duly sworn,

7   testifies as follows:

8           **THE CLERK:**  Have a seat in the witness stand and

9       give the court reporter your name.

10          **WITNESS:**  Jerome Patrick.

11                      DIRECT EXAMINATION

12  **BY MR. ROGERS**

13  **Q**    Good afternoon, sir.  How you doing today?

14  **A**    All right.

15  **Q**    Where were you born?

16  **A**         '. 1961.

17  **Q**              . '61?

18  **A**    Yes, sir.

19  **Q**    And were you born in Columbia?

20  **A**    No. · Charleston.

21  **Q**    Charleston.  So you consider yourself a South

22      Carolina man?

23  **A**    Yes.

24  **Q**    Okay.  Did you -- when did you first come to

25      Columbia?

Jerome Patrick - Direct by Mr. Rogers

180

1    A    About four years ago.

2    Q    About four years ago?

3    A    Yes, sir.

4    Q    So you've been in Columbia about three years before

5         the incident we're here today about?

6    A    Yes.  Yes.

7    Q    Okay.  Now, when you came to Columbia, did you have a

8         particular place to stay?

9    A    Yes.  My brother is a minister here.

10   Q    Okay.

11   A    And I moved up in the northeast part of Columbia from

12        Northtrace Smith, Summerton.

13   Q    Okay.  And did you hang out in downtown much?

14   A    Yeah.  I came downtown because that was ministry, the

15        street ministry as far as my brother's church.  I was

16        on the street ministry.  So I stayed just about every

17        day in the park, just about every day on the park.

18   Q    And while you were in the park, did you ever see the

19        defendant, Mr. Folkes?

20   A    Oh, yes.  We were friends.  Yes, yes.

21   Q    About how long had you known him before this date?

22   A    Oh, we had known each other a good little while

23        because we worked together and we used to be down in

24        the park for a while.  Yes, sir.

25   Q    Now, before we get too much into what happened on the

Jerome Patrick - Direct by Mr. Rogers

181

1       date in question today; I'm not trying to embarrass

2       you, but have you ever had a problem with the law

3       before?

4   A   Oh, yes, sir.

5   Q   Been arrested a couple of times?

6   A   Yes, sir.

7   Q   Okay.  Now, like I said, I'm not trying to embarrass

8       you, but I've got to go through your record a little

9       bit while we're here.

10  A   Oh, that's okay.

11  Q   Okay?

12  A   Yes, sir.

13  Q   Did you have a simple assault back in the eighties?

14  A   Yes, sir.

15  Q   Furnishing contraband in '89?

16  A   Yes.  Contraband.

17  Q   There was a driving under -- well, hang on.  An auto

18      breaking in '95?

19  A   Yes.  I did that.  Yeah.  Through a friend.

20  Q   What about a false police report?

21  A   Yes.

22  Q   Do you remember something like that?

23  A   Yes.  Greenville.

24  Q   Okay.  I'm sorry.  I just wanted to make sure I

25      didn't cut you off.  I'm sorry.

**JA347**

Jerome Patrick - Direct by Mr. Rogers

182

1    A    No.  No.

2    Q    In '98 did you have a giving false information

3         charge?  Do you remember something about that?

4    A    I think so.  '98.

5    Q    Okay.  In 2000 did you have a shoplifting charge?

6         Does that sound familiar?

7    A    Yes.  It sounds familiar.

8    Q    Okay.  Did you have another one in 2001 you think?

9    A    Yeah.  Back to back.

10        COURT REPORTER:  Could you move up and speak

11        into the microphone, please.

12        WITNESS:  Oh, yes.

13        COURT REPORTER:  And scoot your chair up there,

14        please.

15   Q    We just want to make sure everybody can hear you.

16        WITNESS:  Oh, okay.  Can you hear me now?

17   Q    Yeah.  Just try and speak up for me.

18   A    Okay.

19   Q    Then I show another property offense in 2001?

20   A    Yes.  Yes.  That's right.

21   Q    Okay.  And then in 2002 I see a financial transaction

22        card fraud.

23   A    Yes.

24   Q    Does that sound right?

25   A    Yes, sir.

Jerome Patrick - Direct by Mr. Rogers

183

1    Q    And then maybe another shoplifting in 2004?

2    A    Yes, sir.

3    Q    And then you had a little trouble in 2005.  I'm

4         showing an interfering with officers, hindering an

5         officer?  Or it became -- it looks like it came with

6         a receiving stolen goods?

7    A    Yeah.

8    Q    Two counts of receiving stolen goods?

9    A    Yes.

10   Q    And then a driving under suspension?

11   A    Uh-huh (affirmative).

12   Q    So you had those arrests?

13   A    Yes.

14   Q    Okay.  But since that time in 2005, you haven't been

15        convicted of anything.  Is that true?

16   A    That's true.

17   Q    Okay.  Do you have any pending charges right now?

18   A    Yes.

19   Q    What pending charges do you have?

20   A    Breach of trust.

21   Q    Breach of trust?

22   A    (Nods head affirmatively).

23   Q    Is that here in Richland County?

24   A    Yes.

25   Q    Now, we're not here to talk about that today.

Jerome Patrick - Direct by Mr. Rogers

184

1   A   Yes, sir.

2   Q   But I just wanted to ask you a couple of questions.

3       Have we offered -- my office, the Solicitor's Office,

4       have we made any promises to you related to that

5       charge?

6   A   Oh, no.  No, sir.

7   Q   When we've been talking to you about this case, have

8       we even talked about that charge?

9   A   No.

10  Q   So as you sit here today, you're not expecting

11      anything from us --

12  A   No.

13  Q   -- relating to that charge?

14  A   No, sir.

15  Q   I just want to make sure we go ahead and get that out

16      of the way.  Now, let me direct you back to July

17      22nd, 2007.

18  A   Okay.

19  Q   And I think I heard you say that was your birthday.

20      Is that correct?

21  A   Yes.  That's correct.

22  Q   Okay.  And how did you start your birthday that day?

23  A   I went to church.

24  Q   Was that your brother's church?

25  A   Yes.

**JA350**

Jerome Patrick - Direct by Mr. Rogers

185

1   Q   How did you get there?

2   A   He came to pick us up from Finlay Park.  He comes

3       every Sunday morning.  His minister comes to pick up

4       every Sunday morning.

5   Q   Does he have a van or a truck or something?

6   A   Yes.  He has a van.

7   Q   Did anybody go with you that day?

8   A   Yes.  Karem went with us also.

9   Q   The gentleman sitting behind me?

10   A   Yes.

11   Q   And who else went with you, sir?

12   A   A couple of other people from the park.

13   Q   Do you know Retalia?

14   A   Yes.  Retalia.

15   Q   Did she go with you?

16   A   Yes.  She went to church also.

17   Q   Okay.  Did you -- after you went to church, what did

18       you do?  Did you guys eat up there?

19   A   Yeah.  We ate at the church and then we came back and

20       we came back to the park.  And that's when we parked

21       and we went to Salvation Army to go back.

22   Q   So you came back.  Is it Finlay Park you're talking

23       about?

24   A   Yes.  Yes.

25   Q   So you came back to Finlay Park for a little bit?

Jerome Patrick - Direct by Mr. Rogers

186

1    A    Yes.

2    Q    How long would you say you stayed there before you

3         went back to Salvation Army?

4    A    Church usually gets out about 12, and we stayed there

5         for a couple of hours and then we went up to

6         Salvation Army.

7    Q    And what were you doing up there at the Salvation

8         Army?

9    A    They fed again at Salvation Army.  We met a lot of

10        people.  It was my birthday.  So I didn't want to

11        just lay around the park.  I just wanted to get

12        around.

13   Q    That sounds good.  Did anybody go with you back to

14        the Salvation Army for dinner?

15   A    It was me and Retalia that went back up there.  And

16        we ate.  But on the way coming back, it was me,

17        Retalia and Clinton.  We came back together.

18   Q    But he didn't eat dinner with you?

19   A    No.

20   Q    You just met him up there?

21   A    Yeah.  We met him up there.  Yeah.

22   Q    And you said that you'd known him for a couple of

23        years previously.  Is that true?

24   A    Well, we had seen each other and then we worked

25        together.  All of us worked together at Action Labor.

Jerome Patrick - Direct by Mr. Rogers

187

1    Q    So how long would you say that you would estimate
2         that you knew him before that date?  Are we talking
3         months?  Years?
4    A    Close to a year.  Yeah.
5    Q    Now, you said you worked with him.  What kind of work
6         would you do with him?
7    A    Oh, we used to all catch jobs at Action.  We did a
8         bunch of different type.  But actually worked
9         together, we did roofing together.
10   Q    Okay.
11   A    Yes.
12   Q    What type of roofing?
13   A    Well, I had been on the metal roof and he had been
14        started on the -- he is the one who introduced me to
15        the roofing thing because he was doing the hot tar
16        roof and I was doing -- and he said, "They've got a
17        bunch of roofing jobs."  So by the time I got there,
18        all the hot tar was already full.  So they had the
19        metal roof.  So I went to the metal roof.  And then
20        he came over to the metal roof with me.
21   Q    So you worked with him on the metal roofing?
22   A    Yes.
23   Q    But not the hot tar roof?
24   A    Not the hot tar roof.
25   Q    Do you know what company that was through?

Jerome Patrick - Direct by Mr. Rogers

188

1    A    Campbell.  Campbell Roofing.

2    Q    When you were working with him on those roofing

3         sites, did you have to use any knives?

4    A    Yes.

5    Q    Any type of blades?

6    A    Yes, yes, yes.  Yes, yes, yes.

7    Q    What type of blade -- do you know what type of blade

8         was used on the tar roof?

9    A    Probably the --

10   Q    I mean, if you don't know, that's okay.  But do you

11        know what type of blade you used?

12   A    Probably the straight blade, a straight one.

13   Q    Was there a special blade that was used on the metal

14        roof?

15   A    Yeah.  To cut the styrofoam, yes.  There was two

16        types.  We used a straight blade and a hawk blade,

17        one that was kind of thick.

18   Q    I'm going to show you two things.  One is Defense

19        Exhibit 1 and one is State's Exhibit 25.  Defense

20        Exhibit 1 is the black thing in my hand.  Do you

21        recognize this type of knife?

22   A    Yeah, I recognize that type.

23   Q    How would you describe that?

24   A    Straight blade.  That's a straight, short blade.

25   Q    A straight, short blade?

JA354

· Jerome Patrick - Direct by Mr. Rogers

189

1    A    Yeah.

2    Q    And you used these type of blades on your job site?

3    A    Sometimes.  Yeah.  We was using that at first.  But

4         it wasn't cutting all the way through the thickness

5         of it.  And then we went to the hawk blade because

6         that works better because it was thick styrofoam.

7    Q    So this knife, State's Exhibit 25, the one with the

8         brown handle --

9    A    Yes.

10   Q    -- you used this one?  This one works better on metal

11        roofs?

12   A    Yes.  It worked better.  Yeah.

13   Q    You have one of these when you were working there?

14   A    Yes.

15   Q    By these I mean State's Exhibit 25.  You had one of

16        these?

17   A    Yes.

18   Q    This hook knife, did ever see the defendant with one

19        of these?

20   A    Yeah.  We both had one.  We been sharing one at one

21        time and then they got a couple of them and we all

22        had one.  Well, they had it on the job and we all had

23        used one.

24   Q    So both of you used this knife?

25   A    Yes.

Jerome Patrick - Direct by Mr. Rogers

190

1    Q    This hook knife on the metal roofs?

2    A    Yes.

3    Q    Did you see him ever have that knife outside of work?

4    A    Yes. Yes.

5    Q    Okay. Did he to your knowledge ever have knives on

6       him?

7    A    Well, I know --

8    Q    Like when you were just hanging out in the park?

9    A    Just the regular razor. But then after that, you

10      know, after we had got those kind, I guess he had

11      that kind, too. I know he had that one.

12        *THE COURT:* You need to speak up, please.

13    A    I left mine on the job. And, you know, we used it

14      just about every day.

15    Q    New, let's go back to July 22nd, 2007.

16    A    Yes.

17    Q    After you finished eating at the Salvation Army, I

18      think you said that the defendant and Retalia and

19      yourself --

20    A    Yes.

21    Q    -- went from the Salvation Army down to Finlay Park?

22    A    Yes.

23    Q    Do you remember what about time of the day that was?

24    A    That was after the meal, after 4:30. About 5

25      something because they start feeding about 5:30.

**JA356**

Jerome Patrick - Direct by Mr. Rogers

191

1   Q   Was it still daylight outside?

2   A   Yes, it was still daylight.

3   Q   Do you remember what the defendant was wearing at

4       that time, what shirt he had on?

5   A   A striped shirt.  Yes.

6   Q   A striped shirt?

7   A   Yes.

8   Q   Sir, I'm going to show you what was previously marked

9       as State's Exhibit 24.  Does this shirt look familiar

10      to you?  Does that look familiar at all?

11  A   Pretty much, yes.

12  Q   Pretty much?

13  A   Yes, sir.

14  Q   Where do you think you might have seen this shirt

15      before?

16  A   On Clayton.

17  Q   On Mr. Folkes?

18  A   Yeah.

19  Q   Does this look like the shirt he was wearing on

20      July 22nd, 2007?  Or, yeah.  2007?

21  A   Yes.

22  Q   Okay.  How long did it take you guys to walk from

23      Salvation Army down to Finlay Park?

24  A   Oh, about a couple of minutes.  It's only a few --

25      I'd say about five minutes at the most, five or six

Jerome Patrick - Direct by Mr. Rogers

192

```
 1        minutes.  It don't take that long.
 2   Q    And while you were walking, did you have anything to
 3        drink at that time?
 4   A    Well, I don't drink.  But Mr. Clayton had a couple of
 5        Cobras, those Cobra beers.
 6   Q    King Cobra beers?
 7   A    Yes.
 8   Q    You said he had a couple.  Do you think he probably
 9        had two or more?
10   A    Well, I knew he had it in a bag.  Well, he was
11        drinking -- we was drinking -- he was drinking one.
12   Q    But he had a bag him that had something in it?
13   A    Yeah.  Yeah.  I believe he had some more in the bag
14        at the time.
15   Q    But you said you didn't drink?
16   A    No, no, no.  Not that day, no.
17   Q    Did you have anything else that might have blurred
18        your thoughts that day?
19   A    Oh, no.  Not that day.
20   Q    Once you got to the park, what area of the park did
21        you enter first?
22   A    At the top.  We come in from the top and we came all
23        the way on down to the bottom.
24   Q    All right.  Now, you said at the top.  I'm going to
25        show you what's previously been marked as State's
```

**JA358**

Jerome Patrick - Direct by Mr. Rogers

193

1          Exhibit 8.  Does that picture look familiar to you?

2     A    Yes.  That's up top.  That's coming in from right by

3          the Strom Thurmond building.  And that's the top.

4          And that's where the way we came in.

5     Q    So this is where you came in.  Did you -- this kind

6          of looks down Finlay Park.  Were you all walking down

7          this direction?

8     A    Yes.

9     Q    And can you kind of point -- I don't think you can

10         really see it in this picture, but can you kind of

11         point to the area where you would have been walking

12         to?

13    A    Down here.

14    Q    Down towards that grassy area?

15    A    Yeah.  Around that corner there's trees in the

16         middle, right in the middle right across from the

17         stage right in the center of the field.

18    Q    Was anybody else at the park when you guys got there?

19    A    Oh, yes.  Yes.

20    Q    A lot of people hanging out?

21    A    Yeah.

22    Q    It was a nice day?

23    A    A nice day.  Yeah.

24    Q    Now, I'm going to show you a couple of other pictures

25         here.  I'm going to start out with State's Exhibit

**JA359**

Jerome Patrick – Direct by Mr. Rogers

194

1      No. 4.  What does that look like?  Is that Finlay

2      Park?

3  A   Yes.  That's Finlay Park.

4  Q   And does this kind of show where you came from?

5  A   Yeah.  We came from up here, down past that, across

6      the field into this area over here across from this.

7      It was right over in this area.

8  Q   And you said you were meeting some people under the

9      trees?

10  A   Yes.

11  Q   Does that look like the trees you guys were --

12  A   Yes.  That's correct.

13  Q   And that's State's Exhibit 11?

14  A   Yeah.

15  Q   So can you kind of point to this area where people

16      were hanging out?

17  A   Right down here because the tree shade blocked, had

18      us out in this area right here out in front of the

19      trees.

20  Q   Just out in front of those trees?

21  A   Yes.

22  Q   Now, this is a closer look.  Is that the same tree

23      right there?

24  A   That's the same tree.  We was more right over in this

25      area right here.

Jerome Patrick - Direct by Mr. Rogers

195

1  Q   And that's over by the red mark?

2  A   Yes.

3  Q   And that's State's Exhibit -- let me look -- State's

4      Exhibit No. 10?

5  A   Yes.

6  Q   Okay.  So when you got down to that grassy area

7      underneath the trees, do you remember who was there

8      specifically?

9  A   Yes.  There were James, Tiffany.

10 Q   James.  Do you know James's last name?

11 A   Reddick.  Mr. Reddick.  Yes.

12 Q   Okay.  James and Tiffany.  Do you remember Karem?

13 A   Yes.

14 Q   Mr. Jones?

15 A   Karem was there by Tiffany.  And there were some more

16     people off to the left of that.  Mary.  All the

17     usuals would be out there.

18 Q   When you got back down to the park area down by the

19     trees, did the defendant -- were you able to observe

20     his interaction with Mr. Reddick?  James?

21 A   Yeah.  They had like a little altercation.  They had

22     some words.  And we kind of like had to separate

23     them.  Well, not really separate them.  They

24     separated theirself (sic).  They had words and they

25     separated.  And Mr. Reddick went back to sit down.

**JA361**

Jerome Patrick - Direct by Mr. Rogers

196

1      And I really couldn't see exactly because I was

2      talking to Retalia.  And right after that happened,

3      that's when I guess it escalated on to the next

4      incident.

5  Q   Before we get to that next incident, could you

6      determine who started the argument between James and

7      the defendant?

8  A   Well, Mr. Folkes had kind of like -- because James

9      was already down there and he said some words to

10     James about the hat because he had on a New York hat,

11     you know, that my fiancee gave James.  He asked him,

12     "Where did you get that hat from?"  And he told him

13     that Rita gave him that hat.  He told him he ain't

14     from no New York.  Then that kind of like escalated

15     into a little argument.

16 Q   Now, you talked about your fiancee?

17 A   Yes.

18 Q   What's her name?

19 A   Retalia Green.

20 Q   Do you call her Rita sometimes?

21 A   Rita.  Yes.

22 Q   That's the same young lady that was walking with you

23     from the Salvation Army?

24 A   Yes.  That's correct.

25 Q   I just want to make sure I've got everybody straight.

Jerome Patrick - Direct by Mr. Rogers

197

1    A    Okay.

2    Q    So after the defendant got in the argument with

3         James --

4    A    Yes.

5    Q    -- about how soon was that from the time that he got

6         in an argument with Mr. Jones?

7    A    A couple of minutes right after that, right after

8         that.

9    Q    Pretty quick?

10   A    Yeah.  Pretty -- well, not -- pretty quick, because

11        right after we calmed them down, then this happened.

12        Yeah.

13   Q    Do you remember how the incident started between the

14        defendant and Mr. Jones?

15   A    Well, Karem was lying down talking to Tiffany.  And I

16        guess once he had got through arguing with James, he

17        just turned to that direction because we was all

18        right there, if you can understand what I'm saying.

19   Q    All right there under the trees?

20   A    Yeah.  All right under the trees.  And I guess

21        because he was standing right over Mr. Hakim

22        (phonetic) at the time.  So when he turned to him, I

23        guess he was upset because of Tiffany because, you

24        know, him and Tiffany was kind of close.

25   Q    Kind of close.  Do you know if they'd ever dated?

JA363

Jerome Patrick - Direct by Mr. Rogers

198

| | | |
|---|---|---|
| 1 | A | Yeah.  They were going together.  And just I think |
| 2 | | that night before, that's when they had kind of like |
| 3 | | separated. |
| 4 | Q | So they'd broken up just before that day? |
| 5 | A | Yes.  Yes.  Just the day before. |
| 6 | Q | When Mr. Jones was talking to Tiffany, were they |
| 7 | | doing anything?  Were they touching? |
| 8 | A | No, no.  They were just talking. |
| 9 | Q | Just talking in the grass? |
| 10 | A | Yes. |
| 11 | Q | You said the defendant came up to Mr. Jones first? |
| 12 | A | Yes. |
| 13 | Q | And they had words? |
| 14 | A | Yes. |
| 15 | Q | Did there come a point when Mr. Jones stood up? |
| 16 | A | Yes. |
| 17 | Q | Did it appear to you that -- who appeared to you that |
| 18 | | started the argument? |
| 19 | A | Well, Mr. Folkes, because Mr. Jones just laying |
| 20 | | there.  And I guess he didn't like the idea of |
| 21 | | someone arguing, coming standing up over him.  And, |
| 22 | | you know, he had no control of what happened the day |
| 23 | | before just because he -- because we had just came |
| 24 | | back from church together.  Both of these are, you |
| 25 | | know, friends of mine.  And what happened was I guess |

Jerome Patrick - Direct by Mr. Rogers

199

1      he was upset because he was talking to Tiffany.  And

2      he said some words to Mr. Jones.  Then he got up.

3      And at that time everything just started happening so

4      fast.

5   Q  Okay.  So let's slow it down.  Things started

6      happening fast.  What was the first thing that

7      happened?  They got in an argument?

8   A  Yeah.  They got in an argument.

9   Q  Did it turn physical?

10  A  Yeah.  It go physical because Mr. Folkes still had

11     the beer bottle in his hand.

12  Q  Was it a glass bottle?

13  A  Yeah.  It was a glass bottle.

14  Q  One of the bigger glass bottles?

15  A  Yeah.  It was a quart bottle of King Cobra.  And he

16     swung it at him but it came out of the bag.  And then

17     at that time, that's when he had threw a jab and hit

18     Mr. Jones on the side of the head.  And --

19  Q  The bottle, was it a full glass bottle?

20  A  No.  He was drinking out of it.  Yeah.  He was

21     drinking out of it.  And --

22  Q  So the first thing was the defendant hit Mr. Jones?

23  A  Yes.

24  Q  What did Mr. Jones do after that?

25  A  Right after that, that's when he threw a -- he jabbed

Jerome Patrick - Direct by Mr. Rogers

200

1       I mean.  Well, when he throwed the bottle, he blocked

2       it, but he didn't do anything until he jabbed him

3       with a punch.  Because, see, the bottle came out of

4       the bag when he went to swing it.  And then after

5       that he pulled a jab and hit him, and then that's

6       when he retaliated, hit him two times and he fell to

7       the ground.

8  Q   So just two quick hits?

9  A   Yeah.

10  Q   When the defendant fell to the ground, what did Mr.

11      Jones do?

12  A   Mr. Jones went over him to try to hold him down to

13      let him know that it ain't what he thought it was in

14      so many words.

15  Q   What do you mean by that, it wasn't what he thought

16      it was?

17  A   Because he really thought that he was trying to go

18      with Tiffany I guess or be with Tiffany.  And knowing

19      that they all be in that park and he knowing that

20      Tiffany was his girlfriend, and that would be like a

21      disrespect thing.

22  Q   So did it look like Mr. Jones was trying to avoid a

23      fight?

24  A   Yeah.  He was trying to avoid it.  He was trying to

25      tell him, "No, no, man.  It ain't like that.  I ain't

Jerome Patrick - Direct by Mr. Rogers

201

1       trying to fight you or nothing like that."  And

2       that's when, you know, the next thing I know, I

3       thought he had just reached up and boxed him.  And

4       then after that everybody say he cut.  And then I

5       didn't really look in the hand, and then I saw the

6       knife blade and then I saw the opening.  All of that

7       was opened up.  And that's --

8   Q   Let me just stop you just there for a second.  Your

9       Honor, may the witness step down for a demonstration?

10          THE COURT:  Yeah.  You've got about two minutes

11      and we're breaking for the night.  So if you want

12      to --

13  Q   You know what?  You can keep your seat.  We'll just

14      try and keep it frequent.  Your Honor, if the Court

15      would like, we can go ahead and break now.

16          THE COURT:  All right.  Ladies and gentlemen,

17      we're going to go ahead and recess for the evening.

18      I'm going to ask you not to discuss this case while

19      you're gone tonight.  We'll start tomorrow morning at

20      9:30.  Please be prompt.  Do not be late.  And you

21      all have a nice evening.  Don't discuss the case with

22      anybody while you're gone.  We'll see you tomorrow

23      morning at 9:30.

24          (Jury out at 5:25 p.m.)

25          THE COURT:  Is Mr. Patrick under subpoena?

202

1    **MS. WEISS:** Yes, sir, Your Honor.

2    **THE COURT:** All right. Mr. Patrick, you need to

3    make sure you're here tomorrow morning so you can

4    resume the stand. Be here by about 9:15.

5    **WITNESS:** Yes, Your Honor.

6    **THE COURT:** Do not discuss the case with anybody

7    while you're gone tonight. Don't talk to anybody

8    about it. Okay?

9    **WITNESS:** Yes, Your Honor.

10    **THE COURT:** All right. You can step down. What

11    other witnesses are you all going to have in this

12    case?

13    **MS. WEISS:** Your Honor, we have two more lay

14    witnesses.

15    **THE COURT:** All right. Just tell me who they

16    are.

17    **MS. WEISS:** They are Retalia Green and Tim

18    Abney.

19    **THE COURT:** Are they just to say the same thing

20    that's been said?

21    **MS. WEISS:** No, sir, Your Honor. Just a little

22    bit different.

23    **THE COURT:** All right. Well, we don't need five

24    witnesses saying the same thing. We can condense

25    that. If they've got something else, that's fine.

2:19-cv-00760-RMG-MGB    Date Filed 07/03/19    Entry Number 14-1    Page 206 of 505

203

1     What else?  We've got Retalia and who else?

2         MS. WEISS:  Retalia Green and Tim Abney.  And

3     then --

4         THE COURT:  And then you have the investigator.

5         MS. WEISS:  Then we have the 911 just to get

6     those tapes.  Those won't be long.  And then we have

7     the responding officer also that found the shirt, the

8     officer that took them to the show-up.  The EMT.  And

9     the investigator, the doctor.  And what?  Oh, yeah.

10    The arresting officer.  All those are going to be

11    just very brief.

12        THE COURT:  So you'll finish in the morning.

13        MS. WEISS:  We should finish by lunchtime, Your

14    Honor.  Actually my doctor, I'd like to do him at

15    2:00 tomorrow morning afternoon.  He can't come in

16    until then.  But he'll be the last witness at 2:00

17    tomorrow afternoon.  He'll be very brief.

18        THE COURT:  I'm going to need to know whether

19    your client is going to testify or not.

20        MR. O'NEIL:  I don't anticipate it at this

21    point, Your Honor.

22        THE COURT:  All right.  Well, you don't have to

23    make that decision at this point.  We'll address it

24    when we get there.  All right.  Let me see you all

25    back in the office.  We'll start at 9:30 in the

**JA369**

204

1    morning.

2        (Whereupon, the proceedings are concluded for

3    the day, to be reconvened tomorrow morning)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

205

1              Tuesday, July 8, 2008

2          **THE COURT:**  All right.  Where is our witness?

3          **MS. WEISS:**  Our witness is right outside, Your

4    Honor.

5          **THE COURT:**  Do you want to get him in here?  Do

6    we have anything we need to take up this morning?

7          **MR. O'NEIL:**  Your Honor, we do have an issue not

8    with this witness but with witnesses I guess further

9    down the line, that if the State intends to introduce

10   the 911 tape, I would have an objection to part of

11   that 911 tape.  Of course it's not this next upcoming

12   witness, but I guess at a break we could take up that

13   issue with the 911 tape.

14         **THE COURT:**  What's the issue?

15         **MR. O'NEIL:**  Basically, Your Honor, there's

16   three calls on the 911 tape, one call from the

17   victim, Karem Jones.  The second call is from an

18   unidentified person.  The third call is from Tim

19   Abney, a witness on the State's witness list.

20         I have objection to the second call from the

21   unknown person based on confrontation clause issues,

22   it being cumulative, and also Crawford issues, Your

23   Honor.

24         **THE COURT:**  What do you say about that?

25         **MS. WEISS:**  Your Honor, they are 911 calls.

**JA371**

206

1    They are not made for the purpose of being testimony

2    in court.  They're made to get help.  We have a

3    records custody from 911 who says that these calls

4    are the calls that came into 911 and, I mean, they're

5    calls that are made for the purpose of getting help.

6    I think that gets around Crawford, and I think --

7        *THE COURT:*  What does the one from the unknown

8    person say?

9        *MS. WEISS:*  That there was a stabbing at the

10    park.  I mean, we can play it for you.

11        *THE COURT:*  That's all it says?

12        *MS. WEISS:*  I mean, I don't know all the

13    intricacies.  I can play it for you though.

14        *THE COURT:*  Well, I mean, have you all not

15    listened to the tape?

16        *MS. WEISS:*  We have.  That's pretty much all

17    that's on it.  I've listened to it and Mr. -- and

18    Andrew has listened to it.  So --

19        *THE COURT:*  All right.  And you have some

20    objection to that?

21        *MR. O'NEIL:*  Yes, Your Honor.  I have objection

22    to that based on Crawford, confrontation, and it

23    being cumulative.  I think the person also goes on to

24    say that the victim is bleeding really bad and some

25    other particular things I'm not exactly sure of.

**JA372**

207

1      **THE COURT:** All right. Well, I'm going to

2  exclude it. We don't need it. I mean, I don't know

3  what the issue is. We know the guy got stabbed. Is

4  that an issue?

5      **MR. O'NEIL:** No, Your Honor.

6      **THE COURT:** I mean, you know. But there's no

7  point in playing all three of them.

8      **MS. WEISS:** Okay. And also, Your Honor, just

9  while we're talking about this, I tried to cover all

10 my bases by putting three records custodians from 911

11 on the witness list. And of course two of those are

12 out of the office. The third one can't come. So

13 it's a fourth record custodian that is actually

14 coming. His name is Tim Brown. He's a records

15 custodian from 911, but he was not on the witness

16 list.

17     **THE COURT:** Do you all have an issue as to -- do

18 we need to bring a records custodian in?

19     **MR. O'NEIL:** No, Your Honor.

20     **THE COURT:** You all will stipulate that this is

21 the 911 tape?

22     **MR. O'NEIL:** Yes, Your Honor.

23     **THE COURT:** All right. Does that help you?

24     **MS. WEISS:** Yes, Your Honor. We can just play

25 it in as a stipulation that these two are 911 calls?

208

1    **THE COURT:** Stipulate that the 911 calls, these

2    were 911 calls that were received by the 911

3    operators.

4    **MR. O'NEIL:** Just so we're clear, the first one

5    we're clear but not the second one.

6    **THE COURT:** All right.

7    **MS. WEISS:** Thank you, Your Honor.

8    **THE COURT:** And you don't need the custodian if

9    you don't want them.

10   **MS. WEISS:** Okay. Thank you, Your Honor.

11   **THE COURT:** Anything else?

12   **MS. WEISS:** No, Your Honor.

13   **THE COURT:** All right. Let me get your witness

14   back up here, if we could, please, sir. All right.

15   Mr. Patrick, you didn't talk about this case since we

16   left yesterday, have you?

17   **WITNESS:** No, Your Honor.

18   **THE COURT:** All right. Let's bring the jury in,

19   if we could.

20   (Jury in at 9:37 a.m.)

21   **THE BAILIFF:** The jury is seated, Your Honor.

22   **THE COURT:** All right. Thank you very much.

23   Good morning, Ladies and Gentlemen. Nice to see you

24   this morning. Let me ask you a couple of things

25   before we get started. Did anybody have any

**JA374**

Jerome Patrick - Direct by Mr. Rogers

209

1    discussions about this case since we left yesterday

2    afternoon?  Were you approached by anyone to discuss

3    the case?  Okay.  Good.

4        Ladies and gentlemen, as you remember when we

5    broke, the State was in the process of offering their

6    witness, Mr. Jerome Patrick.  And Ms. -- who was

7    directing this?  Mr. Rogers was handling the

8    questioning of the witness.  So, Mr. Rogers, I'll ask

9    if you would please proceed, sir.

10       *MR. ROGERS:*  Thank you, Your Honor.  May it

11   please the Court.

12  Q  (By Mr. Rogers)  Good morning, sir.

13  A  Good morning, sir.

14  Q  Good to see you again this morning.  Before we get

15   back into July 22nd I'd just like to touch on

16   something for a second.  We spoke yesterday that you

17   have a pending charge up here in the Solicitor's

18   Office.  Is that correct?

19  A  Yes.  That's correct.

20  Q  Do you know when that charge -- did that charge occur

21   before or after July 22nd, 2007?

22  A  Oh.  Way after.

23  Q  And was that before or after you'd already spoken to

24   the police?

25  A  Way after.

**JA375**

Jerome Patrick - Direct by Mr. Rogers

210

1  Q  Way after?

2  A  Yeah.

3  Q  And I'd like to bring you back to July 22nd, 2007.

4     That's that we were talking about yesterday just

5     before we broke for the end of the day.  I believe we

6     left off right when you were describing the fight as

7     it occurred between the defendant and Mr. Jones.  Is

8     that correct, sir?

9  A  That's correct.

10 Q  Okay.  I'd like to start off by reiterating for the

11    jury, who threw the first punch?

12 A  Mr. --

13 Q  Mr. Jones?

14 A  No.

15 Q  Or the defendant, Mr. Folkes?

16 A  Yes.  Mr. Folkes.

17 Q  Your Honor, if it please the Court, I'd like for the

18    defendant (sic) to step down from the stand for a

19    brief demonstration.

20         *THE COURT:*  All right.

21 Q  I'm sorry.  The witness.  I think I misspoke and said

22    the defendant, Your Honor.  All right.  So we're

23    going to pretend for a second that I'm Mr. Jones and

24    you're Mr. Folkes.

25         *COURT REPORTER:*  Could they switch places,

Jerome Patrick - Direct by Mr. Rogers

211

1     please, Your Honor?

2         **MR. ROGERS:**  Yes, ma'am.  Is this better for

3     you?

4         **COURT REPORTER:**  Much better.

5  Q  Okay.  So I'm Mr. Jones and you're Mr. Folkes.  How

6     close were they standing when the first punch was

7     thrown?

8  A  He swinged (sic) the bag.  He swinged the bag about

9     right here.  And the beer came out of the bag.  And

10    then he hold his hand up, and that's when he threw

11    the first punch.

12  Q  Okay.

13        **THE COURT:**  Speak up, please, sir.

14  A  When he threw -- he had a bag with a beer in it and

15    he slung it but the beer came out of the bag.  And

16    then that's when he came back with a punch to the

17    face, and that's when Mr. Jones hit him with two

18    pieces.  Then when he went down --

19  Q  Hang on.  So the defendant threw the first punch and

20    hit Mr. Jones in the face?

21  A  Yeah.

22  Q  Okay.  At that point then Mr. Jones threw two

23    punches?

24  A  Yes.

25  Q  Where did he hit the defendant?

Jerome Patrick - Direct by Mr. Rogers

212

1   **A**   In the face.

2   **Q**   In the face.  So one, two?

3   **A**   Mm-hmm (affirmative).

4   **Q**   A right and a left?

5   **A**   Yes.

6   **Q**   From that point what happened?

7   **A**   Then Mr. Folkes went to the ground.

8   **Q**   Okay.  The defendant?

9   **A**   Yes.  He had went to the ground.  And Mr. Jones came

10   over to try to hold him down and said, "Stop.  I

11   don't want to -- we don't have to go through this

12   right here."  That's when, he came out with the blade

13   and hit him across the face and then he hit him

14   across the arm.

15   **Q**   So he cut him.  When he threw that punch, this sling

16   that cut him, did you see a knife then?

17   **A**   No, I didn't.  Actually I thought it was a box at

18   first.  And then I saw the knife in his hand.  And

19   then I didn't really realize he was bleeding until he

20   got back up because, you know, after the punch he

21   kind of rose back up and I saw that this was opened

22   up.

23   **Q**   Now, at that time when the defendant threw the strike

24   that cut Mr. Jones, was Mr. Jones trying to avoid a

25   fight still at that point?

Jerome Patrick - Direct by Mr. Rogers

213

1    A    Yeah.  He was trying to avoid a fight.  Than he was

2         standing up.  And then we said, "You're cut."  And

3         then he felt his neck.  And then he looked at the

4         blood, and that's when he turned and he ran.

5    Q    And by "he" you mean Mr. Jones?

6    A    Yes.  Mr. Jones ran.

7    Q    So once Mr. Jones realized he was cut he ran?

8    A    Yeah.

9    Q    Which direction did he run?

10   A    He ran towards the telephone booth.  The stage is on

11        the left.  He ran towards the telephone booth out

12        into the yard.

13   Q    Thank you, sir.  You may re-take the stand.  When Mr.

14        Jones ran away while he was bleeding, when he ran to

15        the telephone --

16   A    Yeah.

17   Q    -- what did the defendant do at that time?

18   A    Well, he was kind of like taunting and rejoicing, and

19        he said, "I should have killed your ass."  You know

20        what I'm saying?  And he had the blade then.

21   Q    He was holding the blade up in the air then?

22   A    Yeah.  He had the blade.  And he said, "I should have

23        killed your ass.  I should have killed your ass, you

24        punk."  And then that's when he turned around and hit

25        Ms. Tiffany and grabbed his bag and walked off.

JA379

Jerome Patrick - Direct by Mr. Rogers

214

1   Q   Which direction did he walk when he was leaving?

2   A   He went up the hill away from the officers' direction

3       going up the hill to the top of the park.

4   Q   Is that the same general direction that you and he

5       and Ms. Retalia had come into the park previously?

6   A   That's correct.

7   Q   After he walked away, did you remain there at the

8       scene?

9   A   Yes, I did.

10  Q   Okay.  And did you follow the defendant or the

11      victim?  Did you walk anywhere?

12  A   We stood there for a while until -- because we were

13      still like kind of in shock because of, you know,

14      what had happened.  Then when we saw the blood and we

15      saw the guy helping.  The guy came over to help him

16      with the rag.  And they went to call.  Everyone was

17      still huddled, you know, and amazed that someone --

18      that he was cut.  And we didn't know how really bad

19      it was.  And I was kind of comforting Retalia at the

20      time.  But then we walked over there towards him.

21  Q   Now, I think you said that somebody tried to help him

22      with a rag?

23  A   Yes.  The guy who was throwing the football out there

24      with the kids came over with the rag and he saw, you

25      know, all the blood started coming out real bad at

USCA4 Appeal: 21-6217    Doc: 11-1      Filed: 03/24/2021    Pg: 385 of 504    Page 218 of 505
2:19-cv-00760-RMG-MGB    Date Filed 07/03/19    Entry Number 14-1

1        that particular time because he had already ran

2        across the field.  And his shirt was kind of soaked

3        with the blood.  The guy came over and administered

4        ice and a rag to his neck.

5    Q   To try and help control the bleeding?

6    A   Yes.  That's correct.

7    Q   Were you there when the police arrived?

8    A   Yes, I was.

9    Q   And after the police arrived on the scene, did you

10       speak with them?

11   A   Yes, I did.

12   Q   And did anything happen from your point after the

13       police arrived?  Did you do anything further?  Did

14       you see anything further?

15   A   Yes.  When the police arrived they taped off the area

16       because they said it was a crime scene and they taped

17       off the area.  And they had asked us which direction

18       that he went.  And they said if you don't mind

19       walking us in the direction.

20   Q   Did you walk this with them?

21   A   Yes.

22   Q   Was anybody else with you at that time?

23   A   Yes.  Retalia.  And we walked up the hill.  And, you

24       know, there's a couple of paths.  And we walked with

25       them up there.  And it just so happened they said,

Jerome Patrick - Direct by Mr. Rogers

216

1       "Well, did he still have a knife on him?"  We said we

2       believe so.  They were kind of like backtracking,

3       looking for the knife.  And then we went by the

4       garbage can, looking for the knife.  And when we

5       looked in the garbage can, that's when they found the

6       shirt.

7   Q   Now, I'd like to please let the record reflect I'm

8       showing opposing counsel what's previously been

9       marked as State's Exhibit 21.  Let me show you a

10      picture.  Please tell me if you recognize this

11      picture?

12  A   Yes, I do.

13  Q   And what is this a picture of?

14  A   That's the garbage can right off the top of the hill

15      where they found the shirt at.

16  Q   And does that fairly and accurately depict the

17      trashcan as it appeared on July 22nd, 2007?

18  A   Yes, it is.

19          MR. ROGERS:  Your Honor, at this time we'd like

20      to enter this exhibit, State's Exhibit 21, in

21      evidence.

22          MR. O'NEIL:  No objection, Your Honor.

23          THE COURT:  So admitted.

24          (WHEREUPON, State's Exhibit No. 21 is admitted

25      into evidence.)

**JA382**

Jerome Patrick - Direct by Mr. Rogers

217

1  Q  You said that the shirt was recovered from inside

2     that trash bag (sic), sir?

3  A  That's correct.

4  Q  I'm going to show you another picture that's been

5     previously marked and entered as State's Exhibit 23.

6     Does that look like what the shirt looked like that

7     day?

8  A  That's correct.

9  Q  And it was sitting in the trashcan at that point?

10 A  That's correct.

11 Q  Now, do you remember what officer you were walking

12    with at that time?  If you don't, that's okay.  Do

13    you remember?

14 A  No.  I don't remember.

15 Q  But it was you, Retalia, and the officer?

16 A  And the officer.  That's correct.

17 Q  Okay.  A brief moment, Your Honor.

18       *THE COURT:*  Yes, sir.

19 Q  Sir, do you see in court today the person who cut Mr.

20    Jones?

21 A  Yes, I do.

22 Q  And can you please point him out for the jury?

23 A  In the center of the two guys right there, Mr. Folkes

24    with the paper in his hands.

25 Q  The gentleman in the blue shirt between the two

**JA383**

Jerome Patrick - Direct by Mr. Rogers

218

1          attorneys?

2     A    Yes, sir.

3               MR. ROGERS:  Your Honor, I'd like the record to

4          reflect that the witness has identified the

5          defendant.

6               THE COURT:  It does.

7     Q    Thank you, sir.  Sir, I have no further questions for

8          you at this time.  Please answer any questions

9          opposing counsel may have.

10                        CROSS EXAMINATION

11    BY MR. O'NEIL

12    Q    Mr. Patrick, good morning.

13    A    Good morning.

14    Q    Let me make sure I have your prior record straight.

15         Have you three shopliftings?

16    A    Mm-hmm (affirmative).

17    Q    You have a financial transaction card fraud?

18    A    That's correct.

19    Q    You have a receiving stolen goods?

20    A    Mm-hmm (affirmative).

21    Q    You have a simple assault?

22    A    Mm-hmm (affirmative).

23    Q    An auto breaking?

24    A    Mm-hmm (affirmative).

25    Q    And you have I think two filing of false police

Jerome Patrick - Cross by Mr. O'Neil

219

```
 1        reports and one hindering a police officer?
 2    A   I believe so, sir.
 3    Q   And a driving under suspension?
 4    A   Mm-hmm (affirmative).
 5    Q   Now, I think you said this particular day was your
 6        birthday?
 7    A   That's correct.
 8    Q   And you say you hadn't been using any drugs on this
 9        particular day?
10    A   That's correct, sir.
11    Q   And it was also Tiffany Briggs' birthday as well?
12    A   That's correct.
13    Q   Okay.  Now, you're familiar with box cutters.  I
14        think you said you worked with them actually?
15    A   Yes.
16    Q   And you're familiar with hook blades?
17    A   Yes.  That's right.
18    Q   And I'm going to show you what's been marked
19        Defendant's Exhibit 1 for I.D. and State's Exhibit 23
20        I think for I.D.  Defense Exhibit 1 is a box cutter.
21    A   That is correct.
22    Q   And State's Exhibit 23 is a hook blade?
23    A   Yeah.
24    Q   And there is a big difference between those two?
25    A   I understand that, sir.
```

Jerome Patrick - Cross by Mr. O'Neil

220

1   Q   And you understand that the hook blade has probably

2       like a three-inch curved blade on the end of it?

3   A   That's correct.

4   Q   But a box cutter has a straight edge like that?

5   A   Yeah.  That's correct.

6   Q   So you won't get these two mixed up?

7   A   No.  No.

8   Q   And what color blade, what color weapon did you see

9       that day?

10  A   What color blade?

11  Q   Yeah.

12  A   The blade was shiny just like that, as far as the

13      blade.

14  Q   What color was the handle?

15  A   The handle was flat.  Because we use it.  It was a

16      flat one, the one that me and Mr. Folkes used.

17      Because we used the hook blade instead of the box

18      cutter due to the fact that the styrofoam that we cut

19      wouldn't cut with a regular box cutter.  So that's

20      why they went and bought these hawk blades so we can

21      use that to cut deeper into the styrofoam because we

22      were setting them on the roof.

23  Q   I understand that.  But my question to you, sir, is,

24      what color was the handle you saw?

25  A   The handle that I saw?

**JA386**

Jerome Patrick - Cross by Mr. O'Neil

221

1   **Q**   Yeah.

2   **A**   Well, he had it in his hand at that particular time,

3       that handle.

4   **Q**   So you didn't see the handle?

5   **A**   I saw part of the handle, and part of the handle had

6       the wood grain to it.

7   **Q**   So it was wood grain?

8   **A**   And blue.

9   **Q**   Wood grain and blue?

10   **A**   Yeah.

11   **Q**   Okay.  Now, you said you and Mr. Folkes worked

12       together?

13   **A**   That's correct.

14   **Q**   At Action Labor?

15   **A**   Yes.

16   **Q**   But in fact you all only worked I think one day

17       together?

18   **A**   No.  That's incorrect sir.

19   **Q**   What days did you work at Action Labor back in July

20       of 2007?  You worked on July 2nd?

21   **A**   Yeah.  It was prior to -- he had had the blade for

22       prior because we was working.  We was trying to

23       actually get a job with Campbell Roofing.  And me and

24       him was working side-by-side.  Actually they had

25       employees and we were temps.  So we were working

Jerome Patrick - Cross by Mr. O'Neil

222

```
 1          extra hard to try to get a job.  We was working real

 2          hard together.

 3     Q    I understand that, Mr. Patrick.  But what I'm trying

 4          to get to is the days you worked.  I think you worked

 5          July 2nd.  Do you remember that?

 6     A    I believe so.

 7     Q    July 3rd?

 8     A    I believe so.

 9     Q    July 6th?

10     A    That's after the 4th.  I believe.

11     Q    July 7th?

12     A    I believe.

13     Q    July 9th?

14     A    Yeah.  We worked.  Well, we had to work.

15     Q    Then you skipped over to July 18th and then

16          July 16th?

17     A    I don't think we skipped no week's work.

18     Q    I'm asking you about whether you skipped some weeks

19          in there?

20     A    No.  No, I didn't.

21     Q    So you didn't skip a week in there?

22     A    No.

23     Q    Okay.  Now, you said that Action Labor doesn't supply

24          the tools for you?

25     A    No.
```

**JA388**

Jerome Patrick - Cross by Mr. O'Neil

223

1   Q   You have to get these tools on your own?

2   A   No.  Campbell supplies these tools.

3   Q   The work site supplies them?

4   A   Yes.  Yes, they did.

5   Q   The supervisor is there to make sure you turn these

6       tools back in?

7   A   They just asked us to put them in the box.  And

8       sometimes we just leave them on the roof.

9   Q   Some way to make sure you turn them back in.  You

10      either put them in the box or leave them on the roof?

11  A   Yeah.  They didn't really check, you know, pat you

12      down to make sure you didn't take it with you or

13      anything.

14  Q   But you had to leave it in those two areas?

15  A   Yes.

16  Q   And you said this probably happened last July?

17  A   Yes, sir.

18  Q   Almost about a year ago?

19  A   That's correct.

20  Q   And there were other people out in the park besides

21      the group you were with?

22  A   That's correct.

23  Q   You said that people were out there playing football?

24  A   Mm-hmm (affirmative).

25  Q   There were little kids over there in the little kid

Jerome Patrick - Cross by Mr. O'Neil

224

1          area?

2     A    That's correct.

3     Q    Other people just sitting out there in the grass

4          area?

5     A    That's correct.

6     Q    It's fair to say the park was full of other people

7          around this time?

8     A    Yes.

9     Q    And you never -- you say you spoke to police that

10         day?

11    A    Yes, I did.

12    Q    But you never sat down and gave a statement to

13         police, did you, a written statement?

14    A    A verbal.

15    Q    But you didn't sit down and write a written statement

16         as to what happened?

17    A    No.

18    Q    None of the things you've said today did you sit down

19         and write a statement out to the police officer about

20         what happened?

21    A    No.  I didn't wrote (sic) it down.

22    Q    Okay.  And since last July, I think you said you've

23         picked up charges of your own?

24    A    Yes.

25    Q    Back in April of this year?  That sounds about right?

**JA390**

Jerome Patrick - Cross by Mr. O'Neil

225

 1  A   Yeah.  April of this year.

 2  Q   You picked up a breach of trust?

 3  A   Yes.

 4  Q   And a carrying a concealed weapon?

 5  A   Yeah.  But that was my razor for work.  And they

 6      dropped that, threw that out already.

 7  Q   Okay.  But the breach of trust is still pending?

 8  A   Yes.

 9  Q   And that charge is being prosecuted by the same

10      office that Mr. Rogers and Ms. Weiss works for,

11      correct?

12  A   I believe so.

13  Q   And you hope that your testimony today will kind of

14      benefit you in some way with your pending charges.

15      Is that correct, sir?

16  A   No.  No, sir.  No, sir.

17  Q   You hope that your testimony is going to hurt you?

18  A   No.  I hope that it has no bearing on it because what

19      I did in that breach of trust, I did that, you know,

20      if you understand what I'm saying.

21  Q   And you and Ms. Rita Green, you all are fiancees?

22  A   Yeah.  That's my fiance.

23  Q   You all are engaged?

24  A   Yes.

25  Q   You all have been together about what?  Over four

JA391

Jerome Patrick - Cross by Mr. O'Neil

226

1          years now?

2    A     Yes.  That's correct.

3    Q     And in fact, I think you all live together?

4    A     Yes.

5    Q     You all eat together?

6    A     When we're together, yes.

7    Q     In fact, did you all go home together, last night

8          together?

9    A     Yes.  We did.

10   Q     You all spent last night together as well?

11   A     Yes.

12   Q     And have you seen the other witnesses involved in

13         this case since last July?

14   A     Since last July?

15   Q     Yeah.

16   A     Yes.

17   Q     Ms. Tiffany Briggs?

18   A     Well, Tiffany, here and there.  You know, they're all

19         in the park once in a while.

20   Q     So you saw some of the other witnesses hanging out in

21         the park?

22   A     Yeah.

23   Q     Did you see Mr. Jones in the park since last July?

24   A     Not in the -- once I think I saw him in the park.

25   Q     Okay.  And you all conversated when you all saw each

Jerome Patrick - Cross by Mr. O'Neil

227

```
 1        other?  You all talked when you all saw each other?
 2   A    Well, hi and bye, how you doing?  You know what I'm
 3        saying?
 4   Q    And you talked with people from the prosecutor's
 5        office about the case?
 6   A    Since when?
 7   Q    Since last July.  You talked to people from Mr. --
 8   A    Well, they came to, you know, ask me what happened.
 9        So then I --
10   Q    They came.  You saw two of them?
11   A    Yeah.
12   Q    And you talked about the case?
13   A    Yes, about what I saw.
14   Q    And you said the -- you would say the fight happened
15        between Mr. Folkes and Mr. Jones pretty fast?
16   A    Well, it's what you consider fast.  Because first it
17        was verbal, then it got physical, and then it got
18        deadly.
19   Q    And you said Mr. Folkes hit Mr. Jones one time in the
20        eye?
21   A    Yeah.
22   Q    With his right hand?
23   A    Yes.
24   Q    To Mr. Jones' -- I guess that would be his left eye?
25   A    I guess it would be his left.  It would be towards
```

Jerome Patrick - Cross by Mr. O'Neil

228

```
 1        left.
 2   Q    He had a beer bottle in his right hand I think you
 3        said?
 4   A    Yeah.  The beer bottle came out, and that's the same
 5        hand that he --
 6   Q    So he swung at him with the beer bottle --
 7   A    And missed.
 8   Q    And missed?
 9   A    The beer came out of the bag because the bag was wet.
10   Q    And then your testimony is that he was able to hit
11        him with the right hand before Mr. --
12   A    Yeah.  Because he didn't want to fight, and he wasn't
13        -- if you can understand what I'm saying, he was just
14        standing there.  He just stood there when he threw
15        the beer bottle and amazed because he wasn't going to
16        fight him.  You know what I'm saying?  He was just
17        standing there and the beer bottle flew out of the
18        bag.  And then that's when he just stood there and,
19        you know, he was looking at him and amazed that he
20        wasn't actually going to fight him because he didn't
21        really think that he was going to fight him.  But
22        then he actually through a blow to the head.  And
23        then I guess that's what caused him to react.
24   Q    To the left side of the head?
25   A    Yeah.
```

Jerome Patrick - Cross by Mr. O'Neil

229

1   Q   To the eye you're saying.  And then did Mr. Jones

2       have any bruising to his left side of his face?

3   A   No, not at that time.

4   Q   Hitting him did not cause any damage?

5   A   No.  Like I said, well, it hit off the side of the

6       face.  It was such, you know, he was moving at the

7       same time, but it was a blow.

8   Q   Okay.  And was Mr. Jones ever on top of Mr. Folkes?

9   A   As far as not on top, but he was attempting to try to

10      hold both of his hands down at that particular time

11      to tell him, "Hey, it ain't like that."  Because, you

12      know, he was already -- he had already knocked him

13      down, you know, and everybody had already saw that.

14      So he didn't really want to fight.  So he was trying

15      to hold his hands down and say, "Hey, man, it ain't

16      really like that."  And that's when --

17  Q   So he was on top of him holding his hands down?

18  A   Yeah.  He didn't really all the way get down to his

19      knees, but he was just over him, you know, just hold

20      him down.  You know what I'm saying?

21  Q   Beg the Court's indulgence, Your Honor.

22          *THE COURT:*  Yes, sir.

23          (Pause)

24  Q   Mr. Patrick, you agree that you weren't drinking that

25      night?

**JA395**

Jerome Patrick - Cross by Mr. O'Neil

230

1    A    Yes.

2    Q    That's your testimony?

3    A    Mm-hmm (affirmative).

4    Q    You agree that most everybody was drinking that

5         night?

6    A    I didn't know about everybody else.  I had went to

7         church that morning.  And then when we got back from

8         church, we went to the Salvation Army.

9    Q    Okay.  No further questions, Your Honor.

10             THE COURT:  Anything?

11             MR. ROGERS:  Yes, Your Honor.  Briefly.

12                  REDIRECT EXAMINATION

13   BY MR. ROGERS

14   Q    Sir, Mr. O'Neil asked you if you spoke to people

15        between July 22nd and now.  Did you ever speak to

16        O'Neil before today?

17   A    Yes.  I spoke with him, too, at the --

18   Q    When did you speak with him?  Do you remember?

19   A    At the park that time when they come to the park,

20        when you all been up there.  I figured they came up

21        the same day.

22   Q    And Mr. O'Neil had a chance to speak with you then?

23   A    That's correct.

24   Q    Do you remember the other attorney, the gentleman

25        sitting in the brown coat at the end of the table?

**JA396**

Jerome Patrick - Redirect by Mr. Rogers

231

1   A   Yeah.  I think they been together.

2   Q   So you think you remember speaking to him, too?

3   A   I know there was two of them at that particular time.

4       Yes.  I'm not pretty sure if that's the same one, but

5       I know it was Mr. O'Neil and another guy.

6   Q   Okay.  Fair enough.  Now, just to clarify, is there

7       any doubt in your mind who cut Mr. Jones?

8   A   No.  There's no doubt in my mind.

9   Q   And just to clarify, who cut Mr. Jones?

10  A   Mr. Folkes.

11  Q   Thank you, sir.  No further questions.

12          MR. O'NEIL:  No questions.

13          THE COURT:  All right.  Thank you.  You may step

14      down, Mr. Patrick.

15          WITNESS:  Yes, sir.

16          THE COURT:  All right.  Call your next witness

17      please, sir.

18          MR. ROGERS:  Thank you, Your Honor.  The State

19      calls Retalia Green.  Your Honor, if the Court

20      doesn't object, we ask that Mr. Patrick be excused

21      from his subpoena.

22          THE COURT:  He's free to leave if he wants to.

23          RETALIA GREEN, after being duly sworn, testifies

24      as follows:

25          THE CLERK:  Thank you.  Have a seat in the

*Jerome Patrick - Redirect by Mr. Rogers*

232

1              witness stand and give the court reporter your name.

2                              <u>DIRECT EXAMINATION</u>

3    *BY MR. ROGERS*

4    Q      Good morning, ma'am.  Can you please state your name

5           for us?

6    A      My name is Retalia Green.

7    Q      Ms. Green, where do you live?

8    A      Right at this time I am living in a hotel.  But I

9           will be living in Eastover just about in a month or

10          more, in the Columbia area.

11   Q      Were you born here in Columbia?

12   A      Yes, sir, I am.

13   Q      Have you lived in Columbia pretty much your whole

14          life?

15   A      Yes, sir.

16   Q      Were you living in Columbia on July 22nd, 2007?

17   A      Yes, sir.  Actually I was homeless at that time.

18   Q      Were you friends with Mr. Jerome Patrick?

19   A      Yes, sir.  I am friends with him.  As a matter of

20          fact, Jerome Patrick is my fiancee.

21   Q      Congratulations.  The two of you were together last

22          year at that time?

23   A      Yes, sir, we were.

24   Q      And do you remember July 22nd?

25   A      Yes, sir.

**JA398**

Retalia Green – Direct by Mr. Rogers

233

1   Q   Do you remember how that day started for you?

2   A   Yes.  We were together here at the Finlay Park.  We

3       went to eat at several places.  At the end we were at

4       the Salvation Army, and we left the Salvation Army

5       and we came to the Finlay Park.

6   Q   Did you start that day going to church?

7   A   Yes, sir.

8   Q   And how did you get to church?

9   A   We went to church with his brother, Samuel Patrick,

10      who is the pastor at Christ Church on Decker.  He

11      picks us up and he takes us to the church service.

12  Q   After church did you come back into town?

13  A   Yes.  We went to the Red Ministry in the park and

14      also to the Cafe Ministry.

15  Q   And did you end up eating dinner?

16  A   At the Salvation Army.

17  Q   Who ate dinner with you that day?

18  A   It was me, Jerome and "New York".

19  Q   And by "New York", who do you mean?

20  A   "New York", that's what I know him as from the

21      streets.  Clayton.

22  Q   Clayton?

23  A   Folkes.

24  Q   You mean the defendant, Mr. Folkes?

25  A   Yes, sir.

Retalia Green - Direct by Mr. Rogers

234

1    Q    And that's his nickname on the streets?

2    A    Yes, sir.

3    Q    Before that day had you ever come in contact with the

4         defendant?

5    A    Yes, sir.  We were all in the park for like a year in

6         Finlay Park.  We work at Action Labor through the

7         temp service together.  We see each other basically

8         every day all day.

9    Q    A lot of people hang out in the park usually?

10   A    Yes, sir, we do.

11   Q    And that's where you started to get to know him?

12   A    Yes, sir.

13   Q    Okay.  After you ate dinner at the Salvation Army,

14        where did you go from there?

15   A    We left the Salvation Army and went to the Finlay

16        Park.

17   Q    Now, before we get into actually what happened in

18        Finlay Park, there's a couple of things that I need

19        to go over with you.  I'm not trying to embarrass

20        you, but have you ever been in trouble with the law

21        before?

22   A    Yes.  I've been in trouble.  I have a real -- a real

23        long history of trouble.

24   Q    That's okay.  I just need to hit a couple of things

25        for you, see if you remember them.  Okay?

JA400

Retalia Green - Direct by Mr. Rogers

235

1    A    All right.

2    Q    Now, in 1990, did you have a forgery?

3    A    Yes, sir.

4    Q    What about in 1992?  Do you remember another forgery?

5    A    Yes, sir.

6    Q    In 1992, do you remember a third forgery?

7    A    Yes, sir.

8    Q    What about a shoplifting that year?

9    A    Yes, sir.

10   Q    And the next year another shoplifting?

11   A    Yes, sir.

12   Q    And one additional shoplifting in 1993?

13   A    Yes, sir.

14   Q    Does that sound familiar?  Then I show another

15        shoplifting charge in 1997?

16   A    Yes, sir.

17   Q    Then I show in 2004 a financial transaction card?

18   A    Yes, sir.

19   Q    Theft.  Does that sound correct, ma'am?

20   A    Yes, sir.

21   Q    Okay.  I just wanted to make sure we got that out in

22        the open so there's no questions about that.

23   A    All right.

24   Q    Now, when you left the Salvation Army and you headed

25        into the park, who was with you at that time?

**JA401**

Retalia Green - Direct by Mr. Rogers

236

```
1   A   At the time it was me, Jerome Patrick and "New York"
2       which is Clinton Folkes.
3   Q   Do you remember, what part of the park did you enter
4       into?
5   A   We came in from the top side, which it would come
6       from the Strom Thurmond building.  We came down the
7       step way and made it all the way down to the middle
8       of the park.  Which it's a stage there, a grass area.
9       They have like where you have fishes at, a water site
10      right there in the middle of the park, too,
11      basically.
12  Q   Your Honor, I'd like the record to reflect I'm
13      showing defense counsel what's previously marked as
14      State's Exhibit 20.  Now, ma'am, I want to show you a
15      picture.  Tell me if you recognize this picture?
16      Does that place look familiar?
17  A   Yes.  That's the entries of coming in the park.  When
18      we came from the Salvation Army, we were entering in
19      through that side right there.
20  Q   And does this fairly and accurate depict the entrance
21      to the park as you remember it on July 22nd?
22  A   Yes, sir, it is.
23  Q   Now, when you entered the park, was that police car
24      there?
25  A   No, it wasn't.
```

Retalia Green - Direct by Mr. Rogers

237

1   Q   So with the exception of that police car in the

2       picture, everything else look the same?

3   A   Yes, sir, it is.

4           MR. ROGERS:  Your Honor, at this time we'd like

5       to move State's Exhibit 20 into evidence.

6           MR. O'NEIL:  No objection, Your Honor.

7           THE COURT:  So admitted without objection.

8           (WHEREUPON, State's Exhibit No. 20 is admitted

9       into evidence.)

10  Q   If you could point out, it looks like there may be a

11      couple of different ways that you can get into the

12      park there.  Do you remember which side you came in

13      on?

14  A   We were coming from across the street, and we would

15      walk down these step ways right here.

16  Q   Right down those stairs.  Okay.  Now, I think you

17      told me you ended up in the middle of the park down

18      by the trees?

19  A   Yes, sir.

20  Q   Is that true?

21  A   Yes, sir.

22  Q   I'd like to show you another couple of pictures.  I

23      show you what's previously been marked as State's

24      Exhibits 10 and 11.  Does that look like the area?

25  A   That is the area that we were in.

**JA403**

Retalia Green - Direct by Mr. Rogers

238

1   Q   And that's State's Exhibit 11.  This is State's
2       Exhibit 10?
3   A   Yes, sir.
4   Q   Now, there's a red mark there.  Does that look about
5       like where people were congregating at that time?
6   A   Yes.  That's where we wind up being, right at that
7       exact location.
8   Q   And there were a couple of people down there?  It
9       wasn't just you?
10  A   Yes.  There were several people there, all laying out
11      in the grass socializing.
12  Q   Do you remember specifically any particular people
13      being down there?
14  A   At that time we had James Reddick.  We had myself,
15      Jerome.  We had Hakim.  We had Tiffany.  We had a lot
16      of other people there that I may be able to speak of
17      their street names but don't know their biological
18      names.  But they were basically the people that were
19      in the church service, the people that goes down to
20      eat at the Salvation Army, and they are homeless
21      people.
22  Q   You said they were your friends?
23  A   Yes, they are.
24  Q   When you say Hakim, are you talking about Mr. Jones?
25  A   Yes, sir.

JA404

Retalia Green - Direct by Mr. Rogers

239

1    Q    I just want to make sure we're familiar with

2         everybody we're talking about.  Did there come a time

3         that the defendant got into an argument with Mr.

4         Reddick?

5    A    Yes, sir.  When we first got down there --

6             MR. O'NEIL:  Objection, Your Honor.  At this

7         point I just object.  Under 403, I think this is

8         cumulative and already been covered by other

9         witnesses.

10            THE COURT:  What's the question again?

11            MR. ROGERS:  Did there come a time when the

12        defendant got in a fight with Mr. Reddick.

13            THE COURT:  I'm going to let her answer that.

14        You know, if it's the same testimony over and over

15        again, we really don't need to go into the detail of

16        it.  But I'll let her answer that question.

17            MR. ROGERS:  Yes, sir.

18   A    Yes.  They did not physically fight but they were

19        verbally fighting.  Mr. Folkes and Mr. Reddick was

20        verbally figuring until Mr. Folkes pulled out

21        something and Mr. Reddick put his hands up and backed

22        away.

23   Q    After that did Mr. Folkes have words with Mr. Jones?

24   A    Yes, sir.  He had words with Mr. Jones.  And Mr.

25        Jones was just standing there at the time.

Retalia Green - Direct by Mr. Rogers

240

1   Q   Now, if I could, how much time took place between?

2   A   It was just right back to back.  It was like it was

3       he came out of one incident and then it was straight

4       to the next one.

5   Q   Now, did the defendant come up to Mr. Jones, or did

6       Mr. Jones seek out the defendant?

7   A   The defendant came to Mr. Jones.

8   Q   And when Mr. Folkes came to the defendant, what

9       was -- excuse me.  When Mr. Folkes came to Mr. Jones,

10      what was Mr. Jones doing at that time?

11  A   Mr. Jones was actually standing there.  I don't think

12      that Mr. Jones -- I don't think he was like preparing

13      himself for a fight until the defendant swung and hit

14      him first.

15  Q   So did they exchange words first?  Did they get into

16      a verbal fight?

17  A   They passed a few words.  I can't recall what it was.

18      But there was something said.  And then the defendant

19      swung.  He hit Hakim and then the second swung (sic),

20      he missed him.

21          MR. ROGERS:  Your Honor, if I could ask the

22      witness to step down for a second for a brief

23      demonstration?

24          THE COURT:  You may.

25          MR. ROGERS:  Thank you, Your Honor.

**JA406**

Retalia Green - Direct by Mr. Rogers

241

1    Q    Ma'am, if you could stand right here for me.  When

2         the defendant and Mr. Jones first got in the first

3         verbal argument, how close were they together?

4    A    They were like this.

5    Q    So when they're talking, they're about this far?

6    A    Uh-huh (affirmative).

7    Q    Then who threw the first punch?

8    A    The defendant threw the first punch.

9    Q    How close were they when he threw the punch?

10   A    They'd be like this right here, and he did this and

11        then he swung and hit him.

12   Q    The defendant swung?

13   A    Yeah, the defendant swung.  He hit Jones in the eye.

14   Q    Like on this side?

15   A    Yes.  And the second time he swung he missed.  And

16        when he missed, Jones came back and hit him twice,

17        that's twice, and he dropped to the ground.

18   Q    Hit him with a left/right?

19   A    Uh-huh (affirmative).

20   Q    And knocked him to the ground?

21   A    Uh-huh (affirmative).

22   Q    Then when Mr. Folkes was on the ground, was Mr. Jones

23        standing over him?

24   A    Mr. Jones came like he was trying to keep him from

25        getting up off the ground.  And Mr. Folkes went in

Retalia Green - Direct by Mr. Rogers

242

1    his pocket, came up with a blade, came up, reached up

2    and cut him across the neck.

3  Q   Now, when he reached up, did you see a blade that

4    first time?

5  A   The first time I thought it was a comb.  That's what

6    I seen, a comb fell out.  I didn't see the blade at

7    first.  But when he came up, we seen the wooden

8    handle, and that's when we realized that Jones was

9    cut.

10  Q   Now, I want to make sure.  He didn't swing first at

11    the leg?

12  A   No.  He came up.  He came from the ground.  He was

13    here.  When he came up, he came up like this.  So it

14    was like; me, myself, I would say that he was

15    intentionally trying to do it.

16       MR. O'NEIL:  Objection, Your Honor.

17       THE COURT:  I'm going to let her testify what

18    her -- how she viewed it.  Overruled.

19  Q   All right, ma'am.  If you could just take a seat.

20    When you first noticed Mr. Jones was cut, how close

21    were you to him?

22  A   I was standing -- I was standing very close to it.

23  Q   Very close.  Would you say within ten feet?

24  A   Yes, sir, I was.

25  Q   Were you able to see the actual wound?

**JA408**

Retalia Green - Direct by Mr. Rogers

243

1   A    Yes, sir.  Well, at the time he didn't even know he
2        was cut.  We saw the cut first.
3   Q    Then was he bleeding anywhere else on his body, too?
4   A    He was bleeding on his arms.
5   Q    Do you remember which arm?
6   A    No, sir, I didn't.
7   Q    Just one of his arms?
8   A    I know that one of his arms was bleeding.  When he
9        grabbed -- when he went to grab for his neck, we
10       realized the arm was bleeding also.  At that time we
11       grabbed for his neck.  We told him he was bleeding.
12       He ran to the telephone --
13  Q    Okay.
14  A    -- which was a short distance away from him, the
15       stage.
16  Q    Now, I show you another picture.  This is what's been
17       marked as State's Exhibit 3.  Do you see the
18       telephone that Mr. Jones ran to?
19  A    Yes.  He came from -- these are the trees.  He ran
20       across the field to this telephone booth right here.
21  Q    So he ran from these trees back here?
22  A    Yes, sir.
23  Q    Is that correct?  To this blue telephone here.  Is
24       that correct?
25  A    Yes, sir.

Retalia Green - Direct by Mr. Rogers

244

1    Q    Did anyone go with him at that time?

2    A    At that time he was running, no.  No one went with

3         him.  We came behind him.

4    Q    What did the defendant do as Mr. Jones was running

5         away?

6    A    He were running sort of like acting like he were

7         running or running a slow pace saying, "Run, mother

8         fucker, run.  Punk ass bitch, run.  I should have

9         killed your mother fucking ass."

10   Q    And that's what the defendant said to Mr. Jones?

11   A    Yes, sir.

12   Q    Once Mr. Jones reached the telephone, did Mr. Folkes

13        stay in the area?

14   A    No.  Mr. Folkes realized that Mr. Jones was at the

15        phone booth calling 911.  Immediately he left out the

16        park going back the way we came in.

17   Q    Did he carry anything with him at that time?

18   A    He had a book bag with a sleeping bag in it.  I think

19        he had a couple of quarts of beer.

20             (WHEREUPON, State's Exhibit No. 28 is marked for

21        identification.)

22   Q    He had a bag with him at that time when he left.  Is

23        that correct?

24   A    Yes, sir.

25             MR. ROGERS:  Your Honor, please let the record

Retalia Green - Direct by Mr. Rogers

245

1       reflect I'm showing opposing counsel what's

2       previously marked as State's Exhibit 28.

3   Q   Now I want to show you something, and you tell me if

4       you recognize this object?

5   A   That is Mr. Folkes' bag.

6   Q   This is Mr. Folkes' bag?

7   A   Yes, sir, it is.

8   Q   Is this the bag you saw him carrying on July 22nd?

9   A   Yes, sir.  The only difference is that he had it

10      unzipped.

11  Q   When you saw it, it was unzipped?

12  A   Unzipped, yes.

13          MR. ROGERS:  Your Honor, at this time we'd like

14      to enter State's Exhibit 28 into evidence.  It's been

15      identified by the witness.

16          MR. O'NEIL:  No objection.

17          THE COURT:  So admitted.

18          (WHEREUPON, State's Exhibit No. 28 is admitted

19      into evidence.)

20  Q   And when Mr. Folkes walked away, was he walking in

21      the same general direction that you had previously

22      entered the park?

23  A   Yes, sir, he was.

24  Q   When Mr. Jones was at the telephone, did anyone try

25      and give him assistance for his neck?

Retalia Green - Direct by Mr. Rogers

246

1    A    Yes.  There's a guy.  At the time I did not know the
2         gentleman but I got to meet him.  He gave him an ice
3         pack.  I think he was in the park with his son and
4         they were out throwing the football.  And he realized
5         that Mr. Jones was cut and he gave him an ice pack to
6         put on the bleeding area.  So ...
7    Q    Did you stay in the area?
8    A    Yes, sir, I did.  Actually I waited on the police to
9         arrive.  They came --
10   Q    And did they rush -- I'm sorry.  I didn't mean to cut
11        you off.  You were saying?
12   A    They came in the park and they were questioning what
13        happened.  I was there.  I took them.  I walked with
14        the police all the way through the park.
15   Q    Did the police arrive pretty closely after the
16        incident?
17   A    Yes, sir, they did.
18   Q    And after you spoke with them, did you walk with them
19        through the park?
20   A    Yes, sir, I did.
21   Q    Did anyone walk with you at that time?
22   A    I think it was -- as a matter of fact, it was me, my
23        fiancee, Jerome Patrick, and the officer.  And we
24        walked through the park from the area the incident
25        happened all the way to the entrance we came in the

**JA412**

Retalia Green - Direct by Mr. Rogers

247

```
1         park.
2    Q    Now, do you remember which officer you walked that
3         path with?
4    A    No, sir, I don't.
5    Q    That's okay.  When you walked up, you said you were
6         trying to what?  Trace the steps the defendant was
7         walking?
8    A    Actually we were trying to find the blade that the
9         defendant were cut with.  But once we got up the
10        steps, we realized that the shirt that "New York"
11        which is Clayton Folkes had on was in the garbage
12        can.  He had changed clothes into another shirt.
13   Q    Now, did you see the shirt as it was in the trashcan?
14   A    Yes, sir.  I walked up and picked it out of the
15        trashcan.
16   Q    Ma'am, I want to show you what's previously been
17        entered into evidence as State's Exhibits 23 and 21.
18        I'm going to ask you if you remember State's Exhibit
19        21?
20   A    Yes, sir, I do.
21   Q    And what is this a picture of?
22   A    That is the picture of the trashcan where the shirt
23        was at.
24   Q    And where is this trashcan located?
25   A    It's in the entries of the park where we came down.
```

Retalia Green - Direct by Mr. Rogers
248

1        It's right below the steps.

2    Q   This is right near where you entered the park?

3    A   Yes, sir, it is.

4    Q   I'm going to show you what's State's Exhibit 23.

5        Does that look familiar?

6    A   Yes, sir.  That is the shirt.

7    Q   That is the shirt.  Is that the shirt in the

8        trashcan?

9    A   Yes, sir, it is.

10   Q   And is that the same trashcan that we previously

11       looked at?

12   A   Yes, sir, it is.

13   Q   A brief moment, Your Honor.  Ma'am, I'm going to show

14       you something else, too.  I show you what's been

15       marked as State's Exhibit 24.  Does this shirt look

16       familiar at all?

17   A   That is the shirt that Mr. Folkes had on as he was in

18       the park.

19   Q   This is the shirt?

20   A   Yes, sir, it is.

21   Q   And was this what the defendant was wearing when you

22       saw him cut Mr. Jones?

23   A   Yes, sir.

24   Q   One moment, Your Honor.  When you were walking with

25       the police officer after they responded to the

JA414

Retalia Green - Direct by Mr. Rogers

249

1       scene --

2    A  Yes, sir.

3    Q  -- did you stick to the normal concrete paths?

4    A  No, sir, I didn't.  Actually it's several areas in

5       the park where we have places that you can go behind

6       the trees.  You can go --

7    Q  Who usually goes back there?

8    A  The people that are hiding clothes or where they put

9       their belongings because they're homeless.  They've

10      got clothes out there in the park.  Which the people

11      that utilize the place, that cuts to get through the

12      -- the homeless actually utilize those areas to put

13      their clothing or drink or whatever the case may be,

14      whatever they do, there's like cuts.  That's who goes

15      through those cuts.

16   Q  These are like shortcuts?

17   A  Yes, sir, they are.

18   Q  And have you ever been back there yourself?

19   A  Yes, sir.

20   Q  And that's where you took the officers?

21   A  Yes, sir.

22   Q  Thank you, ma'am.  On July 22nd, 2007, had you had

23      anything to drink that day?

24   A  No, sir.  I don't drink.  I don't do any drinking at

25      all.

Retalia Green - Direct by Mr. Rogers

250

| | | |
|---|---|---|
| 1 | Q | Did you have anything that might have blurred, |
| 2 | | impaired your vision or your memory at all? |
| 3 | A | No, sir. |
| 4 | Q | So you remember those incidents clearly? |
| 5 | A | Yes, sir, I do. |
| 6 | Q | And based on your memory, do you see the person in |
| 7 | | court today? |
| 8 | A | Yes, sir. |
| 9 | Q | Is there any doubt in your mind who cut Mr. Jones? |
| 10 | A | No, sir, there isn't. |
| 11 | Q | Who do you remember cutting Mr. Jones in the park? |
| 12 | A | "New York", which he is sitting between the two |
| 13 | | gentlemens (sic) on this other opposite side which is |
| 14 | | Clayton Folkes. |
| 15 | | **MR. ROGERS:** Your Honor, I'd like the record to |
| 16 | | reflect she has identified the defendant. |
| 17 | | **THE COURT:** Okay. |
| 18 | Q | No further questions for you at this time, ma'am. |
| 19 | | Please answer any questions opposing counsel may |
| 20 | | have. |
| 21 | A | Yes, sir. |
| 22 | | CROSS EXAMINATION |
| 23 | **BY MR. O'NEIL** | |
| 24 | Q | So, Ms. Green, it's your testimony that you wasn't |
| 25 | | struggling to stay clean from drugs back in July of |

Retalia Green - Cross by Mr. O'Neil

251

1      2007?

2   A   Actually I was clean already in 2007.  I was already

3      clean.

4   Q   You wasn't using drugs at all in July of 2007?

5   A   No, I wasn't.

6   Q   Okay.  And you say you ate dinner with Mr. Folkes

7      that afternoon?

8   A   Yes.  Me, Jerome Patrick, and Mr. Folkes; we all ate

9      at the Salvation Army.

10  Q   And he didn't go to church with you all, did he?

11  A   No, he didn't.

12  Q   He went to work that day?

13  A   Yes, sir.

14  Q   He got off work about 5:30?

15  A   I don't know what time he got off work.  I know we

16     ate at the Salvation Army.  I don't know --

17  Q   What time you ate at the Salvation Army?

18  A   We ate at -- the dinner is served 4:30 'til 5:30.

19  Q   So he got off work at 5:30, he couldn't have ate

20     dinner with you all at 4:30?

21  A   Sir, like I said, I do not know what time he did get

22     off, but I know he ate dinner with me.

23  Q   And you said you didn't know Tim Abney that day?

24  A   No, sir, I didn't.

25  Q   And you say you had a chance to meet Tim Abney

**JA417**

Retalia Green - Cross by Mr. O'Neil

252

1          though?

2    A     Yes, I did.

3    Q     When did you meet Tim Abney?

4    A     I met Tim the day that he gave him, Jones, the ice

5          pack in the park when I was talking with the officer.

6          And also I got a chance to meet him as we came into

7          court yesterday.

8    Q     So you talked to him as you were coming into court

9          today?

10   A     I talked to him on yesterday.

11   Q     You talked to him yesterday?

12   A     Yes, sir.

13   Q     While you were sitting outside?

14   A     Yes, sir.

15   Q     And you and Mr. Patrick -- I think he's still in the

16         courtroom right there -- you all are engaged?

17   A     Yes, sir.  We've been -- actually we've been together

18         five years now.

19   Q     How long have you all been engaged?

20   A     We have been engaged two.

21   Q     Two years?

22   A     Yes, sir.

23   Q     And you all live together?

24   A     Yes, we do.

25   Q     In fact, I guess you all have been living together as

**JA418**

Retalia Green - Cross by Mr. O'Neil

253

| | | |
|---|---|---|
| 1 | | late as last night?  You all stayed together last |
| 2 | | night? |
| 3 | **A** | Yes, sir. |
| 4 | **Q** | Okay.  And have you ever been talking with anybody |
| 5 | | else involved, any other witnesses involved in the |
| 6 | | case? |
| 7 | **A** | No, sir.  We were instructed that after the trial |
| 8 | | started we would no longer talk to each other.  I |
| 9 | | don't feel as though there was any reason to talk |
| 10 | | about it. |
| 11 | **Q** | And you didn't give a statement to the police, did |
| 12 | | you? |
| 13 | **A** | I don't recall if I gave a statement on paper, but I |
| 14 | | did talk to them. |
| 15 | **Q** | So no written statement? |
| 16 | **A** | I don't think so. |
| 17 | **Q** | So the things you said that Mr. Folkes said you |
| 18 | | didn't write down for the police? |
| 19 | **A** | I never said he said anything.  All I -- oh, yes.  I |
| 20 | | gave them a statement, verbal statement.  I didn't |
| 21 | | write anything down. |
| 22 | **Q** | Now, let me make sure I got your prior record |
| 23 | | correct.  You have I think three forgeries? |
| 24 | **A** | Yes, sir. |
| 25 | **Q** | Four shopliftings? |

Retalia Green - Cross by Mr. O'Neil

254

1  A   Uh-huh (affirmative).

2  Q   And a financial transaction credit card theft?

3  A   Yes, sir.

4  Q   Do you have any pending charges right now?

5  A   No, sir.

6  Q   No pending charges?

7  A   No, sir.

8  Q   And did anybody from the Solicitor's Office tell you

9      they would help you out?

10 A   No, sir, they didn't.

11 Q   Nobody ever told you that?

12 A   No, sir.

13 Q   And when you saw the fight, you were saying that Mr.

14     Jones was getting the best of Mr. Folkes?

15 A   What happened was Mr. Folkes hit Mr. Jones.  It

16     wasn't really a fight.  Mr. Jones -- Mr. Folkes hit

17     Mr. Jones.  Mr. Jones hit him with a two-piece to

18     keep him off of him, because he actually wasn't

19     trying to fight Mr. Folkes.

20 Q   Now, did Mr. Folkes swing once or twice?

21 A   Mr. Folkes swung twice.

22 Q   So if somebody said he swung once that wouldn't be

23     correct?

24 A   No, it's not correct.  Because the first time he hit

25     him; the second time he missed.

Retalia Green - Cross by Mr. O'Neil

255

1   Q   So the first time he hit him, the second time he
2       missed?
3   A   Yes.
4   Q   And you were friends with Mr. Jones back then,
5       correct?
6   A   I was friends with Mr. Jones and also Mr. Folkes.  I
7       don't have anything against neither one.  But right
8       is right and wrong is wrong.
9   Q   And you were friends with Mr. Reddick back then?
10  A   Mr. Reddick is my brother in Christ.
11  Q   And you were friends with Mrs. Brings, Tiffany
12      Briggs?
13  A   No.  No, sir.  I'm not friends with Ms. Briggs.  I
14      associate with Ms. Tiffany, but we're not friends at
15      all.
16  Q   And you just kind of just hung out together in the
17      park sometimes?
18  A   Yeah.  We hung out.  Because we are actually out in
19      the park saying God can use sinners actually,
20      prescribing to get light.
21          MR. O'NEIL:  Okay.  Beg the Court's indulgence,
22      Your Honor.  No further questions, Your Honor.
23          THE COURT:  Anything?
24          MR. ROGERS:  Nothing from the State, Your Honor.
25          THE COURT:  All right.  Thank you.  You may step

256

1    down.

2         MR. ROGERS:  Your Honor, we ask that this

3    witness be excused from her subpoena.

4         THE COURT:  Thank you.  Are you free to leave.

5         WITNESS:  Thank you.

6         MS. WEISS:  Your Honor, before we call our next

7    witness, I'd like to play one of the stipulated

8    tracks from the 911 call.

9         THE COURT:  All right.  Ladies and gentlemen,

10   the State and the defense counsel have agreed or

11   stipulated that they're going to play two 911 calls

12   that were made to the 911 center and that these are

13   the two calls that were placed.

14        MS. WEISS:  I'm actually going to play one now

15   and one with the next witness.

16        THE COURT:  Okay.  That is the correct

17   stipulation.  Is that right?

18        MR. O'NEIL:  Yes, Your Honor.

19        (Whereupon, the 911 tape is played)

20        MS. WEISS:  The State calls Tim Abney.

21        TIM ABNEY, after being duly sworn, testifies as

22   follows:

23        THE CLERK:  Thank you.  Have a seat in the

24   witness stand and give the court reporter your name.

25        WITNESS:  My name is Tim Abney.

**JA422**

Tim Abney - Direct by Ms. Weiss

257

```
 1                    DIRECT EXAMINATION
 2   BY MS. WEISS
 3   Q   Good morning, Mr. Abney.  How are you?
 4   A   I'm okay.  How are you this morning?
 5   Q   Good.  I want to introduce you a little bit to the
 6       jury.  Where are you from originally?
 7   A   Originally?  My home town really is from Waggoner,
 8       South Carolina.  But I moved to Columbia about 20
 9       years ago.
10   Q   And who do you live here with?
11   A   I live by myself.
12   Q   Do you have any family in Columbia?
13   A   Yes.  I have plenty of family in Columbia.  As a
14       matter of fact, my brothers are law enforcement
15       officers.  I have sisters who work for Department of
16       Social Services, work for DMV and others sisters that
17       works for Michelin and Brothers in Service and
18       everything like that.
19   Q   Now, where do you live in Columbia?
20   A   I live on 2406 Cypress Street in Columbia, South
21       Carolina.
22   Q   And that's a home?
23   A   Yes, ma'am.
24   Q   And how long have you lived there?
25   A   Oh, about 18 years.
```

**JA423**

Tim Abney - Direct by Ms. Weiss

258

1   Q   Okay.  Are you employed?

2   A   I work for Quest Diagnostics.  It's a bio lab.  We do

3       all types of drug testing, all types of medical

4       testing, any type of testings that need to be done

5       for the hospitals, military base, things of that

6       nature.

7   Q   And how long have you been working for Quest?

8   A   About seven years.

9   Q   Taking you back to July 22nd of 2007, do you remember

10      being in the park that day?

11  A   Yes, I was.  I was out there with a friend of mine

12      and her son.  We were out there throwing, playing

13      football, throwing a football with them, teaching

14      them how to catch and throw.  Also I do training on

15      side in that particular area also.  So I was kind of

16      showing him things to do if he wanted to play

17      football.

18  Q   Okay.  Did you play football at some time?

19  A   Yes.  I played a year for South Carolina State.

20  Q   South Carolina State?

21  A   Yes, ma'am.

22  Q   So you were playing football, teaching him how to

23      play football and trying to teach him how to get into

24      it.  Do you remember the day itself?

25  A   Well, it was hot.  It was hot and a little sweaty.

Tim Abney - Direct by Ms. Weiss

259

1    It seemed like everybody was having a good time out

2    there with everyone.  And we were just kind of

3    relaxing, you know.

4  Q  Were you drinking?

5  A  No.  No.  No.  Gatorade, yes; and water, yes.

6    Alcoholic beverages, no.

7  Q  And do you recall something happening out of the

8    ordinary that day?

9  A  Yes.  As a matter of fact, I did; as pertaining to an

10   in incident that occurred in which --

11 Q  Please tell the jury about that?

12 A  Well, at that particular point we were near the

13   staging area.  And the incident occurred where a

14   gentleman was assaulted, was cut and had an injury.

15   So I heard a commotion first.  Then the gentleman

16   seated right there with the striped shirt there came

17   in my direction and a lady that was with him.  He was

18   holding his neck and I saw a bunch of blood

19   protruding down his hand.

20       So I asked to look at the wound to see where

21   exactly the wound was at.  And the wound was near the

22   -- coming down the neck near the artery area.  So I

23   had some ice in a cup and I drained the cup out and

24   gave him the ice to put on his neck and I started

25   calling 911 myself trying to get law enforcement or

Tim Abney - Direct by Ms. Weiss

260

```
1        any EMT down there to assist him because of the

2        nature of the wound was so near the artery area.

3   Q    Did you have the opportunity to see the defendant

4        that day?

5   A    I didn't actually see him, but I was told that --

6            MR. O'NEIL:  Objection, Your Honor.

7   Q    Without talking about what you were telling us, did

8        you actually see him?  You didn't actually see him?

9   A    I didn't actually see him.

10  Q    Okay.  And do you have any training or any experience

11       dealing with wounds?

12  A    Yes.  Yeah, yeah.  With my job also, we take a first

13       aid CPR course with my job also in that we're dealing

14       with bio labs and we're dealing with working in the

15       medical area.  We also take extensive courses within

16       having cuts and dealing with in the phlebotomy area

17       also.  And by the notice of the wound of the victim,

18       that it is a very serious injury --

19           MR. O'NEIL:  Objection, Your Honor.  I don't

20       think this witness has been qualified as an expert to

21       give his opinion.

22           THE COURT:  Well, I'm going to let -- he can

23       testify that it was a serious cut, wound.  Overruled.

24  A    Thank you.  Well, by the notice of the injury, like I

25       said before, that it seemed like it was very serious.
```

Tim Abney - Direct by Ms. Weiss

261

1   And --

2   Q   And were you able to -- do you have experience

3       helping to control bleeding?  Is that part of your

4       training?

5   A   Yes, ma'am.  And that's why I offered ice and told

6       him to do direct pressure to the wound to keep it

7       from bleeding as much until the EMT gets to him.  And

8       then also I told him that he is going to need

9       stitches for that particular wound.

10  Q   And did you stay with him until the EMT's got there?

11  A   Not quite.  Because the officer came up and I was

12      talking with him.  And then the EMT's went on over to

13      assist him over near the bathroom area.  So I was

14      talking with the officers.  I also told them what I

15      seen.

16  Q   Okay.  And you talked to the officers and gave them

17      all your information?

18  A   Yes.  Yes, ma'am.

19  Q   And did you notice if the bleeding had somewhat

20      gotten under control?

21  A   Yeah.  A little bit.  A little bit, but the wound

22      still was there.  But the bleeding had stopped

23      because of the ice and the coldness near the area

24      kind of slowed the bleeding down.

25  Q   And you said you called 911?

Tim Abney - Direct by Ms. Weiss

262

| | | |
|---|---|---|
| 1 | **A** | Yes.  I called 911 -- |
| 2 | **Q** | On your own? |
| 3 | **A** | -- also. |
| 4 | **Q** | I'm just going to ask you to listen to this |
| 5 | | (Whereupon, a portion of the 911 tape is played) |
| 6 | **Q** | And that was your voice on that recording? |
| 7 | **A** | Yes, it was.  May I say?  I sound like my brother. |
| 8 | | But, yes, ma'am.  Yes, ma'am, that was me.  Yes, |
| 9 | | ma'am. |
| 10 | **Q** | And the description you were giving, that was not of |
| 11 | | your own? |
| 12 | **A** | No, ma'am.  It was someone speaking telling me the |
| 13 | | description of the person who actually did the act. |
| 14 | **Q** | And would you say that things are kind of chaotic |
| 15 | | down there? |
| 16 | **A** | Very much so.  That's why I was speaking I guess in |
| 17 | | that particular tone because I was trying to get him |
| 18 | | assistance as fast as he could get it because of the |
| 19 | | nature of the injury. |
| 20 | **Q** | Okay.  Thank you. |
| 21 | **A** | You're welcome. |
| 22 | | **MS. WEISS:**  No further questions, Your Honor. |
| 23 | | **MR. O'NEIL:**  Just briefly, Your Honor. |
| 24 | | CROSS EXAMINATION |
| 25 | **BY MR. O'NEIL** | |

**JA428**

Tim Abney – Cross by Mr. O'Neil

263

1    Q    So, Mr. Abney, you didn't see the fight?

2    A    No, sir.  I didn't see that directly, sir.

3    Q    In fact, like you said, the description you gave of

4         the subject you got from somebody else?

5    A    Yes, sir.

6    Q    And you helped get the bleeding -- did you help get

7         the bleeding under control?

8    A    Yes, sir.  I gave him some ice.  I gave him some ice

9         out of a cup and told him to apply direct pressure to

10        his neck.

11   Q    Did you see a white guy with long hair also get the

12        bleeding under control?

13   A    No, sir, I didn't.

14   Q    You didn't see that?

15   A    No, sir.

16   Q    So it was you who got the bleeding under control?

17   A    Yes, sir.  I was assisting him.

18   Q    And you actually thought Mr. Jones had gotten outside

19        the park?

20   A    Excuse me?

21   Q    You thought Mr. Jones had left the park?  The victim,

22        Mr. Jones, you thought he left park?

23   A    No, sir.  No, sir.  I didn't think he left the park.

24   Q    You didn't tell the people on 911 that the victim had

25        gone to his car outside the park?

**JA429**

Tim Abney - Cross by Mr. O'Neil

264

1   A   I wouldn't -- no, sir.  He didn't leave the park,

2       because I was there with him.

3   Q   But do you remember telling 911 that he had left the

4       park and went outside to his car?

5   A   No, sir.  I don't remember that.

6   Q   Okay.  That's fine.  And you actually had to ask Mr.

7       Jones whether or not he needed medical attention?

8   A   Yes, sir.  After I looked at the wound I asked him

9       because the bleeding was slowing down.  And I looked

10      at the wound again, and I asked him if he wanted

11      medical attention.  Then I seen the nature of the

12      cut, that he definitely needed it.  And I told him he

13      was going to need some stitches.

14  Q   And in fact, when were you on the phone with 911, you

15      had to stop and ask Mr. Jones whether or not he

16      needed an ambulance?

17  A   Yes, sir.

18          MR. O'NEIL:  Okay.  No further questions, Your

19      Honor.

20          THE COURT:  All right.  Thank you, sir.  You may

21      step down.

22          MS. WEISS:  Your Honor, may Mr. Abney be

23      excused, please?

24          THE COURT:  You may.  Thank you.  You're free to

25      leave.

**JA430**

Tim Abney - Cross by Mr. O'Neil

265

1       **MR. ROGERS:** Your Honor, the State calls Officer

2    Sessions.

3       ANTONIO SESSIONS, after being duly sworn,

4    testifies as follows:

5       **THE CLERK:** Thank you. Have a seat in the

6    witness stand and give the court reporter your name.

7            DIRECT EXAMINATION

8   **BY MR. ROGERS**

9   Q   Please state your name, sir?

10   A   Officer Antonio Sessions.

11   Q   Sir, where are you currently employed?

12   A   For the City of Columbia police.

13   Q   How long have you been employed there?

14   A   Currently two years.

15   Q   And were you employed in law enforcement before that?

16   A   Yes, sir.

17   Q   Where was that?

18   A   Department of Corrections.

19   Q   How long were you employed at the Department of

20    Corrections?

21   A   About a year.

22   Q   Is that the extent of your law enforcement

23    experience, sir?

24   A   Yes, sir.

25   Q   Were you working with Columbia Police Department on

Antonio Sessions - Direct by Mr. Rogers

266

1         July 22nd of 2007?

2    A    Yes, sir.

3    Q    And what was your job capacity at that time?

4    A    I'm actually a patrolman, pretty much to go to calls

5         of service and to actually patrol my territory.

6    Q    Kind of a first responder?

7    A    Yes, sir.

8    Q    Were you -- you said you were working on July 22nd?

9    A    I was.

10   Q    Of 2007?

11   A    Yes, sir.

12   Q    Did you receive a call to Finlay Park on that day?

13   A    I did.  I received a call while I was in roll call in

14        reference to a fight in progress with a weapon.

15   Q    And did they say where that -- where were you

16        dispatched to?

17   A    Finlay Park which is at 900 Laurel street.

18   Q    Did they give you a particular area of Finlay Park

19        that you were dispatched to?

20   A    On the Taylor Street side.

21   Q    The Taylor Street side?

22   A    Yes, sir.

23        (WHEREUPON, State's Exhibit No. 29 is marked for

24        identification.)

25        MR. ROGERS:  Please let the record reflect I'm

Antonio Sessions - Direct by Mr. Rogers

267

1    showing opposing counsel what has been marked as

2    State's Exhibit 29.

3        *THE COURT:*  Mr. Rogers, when you say I'm showing

4    it, the record will reflect that.  Because anything

5    you say, the record reflects that.

6        *MR. ROGERS:*  Yes, sir.  I just want to make

7    sure, Your Honor.

8  Q    Sir, do you recognize this?

9  A    Yes.

10 Q    What does this look like to you?

11 A    Like the overlook of the downtown area.

12 Q    Do you see Finlay Park in this area, sir?  Do you see

13     Assembly Street?

14 A    Yes.  I see Assembly Street right here.

15 Q    And do you recognize Finlay Park anywhere in that

16     picture?

17 A    Taylor Street is all the way down.

18 Q    You don't?

19 A    Would it be in this area?

20 Q    Does it look familiar?  That's okay.  The park that

21     you responded to, was that towards the upper portion

22     of the park or the lower portion of the park?

23 A    It was on the lower portion of the park.

24 Q    Is there any type of feature down by that area that's

25     specific?

Antonio Sessions - Direct by Mr. Rogers

268

1   **A**   They have the stage and the restrooms in the bottom

2       part of the park.

3   **Q**   When you responded down to the stage, did you see

4       anybody upon -- did you make any contact with anybody

5       upon responding to the scene?

6   **A**   Yes, sir.  I made contact with the alleged victim and

7       also a witness at the time.

8   **Q**   Do you remember the victim's name?

9   **A**   From my understanding, his name was Karem, if I can

10      remember.

11   **Q**   And you said you spoke to some witnesses.  Is that

12      accurate?

13   **A**   I spoke with one of the witnesses that was there.

14   **Q**   Do you remember which witness you spoke to, sir; or a

15      description of that person?

16   **A**   She probably was a five-five black female, short

17      hair.

18   **Q**   Kind of a skinny lady?

19   **A**   Skinny, yes.  Weighed about 135 to 140.

20   **Q**   So you spoke with those two people in reference to

21      the fight?

22   **A**   Yes, sir.

23   **Q**   Did you take any type of witness statements, or did

24      you get a --

25   **A**   At that time I spoke with the witness, and she gave

Antonio Sessions - Direct by Mr. Rogers

269

1    me a description of the alleged suspect.  And at that

2    time, from my understanding, he was wearing a -- I

3    can't remember the name and the description of his

4    shirt, so I'm not going to speak upon that.  But she

5    did tell me that he went across Finlay Park toward

6    the Laurel Street side.

7  Q  The description of the suspect, did that develop over

8     the course of that time?

9  A  It did.

10 Q  With the initial description, do you remember what

11    the initial description was?  Was it pretty specific,

12    or was it more vague?

13 A  It was more vague.  I can't remember the description

14    at the time that she gave me.

15 Q  But would you say that the description became more

16    specific as the events unfolded?

17 A  Yes, sir.

18 Q  Did the witness seem to know the suspect?

19 A  Yes, sir.

20 Q  Did she seem -- did she give you any indication how

21    she knew him?

22 A  She indicated that she was involved with him at one

23    point, at one time, and that the altercation started

24    off in reference to those individuals being together

25    in that altercation.

Antonio Sessions - Direct by Mr. Rogers

270

1   Q   When you say involved, do you mean romantically?

2   A   Yes, sir.

3   Q   When you inspected the victim, did you look at his

4       wounds?

5   A   From what I can remember, I believe he had puncture

6       wounds on the right side of his neck.

7   Q   Did you call any kind of EMS to the scene?  Were you

8       aware if they responded?

9   A   The EMS was already been dispatched on the scene as

10      well.  Once I arrived, EMS was already -- we actually

11      arrived at the same time.

12  Q   So when you received the call, it was your

13      understanding EMS was already on the way?

14  A   Correct.

15  Q   When you responded to the scene, would you --

16  A   EMS was on the scene.  EMS and myself was on the

17      scene as well.

18  Q   Who was tending to the victim?

19  A   EMS.  EMS personnel was attending to the victim.

20  Q   Were you able to observe his wounds in any kind of

21      detail?

22  A   Not in detail, I was not able to identify his wounds.

23      But --

24  Q   And is that because the EMS was treating him at that

25      time?

JA436

Antonio Sessions - Direct by Mr. Rogers

271

1   A   That's correct.

2   Q   After you received a description from the witness and

3       the victim, did you -- how did you make that known to

4       the other officers?

5   A   I went over the air, over the radio and announced

6       that it was a black male with the description that

7       the witness gave me and that he was heading to the

8       direction of the Laurel Street side.

9   Q   You're in civilian clothes today.  At that time were

10      you in uniform?

11  A   Yes, sir, I was.

12  Q   And is part of your uniform a radio?

13  A   Yes, sir.

14  Q   And that's on your person at all times?

15  A   That's correct.

16  Q   And is that same radio that you used to make the

17      announcements?

18  A   Yes, sir.

19  Q   Were you aware of whether or not Mr. Jones, the

20      victim in the case, was transported away from the

21      scene with the EMS?

22  A   Yes, sir.

23  Q   And do you know where they took him?

24  A   From my understanding, they took him to Richland

25      Hospital.

Antonio Sessions - Direct by Mr. Rogers

272

1    Q    Did you stay on the scene down at Finlay Park the

2         entire time?

3    A    Yes, sir.

4    Q    Did you ever have an occasion to transport the

5         witness?

6    A    I did.

7    Q    And this was the same witness that you had spoken to

8         the whole time you were there?

9    A    Right.  Correct.

10   Q    Where did you transport her to?

11   A    I transported her to the police headquarters.

12   Q    Is that far from Finlay Park?

13   A    No.  It's probably about two blocks.

14   Q    And you transported her in your squad car?

15   A    Yes, sir.

16   Q    Do you remember was there a -- did you give her to

17        another officer?  Did you hand her off to somebody

18        else?

19   A    Once I transported her to headquarters, she was

20        released to investigations.

21   Q    Do you remember which investigator?

22   A    No, sir, I don't.

23   Q    Did you -- after you transported the witness to

24        headquarters, where did you go from there?

25   A    At that time I was still at headquarters and at that

Antonio Sessions - Direct by Mr. Rogers

273

1        time I completed the report.

2    Q   Are you aware of whether or not any evidence was

3        recovered in relation to this incident?  Physical

4        evidence?

5    A   At that time I was not aware of what evidence was

6        recovered.

7    Q   Are you aware -- do you know if a suspect was

8        arrested that night?

9    A   Yes, sir.

10   Q   Were you present when that suspect was arrested?

11   A   I was not present.

12   Q   Is that uncommon in situations such as this?

13   A   No, it's not uncommon.

14   Q   Are you aware of how many officers responded to this

15       scene in total?

16   A   I know it was a large quantity.  I don't know the

17       exact amount of officers.

18   Q   So you had a specific job to play in this

19       investigation?

20   A   Yes, sir.

21   Q   Were you present when any identifications were made,

22       sir?

23   A   I'm sorry?

24   Q   Were you present when any identifications were made?

25   A   No, sir.

Antonio Sessions - Direct by Mr. Rogers

274

1   Q   Did there come a point in the evening to where you

2       were aware of the suspect's name?

3   A   There was, but I cannot remember his name at this

4       time.

5   Q   Would you have given that name over the radio?

6   A   Well, at the time when I arrived at investigations, I

7       actually received a photocopy of his picture and his

8       name.

9   Q   Before you received that at headquarters, when you

10      were still speaking with the witness and you were

11      trying to develop a description of the suspect?

12  A   Right.

13  Q   You said that she knew him?

14  A   Right.

15  Q   That she had been in a relationship with him?

16  A   Right.

17  Q   Do you recall getting his name from her?  If you

18      don't remember --

19  A   When he gave me his description she did give me his

20      name.  She gave me the description of what he was

21      wearing and she did give me his name.

22  Q   When you got that description, what did you do with

23      that description?

24  A   I gave that description over the air to the officers.

25  Q   So that every responding officer was aware of who to

Antonio Sessions - Direct by Mr. Rogers

275

1        look for?

2    A   Correct.

3    Q   A brief moment.  Your Honor, the State would have no

4        further questions at this time.

5            THE COURT:  Anything?

6            MR. SHEALEY:  Thank you, Your Honor.  May it

7        please the Court.

8            THE COURT:  Yes, sir, Mr. Shealey.

9                    CROSS EXAMINATION

10   BY MR. SHEALEY

11   Q   Good morning, Officer.

12   A   Good morning, sir.

13   Q   So you've been with City of Columbia I think you

14       testified two years now, right?

15   A   Yes, sir.

16   Q   I think the Department of Corrections before that for

17       a year?

18   A   That's correct.

19   Q   Now, it takes some substantial training to become a

20       City of Columbia police officer, right?

21   A   That's correct.

22   Q   I mean, they trained you in many aspects of how to do

23       your job, right?

24   A   That's correct.

25   Q   You're trained to be proficient with your fireman?

Antonio Sessions - Cross by Mr. Shealey

276

```
 1   A   Correct.

 2   Q   You're trained to secure a crime scene?

 3   A   Correct.

 4   Q   To locate any possible witnesses, right?

 5   A   Correct.

 6   Q   You're trained to fill out a police report?

 7   A   Correct.

 8   Q   And in fact, you all have a standard police report

 9       that you fill out?

10   A   That's correct.

11   Q   Okay.  And every little box means something, right?

12   A   That's correct.

13   Q   And there's a box for the victim's name?

14   A   Correct.

15   Q   A box for a complainant's name?

16   A   Right.

17   Q   A box for a suspect's name.  A box that tells you

18       when you got there?

19   A   Correct.

20   Q   A box that tells you when you left?

21   A   Correct.

22   Q   Also a place to write out your narrative so you can

23       recall what happened?

24   A   That's correct.

25   Q   Because it's hard to recall what happened a year
```

Antonio Sessions - Cross by Mr. Shealey

277

1       later, right?

2   A   That's true.

3   Q   So today you don't remember what the description was

4       of the shirt --

5   A   That's correct.

6   Q   -- exactly, right?  You don't remember exactly the

7       name that was given to you of the suspect, right?

8   A   That's correct.

9   Q   And you don't remember exactly what witness, what her

10      name was, right?

11  A   That's correct.

12  Q   That's why we have these incident reports that help

13      us document these things years later, months later?

14  A   Right.

15  Q   Because no one is perfect.  And as the solicitor was

16      asking you about, you were the first one there,

17      right?

18  A   Correct.

19  Q   So you would secure that scene?

20  A   Correct.

21  Q   Make sure nothing gets tampered with?

22  A   That's correct, sir.

23  Q   Right?  Now, if I told you that a woman who was

24      listed as the complainant, her name was Tiffany

25      Briggs, would that refresh your memory?

Antonio Sessions - Cross by Mr. Shealey

278

1   A   That would.

2   Q   Okay.  Now, do you have your report with you today?

3   A   I do not, sir.

4   Q   Okay.  Now, she is the only person you talked to

5       about this incident other than the victim, right?

6   A   That's correct.

7   Q   So while you're there securing the scene, you'll

8       agree that no other witnesses came up to you and told

9       you anything about this incident?

10  A   I wouldn't say that, sir.  Other witnesses came up to

11      me.  And they were just pretty much crowded around me

12      trying to give me statements.  But the only

13      individual that I actually was listening to was

14      Tiffany because she was part of the altercation that

15      took place, that escalated to this point.

16  Q   Now, just told me there that there's a place for

17      witnesses on this report?

18  A   Right.

19  Q   So you would have written their names down, correct?

20  A   That's correct.

21  Q   Okay.

22  A   Right.

23  Q   Can you show me on your own report any other names of

24      witnesses you wrote down that day?

25  A   Well, it's not going on the written report sir.  Like

Antonio Sessions - Cross by Mr. Shealey

279

1    I said, Tiffany was the only witness that I put on

2    the report.

3  Q    Okay.

4  A    She gave me a valid statement.

5  Q    Because she was memorable to you?

6  A    Yes, sir.

7  Q    So if there was another memorable witness, you would

8    have written it down in your report?

9  A    That's correct.

10  Q    Their name and all their information?

11  A    That's correct.

12  Q    And in securing this crime scene, you didn't find any

13    weapons that day, did you?

14  A    No, sir.

15        MR. SHEALEY:  Beg the Court's indulgence.

16    Nothing further from this witness.

17        THE COURT:  Anything, Mr. Rogers?

18        MR. ROGERS:  Nothing from the State, Your Honor.

19        THE COURT:  Thank you, Officer.  You may step

20    down.

21        MR. ROGERS:  Your Honor, we ask that this

22    witness be relieved from his subpoena.

23        THE COURT:  Officer, you're free to leave if

24    you'd like.  Thank you.

25        WITNESS:  Thank you, sir.

280

 1           **THE COURT:** All right.  I tell you, I think

 2      we'll just go ahead and take a break at this point.

 3      Ladies and gentlemen, I'll let you step back to the

 4      jury room.  We'll take about a 15 or 20-minute break.

 5      Please don't discuss the case while you're back

 6      there.  And we'll bring you back in just a few

 7      minutes.  Thank you.

 8           (Jury out at 10:50 a.m.)

 9           **THE COURT:** Okay.  We'll take a 15-minute break

10      and come back.

11           **MS. WEISS:** Thank you, Your Honor.

12           (Whereupon, a break is taken)

13           (WHEREUPON, State's Exhibit No. 30 is marked for

14      identification.)

15           **THE COURT:** Who is next?

16           **MR. ROGERS:** Officer Oulette.

17           **THE COURT:** Officer Oulette.  All right.  Is

18      Officer Oulette in the room?

19           **MS. WEISS:** Your Honor.

20           **THE COURT:** Yes, ma'am.

21           **MS. WEISS:** I'm not sure if this was clarified

22      earlier.  But we'd like to add the stipulation that

23      those tracks one and three be entered into evidence

24      as State's Exhibit 30 -- they were played on the

25      record -- be entered into evidence.

Antonio Sessions - Cross by Mr. Shealey

281

1          **THE COURT:**  You got any objection to that?

2          **MR. O'NEIL:**  No, Your Honor.

3          **THE COURT:**  All right.

4          **MS. WEISS:**  Thank you, Your Honor.

5          **THE COURT:**  So admitted.  All right.  Let's

6      bring the jury in.

7          (WHEREUPON, State's Exhibit No. 30 is admitted

8      into evidence.)

9          (Jury in at 11:09 a.m.)

10         **THE BAILIFF:**  The jury is seated, Your Honor.

11         **THE COURT:**  Okay.  Mr. Rogers, do you want to

12     call your next witness, please?

13         **MR. ROGERS:**  Thank you, Your Honor.  The State

14     calls Officer Oulette.

15         DAVID OULETTE, after being duly sworn, testifies

16 as follows:

17         **THE CLERK:**  Thank you.  Have a seat in the

18     witness stand and give the court reporter your name.

19         **WITNESS:**  Officer David Oulette, City of

20     Columbia Police Department.

21                    DIRECT EXAMINATION

22 **BY MR. ROGERS**

23 **Q**    Sir, how long have you been employed with the

24     Columbia Police Department?

25 **A**    It will be 18 years in August.

David Oulette - Direct by Mr. Rogers

282

1    Q    18 years?  And what type of jobs have you held within

2         the CPD?

3    A    I've worked patrol in the Metro unit.

4    Q    What is your main responsibility as a patrol officer?

5    A    The downtown area between Taylor Street and the zoo.

6    Q    What types of duties do you do on a regular daily

7         basis?

8    A    Answer dispatch calls, traffic.

9    Q    Okay.  Were you working with the Columbia Police

10        Department on July 22nd, 2007?

11   A    Yes, I was.

12   Q    Do you know when your shift started that day?

13   A    My shift started at 6:00 in the morning.

14   Q    Did there come a time when you were dispatched to

15        Finlay Park?

16   A    Yes, there was.

17   Q    Do you remember about what time that call came in?

18   A    I believe around 6 in the afternoon, 6 or ten after

19        6.

20   Q    Was that towards the ends of your shift?

21   A    Towards the end of my shift.

22   Q    When you responded -- or did you respond to that

23        call?

24   A    Yes, I did.

25   Q    And what area of the park did you respond to?

David Oulette - Direct by Mr. Rogers

283

```
 1   A   I responded to the upper side between Laurel and
 2       Assembly, up in that area.
 3   Q   And what particularly were you looking for at that
 4       time?
 5   A   They put out a description of a suspect and I was
 6       circulating the area looking for him.
 7   Q   Do you remember what that initial description was?
 8   A   Black male.  I don't remember the clothing
 9       description.
10   Q   So the initial description was pretty vague?
11   A   Yes.
12   Q   Did you make any -- did you stop anyone regarding
13       that description?
14   A   I stopped somebody on the corner of Laurel and
15       Assembly almost right outside of this building.
16   Q   And is that close to the park?
17   A   Yes, it is.
18   Q   Sir, I'm going to show you what's previously been
19       marked as State's Exhibit 29.  I'm also showing
20       defense counsel.  Sir, I show you this.  Can you
21       identify what this is?
22   A   That's a map of the downtown area.
23   Q   Do you see Finlay Park in this?
24   A   Yes, I do.
25   Q   Do you see the courthouse?
```

David Oulette - Direct by Mr. Rogers

284

1    A    Yes, I do.

2    Q    Does this accurately depict the layout of that area?

3    A    Yes, sir.

4    Q    On July 22nd?

5    A    Yes, sir, it does.

6    Q    Of 2007?

7    A    Yes, sir.

8         MR. ROGERS:  Your Honor, at this time we move

9    State's 29 into evidence.

10        MR. O'NEIL TWO:  Without objection.

11        THE COURT:  So admitted.

12        (WHEREUPON, State's Exhibit No. 29 is admitted

13   into evidence.)

14   Q    All right, sir.  If you could do me a favor.  I've

15   got a marker right here, a red marker.  Your Honor,

16   may the witness step down for a second so as not to

17   block anybody's view?

18        THE COURT:  So as to.

19   Q    I'm trying to figure out how he can mark it without

20   cutting off everybody.  Put it right here?

21        THE COURT:  I don't know who "everybody" is, but

22   the jury is who you want to make sure is not blocked

23   off.

24        MR. ROGERS:  Yes, sir.  I just wanted to make

25   sure opposing counsel can see it.

David Oulette - Direct by Mr. Rogers

285

1      *THE COURT:*  Well, they can move.

2  Q   Sir, can you show us where Finlay Park is on this

3      map?

4  A   This is Finlay Park down here.  That's the body of

5      water.  Finlay Park sits in this *whole area here*.

6  Q   Are you familiar with the stage in Finlay Park?

7  A   Yes, I am.

8  Q   Where is that located?

9  A   That's going to be out in this area here.

10 Q   And the upper side where you responded, where is

11     that?

12 A   Up around Laurel and Assembly up here.

13 Q   Sir, I'm going to show you what's been marked as

14     State's Exhibit No. 20.  Do you recognize that

15     picture?

16 A   Yes.  That's it.

17 Q   Where is this picture on that map?

18 A   That's going to be up in here.

19 Q   Okay.  Now, you said you stopped some suspects after

20     the initial description.  Can you mark on the map

21     with a number 1 where you stopped those *suspects*?

22 A   Somewhere up in here.

23 Q   Could you circle that for us?

24         (Witness complies)

25 Q   At that time how many suspects did you stop?

**JA451**

David Oulette - Direct by Mr. Rogers

286

1   A   I'm not positive.  One or two.

2   Q   Okay.  And why did you stop them?

3   A   Because they fit the description that was put out.

4   Q   And that was the initial description?

5   A   The initial description.

6   Q   Were you in your patrol car at that time?

7   A   Yes, I was.

8   Q   Did you exit your car?

9   A   Yes, I did.

10  Q   When you made contact with them, what did you do?

11  A   I got their I.D.'s, their state I.D.'s from them and

12      checked them through our front desk for warrants and

13      then I released them.

14  Q   And did you write down that information?

15  A   Yes, sir.

16  Q   The names of those individuals?

17  A   Yes, I did.

18  Q   Was Mr. Folkes, Clinton Folkes, one of the people who

19      you stopped at that time?

20  A   Yes, he was.

21  Q   But you let him go.  Is that correct?

22  A   Yes, I did.

23  Q   And why did you release him?

24  A   He had no warrants on him and the description was

25      vague.

David Oulette - Direct by Mr. Rogers

287

1   Q   Did there come a point where a name of the suspect
2       was released over the radio?
3   A   Yes, there was.
4   Q   What name was given?
5   A   Clinton Folkes.
6   Q   At that time what did you do then?
7   A   I started circulating the area where I released him
8       and saw him walking to and stopped him again shortly
9       after.
10  Q   How much time took place between when you stopped him
11      initially and when the name came over the radio?
12  A   I believe it was about five or ten minutes.
13  Q   A pretty quick amount of time?
14  A   Pretty quick.
15  Q   You said you found him a second time?
16  A   Yes.
17  Q   A short time later?
18  A   Yes.
19  Q   Can you show us on the map where you found him that
20      second time?
21  A   It was right up in here.
22  Q   If you could mark that with a 2 and circle it.  Thank
23      you.
24          (Witness complies)
25  Q   When you -- did you recognize him by sight the second

David Oulette - Direct by Mr. Rogers

288

1        time?

2    A   The second time.  Yes.

3    Q   At that time what did you do?

4    A   I stopped him and detained him.

5    Q   Okay, sir.  I'll borrow that photo back from you.  I

6        show you what's previously been marked as State's

7        Exhibit 19.  I'm showing opposing counsel first.

8        Showing you State's Exhibit 19, sir, do you recognize

9        that?

10   A   Yes.  Mr. Folkes on the night I stopped him.

11   Q   It's a picture of the defendant?

12   A   Yes.

13   Q   Does this fairly and accurately depict the defendant

14       as he appeared when you arrested him the second time?

15   A   Yes.

16   Q   Or excuse me.  I guess placed him under the arrest

17       the first time?

18   A   Yes, sir.

19           MR. ROGERS:  Your Honor, at this time we move

20       State's Exhibit No. 19 into evidence.

21           THE COURT:  Anything?

22           MR. SHEALEY:  Your Honor, we do object to the

23       this.

24           MR. O'NEIL:  May we approach, Your Honor?

25           MR. SHEALEY:  May we approach?

**JA454**

David Oulette - Direct by Mr. Rogers

289

1        **THE COURT:** You may.

2        (Whereupon, a bench conference is had)

3        **THE COURT:** All right.  I sustain the objection.

4  Q  Did you remain with the defendant for the rest of the

5      evening, sir?

6  A  No, I didn't.

7  Q  And why was that?

8  A  Because it was the end of my shift.  He was released

9      to the oncoming shift.

10  Q  Do you remember -- so you released him to another

11     officer?

12  A  Another officer.

13  Q  Do you remember which officer that was?

14  A  Officer Battiste.

15  Q  Thank you, sir, very much.  I've got no further

16     questions for you at this time.  Answer any questions

17     opposing counsel may have.

18        **THE COURT:** Anything?

19        **MR. SHEALEY:** Yes, Your Honor.  May it please

20     the Court.

21              CROSS EXAMINATION

22  **BY MR. SHEALEY**

23  Q  Good morning.

24  A  How you doing?

25  Q  Good.  So you've been with City of Columbia for 18

David Oulette - Cross by Mr. Shealey

290

1      years?

2  A   Yes, sir.

3  Q   Is that the only law enforcement agency you've worked

4      with?

5  A   Yes, sir.

6  Q   And you've worked as a patrol officer this whole

7      time?

8  A   Yes, sir.

9  Q   Okay.  Never tried to advance or anything like that?

10 A   Excuse me?

11 Q   I mean, the same job description this whole time?

12 A   Yes, sir.

13 Q   And of course you got substantial training to do the

14     job that you do today, right?

15 A   Yes, sir.

16 Q   I mean, you had to go through an academy?

17 A   Yes, sir.

18 Q   They train you to write police reports?

19 A   Yes, sir.

20 Q   They train you to talk to people to find out what's

21     going on?

22 A   Yes, sir.

23 Q   To look for suspects?

24 A   Yes, sir.

25 Q   Secure a scene?

David Oulette - Cross by Mr. Shealey

291

1   A   Yes, sir.

2   Q   You didn't write a report in this case though, right?

3   A   No, sir.

4   Q   And like you were testifying a little while ago, you

5       basically responded to dispatch, correct?

6   A   Yes, sir.

7   Q   And I know you don't really remember the exact

8       description, but I think you just testified that you

9       were looking for black males?

10  A   Yes, sir.

11  Q   So you were stopping black males?

12  A   In the area.

13  Q   Okay.  A pretty big area?

14  A   Around Finlay Park; yes, sir.

15  Q   Okay.  And you stopped Mr. Folkes along with another

16      person?

17  A   Yes, sir.

18  Q   Do you recall who that other person was?

19  A   No, sir.

20  Q   If I told you his name was Nathaniel Spann, would

21      that refresh your memory?

22  A   It's possible.

23  Q   Okay.  You ended up arresting that other person,

24      right?

25  A   I believe he had a warrant on him.

David Oulette – Cross by Mr. Shealey

292

1   Q   Okay.  Now, although you don't recall today what the

2       exact description is, you let Mr. Folkes go at that

3       point?

4   A   Yes, sir.

5   Q   He didn't match the description that you were given

6       over dispatch?

7   A   Yes.

8   Q   Obviously you stopped both of these people long

9       enough to get their I.D.'s, right?

10  A   Yes, sir.

11  Q   You were looking for those warrants in case there

12      were any out there, right?

13  A   Uh-huh (affirmative).

14  Q   Were you questioning them generally at the time about

15      what you were out there for?

16  A   I don't believe I even mentioned it.

17  Q   Okay.  You just said, "I'm stopping you because

18      you're a black male"?

19  A   I just advised them I was stopping them, checked

20      their I.D.'s and released them.

21  Q   So at that point the other man who you're not sure

22      who his name was, he wouldn't have said, "I think Mr.

23      Folkes changed clothes"?  You don't recall anything

24      like that, do you?

25  A   No, sir.

2:19-cv-00760-RMG-MGB    Date Filed 07/03/19    Entry Number 14-1    Page 296 of 505

David Oulette - Cross by Mr. Shealey

293

1    **Q**    That would have made a report had you written one?

2    **A**    I'm sure it would have.

3    **Q**    Beg the Court's indulgence.  Just briefly.  Mr.

4          Folkes, when you stopped him that first time, he was

5          very cooperative with you, right?

6    **A**    Yes, he was.

7    **Q**    He didn't run from you or anything like that?

8    **A**    No.

9    **Q**    Nothing further.

10             *THE COURT:*  Anything?

11             *MR. ROGERS:*  Briefly, Your Honor.

12                    REDIRECT EXAMINATION

13   *BY MR. ROGERS*

14   **Q**    Sir, the initial description that came over dispatch,

15          what type of description was that?

16   **A**    It was just a very vague description.  I don't recall

17          a clothing description.

18   **Q**    Was it mostly a clothing description?

19   **A**    Black male and they gave a clothing description.

20   **Q**    Did that description become more specific later?

21   **A**    Yes, I did.

22   **Q**    And was it based on that first vague description that

23          you stopped Mr. Folkes at the number 1 spot?

24   **A**    At the number 1 spot, yes.

25   **Q**    Why did you stop him the second time?

**JA459**

David Outlette - Redirect by Mr. Rogers

294

1   A    Because his name was broadcast over the radio.

2        MR. ROGERS:  No further questions, Your Honor.

3        THE COURT:  All right.  Thank you, Officer.  You

4   may step down.  You are free to leave.

5        WITNESS:  Thank you.

6        MS. WEISS:  The State calls Kermit Scott.  I'm

7   sorry.  May this officer be free to leave, excused?

8        THE COURT:  I've already told him that.

9        MS. WEISS:  Sorry.  Thank you, Your Honor.

10       KERMIT SCOTT, after being duly sworn, testifies

11  as follows:

12       THE CLERK:  Thank you.  Have a seat in the

13  witness stand and give the court reporter your name.

14       WITNESS:  Sergeant Kermit Scott.

15                  DIRECT EXAMINATION

16  BY MS. WEISS

17  Q    Sergeant Scott, what is your current position with

18       the Columbia Police Department?

19  A    I'm the supervisor for the crime scene unit for the

20       criminal investigations division.

21  Q    And what are your duties as the supervisor?

22  A    My duties are to supervise a group of six personnel

23       in the crime scene processing, collection,

24       documentation and analyzation of evidence collected

25       at a crime scene.

Kermit Scott - Direct by Ms. Weiss

295

1   Q   And as a part of that are you assigned to specific
2       cases?
3   A   Yes, ma'am, we are.
4   Q   Are you specifically assigned to specific cases as
5       well?
6   A   No, ma'am, I'm not.
7   Q   Okay.  So as the supervisor, do you sometimes do
8       clean up and bits and pieces of other cases?
9   A   Yes, I do.
10  Q   In this case did you have the opportunity to become
11      involved in it?
12  A   Yes, I did.
13  Q   And what was the date of that?
14  A   It was on June the 2nd.
15  Q   Okay.  I'm going to show you State's Exhibit 24.  Do
16      you recognize this?
17  A   Yes, ma'am, I do.
18  Q   And how do you recognize it?
19  A   That was a shirt that I took to Richland County
20      Sheriff's Department to their lab for analysis.
21  Q   Okay.  And what happened when you took it there?
22  A   It was turned in and analyzed by their lab
23      specialists and with the results of no DNA found.
24  Q   Okay.  So were they able to analyze anything off that
25      shirt?

**JA461**

Kermit Scott - Direct by Ms. Weiss

296

1   A   No, ma'am, they were not.

2   Q   And what did you do next?

3   A   I brought it back to the lead investigator,

4       Investigator McCracken.

5   Q   Okay.  Thank you.  No further questions, Your Honor.

6           THE COURT:  Anything?

7           MR. SHEALEY:  Just briefly, Your Honor.

8                   CROSS EXAMINATION

9   BY MR. SHEALEY

10  Q   Good morning, Mr. Scott.  How are you?

11  A   Good morning, sir.

12  Q   You say you got involved with this case June 2nd?

13  A   Yes, it was, sir.

14  Q   This year?

15  A   Yes, sir.

16  Q   Okay.  And this incident happened July 22nd of '07,

17      right?

18  A   Yes, sir.

19  Q   Now, I'm not going to go through all your

20      credentials.  I know you're very well experienced and

21      trained.  But basically you deal with DNA,

22      fingerprints, all those types of things you're

23      qualified to do?

24  A   Yes, sir.

25  Q   How long have you been doing it?

Kermit Scott - Cross by Mr. Shealey

297

1   A   I've been doing this, sir, since 2004.

2   Q   Okay.  How long have you been with the City of

3       Columbia?

4   A   I've been with the City for seven years.  I came here

5       in 2001.

6   Q   Okay.  And she just went through this shirt here in

7       evidence.  And you said no DNA came back to it,

8       right?

9   A   That is correct, sir.

10  Q   So is there DNA in blood?

11  A   Is there DNA in blood, sir?

12  Q   Yes, sir.

13  A   Yes, sir, there is.

14  Q   So if there had been blood on this shirt you would

15      have found some DNA?

16  A   Yes, sir.

17          MR. SHEALEY:  Nothing further, Judge.

18          THE COURT:  All right.  Thank you, sir.  You may

19      step down.  Officer, you are free leave.  Thank you.

20          MS. WEISS:  The State calls Investigator

21      McCracken.

22          ROBERT MCCRACKEN, after being duly sworn,

23  testifies as follows:

24          THE CLERK:  Thank you.  Have a seat and give the

25      court reporter your name.

JA463

1    **WITNESS:**  Robert McCracken.

2    DIRECT EXAMINATION

3    BY MS. WEISS

4    Q    Investigator McCracken, please introduce yourself to

5         the jury.  Tell them where you're employed, what your

6         current job is?

7    A    I'm Robert McCracken.  As I said, I'm employed at the

8         Columbia Police Department here in South Carolina.  I

9         am currently assigned to the violent crimes unit and

10        I do investigations, follow-up investigations for

11        that unit.

12   Q    And what are your general duties on a day-to-day

13        basis?

14   A    We are assigned cases to follow up on.

15        Occasionally -- well, more than occasionally -- we

16        get called out to crime scenes when there's a need

17        for us to be there, immediate follow-up needs to be

18        conducted.  A lot of our cases we just get a report

19        put on our desk and we're required to follow up on

20        it, attempt to identify suspects, identify evidence

21        and prosecute in order for the Solicitor's Office to

22        prosecute a case.

23   Q    How long have you been in law enforcement?

24   A    This is my 19th year.

25   Q    And have you been with the City of Columbia the

Robert McCracken - Direct by Ms. Weiss

299

 1        entire time?

 2   A    Yes, ma'am.

 3   Q    What did you start as at the City of Columbia?

 4   A    I started as a patrolman as everybody does at the

 5        City of Columbia or most everybody does and was

 6        promoted to -- started in investigations in June of

 7        1998 and was promoted to investigator in October of

 8        '99.

 9   Q    So a general case, who responds first to the scene?

10   A    Most of the time it's a patrol officer. They're the

11        first responding officers to a scene. They get

12        called to it.

13   Q    And what are their duties when they respond?

14   A    Their duties are to first and foremost find a victim,

15        check on the victim, make sure the victim has medical

16        care if necessary, locate and identify a suspect if

17        there's one on the scene, also secure the crime scene

18        if there's one available if we can find the crime

19        scene at the time, secure it. Any witnesses, they

20        try to identify witnesses and get a general idea of

21        what happened when they respond to the scene.

22   Q    Are their duties limited primarily to the actual

23        scene and that day?

24   A    Yes, ma'am.

25   Q    And that general time period as well?

Robert McCracken - Direct by Ms. Weiss

300

```
 1   A   Right.  They go to the scene.  Once they're released
 2       they go to the next call or go home and they're
 3       pretty much done with it.
 4   Q   Taking you back to July 22nd of 2007, were you on
 5       duty that day?
 6   A   Yes.
 7   Q   And did you get called out to a crime scene that day?
 8   A   I got called that day to respond to Sumter and I
 9       believe it was Laurel and Sumter or Sumter and
10       Richland Street in reference to a possible suspect
11       referenced to the crime in question.
12   Q   And were you told what type of crime occurred?
13   A   Yes.  I was told someone was cut severely.
14   Q   Were you told who you were going to be meeting when
15       you got to Sumter and Richland?
16   A   The only thing I knew at that point was a possible
17       suspect.
18   Q   And who did you see when you got to Sumter and
19       Richland?
20   A   Officer Battiste was present along with Mr. Folkes.
21   Q   Had the witness already come at that point?
22   A   No, ma'am.
23   Q   So were you there when Tiffany Briggs was brought to
24       Sumter and Richland?
25   A   Yes, ma'am.  Sergeant Shuler pulled up.  I advised
```

Robert McCracken - Direct by Ms. Weiss

301

1      Sergeant Shuler to go back down to the park and find

2      the eye witness that could identify Mr. Folkes as the

3      person who committed this act, and he went back to

4      the park and brought her to me.

5  Q   Okay.  And how did the show-up happen?

6  A   Sergeant Shuler pulled up with the -- Ms. Briggs in

7      the vehicle.  Mr. Folkes was asked to exit the police

8      vehicle.  He got out.  I walked over to Sergeant

9      Shuler's vehicle where Ms. Briggs was, asked her if

10     that's the person.  She stated, "Yes, that's

11     Clayton."  She called him Clayton.  Clayton.  "But

12     he's changed clothes.  He's got different clothes on

13     now."

14 Q   Okay.  And was there anything further done at that

15     time?

16 A   Not right there.

17 Q   Okay.  Where did she go from there?

18 A   She went back to the park because at that point we

19     did not have an actual location in the park where

20     this occurred, so what we wanted to do was find a

21     location where there may be blood or some other

22     evidence such as a weapon or anything like that.  So

23     I had Sergeant Shuler take her back to the park since

24     she was now a witness to identify exactly where this

25     incident occurred.

**JA467**

Robert McCracken - Direct by Ms. Weiss

302

1    Q    And what did you do next?

2    A    I went back to the park also after leaving that

3         location where Mr. Folkes was and Officer Battiste.

4    Q    If you can use that pointer that's right next to you

5         that's hanging on the wall.  Does that pull out?  I'm

6         sorry.  No.  You can leave that there.  Will you show

7         where you were at Sumter and Richland?

8    A    We were in this area here next to this parking lot

9         which is labeled number 2.

10   Q    And then where is the park?

11   A    It's just pretty much this whole block right here

12        behind the post office.

13   Q    Is that in the City of Columbia?

14   A    Yes, ma'am, it is.

15   Q    Is that in Richland County?

16   A    Yes, ma'am.

17   Q    So where did you go when you went to the park?

18   A    When I went back to the park, I came down and went

19        into the parking lot here.  Once I got here I ran

20        into Investigator Montgomery who was already on the

21        scene.  When we work evening shift, this was an

22        evening shift thing, we were limited to, I think we

23        had two investigators at that time.  We may have had

24        three.  But I was the violent crimes investigator, so

25        I would be handling this case.  The other

**JA468**

Robert McCracken - Direct by Ms. Weiss

303

| | | |
|---|---|---|
| 1 | | investigators would be there if I needed them and |
| 2 | | they weren't busy.  Once I got there I spoke with |
| 3 | | officer or Investigator Montgomery.  Then I spoke |
| 4 | | with Officer Dingle and we went into the park to |
| 5 | | locate where the crime scene occurred or where the |
| 6 | | crime actually occurred in the park. |
| 7 | Q | Okay.  And did you have the opportunity to talk to |
| 8 | | anybody from I.D.? |
| 9 | A | Yes.  Initially at Sumter and Richland Street I had |
| 10 | | CSI Ross who used to be with the City of Columbia but |
| 11 | | he is now with Lexington County respond out to that |
| 12 | | location to photograph Mr. Folkes and his clothing. |
| 13 | Q | So you had an officer, two investigators at the crime |
| 14 | | scene out there trying to locate any evidence at the |
| 15 | | crime scene, blood, any of that? |
| 16 | A | Right.  CSI Ross responded up there.  He was cut |
| 17 | | loose because we didn't have anything at the park at |
| 18 | | that time.  He was eventually called back to the |
| 19 | | park. |
| 20 | Q | And did you find any blood at the park? |
| 21 | A | I did not see any blood.  I didn't. |
| 22 | Q | Did you find a weapon? |
| 23 | A | No, ma'am.  We did not find a weapon. |
| 24 | Q | Explain to the jury what lengths you went to to try |
| 25 | | to locate the clothing or weapon or anything in the |

JA469

Robert McCracken - Direct by Ms. Weiss

304

1    park?

2    A    Well, after speaking with the witness that observed

3    the incident, Ms. Briggs, we identified a location or

4    a general location where the assault occurred at.

5    They gave me the direction of travel that the

6    defendant had taken or that the suspect had taken.

7    And Ms. Retalia Green, she approached me, said she

8    had seen the whole thing.  She took me and Jerome and

9    Officer Dingle in the location where Mr. Folkes had

10    traveled.

11    She stated that she knew where the homeless

12    people kept their clothes and stuff and she would

13    show me those locations.  And we went through some

14    cuts on the right-hand side right behind the post

15    office right in here which leads around and in this

16    area here.  And lots of bags, clothing, bags of

17    clothing, sleeping bags, things of that nature, I

18    mean just all through that.  You would really be

19    surprised at what's in there.  There was no way to

20    check all those bags, no way possible.

21    Q    But did you find a weapon?

22    A    No, we did not find a weapon.

23    Q    You had already been told by Ms. Briggs that the

24    defendant had changed clothes?

25    A    Yes.

*Robert McCracken - Direct by Ms. Weiss*

305

1    Q    And --

2    A    We were also --

3    Q    -- were you able to find anything that resembled what

4         he had been described originally wearing?

5    A    No, ma'am.

6    Q    Not back in that area?

7    A    Not in that area.

8    Q    And did you continue looking?

9    A    Yes.  We followed it all the way up to the park.  My

10        main concern was looking in trashcans.  I asked

11        Officer Dingle to look in trashcans, areas that he

12        may have thrown it.  And we did ultimately find a

13        shirt that was described as being Mr. Folkes' shirt

14        and identified as such.

15   Q    I show you State's Exhibits 21 and 23.  Do you

16        recognize this photo?

17   A    Yes, ma'am.  That's the trashcan at the top of the

18        park where the shirt was located.

19   Q    Okay.  And is that the condition which you found it?

20   A    Yes.  Photos.  That's why I called the CSI guy back

21        out to take photographs of the area where the shirt

22        was found.

23   Q    And State's Exhibit 23, is that just a close-up view?

24   A    Yes, ma'am.  And that's after it was pulled out and

25        laid up on the edge of the trashcan.

**JA471**

Robert McCracken - Direct by Ms. Weiss

306

1   Q   Okay.  And who did you have with you when you found

2       that shirt?

3   A   Retalia Green was with me.  I believe there was

4       another officer up on top.  Officer Huntley I believe

5       was up on top.  He was in the area.  But mainly I

6       remember Retalia Green being there.

7   Q   And was Ms. Green able to positively identify that

8       shirt?

9   A   Yes, ma'am.

10  Q   Now, you said you talked to Jerome Patrick and

11      Retalia Green in the park that day?

12  A   Yes, I did.

13  Q   Did you ever take statements from them?

14  A   They told me what happened.  I put a general synopsis

15      of what happened in my case notes with their names

16      and information or contact information.  I did not

17      get a written statement from them at that time.

18  Q   Okay.  Did you intend to go back and talk to them?

19  A   I intended to.  Unfortunately within a couple of

20      hours you've got another case.  The next day you've

21      got three or four more cases.  And my intent was to

22      go back but I did not do that.

23  Q   But you did put contact information and a brief

24      synopsis of what they had said?

25  A   Yes, ma'am.

Robert McCracken - Direct by Ms. Weiss

307

1   Q   And you heard in the testimony that there were

2       numerous people out there hanging out with Jerome and

3       Retalia including James Reddick and a couple of

4       others.  Did you go back down to the park or talk to

5       anybody else in the park that day?

6   A   I don't recall talking to anyone else.  I talked with

7       Jerome.  I talked with Retalia, Tiffany.  I don't

8       recall anyone else, speaking with anyone else.

9   Q   And did you ever go back down into the park and try

10      to find any other witnesses?

11  A   Not after that initial incident, based on the number

12      of witnesses that I had.

13  Q   Okay.  Now, once you left the park that day, where

14      did you go next?

15  A   I had Ms. Briggs transported up to headquarters and I

16      took a statement from her, a written statement, a

17      formal statement.

18  Q   And is there any reason you didn't have Ms. Green or

19      Mr. Patrick transported to headquarters?

20  A   Didn't have the personnel as far as investigators to

21      do it at that time.  And I like I said, I was going

22      back to take care of it.

23  Q   And you took a statement from Ms. Briggs?

24  A   Yes, ma'am.

25  Q   What is your normal form for taking a statement?

Robert McCracken - Direct by Ms. Weiss

308

```
 1   A   We have an interview room and we have a statement
 2       form and basically ask them what happened.  Once they
 3       initially write what they observed or what they saw,
 4       a lot of times we have more specific questions that
 5       we need to ask and then we'll do a Q and A, question
 6       and answer type thing.
 7   Q   And then do you give them an opportunity to read over
 8       the question and answer part?
 9   A   Yes, ma'am.  They read over it.  They do read over
10       it.  And then they sign it and we swear it.
11   Q   And are you a notary?
12   A   Yes, ma'am.
13   Q   And you notarized that form as a sworn statement?
14   A   Yes, ma'am.
15   Q   Was that the end of your investigation for this day?
16   A   For that particular day; yes, ma'am.
17   Q   Did you direct anything to be taken into evidence?
18   A   I did ask at the time Mr. Folkes was arrested that
19       his belongings be taken into evidence.  Of course the
20       shirt that would be taken into evidence.
21   Q   And are you aware of what was taken into evidence?
22   A   Yes, ma'am.
23           (WHEREUPON, State's Exhibit No. 31 is marked for
24       identification.)
25   Q   Okay.  I'm going to show you State's Exhibit 31 for
```

**JA474**

Robert McCracken - Direct by Ms. Weiss

309

1          identification.  Do you recognize this package?

2    A     I recognize the package; yes, ma'am.

3    Q     And what do you recognize the package as?

4    A     That is -- that contains a broken beer bottle that

5          was taken into evidence.  It was not broke at the

6          time it was taken into evidence but somehow it got

7          broke.

8    Q     When did it get broken?

9    A     Do not know.

10   Q     But not when it was collected?

11   A     Not when it was collected.  It was after the fact in

12         our property room.  Somehow it got broke.

13   Q     Do you know where this was taken into evidence?

14   A     At the location where Mr. Folkes was stopped.

15   Q     And do you know what type of beer bottle this is?

16   A     I believe it's a King Cobra.  But without opening it

17         up I couldn't tell you.  But it's in pieces.

18   Q     So would you say it's not safe to open it up?

19   A     Not without putting it in a box and cutting yourself.

20             MS. WEISS:  Your Honor, at this time I'd like to

21         enter State's Exhibit 31 into evidence.

22             MR. SHEALEY:  Your Honor, I would object to

23         that.  It's not in the same condition as it was when

24         it was collected per the officer's own testimony.  I

25         don't see how it's relevant in this condition.

Robert McCracken - Direct by Ms. Weiss

310

1       **THE COURT:**  So your sole objection is because it

2    is broken since it's been taken into custody?

3       **MR. SHEALEY:**  Well, it's also -- I think in that

4    condition, it's prejudicial being broken.

5       **THE COURT:**  All right.  I'm going to admit it

6    over the objection of the defendant.  It's

7    acknowledged, ladies and gentlemen, that the bottle

8    was not broken at the time it was taken into custody

9    and is broken now.  So you're not to give any sort of

10    weight to the fact that it is broken.

11       (WHEREUPON, State's Exhibit No. 31 is admitted

12    into evidence.)

13  **Q**  Did you that night have the opportunity to talk to

14    Karem Jones?

15  **A**  No, ma'am.  Sergeant Shuler called me and stated that

16    he had been taken into emergency surgery.  So I could

17    not speak with him at that time.

18  **Q**  Okay.  So did you have the opportunity to see the

19    wound at all that day?

20  **A**  No, ma'am.  No.

21  **Q**  When did you get to talk to Mr. Jones?

22  **A**  I spoke with Mr. Jones the next day in his hospital

23    room.

24  **Q**  Was anybody else in the room with you?

25  **A**  I don't recall anyone being in there with me.  No,

Robert McCracken - Direct by Ms. Weiss

311

1       ma'am.

2   Q   What happened when you went to the room?

3   A   I went in.  I spoke with Mr. Jones.  I got a brief

4       verbal statement from him initially as to what

5       transpired.  I asked him if he could identify the

6       person that had cut him.  He stated adamantly that he

7       could.  He had no doubt that he could identify the

8       person that cut him.  He knew the person as "New

9       York".  I had has photo line-up already prepared.  I

10      showed him a photo line-up.

11  Q   Now, how do you show a photo line-up when you do it?

12      What is your proceeding?

13  A   When I do it I lay the photo line-up face down.  As

14      he was in the hospital bed, I would have laid it face

15      down on my portfolio binder.  I lay it face down so I

16      hold it out to them and I ask them to turn it over

17      and look at it.  That way I don't have my hands on it

18      somewhere covering something up or pointing to

19      someone.

20          They turn it over.  I ask them do they recognize

21      anyone in those photographs.  Most of the time

22      they'll say yes, that's the person that did this,

23      that or the other.  I can't remember his exact words,

24      but he identified Mr. Folkes.  I asked him how does

25      he know Mr. Folkes.  "He's the person that cut me."

JA477

Robert McCracken - Direct by Ms. Weiss

312

1   Q   Okay.  And is this the photo line-up, State's Exhibit

2       1 --

3   A   Yes.

4   Q   -- you showed him?

5   A   Yes, ma'am.

6   Q   And is that your handwriting or Mr. Jones'?

7   A   That's Mr. Jones' handwriting.

8   Q   Do you instruct him to circle the picture?

9   A   Correct.  And put their initials on it.

10  Q   And State's Exhibit 2, do you recognize this form?

11  A   Yes, ma'am.  That's a form that we fill out on top of

12      the circling and initialing the picture to identify

13      which photo he picks.

14  Q   Okay.  And do you fill the whole thing out or --

15  A   I fill out everything except for the picture number

16      and the signature at the bottom which would be his

17      signature.

18  Q   So he wrote the picture number?

19  A   Yes.

20  Q   And then --

21  A   How many pictures and the picture number itself.

22  Q   And then he signed it here?

23  A   And he signs it and I notarize it.

24  Q   And once again you have him swear this is the truth?

25  A   Yes, ma'am.

**JA478**

Robert McCracken - Direct by Ms. Weiss

313

1    Q    Did you have the opportunity to see the wound at that

2         time?

3    A    No, ma'am.  He was bandaged up.

4    Q    Did he appear to be under the influence of anything

5         when you talked to him?

6    A    No, ma'am.  He was coherent.

7    Q    Did you do anything else that day involving this

8         case?

9    A    The only thing I did was take a written statement

10        from him and I had to write it.  So because he was

11        laid up in the hospital, I wrote it, had him sign it,

12        and he swore to that also before he signed it.  And

13        then I asked him to come by headquarters once he got

14        out of the hospital so we could take photographs of

15        the wound.

16   Q    And did he in fact do that?

17   A    Yes, he did.

18   Q    Okay.  And, in fact, he came by the next day?

19   A    I believe it was the next day.  Yes, ma'am.  He got

20        out the next day.

21   Q    And when he came by did you instruct anyone to take

22        photographs?

23   A    Yes.  I contacted our CSI; I believe it was Currie at

24        the time, and he took the photographs.

25   Q    And did you have the opportunity to observe the

**JA479**

Robert McCracken - Direct by Ms. Weiss

314

1       wounds at that time?

2  A  Yes, I did.

3  Q  I show you State's Exhibits 18, 13, 14, 12, 17, 16

4       and 15.  Do you recognize these pictures?

5  A  Yes.  This one is a picture of the wound on his neck.

6       Basically this is the same picture but with a scale

7       up under it.  I think that's where he got cut under

8       the chin.  Another photo of a picture with the scale

9       of his neck and a photo of the neck and the cut under

10      his chin and a photo of the cut on Mr. Jones' arm and

11      again two more photos of the cut on Mr. Jones' arm.

12  Q  Those are the pictures that were taken that day two

13      days after the incident had occurred?

14  A  It was after the incident occurred; yes, ma'am, when

15      he came to the headquarters.

16  Q  Now, on July 26th which is four days after you have a

17      notation where you talked to Investigator McCracken,

18      did you sit down and review the case with him?

19  A  I spoke with him briefly.  The only thing he did was

20      the initial response.  He spoke to the person that

21      called 911 and I got that information from him.

22  Q  Okay.  And then following that you have the

23      information about Retalia Green and Jerome Patrick?

24  A  Yes, ma'am.

25  Q  Is there that reason that those would be after that

Robert McCracken - Direct by Ms. Weiss

315

1      entry on July 26th?

2  A   It's notes I write down in my little notebook and

3      then I transfer it over to the actual form that I

4      fill out from my case notes.  I don't take that form

5      out into the field.  I can't.

6  Q   And so the information that you gathered from Jerome

7      and Retalia is not a separate interview on July 26th?

8  A   No, ma'am.  Not at all.

9  Q   This is from the initial?

10  A   Correct.

11  Q   Court's indulgence one moment.  Thank you,

12      Investigator McCracken.  No further questions for

13      this witness at this time.

14          THE COURT:  All right.  Mr. Shealey.  Mr.

15      Shealey.

16          MR. SHEALEY:  Thank you.  May it please the

17      Court.

18                    CROSS EXAMINATION

19  BY MR. SHEALEY

20  Q   How you doing, Investigator?

21  A   Good, sir.

22  Q   Good.  You've been with the City of Columbia a long

23      time, right?

24  A   A good long time.

25  Q   I think you said 19 years in law enforcement?

JA481

Robert McCracken - Cross by Mr. Shealey

316

1    A    In my 19th year; yes, sir.

2    Q    I think you said all that was with the City of

3         Columbia?

4    A    Yes, sir.

5    Q    And I think you testified that everybody starts as a

6         patrolman, right?

7    A    99.9 percent do.  Yes, sir.

8    Q    Almost everybody?

9    A    Almost everybody.

10   Q    But you have advanced past that?

11   A    Yes, sir.

12   Q    I mean, you are the lead investigator on this

13        particular case, right?

14   A    Yes, sir.  Yes, sir.

15   Q    I think you said you're in violent crimes?

16   A    In the violence crimes unit.  Yes, sir.

17   Q    So, I mean, you've been promoted within the City of

18        Columbia?

19   A    Yes, sir.  I put in for investigator and that's where

20        I intend to stay.

21   Q    And I guess it doesn't come easy.  It takes hard

22        work, experience, training, correct?

23   A    Yes, sir.

24   Q    They don't just give away investigator positions, do

25        they?

Robert McCracken - Cross by Mr. Shealey

317

1   A   I don't think so.

2   Q   So obviously you started off.  You went through

3       initial police academy training that everybody gets,

4       right?

5   A   Yes, sir.

6   Q   Okay.  And you had to go through some specialized

7       training I imagine to be an investigator?

8   A   We get extra training.  Yes, sir.

9   Q   All right.  Tell us about some of that extra

10      training?

11   A   At some point initially before I became an

12      investigator when I was an MPO working as an

13      investigator in '98, either '98 or early '99 I had

14      went through an investigative class at the academy,

15      basic investigation.  Since then I've had some other

16      classes involving specific death investigation,

17      interview classes, things like that.

18   Q   And as the investigator in the case, pretty much all

19      the work that's done you're responsible for?

20   A   I am responsible for it.  Yes, sir.

21   Q   A lot of these men that are on the scene are acting

22      at your direction?

23   A   When I get there they are acting at my direction as

24      best I can direct them.  A lot of situations the

25      sergeants have to direct their patrolman because I'm

JA483

Robert McCracken - Cross by Mr. Shealey

318

1          tied up on things.

2     Q    Okay.  So obviously you know how to secure a crime

3          scene?

4     A    Yes, sir.

5     Q    Obviously probably very proficient in your police

6          issued, standard issued firearm?

7     A    Yes, sir.

8     Q    Obviously you know how to fill out an incident

9          report?

10    A    Yes, sir.

11    Q    And you actually know how to read one because you're

12         getting these reports from responding officers?

13    A    Yes, sir.

14    Q    Like we said, every little box means something?

15    A    Yes, sir.

16    Q    Places for the suspect's name, witness names,

17         correct?

18    A    Yes, sir.

19    Q    And as the investigator you also have a case summary

20         that you write out?

21    A    I do case notes.  Yes, sir.

22    Q    Okay.  I mean, the purpose of it is so that a year

23         later, like we are today, you can look at this and

24         you know exactly what happened?

25    A    Yes, sir.  That's the purpose.

**JA484**

Robert McCracken - Cross by Mr. Shealey

319

1   Q   I mean, it's documented for accuracy?

2   A   Yes, sir.

3   Q   So you can give a truthful account to the jury?

4   A   Yes, sir.

5   Q   Now, one of the big things you also do as an

6       investigator -- correct me if I'm wrong -- but you

7       interview witnesses?

8   A   Yes, sir.

9   Q   Okay.  And like in this case you take statements from

10      these witnesses re-doing them to writing?

11  A   Yes, sir.

12  Q   And I think you did that with Ms. Briggs?

13  A   Yes, sir.

14  Q   Mr. Jones?

15  A   Yes, sir.

16  Q   Okay.  Now, you'd agree that interviewing witness and

17      reducing to it writing is a fundamental part of

18      investigation?

19  A   Interviewing a witness; yes, sir.  And we try to

20      reduce it to writing when we can.  Yes, sir.

21  Q   I mean, you're not going to reduce a witness's

22      statement to writing unless they have something

23      helpful for you, right?

24  A   No, sir.  We take statements from witnesses even when

25      it's not helpful.

**JA485**

Robert McCracken - Cross by Mr. Shealey

320

1    Q    Excuse me?

2    A    We would take statements from witnesses even when

3         it's not helpful.

4    Q    Okay.  When it's not helpful to you, you take a

5         statement?

6    A    Yes, sir.  We take statements.

7    Q    Okay.  So you took a statement from the mother of a

8         child playing in the park at the incident?

9    A    No, sir.

10   Q    I mean, I'm not sure I --

11   A    My point is, if the person has something to say, then

12        we would take a statement from them if we can get it,

13        yes.

14   Q    And the helpful statement is so that you can

15        accurately know what's going on years later when you

16        reduce those to writing?

17   A    We try to.

18   Q    Because that's how we know we can keep this thing

19        together years later?

20   A    Yes, sir.  It's pretty much from the witness's

21        memory.

22   Q    You never reduced the statement from Tim Abney, did

23        you?

24   A    No, sir.

25   Q    You never got a written statement from Jerome

Robert McCracken - Cross by Mr. Shealey

321

1      Patrick?

2   A   No, sir.

3   Q   You never got a written statement from Retalia Green?

4   A   No, sir.

5   Q   You never got a written statement from James Reddick?

6   A   No, sir.  I didn't know James Reddick at the time.

7   Q   Now, you recall, since you're in charge of this

8       investigation, you do recall that the name of

9       Nathaniel Spann, don't you?

10  A   Yes, sir.

11  Q   And he was stopped pursuant to this investigation?

12  A   He was stopped by Officer Oulette.

13  Q   Pursuant to the investigation?

14  A   He -- well, I guess you could say that.

15  Q   You never took a statement from him, did you?

16  A   No, sir.

17  Q   You never took any statements from anybody in the

18      park that was telling you Mr. Folkes was changing his

19      clothes, did you?

20  A   Nobody told me that in the park other than Ms.

21      Briggs.

22  Q   You just got that from Ms. Briggs, right?

23  A   That he had changed clothes, yes.

24  Q   All right.  Beg the Court's indulgence.  Do you have

25      your notes in your case file with you today?

Robert McCracken - Cross by Mr. Shealey

322

```
 1   A   It's in my case file, yes.
 2   Q   Being in charge of this investigation, I mean, you've
 3       looked at all this before, right?
 4   A   Yes, sir.  I looked at the notes.
 5   Q   You've also looked at property forms in this case,
 6       right?
 7   A   I don't -- you'd have to show me and I'll tell you if
 8       I looked at them or not.
 9   Q   You know how to read property forms, right?
10   A   Yes, sir.
11   Q   Being trained as you are -- Your Honor, may I
12       approach?
13           THE COURT:  You may.
14   Q   I'm handing you two property forms in this case.
15       Would you mind reading those to yourself?
16   A   To myself?
17   Q   Sure.  Just let me know when you're done?
18   A   Okay.  What I can read I've read.
19   Q   And basically that form is what was taken off Mr.
20       Folkes and entered into evidence.  And one is a form
21       for Mr. Jones, the victim, right?
22   A   Yes, sir.
23   Q   Okay.  And you'll agree by reading that that Mr.
24       Jones was listed as having a gray and black backpack,
25       right?
```

Robert McCracken - Cross by Mr. Shealey

323

```
 1   A    Yes, sir.  That's what's on here.
 2   Q    And Mr. Folkes was listed as having a tote bag,
 3        correct?
 4   A    A tote bag.  Yes, sir.
 5   Q    Okay.  You've been sitting here through this whole
 6        trial.  So you know what's been entered into
 7        evidence?
 8   A    Yes, sir.
 9   Q    But is it fair to say that a backpack is not a tote
10        bag?
11   A    I would call that a backpack.  Yes, sir.
12   Q    Okay.  Nothing further.
13            THE COURT:  Anything?
14            MS. WEISS:  Very briefly, Your Honor.
15            THE COURT:  Ma'am?
16            MS. WEISS:  Very briefly.
17            THE COURT:  I'm sorry?
18            MS. WEISS:  Just very briefly.
19            THE COURT:  Oh.
20            (WHEREUPON, State's Exhibit No. 32 is marked for
21        identification.)
22                     REDIRECT EXAMINATION
23   BY MS. WEISS
24   Q    I show you what's been marked as State's Exhibit 32.
25        Do you recognize this backpack?
```

Robert McFadden - Redirect by Ms. Weiss

324

1   A   Yes.

2   Q   And would you say this is also a gray and back

3       backpack?

4   A   Yes, ma'am.

5   Q   It can also be described as a tote bag?

6   A   Yes, ma'am.

7   Q   And was this entered into evidence?  I mean, was this

8       put in the evidence room as well?

9   A   According to this; yes, ma'am.

10          MS. WEISS:  Your Honor, at this time we'd like

11      to enter State's Exhibit 32 into evidence.

12          MR. SHEALEY:  Do we know -- is there anything

13      else in there?  I don't think I've seen what's in

14      there.

15          MS. WEISS:  I showed it to you.

16          MR. SHEALEY:  Bring it on.

17          MS. WEISS:  Okay.  It's listed on here if you

18      want this.

19          MR. SHEALEY:  I have no objection.

20          THE COURT:  So admitted, without objection.

21          (WHEREUPON, State's Exhibit No. 32 is admitted

22      into evidence.)

23          MS. WEISS:  No further questions, Your Honor.

24          THE COURT:  All right.  Anything?

25          MR. SHEALEY:  No, Your Honor.

325

1          *THE COURT:* All right.  Thank you, Investigator.
2     You may step down.
3          *MS. WEISS:* Your Honor, this is all the
4     witnesses for the morning.  Our next witness will be
5     here at 2:00, our final witness.
6          *THE COURT:* All right.  Ladies and gentlemen,
7     the State has one more witness.  I think it is a
8     physician.
9          *MS. WEISS:* Yes, Your Honor.
10         *THE COURT:* And they had to schedule the
11    physician to be here when they could.  But he's
12    scheduled to be here at 2:00.  We anticipated going a
13    little bit later this morning.  So we're going to go
14    ahead and break for lunch.  When we come back the
15    State indicates that's their last witness in their
16    case in chief.  Don't discuss the case while we're
17    gone.
18         Let me get you when you come back, how about
19    come back about ten minutes before 2 and let me get
20    you all to select a foreperson of this jury for me if
21    you don't mind.  That's the only discussions that you
22    need to have about the case.  You all have a nice
23    lunch and we'll see you back here at ten 'til 2.
24         (Jury out at 12:02 p.m.)
25         *THE COURT:* Okay.  You all got any charges you

**JA491**

326

1     want me to look at?

2        *MR. O'NEIL:* Yes, Your Honor.

3        *THE COURT:* What kind of charges? Does the

4     State have any charges?

5        *MS. WEISS:* Your Honor, I would just ask, do you

6     have your standard charge? If I can show what your

7     standard ABIK charge is, I think it will probably

8     just be standard charges.

9        *THE COURT:* My standard ABIK charge?

10        *MS. WEISS:* Yes, sir, Your Honor.

11        *THE COURT:* Is there something other than a

12     standard ABIK charge?

13        *MS. WEISS:* I don't know which versions of

14     malice and intent, whether or not -- how much you

15     tend to go into those.

16        *THE COURT:* Which version? Malice is hatred,

17     ill will or hostility towards another person, the

18     intentional doing of a wrongful act without just

19     cause or excuse and with an intent to inflict injury

20     or under circumstances the law will infer an evil

21     event.

22        And malice aforethought does not require that

23     malice exist for any particular time before the act

24     is committed but malice must exist in the mind of the

25     defendant just before and at the time the act was

2:19-cv-00760-RMG-MGB   Date Filed 07/03/19   Entry Number 14-1   Page 330 of 505

327

1    committed.  Therefore, there must be a combination of

2    previous evil intent and the act.  Malice may be

3    expressed or inferred.

4         I describe express or inferred.  Malice may be

5    inferred from conduct showing total disregard for

6    human life.  Inferred malice they also arise when the

7    deed is done with a deadly weapon.  A deadly weapon

8    is any article or instrument which is likely to cause

9    death or great bodily harm.  Whether an instrument

10   has been used as a deadly weapon depends on the facts

11   and circumstances of each case.

12        *MS. WEISS:*  I just wanted to make sure that's

13   the same thing that I would ask for, Your Honor.  The

14   defense had just --

15        *THE COURT:*  I feel better about that.

16        *MS. WEISS:*  I'm sorry, Your Honor?

17        *THE COURT:*  I feel better about that.

18        *MS. WEISS:*  The defense kept talking about

19   attempted murder in the opening.  I didn't think

20   there would be.

21        *THE COURT:*  Attempted murder.

22        *MS. WEISS:*  That's what they kept saying in

23   their opening.  I just wanted to make certain there

24   would not be a mention of anything mentioning murder.

25   I wasn't sure in the standard charge.  I just wanted

328

1        to make sure.

2             **THE COURT:**  They want a charge of lesser

3        included of ABHAN.  Do you all have any objection to

4        that?  Pardon me?

5             **MS. WEISS:**  Just beg the Court's indulgence one

6        minute.  Your Honor, I think we have shown that he

7        had an intent to kill him.  There are statements that

8        he stated he should have killed him.  He said, "I'm

9        going to" -- I believe the victim even testified he

10       said, I'm going to F you up.  "I'm going to kill

11       you."  I think we showed that there was an intent to

12       kill, and I don't know that there is necessarily a

13       need to charge ABHAN.

14            **THE COURT:**  You don't know whether there's a

15       necessary need to charge it?

16            **MS. WEISS:**  I would ask that you not charge

17       ABHAN, Your Honor.

18            **THE COURT:**  What do you all want to say about

19       that, Mr. --

20            **MR. O'NEIL:**  Your Honor, I think --

21            **THE COURT:**  -- O'Neil?

22            **MR. O'NEIL:**  Thank you, Your Honor.  I apologize

23       for cutting you off.

24            **THE COURT:**  Go ahead.

25            **MR. O'NEIL:**  I think what the case law I think

**JA494**

329

1    in State v. Watson says is that the defendant is

2    entitled to a lesser-included offense if there is any

3    evidence showing that he's guilty of the lesser and

4    not the greater offense, Your Honor.  I think there

5    is ample evidence that Mr. Folkes did not have the

6    intent to kill Mr. Jones.  I think the testimony is

7    that --

8        THE COURT:  I don't know that intent to kill is

9    the requirement.  It's just malice, that he had

10   malice.

11       MR. O'NEIL:  Your Honor, there is case law out

12   there that said at one point there at least needs to

13   be some general intent to kill.  I think that's kind

14   of being merged into the theory of ABHAN.  I think

15   what the case law says, Your Honor, is that if

16   there's any evidence of a lesser-included, he's

17   entitled to a lesser-included.  I don't think there

18   is --

19       THE COURT:  Well, I might agree with that.  Tell

20   me what the evidence is that there's no malice.

21       MR. O'NEIL:  Your Honor, I think the evidence

22   that there is no malice is the fact that, one, the

23   only time -- the evidence is the only time Mr. Folkes

24   cut the victim, cut the victim, Your Honor, was after

25   he had been struck twice, fell on the ground, and the

**JA495**

330

1    victim was either tussling with him on top of him or

2    he was standing over him, Your Honor.  I think the

3    jury can reasonably conclude that Mr. Folkes was

4    merely trying to get the victim off of him at that

5    point and was in some way protecting himself, Your

6    Honor.  I have looked at the law when it deals with

7    ABHAN and ABWIK.

8         *THE COURT:*  Are you saying self-defense?

9         *MR. O'NEIL:*  No, Your Honor.  I'm not saying

10   that he's entitled to self-defense, Your Honor,

11   because he definitely -- I think he loses on all that

12   all the way.  He brought the incident on himself,

13   Your Honor.

14        But I do think a plausible defense claim, Your

15   Honor, can reduce the malice the same way a plausible

16   claim in a murder charge reduces a murder to a

17   voluntary manslaughter, Your Honor.  I looked at some

18   of the case law that I can pull when individuals are

19   charged with ABWIK and requested an ABHAN lesser

20   included.

21        Two of the cases I found, Your Honor, was Hill

22   v. State.  Your Honor, that is 350 SC 465.  And that

23   was a PCR case, Your Honor.  And the claimant in that

24   case was saying that his counsel was ineffective for

25   not requesting an ABHAN charge when he was charged

**JA496**

331

1   with ABWIK, Your Honor. And what the court -- the

2   facts in that case essentially was the defendant

3   attacked his girlfriend who was seven months

4   pregnant, sat on her, stabbed her at least 14 times,

5   punched her, told her, "I'm going to kill you", and

6   only got off the victim in that case when somebody

7   kicked him off, Your Honor.

8        The court in that case held that there could be

9   no other conclusion reached by the jury but that the

10  defendant intended to kill the victim, Your Honor. I

11  think this is solely different from that case, Your

12  Honor. I think the jury could reasonably conclude

13  that Mr. Folkes did not have the intent -- or I'm

14  sorry, Your Honor -- didn't have malice in his heart

15  when it relates to the victim in this case.

16       And also, Your Honor, I submitted a second jury

17  instruction that says the absence of malice is not a

18  requirement of ABHAN, Your Honor. So -- and that

19  case is like a 2004 case, Your Honor. So, Your

20  Honor, based on the case law, the jury could find

21  that Mr. Folkes had malice and he still could be

22  guilty of ABHAN and not ABWIK, Your Honor. I think

23  that case is State v. Tyler, 340 SC 526.

24       *THE COURT:* Have you got a case that says that

25  you don't need malice?

332

```
 1          MR. O'NEIL:  The absence of malice is not an
 2     element of ABHAN.  That's State v. Tyler, Your Honor.
 3          THE COURT:  Well, I don't know what you mean
 4     "the absence of malice".  The difference between
 5     ABWIK and ABHAN is malice in one and not in the
 6     other.
 7          MR. O'NEIL:  Yes, Your Honor.  But I think the
 8     case law has been clear that absence of malice is not
 9     an element of ABHAN.
10          THE COURT:  You got a case that you want me to
11     look at?
12          MR. O'NEIL:  Yes, Your Honor.  State v. Tyler.
13          THE COURT:  You got it?
14          MR. O'NEIL:  No.  I have the cite but I don't
15     have the actual case printed out for Your Honor.
16          THE COURT:  Well, if you want me to look at it,
17     you'd better get it printed out.
18          MR. O'NEIL:  I'll get that for you, Your Honor.
19          THE COURT:  Or get the information so that --
20          MR. O'NEIL:  Your Honor, in that case,
21     essentially what it was, it was -- the discussion in
22     that case was about the jury instruction.  And the
23     actual jury instruction given in that case was that
24     ABHAN required an absence of malice.  And according
25     to that case, the court said that absence of malice
```

333

1    is not an element of ABHAN.  And I'm getting my law

2    clerk to pull that case for Your Honor.

3        MS. WEISS:  Your Honor, if I may?

4        THE COURT:  Well, ABHAN is an assault and a

5    battery and circumstances of aggravation.

6        MR. O'NEIL:  Yes, Your Honor.

7        THE COURT:  Those are the elements of it.

8        MR. O'NEIL:  Yes, sir.

9        THE COURT:  Malice is an element of ABWIK.

10       MR. O'NEIL:  Yes, Your Honor.

11       THE COURT:  I don't know what you mean absence

12   of malice is not.  If you want me to look at that

13   case I'll be happy to do it.

14       MS. WEISS:  Your Honor, if I may?

15       THE COURT:  Huh?

16       MS. WEISS:  If I may just add one more comment?

17       THE COURT:  All right.

18       MS. WEISS:  As far as the malice is concerned, I

19   was speaking to the requisite intent to kill from

20   State vs. Coleman.  But as far as malice is

21   concerned, I think all of the evidence shows that the

22   defendant came to the park armed with a weapon with

23   the intent bent on causing harm, causing a fight and

24   the ability to use that weapon.  I think that's what

25   you've heard.  I think in the evidence most favorable

334

```
 1        to the defense that the defendant came I think with

 2        malice.  I don't think there is any reason for ABHAN

 3        to be charged, Your Honor.

 4            THE COURT:  All right.  Well, if you all got

 5        something you want me to look at, get it to me before

 6        we go to the jury.  All right.

 7            MR. O'NEIL:  Yes, Your Honor.

 8            MS. WEISS:  Thank you, Your Honor.

 9            THE COURT:  You all have a nice lunch.  We'll be

10        back at --

11            DEPUTY:  What time, Your Honor?

12            THE COURT:  He needs to be back here at 2:00.

13        Oh, no.  Let's bring him back here at ten 'til 2 and

14        we'll -- well, 2:00.

15            (Whereupon, a lunch break is taken)

16            THE COURT:  All right.  We ready to go?

17            MS. WEISS:  Yes, Your Honor.

18            MR. O'NEIL:  Your Honor, in addition to I guess

19        our previous arguments about jury instructions, my

20        law clerk gave you State v. Tyler.  He dropped it off

21        by your office, the case I was referring to.

22            THE COURT:  He came by and he said, "It's a

23        terrible case, but he told me to bring it to you."

24            MR. O'NEIL:  I may need to talk to him about

25        that.
```

**JA500**